UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

————————————————————————————

|  |  |  |
|---|---|---|
| STEWARD HEALTH CARE SYSTEM, LLC, | ) | |
| BLACKSTONE MEDICAL CENTER, INC., | ) | |
| f/k/a STEWARD MEDICAL HOLDING | ) | |
| SUBSIDIARY FOUR, INC., BLACKSTONE | ) | |
| REHABILITATION HOSPITAL, INC., | ) | |
| f/k/a STEWARD MEDICAL HOLDING | ) | |
| SUBSIDIARY FOUR REHAB, INC., | ) | |
|  | ) | C.A. No. 13-405 S |
| Plaintiffs, | ) | |
|  | ) | |
| v. | ) | |
|  | ) | |
| BLUE CROSS & BLUE SHIELD OF | ) | |
| RHODE ISLAND, | ) | |
|  | ) | |
| Defendant. | ) | |

————————————————————————————

**OPINION AND ORDER**

WILLIAM E. SMITH, Chief Judge.

The Landmark Medical Center ("Landmark") is a 214-bed, general acute care community hospital located in Woonsocket, Rhode Island. Each year, it provides some 175,000 patients with a wide array of medical services ranging from ambulatory surgery and orthopedics to radiology and cancer treatment. In May 2011, Steward Health Care System, LLC submitted a proposal to acquire Landmark and its subsidiary, the Rehabilitation Hospital of Rhode Island. Approximately a year and a half later, the proposed acquisition was deemed a failure and abandoned. The circumstances surrounding the ill-fated acquisition form the basis of this lawsuit.

The Plaintiffs, Steward Health Care System, LLC, Blackstone Medical Center, Inc., and Blackstone Rehabilitation Hospital, Inc. (collectively, "Steward") allege that the Defendant, Blue Cross & Blue Shield of Rhode Island ("Blue Cross"), violated state and federal antitrust law, and tortuously interfered with contractual relations, by engaging in a series of anticompetitive steps designed to block Steward's acquisition of Landmark and its entry into the Rhode Island markets for the sale of commercial health insurance and the purchase of commercial hospital services. In response, Blue Cross contends that it acted legally when it refused to accept the reimbursement rates at Landmark that Steward was offering, and otherwise operated within its rights in order to promote its business interests.

Now pending is a Motion to Dismiss (ECF No. 16) filed by Blue Cross pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth, the Motion to Dismiss is DENIED.

I.   The Complaint

The facts, as alleged in the Complaint, are as follows: Steward employs a business model focused on the acquisition and development of financially distressed community hospitals, which Steward believes are better suited to provide quality medical services efficiently, as compared to more expensive teaching hospitals. (Compl. ¶¶ 17-18.)  Steward also sells health

2

insurance, and provides much of the care under those policies within its network of community hospitals. (Id. at ¶ 19.)  This model has achieved a level of success in Massachusetts, where Steward is based. (Id. at ¶¶ 5, 18.)

In 2008, against the backdrop of the deterioration of Landmark's finances, the Providence County Superior Court appointed a special master to oversee Landmark's operations (the "Special Master").[1]  (Id. at ¶ 21.)  In February 2011, the Special Master sought a potential buyer to acquire Landmark as a means of resolving Landmark's ongoing fiscal woes. (Id. at ¶ 24.)  In May 2011, Steward submitted a bid and the Special Master recommended that it be accepted. (Id.)  Steward's plan for Landmark involved investing approximately 35 million dollars in capital improvements and physician recruitment, and using Landmark as a base from which to offer limited network insurance plans, as it had done in Massachusetts. (Id. at ¶ 26.)  To bolster Landmark's precarious financial situation, Steward extended Landmark a five million dollar line of credit. (Id.)

Steward alleges that its proposal to acquire Landmark triggered a series of anticompetitive steps by Blue Cross aimed at blocking Steward's entry into the Rhode Island market.  The

---

[1] Steward alleges that, long before its failed acquisition attempt, Blue Cross was in part responsible for the financial struggles at Landmark.  In March 2011, the Special Master sued Blue Cross, alleging that Blue Cross had made inadequate payments to Landmark. (Compl. ¶ 22.)

first of these steps, Steward alleges, took place when Blue Cross filed an objection with the Special Master to Steward's proposal. (Id. at ¶ 25.) Despite the objection, however, Steward and the Special Master executed an asset purchase agreement in June 2011 (the "Purchase Agreement").[2] (Id.)

Following execution of the Purchase Agreement, Steward began negotiating contracts with third parties. In September and October 2011, Steward and Blue Cross exchanged proposals for reimbursement rates that Blue Cross would pay for services rendered to its subscribers at Landmark. (Id. at ¶ 28.)

As these negotiations were ongoing, a separate storyline was unfolding in the Rhode Island legislature. In October 2011, Steward filed an application pursuant to the Rhode Island Hospital Conversion Act (the "Hospital Conversion Act") for permission to acquire Landmark. (Id. at ¶ 29.) In January 2012, as the Hospital Conversion Act filing was pending, a bill was introduced in both houses of the state legislature that would have had a significant bearing on Landmark's plans to operate in Rhode Island. That bill proposed to eliminate a provision of state law barring any owner of a for-profit hospital from converting more than one non-profit Rhode Island hospital to for-profit status in any three-year period – a

---

[2] Steward's obligations under the Purchase Agreement were subject to certain conditions precedent.

change that would have enabled Steward to acquire other facilities and implement its community hospital care model in Rhode Island. (Id. at ¶ 31.) Blue Cross engaged in an intense lobbying effort against passage of the bill, including offering testimony before the House Corporations Committee. (Id. at ¶ 32.)

In May 2012, the Rhode Island Department of Health (the "Department of Health") and the State Attorney General each approved Steward's Hospital Conversion Act application. (Id. at ¶ 35.) Just prior to this approval, however, Blue Cross had filed an application with the Department of Health to make a "material plan modification" to remove Landmark from its provider network. (Id. at ¶ 36.)

Meanwhile, negotiations between Steward and Blue Cross regarding reimbursement rates at Landmark were ongoing. Steward alleges that it offered to accept rates that were 5% less than the average rates Blue Cross was paying to other providers in Rhode Island. (Id. at ¶ 37.) Blue Cross declined the proposal.

Blue Cross' hardline stance at the bargaining table, Steward alleges, was part and parcel with its ongoing attempt to financially destabilize Landmark and undermine Steward's entry into the Rhode Island market. In furtherance of these aims, Steward alleges, in July 2012, while Blue Cross' application to remove Landmark from its provider network was still pending

5

before the Department of Health, Blue Cross sent out letters to its subscribers and doctors informing them that Landmark was likely to be removed from its network. (Id. at ¶ 39.) These letters led to a decline in the number of patients seeking treatment at Landmark and a resulting decline in revenues. (Id. at ¶ 40.) At approximately the same time, Blue Cross stopped making reimbursement payments to Landmark, further undermining Landmark's financial viability. (Id. at ¶ 39.) In September 2012, facing an increasingly desperate financial situation, the Special Master sought permission from the state court to drop Landmark's lawsuit against Blue Cross, previously filed in March 2011, in exchange for Blue Cross recommencing payments. (Id. at ¶ 42.)

Steward alleges that Blue Cross' anticompetitive conduct went beyond direct interference with the Landmark acquisition. More specifically, Steward alleges that Blue Cross discouraged third parties, including Thundermist Health Center, from dealing with Steward, and indicated to these third parties that dealing with Steward might jeopardize their relationships with Blue Cross. (Id. at ¶ 41.)

Likewise, in May 2012, Blue Cross notified Steward that it would not renew its contracts with St. Anne's Hospital, a Steward-owned facility in Fall River, Massachusetts on the Rhode Island border ("St. Anne's"). (Id. at ¶ 45.) Because St.

Anne's was located in Massachusetts, once Blue Cross removed it from its provider network, Rhode Island Blue Cross subscribers could obtain services at St. Anne's only by using the "BlueCard Program."[3]   (Id. at ¶ 46.)   When its Rhode Island subscribers would obtain services at St. Anne's, Blue Cross would reimburse St. Anne's at rates negotiated by Blue Cross & Blue Shield of Massachusetts, plus a BlueCard fee.   (Id. at ¶ 47.)   In an effort to renew an agreement with Blue Cross for St. Anne's, Steward offered to continue reimbursement at the Blue Cross & Blue Shield of Massachusetts rates, less the BlueCard fee that Blue Cross was currently paying.   (Id. at ¶ 48.)   Blue Cross declined.   (Id.)

At the same time, Steward alleges, Blue Cross began falsely telling doctors that St. Anne's reimbursement rates were unnecessarily high, leading doctors to believe that referring patients to St. Anne's would jeopardize their entitlement to certain savings that Blue Cross pays to doctors utilizing cost-efficient providers.   (Id. at ¶ 49.)   The net effect of these actions was to decrease patient and revenue flow at St. Anne's. (Id. at ¶ 51.)

---

[3] The Complaint describes the BlueCard Program as a national program whereby Blue Cross & Blue Shield plans in various states allow subscribers of one plan to access benefits and rates of another plan while traveling or living outside of their home plan's service area.   (Compl. ¶ 46.)

After further efforts to negotiate a deal with Blue Cross for reimbursement rates at Landmark failed, Steward announced on September 27, 2012 that it was terminating its effort to acquire Landmark. (Id. at ¶ 43.) Steward now brings claims for actual and attempted monopolization and monopsonization[4] in violation of § 2 of the Sherman Act and § 6-36-5 of the Rhode Island Antitrust Act, as well as for tortious interference with existing and prospective contractual relations. Blue Cross has moved to dismiss all of these claims.

II.  Standard of Review

"In order to survive a motion to dismiss under Rule 12(b)(6), a plaintiff must 'plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" Sanchez v. Pereira-Castillo, 590 F.3d 31, 48 (1st Cir. 2009) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (alteration in original)). The complaint must "contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." Iqbal, 556 U.S. at 678 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007) (internal quotation omitted)).

---

[4] A monopsony is a market in which a single buyer has disproportionate power – a "buyer's monopoly." See Roger D. Blair and Jeffrey L. Harrison, Antitrust Policy and Monopsony, 76 Cornell L. Rev. 297, 320 (1991). In this context, Steward alleges that Blue Cross exercised monopsony power as a buyer of commercial hospital services.

The Court must "accept as true all the factual allegations in the complaint and construe all reasonable inferences in favor of the plaintiff." Sanchez, 590 F.3d at 41 (internal citation omitted). Nevertheless, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678.

III. Antitrust Claims

To sustain a claim for monopolization under § 2 of the Sherman Act, a plaintiff must demonstrate: (1) that the defendant possessed monopoly power in the relevant market; and (2) the defendant's willful acquisition or maintenance of that power, as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. Diaz Aviation Corp. v. Airport Aviation Servs., 716 F.3d 256, 265 (1st Cir. 2013) (citing United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966)).[5] Logically, the same elements apply to a claim for illegal monopsonization. See Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., 549 U.S. 312, 320-22 (2007); Susan Foster, Monopsony and Backward Integration: Section 2 Violations in the Buyer's Market, 11 U.

---

[5] A § 2 claim for attempted monopolization requires that the plaintiff establish: "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." Diaz Aviation Corp. v. Airport Aviation Servs., 716 F.3d 256, 265 (1st Cir. 2013) (quoting Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456 (1993)).

Puget Sound L. Rev. 687, 699 (1988).  The Court applies the same substantive law to the state and federal antitrust claims as the Rhode Island Antitrust Act mirrors the Sherman Act.  See Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I., 239 F. Supp. 2d 180, 186-87 (D.R.I.  2003); ERI Max Entm't Inc. v. Streisand, 690 A.2d 1351, 1353 n.1 (R.I. 1997).

Blue  Cross'  arguments  in  favor  of  dismissal  may  be summarized as follows: (1) Blue Cross, even as a monopolist, was under no duty to deal with Steward; (2) Steward lacks standing to  bring  antitrust  claims  because  its  alleged  injuries  are speculative and not cognizable under antitrust law, and because Steward is not presently a competitor or consumer in the alleged markets; (3) Steward  failed  to  allege  plausible  product  and geographic markets  as  required  to  sustain  an  antitrust  claim; and (4) Blue Cross' various lobbying activities are immune from antitrust  scrutiny  under  the  Noerr-Pennington  Doctrine.   Each argument is addressed in turn.

A.   Was Blue Cross Obligated to Deal with Steward?

In  the  absence  of  any  purpose  to  create  or  maintain  a monopoly, the Sherman Act does not restrict the long-recognized right of a trader or manufacturer engaged in an entirely private business freely to exercise his own independent discretion as to parties with whom he will deal.  United States v. Colgate & Co., 250 U.S. 300, 307 (1919).  However, the high value placed on the

right to refuse to deal with other firms does not mean that the right is unqualified. Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 408 (2004). Under certain circumstances, a refusal to cooperate with rivals can constitute anticompetitive conduct and violate § 2 of the Sherman Act. Id. Courts have identified examples of conduct giving rise to a § 2 claim for refusing to deal, including the termination of a voluntary (and thus presumably profitable) course of dealing, electing to forego short-term profits for the sake of eliminating competition, and the refusal to deal with the plaintiff even if compensated at prevailing rates for products that the defendant already sells to others. See, e.g., Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 610-11 (1985); Tucker v. Apple Computer, Inc., 493 F. Supp. 2d 1090, 1101 (N.D. Cal. 2006). However, the existence of a valid business justification for a monopolist to engage in this type of behavior may preclude § 2 liability. Aspen Skiing Co., 472 U.S. at 605-06; Creative Copier Servs. v. Xerox Corp., 344 F. Supp. 2d 858, 867 (D. Conn. 2004). Nevertheless, courts have generally recognized that the existence of a business justification is not properly determined on a motion to dismiss. See Creative Copier, 344 F. Supp. 2d at 867.

Steward relies principally on Aspen Skiing in contending that Blue Cross illegally refused to deal. There, the plaintiff

was the owner and operator of a ski mountain in Colorado. 472 U.S. at 578. The defendant owned and operated three nearby mountains. Id. at 589-90. For years, plaintiff and defendant had offered a joint, all-mountain pass that allowed skiers access to all four mountains. Id. at 591. After repeatedly demanding an increased share of the proceeds, defendant ultimately discontinued the joint pass. Id. at 592-93.

Predicting that elimination of the pass would adversely affect its business, plaintiff attempted a variety of methods to recreate the simplicity of the all-mountain pass. For example, plaintiff offered to purchase lift tickets from defendant at retail value, but defendant refused to sell. Id. at 593. Plaintiff later offered an "Adventure Pack" which included a three-day pass to its own mountain, and vouchers for the full cash value of lift tickets at defendant's mountains. Id. at 593-94. Defendant refused to accept the vouchers.

In upholding a § 2 verdict for the plaintiff, the Supreme Court focused on the defendant's abandonment of a successful prior course of dealing (as evidenced by robust sales of the all-mountain pass and high levels of customer satisfaction), id. at 603, defendant's willingness to accept short-term losses to preserve its monopoly (as evidenced by its refusal to sell lift tickets to plaintiff or to accept Adventure Pack vouchers from skiers), id. at 608, and defendant's failure to proffer a

legitimate business justification for its actions, id. at 608-
09.   This unilateral abandonment of a voluntary course of
dealing, forsaking of short-term profits, refusal to transact
business with the plaintiff even if compensated at rates set by
the defendant, and concomitant inability to provide a legitimate
business rationale have evolved to form the baseline
requirements of a § 2 refusal to deal claim.   See, e.g.,
Creative Copier, 344 F. Supp. 2d. 865-66.

Nevertheless, the Supreme Court has subsequently clarified
that "Aspen Skiing is at or near the outer boundary of § 2
liability." Trinko, 540 U.S. at 409.  In Trinko, the defendant,
Verizon, was required under telecommunications regulations to
offer certain "unbundled" services to its competitors.  Id. at
403.   The plaintiff brought a class action under § 2 on behalf
of a competing telecommunication provider's customers alleging
that Verizon filled competitors' orders slowly and on a
discriminatory basis in order to dissuade customers from staying
with the competitors.  Id. at 404-05.   The Supreme Court
reviewed the factors set forth in Aspen Skiing and found that
Verizon's actions were insufficient to subject it to § 2
liability.  Id. at 409-10.  Specifically, the Court found that
because Verizon was required by regulation to share the
unbundled services, it could not be said that Verizon had
previously voluntarily dealt with its competitors.  Id. at 410.

13

What is more, because the price at which the unbundled services were to be provided was statutorily prescribed, the Court could not conclude whether Verizon was foregoing short-term profits to solidify its monopoly.[6] Id.

Several courts in the wake of Trinko have declined to credit refusal to deal claims based on either plaintiffs' failure to establish termination of a voluntary course of dealing contrary to the defendant's short-term business interests[7] or defendant's refusal to sell products to the plaintiff that it made available at retail to other consumers.[8]

---

[6] The Court declines to credit Blue Cross' reliance on Trinko for the proposition that the heavily regulated nature of health care markets makes it improper for courts to intervene on antitrust grounds. See Trinko, 540 U.S. at 412 ("One factor of particular importance is the existence of a regulatory structure designed to deter and remedy anticompetitive harm. Where such a structure exists, the additional benefit to competition provided by antitrust enforcement will tend to be small."). Whereas the telecommunications industry at issue in Trinko was the subject of extensive antitrust regulation, it cannot be said that the same level of antitrust-focused regulation exists in health care markets. See D. Andrew Austin and Thomas L. Hungerford, Cong. Research Serv., R40834, The Market Structure of the Health Insurance Industry 46-47 (2009).

[7] See, e.g., In re Elevator Antitrust Litigation, 502 F.3d 47, 52 (2d Cir. 2007) ("[B]ecause plaintiffs do not allege that defendants terminated any prior course of dealing – the sole exception to the broad right of a firm to refuse to deal with its competitors – the allegations are insufficient to state a [] claim."); see also Christy Sports, LLC v. Deer Valley Resort Co., 555 F.3d 1188, 1197 (10th Cir. 2009).

[8] See, e.g., MetroNet Servs. Corp. v. Qwest Corp., 383 F.3d 1124, 1133 (9th Cir. 2004); Stein v. Pac. Bell, 172 F. App'x 192, 194 (9th Cir. 2006).

At the outer boundaries of § 2 liability though it may be, <u>Aspen Skiing</u> prescribes a set of factors that are present in abundance in this case.  For example, Steward has pled facts sufficient to suggest that Blue Cross, in an effort to undermine the Landmark acquisition and Steward's entry into the Rhode Island market, unilaterally sought to terminate two prior courses of dealing in Landmark and St. Anne's.[9]

Likewise, the Complaint contains sufficient factual allegations suggesting that these terminations of existing courses of dealing were contrary to Blue Cross' short-term financial interests.  With respect to the negotiations between the parties for reimbursement rates at Landmark, Steward alleges that it offered – and Blue Cross rejected – reimbursement rates that were 5% below the average rates that Blue Cross accepted statewide from other hospitals.  (<u>See</u> Compl. ¶ 37.)  And with respect to St. Anne's, Steward has alleged that Blue Cross refused to accept terms that would have preserved prior reimbursement rates, but saved Blue Cross from having to pay certain fees associated with the BlueCard program.  (<u>See</u> <u>id.</u> at ¶ 48.)

---

[9] While it cannot be said that Steward and Blue Cross had a prior course of dealing with each other with respect to Landmark, the Court is not aware of case law that would preclude consideration of Blue Cross' own direct prior course of dealing with Landmark.

Blue Cross correctly notes that the Complaint refers repeatedly to reimbursement rate <u>increases</u> at Landmark. (<u>See</u> Compl. ¶¶ 37-38.)  It contends that Steward is precluded from stating a refusal to deal claim because this concession provides evidence that termination of the prior course of dealing at Landmark would not be contrary to Blue Cross' short-term business interests.  While this argument may prove to be persuasive, there is no record at this early stage of the litigation upon which to rest a conclusion as to when the previous reimbursement rates were negotiated, and how much Steward sought to increase them.  The Complaint does allege, however, that the rates that had previously been in place at Landmark were grossly inadequate to cover Landmark's cost of doing business. (<u>Id.</u> at ¶¶ 22, 23, 28.)  Courts have previously found an unlawful refusal to deal where the defendant would agree only to unreasonable terms and conditions amounting to a practical refusal to deal.  <u>See</u> <u>Aspen Skiing</u>, 472 U.S. at 592; <u>Safeway Inc. v. Abbott Labs.</u>, 761 F. Supp. 2d 874, 894-95 (N.D. Cal. 2011).  For purposes of the instant Motion to Dismiss, it is sufficient for Steward to have pled facts suggesting that Blue Cross rejected proposed reimbursement rates significantly lower than the statewide average that Blue Cross accepted at other hospitals.  <u>See</u> <u>Creative Copier</u>, 344 F. Supp. 2d at 867 ("[T]he presence of a business justification . . . is not

16

appropriately raised at [the motion to dismiss] stage.  . . . [The plaintiff] is not required to allege the negative of every possible justification [the defendant] may offer for its conduct.").

The next hurdle Steward must clear is establishment of facts suggesting that Blue Cross offered a product or service for sale to the public at a retail price that it then refused to provide to Steward on the same terms.  While the facts underlying this case require more parsing than the forlorn skier turned away from the ticket window in Aspen Skiing, the Complaint contains sufficient factual allegations to suggest that Blue Cross refused to purchase hospital services from Steward at or around the same price points that it was willing to pay other providers for similar services.  (See Compl. ¶ 37.)

Blue Cross aptly notes the complexity underlying hospital contracting and suggests that, unlike the ski mountain operator in Aspen Skiing, it does not provide a retail product or service to consumers at a fixed price.  This argument is not without merit, given the odd complexities and idiosyncrasies of our modern health care market.

To briefly sketch the landscape, the health insurance industry as we know it traces its roots to Baylor University Hospital in Dallas.  In the late 1920s, it was discovered that unpaid medical bills from local teachers were placing a strain

17

on the hospital's finances.   See D. Andrew Austin and Thomas L. Hungerford, Cong. Research Serv., R40834, The Market Structure of the Health Insurance Industry 3 (2009).   In an effort to alleviate the financial burden, the hospital created a pre-paid hospitalization benefit plan for teachers.   Unlike previous insurance products that paid a fixed cash indemnity, enrollees in the Baylor plan were entitled to hospital care and services as needed.   Id.

Within several years, hospitals in cities across the country were offering similar plans.   Soon after, hospitals began to collaborate with one another by offering shared community-based plans, providing subscribers access to multiple facilities.   When a group of hospitals in St. Paul, Minnesota joined together to offer one such community-based plan, they chose a blue cross to serve as their emblem.   Other community-based plans began incorporating the same emblem, and through the 1930s, the number of "Blue Cross" plans and subscribers increased rapidly.   Rosemary Stevens, In Sickness and in Wealth: American Hospitals in the 20th Century 186 (Basic Books 1989). With the advent of private health insurance in the 1950s, and the creation of Medicare and Medicaid in the 1960s, in less than a generation, the health care industry had been transformed from a traditional marketplace with individual buyers and sellers, to

one in which the vast majority of Americans obtained medical care through an insurance intermediary.

The modern role played by these intermediaries is enormous. Insurers such as Blue Cross serve a vital function by making coverage eligibility determinations, bridging the informational asymmetry between patients and providers, spreading the risk of catastrophic loss among subscribers, and assuring that providers will be compensated for their services regardless of the patient's ability to pay. As such, they exert substantial influence in setting prices and affording access to medical services. For example, an insurer may choose to pay one provider more or less for the same procedure than it chooses to pay another provider based on the provider's quality of service, bargaining power, or a host of other factors. See, e.g., Kartell v. Blue Shield of Mass., Inc., 749 F.2d 922, 923 (1st Cir. 1984) (upholding health insurer's right to set the prices at which it would reimburse physicians for services rendered to subscribers). But the bargaining power vested in insurers as a result of their unique market function cannot preclude § 2 liability where an insurer engages in anticompetitive conduct to exclude a potential competitor, merely on the grounds that the insurer's market power enables it to set variable prices among

providers such that there is no discernable retail or market price for the services that it transacts.[10]

Next, Blue Cross accurately notes that Steward is asking this Court to recognize Blue Cross' obligation to buy, as opposed to the more traditional refusal to deal claim implicating a monopolist's obligation to sell. Courts have previously found that where there is no evidence of anticompetitive conduct, a manufacturer has no obligation to purchase goods from a particular supplier. See Raitport v. Gen. Motors Corp., 366 F. Supp. 328, 331 (E.D. Pa. 1973). Similarly, courts have found that there can be no duty to buy where the plaintiff seeks to sell goods or services that are inferior or overpriced. See, e.g., Kamine/Besicorp Allegany L.P. v. Rochester Gas & Elec. Corp., 908 F. Supp. 1194, 1207 (W.D.N.Y. 1995) ("It simply does not appear that the effect of [defendant]'s refusal to pay more than its actual avoided cost would have an anticompetitive effect."); AT&T Co. v. Delta Commc'ns Corp., 408 F. Supp. 1075, 1101 (S.D. Miss. 1976)

---

[10] Likewise, that Blue Cross serves as an intermediary between the producer (the hospital) and the ultimate consumer (the patient) does not preclude § 2 liability for an illegal refusal to deal. See, e.g., Otter Tail Power Co. v. United States, 410 U.S. 366, 382 (1973) (finding a power provider in violation of the antitrust laws for its refusal to sell power to certain municipalities in order to prevent those municipalities from establishing their own power infrastructure and distributing power directly to households).

("[T]he undisputed material facts show that the service [plaintiff] was attempting to sell was not worth buying.").

However, this Court is unaware of any case law holding that, as a matter of law, an alleged refusal to buy cannot ever form the basis of a § 2 refusal to deal claim. In this case, Steward has pled facts sufficient to suggest that Blue Cross refused to purchase similar services from Steward that it purchased from other providers, at prices significantly below what Blue Cross was willing to pay to those other providers.[11]

Blue Cross would have the Court believe that Steward's refusal to deal claim fails as a matter of law because Blue Cross has the right to deal, or refuse to deal, with whomever it likes. (See Mot. to Dismiss 10.) This is true to a great extent, but the right is not unlimited. As the Supreme Court recognized in Aspen Skiing, the right of those engaged in private business to choose with whom they will deal is subject to the qualification that the right exists only in the absence

---

[11] Without belaboring the point, it is worth noting again that the unique role played by health insurance intermediaries has a bearing on the allegations in this case. As compared with a traditional manufacturing firm that purchases its raw materials from Party A and sells its finished product to Party B, a health insurer such as Blue Cross employs a wholly different business model in which it sells an insurance product to Party A, contracts to purchase medical services from Party B, then turns around and grants access to those services to Party A. Given this unique function, it should come as no surprise that a refusal to deal allegation against a health insurance provider would implicate the provider's refusal to buy.

of any purpose to create or maintain a monopoly.  Aspen Skiing,
472 U.S. 602 (citing Colgate, 250 U.S. 307).  Accepting as true
the factual allegations in the Complaint and construing all
reasonable inferences in favor of Steward, as the Court must,
the Complaint alleges sufficient facts to suggest that Blue
Cross' conduct falls within the scope previously found by courts
to be violative of the antitrust laws.  That being the case,
dismissal of Steward's refusal to deal claim is unwarranted.

B.   Does Steward Have Standing to Bring Antitrust Claims?

Courts utilize a six-factor test to determine whether a
private plaintiff has standing to bring an antitrust action.
The factors are: (1) the causal connection between the alleged
antitrust violation and harm to the plaintiff; (2) an improper
motive; (3) the nature of the plaintiff's alleged injury and
whether the injury was of a type that Congress sought to redress
with the antitrust laws; (4) the directness with which the
alleged market restraint caused the asserted injury; (5) the
speculative nature of the damages; and (6) the risk of
duplicative recovery or complex apportionment of damages.  Serpa
Corp. v. McWane, Inc., 199 F.3d 6, 10 (1st Cir. 1999).  Blue
Cross makes three distinct arguments in contending that Steward
lacks standing to bring its antitrust claims: (1) Steward's
alleged injury – loss of negotiating leverage – is not
cognizable under antitrust law; (2) Steward's alleged damages

22

are too remote and too speculative to state a valid claim in that they presume the successful acquisition of Landmark, followed by the successful statewide implementation of Steward's community hospital care model; and (3) Steward is a "presumptively disfavored" antitrust plaintiff because, at present, it is neither a competitor nor a consumer in the alleged markets.   The Court rejects these arguments, and finds that Steward has standing.

> i.   Is Steward's Alleged Injury Cognizable Under Antitrust Law?

Every antitrust plaintiff must show that it has sustained antitrust injury.   Sterling Merch., Inc. v. Nestle, S.A., 656 F.3d 112, 121 (1st Cir. 2011).   Antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."   Id. (quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977)).

Blue Cross characterizes Steward's alleged injury as the loss of negotiating leverage that Steward would have attained had it successfully acquired Landmark and implemented its community hospital model in Rhode Island.   As discussed below, Steward vigorously disputes this characterization of the Complaint.   But, accepting Blue Cross' depiction of the alleged injury for the time being, Blue Cross relies principally on the

Brunswick case in contending that the loss of negotiating leverage does not constitute a cognizable antitrust injury.

In Brunswick, the defendant acquired three bowling alleys, all of which were facing financial difficulty.  429 U.S. at 479-80.  The plaintiff, the operator of other bowling alleys in the same area, brought antitrust claims alleging that the defendant's decision to acquire the alleys, rather than letting them go out of business, had deprived the plaintiff of increased market share.  The Supreme Court denied recovery, reasoning that the antitrust laws are for the protection of competition, not competitors.  Id. at 488.  The Supreme Court found that the loss of potential market share was not the type of injury that the antitrust laws were intended to prevent.  Id. at 489.

Blue Cross' reliance on Brunswick is misplaced, as the Brunswick holding arguably counsels against dismissal when considered in the context of the instant facts.  Ultimately, the holding in Brunswick for the defendant was based on the fact that the plaintiff's acquisition of the bowling alleys served to increase, rather than decrease competition.  The Supreme Court reasoned that the antitrust laws were not designed to give rise to a cause of action where the alleged illegal act actually served to increase competition by preventing the bowling alleys from going out of business.  Here, on the completely opposite end of the spectrum, Blue Cross' alleged conduct served to

24

decrease competition by denying Steward access to the Rhode Island market.

What is more, the Court finds merit in Steward's argument that Blue Cross has mischaracterized the Complaint by contending that Steward's alleged injury consists only of the loss of negotiating leverage to seek higher reimbursement rates. Steward disputes this characterization of the Complaint, and accurately points out that the Complaint's reference to loss of negotiating leverage refers not to Steward's alleged injury, but to Blue Cross' alleged rationale for wanting to sabotage the Landmark acquisition: Blue Cross believed that entry by Steward into the Rhode Island market would have decreased Blue Cross' negotiating leverage. Steward argues that its injury is not the loss of negotiating leverage at all, but rather the millions of dollars invested in the Landmark acquisition prior to its abandonment, and the lost profits that would have resulted from entry into the Rhode Island market. This is sufficient to state a cognizable antitrust injury.

ii.  Are Steward's Damages Too Remote or Speculative?

An antitrust plaintiff must show that its alleged damages were caused by the alleged antitrust violation. RSA Media, Inc. v. AK Media Grp., Inc., 260 F.3d 10, 14 (1st Cir. 2001). "[A]ntitrust laws have been interpreted to incorporate common law principles of causation." Rhode Island Laborers' Health &

25

_Welfare Fund ex rel. Trs. v. Philip Morris, Inc._, 99 F. Supp. 2d 174, 187 (D.R.I. 2000).  As such, "[c]ontingencies, conjecture, and speculation will not support a finding of proximate cause," and will, therefore, not support a finding of antitrust liability.  _Id._

Nevertheless, in assessing the standing of would-be market entrants, courts assess the "intent and preparedness" of the prospective entrant.  _See, e.g._, _Huron Valley Hosp., Inc. v. City of Pontiac_, 666 F.2d 1029, 1033 (6th Cir. 1981) (plaintiff's acquisition of land for hospital, performance of feasibility studies, attempts to obtain government approvals, and consummation of contracts were sufficient to establish standing); _see also_ _Shionogi Pharma, Inc. v. Mylan, Inc._, No. 10-1077, 2011 U.S. Dist. LEXIS 98547, at *10-16 (D. Del. August 31, 2011).  A potential competitor's "[i]ndicia of preparedness include adequate background and experience in the new field, sufficient financial capability to enter it, and the taking of actual and substantive affirmative steps toward entry, such as the consummation of relevant contracts and procurement of necessary facilities and equipment."  _Andrx Pharm., Inc. v. Biovail Corp. Int'l_, 256 F.3d 799, 807 (D.C. Cir. 2001) (internal citation and quotation marks omitted).

Blue Cross argues that Steward does not have standing because its alleged damages are too speculative and premised

26

upon multiple assumptions, including satisfaction of conditions precedent in the Purchase Agreement and the ability to create a successful hospital network in Rhode Island thereafter. Relying principally on Huron Valley Hospital and Shionogi Pharma, Steward responds that it has demonstrated its intent and preparedness to enter the Rhode Island market. Indeed, Steward undertook a long series of steps to complete the Landmark acquisition and to gain a foothold in Rhode Island. For example, Steward invested heavily in Landmark by extending a five million dollar line of credit during the pendency of the Purchase Agreement, and completed regulatory filings necessary to effectuate the acquisition. What is more, Steward's market preparedness is demonstrated by its operation of St. Anne's, whose geographic proximity to Rhode Island resulted in a number of Rhode Island patients seeking treatment there.

Shionogi Pharma is instructive. There, the counter-plaintiffs brought antitrust claims against the counter-defendants based on the counter-defendants allegedly having filed a frivolous patent suit to keep the counter-plaintiffs from entering the market for the sale of a pharmacological product. 2011 U.S. Dist. LEXIS 98547, at *3-5. In defending the antitrust claim, the counter-defendant argued that other factors barred the counter-plaintiff's entry into the relevant market, most notably the absence of FDA approval for the

27

counter-plaintiff to market its product. Id. at *11-12. The district court rejected the argument, reasoning that the counter-plaintiff had taken steps to enter the market and had demonstrated its intent and preparedness to sell the product. Id. at *16.

Likewise, here, while Blue Cross avers that Steward had not satisfied certain conditions precedent to the Purchase Agreement at the time of Blue Cross' alleged anticompetitive conduct, Steward has pled facts sufficient to suggest that those actions were the proximate cause of the collapse of the Landmark acquisition. In order to convince a fact finder of Blue Cross' culpability and to establish damages, Steward may ultimately be called upon to demonstrate that its successful acquisition of Landmark would have permitted Steward to develop its community hospital model in Rhode Island. But, Steward need not do so at the initial pleading stage. See Koch v. I-Flow Corp., 715 F. Supp. 2d 297, 302 (D.R.I. 2010). As such, it would be improper to dismiss the action on grounds that the alleged damages are too remote or speculative.

### iii. Is Steward an Improper Plaintiff by Virtue of Not Being a Market Competitor or Consumer?

Because Steward was neither a competitor nor a consumer in the Rhode Island market at the time that the alleged anticompetitive conduct occurred, Blue Cross argues that Steward

is "presumptively disfavored" and thus lacks standing.   What is more, Blue Cross suggests, other parties are better suited to bring antitrust claims, further undermining Steward's standing.

Current competitors and consumers in the alleged relevant market are presumptive antitrust plaintiffs; all other parties are "presumptively disfavored." Serpa Corp., 199 F.3d at 11-12; see also SAS of Puerto Rico, Inc. v. Puerto Rico Tele. Co., 48 F.3d 39, 45 (1st Cir. 1995) ("If competitors and consumers are favored plaintiffs in antitrust cases, the list of those presumptively disfavored is far longer."). Nevertheless, there are circumstances where presumptively disfavored plaintiffs may sustain antitrust claims. See Serpa Corp., 199 F.3d at 12; SAS of Puerto Rico, 48 F.3d at 45. "The most obvious reason for conferring standing on a second-best plaintiff is that, in some general category of cases, there may be no first best with the incentive or ability to sue." SAS of Puerto Rico, 48 F.3d at 45. In market exclusion cases, where evidence indicates that the plaintiff has been directly harmed by the alleged exclusionary conduct, standing may also be established. See Yangtze Optical Fibre v. Ganda LLC, No. CA 04-474ML, 2006 WL 1666180, at *3 (D.R.I. June 9, 2006) (the standing inquiry "center[s] on whether or not the complaining party suffered a sufficiently direct injury as a result of the alleged antitrust violation.").

As an initial matter, the Court notes that Steward was arguably already a participant in the Rhode Island market prior to its attempted acquisition of Landmark. As set forth in the Complaint, Steward had been providing medical services to Rhode Island Blue Cross subscribers through its operation of St. Anne's, in effect selling commercial hospital services to Blue Cross. (See Compl. ¶ 45.)

Regardless, even if the Court were to conclude that Steward is a presumptively disfavored plaintiff, this case is one in which there exists no other party with the incentive or ability to sue. Put simply, there is no party better-suited (or indeed able) to bring claims alleging Steward's unlawful exclusion from the Rhode Island market other than Steward. See SAS of Puerto Rico, 48 F.3d at 45.

What is more, Steward has pled facts sufficient to indicate that it suffered a direct injury as a result of Blue Cross' alleged exclusionary conduct. See Yangtze Optical Fibre, 2006 WL 1666180, at *3. The Complaint plausibly suggests that Blue Cross perceived Steward's entry into the Rhode Island market as a threat, and took steps to undermine Landmark's financial viability and otherwise frustrate Steward's market entry. See Reazin v. Blue Cross & Blue Shield of Kansas, Inc., 899 F.2d 951, 962-63 (10th Cir. 1990) ("While it is true that [plaintiff] was not itself a direct participant in the provision of health

30

care financing, it was, by virtue of its affiliation with [certain third parties], a perceived competitor of [defendant]. Indeed . . . that is the precise reason [defendant] undertook the conduct at issue in this case.") (internal citation and quotation marks omitted).

To permit the defendant in an unlawful exclusion case to hide behind the presumptive disfavoring of non-market participants would subject plaintiffs in such cases to an insurmountable Catch-22. Were courts to observe a blanket prohibition on claims brought by those excluded from the market by alleged anticompetitive conduct, those firms responsible for the exclusion might never be held accountable. In these circumstances, even if one were to conclude that Steward is a presumptively disfavored plaintiff, Steward has pled facts sufficient to establish antitrust standing.

C.    Did Steward Adequately Allege Relevant Markets?

Blue Cross seeks dismissal on grounds that Steward has failed to sufficiently plead relevant product and geographic markets. To state a valid antitrust claim, a plaintiff must allege that the defendant possessed, at a minimum, a "dangerous probability of achieving monopoly power" in a properly-defined relevant market. Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456 (1993); see also Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of Rhode Island, 883 F.2d 1101,

1110 (1st Cir. 1989).  A relevant market includes both (1) the product market and (2) the geographic area involved.  Lee v. Life Ins. Co. of N. Am., 829 F. Supp. 529, 539 (D.R.I. 1993), aff'd, 23 F.3d 14 (1st Cir. 1994).  Failure to plausibly allege each of these components is grounds for dismissal.  Id. at 541. However, because market definition is a "deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market."  Todd v. Exxon Corp., 275 F.3d 191, 199-200 (2d Cir. 2001); see also Morales-Villalobos v. Garcia-Llorens, 316 F.3d 51, 55 (1st Cir. 2003) ("[W]hile there are arguments for a larger [geographic] market, the matter cannot be resolved on the face of the complaint.").

　　　　i.   Does Steward Allege a Valid Product Market?

A relevant product market "is composed of products that have reasonable interchangeability for the purposes for which they are produced – price, use and qualities considered." George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc., 508 F.2d 547, 552 (1st Cir. 1974) (internal citation omitted).  If a plaintiff "alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products . . . the relevant market is legally insufficient and a motion to dismiss may be granted."  Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 436 (3d Cir. 1997).

32

Blue Cross argues that the Complaint's depiction of the market for the purchase of commercial hospital services ignores the presence of Medicare and Medicaid, both major governmental buyers of hospital services. As such, Blue Cross contends, the alleged product market does not encompass all interchangeable substitute products. The scant case law on this topic, however, suggests that Steward's exclusion of Medicare and Medicaid from the relevant product market was not in error.

In <u>United States v. Blue Cross Blue Shield of Mich.</u>, 809 F. Supp. 2d 665 (E.D. Mich. 2011), the government brought antitrust claims against the Blue Cross of Michigan entity related to Blue Cross' use of "most favored nation" clauses in its agreements with hospitals. The complaint alleged that there was no interchangeable product because not everyone qualifies for government health care programs. <u>Id.</u> at 672. That assertion went unchallenged, and the district court found that the complaint had plausibly alleged a relevant product market. <u>Id.</u>

Blue Cross relies principally on <u>Little Rock Cardiology Clinic PA v. Baptist Health</u>, 591 F.3d 591 (8th Cir. 2009). There, an association of cardiologists brought suit against the defendant medical facility and a Blue Cross Blue Shield entity alleging that the facility and Blue Cross had conspired to eliminate them from competing in the market for cardiology services in Arkansas by revoking staff privileges from doctors

33

who had interests in a competing hospital.  Id. at 594.  The plaintiffs argued that the relevant product market to which they were deprived access should be limited to patients using private insurance because private insurance and government programs such as Medicare and Medicaid are not interchangeable.  Id. at 597. They are not interchangeable, plaintiffs suggested, because not everyone qualifies for Medicare and Medicaid based on their age and income level.  Id.

The Court of Appeals for the Eighth Circuit affirmed the district court's dismissal based on the plaintiffs' failure to plead a relevant product market.  Id.  The Eight Circuit reasoned that the plaintiffs were approaching the issue from the wrong perspective.  While it is true that not everyone qualifies for Medicare and Medicaid, from the standpoint of a medical doctor providing services, it does not matter how the patient pays – private insurance, out-of-pocket, or through a government program.  Id. ("But this lawsuit is not about the options available to patients, it is about the options available to shut-out cardiologists. . . . Patients able to pay their medical bill, regardless of the method of payment, are reasonably interchangeable from the cardiologist's perspective—the correct perspective from which to analyze the issue in this case.").

Despite Blue Cross' arguments to the contrary, Baptist Health stands for the proposition that the correct lens through

which to conduct relevant market analysis is from the perspective of the aggrieved party. Steward alleges that it was excluded from the product market for the commercial purchase of hospital services. It is this market in which Steward does not include Medicare and Medicaid as interchangeable substitutes.

Here, the opposite rationale of Baptist Health comes into play. The Baptist Health court focused on the fact that while not everyone qualifies for Medicare and Medicaid, a doctor conceivably has access to every patient in the marketplace regardless of their method of payment. In the marketplace for the purchase of hospital services, however, Medicare and Medicaid purchase hospital services, but they can only do so for the limited number of individuals that qualify for those programs. The remainder of the market consists of private insurers purchasing hospital services for their subscribers. Viewing the product market from the perspective of an aggrieved private purchaser of hospital services, then, it is appropriate to exclude Medicare and Medicaid purchases because the private purchaser was never competing to purchase those services in the first place. For this reason, the Court distinguishes Baptist Health as inapposite and finds that Steward has sufficiently pled a relevant product market.

  ii. Does Steward Allege a Valid Geographic Area?

A relevant geographic market consists of the "the geographic area in which the defendant faces competition and to which consumers can practically turn for alternative sources of the product." Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp., 79 F.3d 182, 196 (1st Cir. 1996) (internal citation omitted). In other words, the relevant geographic market in an antitrust case is the "area of effective competition." Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 327 (1961). Failure to plead a relevant geographic market is grounds for dismissal. See, e.g., E. Food Servs., Inc. v. Pontifical Catholic Univ. of P.R. Serv. Ass'n, Inc., 222 F. Supp. 2d 131, 135-36 (D.P.R. 2002), aff'd, 357 F.3d 1 (1st Cir. 2004).

Blue Cross argues that Steward has failed to plead a plausible geographic market because while Steward identifies Rhode Island as the relevant market, the Complaint admits that people cross state lines to obtain medical services at St. Anne's. This argument, however, oversimplifies the two areas of effective competition at issue in this case. In the first area of effective competition – the market for the sale of commercial health insurance (the market that Blue Cross is alleged to monopolize), the relevant inquiry is not where patients turn for hospital services, but where they turn for insurance. Steward accurately notes that Rhode Island residents cannot practically

turn to out-of-state insurance providers that do not offer in-network access to hospitals and doctors in Rhode Island.

Likewise, in assessing the market for the commercial purchase of hospital services (the market that Blue Cross is alleged to monopsize), the relevant inquiry must assess which hospitals Rhode Island residents can practicably turn to for treatment. While it is true that the Complaint indicates that some Rhode Island residents cross state lines to obtain medical services at St. Anne's, neither party suggests that this practice is widespread. Indeed, common sense suggests that most consumers of medical services would choose to receive those services at locations proximate to their home or work in order to minimize the time and cost of transportation.[12]

Steward has alleged a valid geographic area such that dismissal on these grounds is unwarranted. See Blue Cross Blue Shield of Mich., 809 F. Supp. 2d at 673 ("Geographic markets need not be alleged or proven with 'scientific precision,' nor be defined 'by metes and bounds as a surveyor would lay off a plot of ground.' The complaint need only present sufficient

---

[12] Contrary to the position taken by Blue Cross, the Complaint's acknowledgement that some patients cross state lines to obtain treatment is by no means fatal to the claim. In discussing the Elzinga-Hogarty test for consumer origin, courts have previously found a relevant geographic market where up to 10% of consumers were found to have gone outside the relevant area to obtain a product. See Nilavar v. Mercy Health Sys.-W. Ohio, 244 F. App'x. 690, 697 (6th Cir. 2007); Gordon v. Lewistown Hosp., 272 F. Supp. 2d 393, 426 (M.D. Pa. 2003).

information to plausibly suggest the contours of the relevant geographic market.") (internal citations omitted).

D.   Is Blue Cross Entitled to Immunity for its Lobbying Activities Under the Noerr-Pennington Doctrine?

In addition to the principal claim that Blue Cross engaged in an unlawful refusal to deal, Steward makes a variety of ancillary claims related to Blue Cross' petitioning activities in opposition to the Landmark acquisition. These activities include Blue Cross' filing of an objection with the Special Master, lobbying against passage of an amendment to the Hospital Conversion Act, and filing of an application with the Department of Health to remove Landmark from its provider network. (See Compl. ¶¶ 25, 32-33, 36.)   While both parties conclude that these activities do not independently give rise to the antitrust claims, Blue Cross asks that they be stricken from the Complaint by virtue of the immunity afforded petitioning activity under the Noerr-Pennington Doctrine.

Under Noerr-Pennington, a party that petitions the government for redress is immune from antitrust liability, unless the petitioning is a sham.[13]   Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc., 508 U.S. 49,

---

[13]   The Noerr-Pennington Doctrine is rooted in First Amendment concerns about the chilling of political speech.   See E. R. R. Presidents Conf. v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961).

56-60 (1993) (discussing E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961)). Nevertheless, a plaintiff may properly include evidence of immune lobbying activity in its antitrust allegations insofar as that evidence serves to illustrate the context and motive underlying the alleged anticompetitive conduct. See United Mine Workers of Am. v. Pennington, 381 U.S. 657, 670 n.3 (1965) (An activity "barred from forming the basis for a suit, may nevertheless be introduced if it tends reasonably to show the purpose and character of the particular transactions under scrutiny.").

As noted, both parties conclude that the various petitioning activities undertaken by Blue Cross do not form the basis of Steward's claim, but rather are introduced for the purposes of illuminative Blue Cross' anticompetitive intent. (See Def.'s Mot. to Dismiss 18, ECF No. 16; Pl.'s Objection to Def.'s Mot. to Dismiss 25, ECF No. 23-1.) Under these circumstances, the inclusion of Blue Cross' petitioning activities in the Complaint is proper, and the Court declines Blue Cross' request to strike this material.[14] See Pennington, 381 U.S. at 670 n.3.

IV. Tortious Interference Claims

---

[14] Although briefed by both parties, the Court need not reach the issue of whether the petitioning might be subject to the sham exception to the Noerr-Pennington Doctrine.

To state a claim for tortious interference with existing or prospective contractual relations, the plaintiff must establish: "(1) the existence of a business relationship or expectancy, (2) knowledge by the interferor of the relationship or expectancy, (3) an intentional act of interference, (4) proof that the interference caused the harm sustained, and (5) damages to the plaintiff." Roy v. Woonsocket Inst. for Sav., 525 A.2d 915, 919 (R.I. 1987).   Blue Cross moves to dismiss the tortious interference counts on grounds that Steward failed to sufficiently plead an intentional act of interference.

To satisfy the intentional interference element, a plaintiff must allege "legal malice" or "intent to do harm without justification." Belliveau Bldg. Corp. v. O'Coin, 763 A.2d 622, 627 (R.I. 2000).   Whether an act of interference is unjustified depends on the weighing of several factors[15] and ultimately on the "judgment and choice of values in each situation." Avila v. Newport Grand Jai Alai, LLC, 935 A.2d 91, 98 (R.I. 2007) (internal citation and punctuation omitted).

---

[15] Those factors include:  "(1) the nature of the actor's conduct; (2) the actor's motive; (3) the contractual interests with which the conduct interferes; (4) the interests sought to be advanced by the actor; (5) the balance of social interests in protecting freedom of action of the actor and the contractual freedom of the putative plaintiff; (6) the proximity of the actor's conduct to the interference complained of; and (7) the parties' relationship." Belliveau Bldg. Corp. v. O'Coin, 763 A.2d 622, 628 n.3 (R.I. 2000) (citing Restatement (Second) of Torts § 767, at 26-7 (1979)).

While a defendant may avoid liability for tortious interference where its actions were undertaken with the benefit of a legally recognized privilege or other justification, Alfieri v. Koelle, No. 06-510, 2007 U.S. Dist. LEXIS 24003, at *7 (D.R.I. March 29, 2007), to defeat a tortious interference claim on a motion to dismiss, the privilege or other justification must be one of well-documented and unquestioned authority, whether by contract or statute. See Ira Green, Inc. v. Military Sales & Serv. Co., No. 10-207-M, 2012 U.S. Dist. LEXIS 82290, at *6-7 (D.R.I. June 13, 2012) (citing cases).

Blue Cross' argument may be distilled as follows: any action that it allegedly took to hinder the Landmark acquisition and Steward's entry into the Rhode Island market was justified in order to protect Blue Cross' business interests because Steward intended to acquire Landmark in order to increase its own negotiating leverage. As an initial matter, as noted previously, Blue Cross' argument misconstrues the Complaint's discussion of negotiating leverage. (See supra at Section B(i).) What is more, Blue Cross does not argue, nor could it prove, that its alleged interference with the Landmark acquisition and with Steward's arrangements with third parties including Thundermist Health Center was privileged by contract or statute. See Ira Green, 2012 U.S. Dist. LEXIS 82290, at *6-7; Barkan v. Dunkin' Donuts, Inc., 520 F. Supp. 2d 333, 341-42

41

(D.R.I. 2007); Avila, 935 A.2d at 99.   Determining whether Blue Cross' actions were justified will require a fact-intensive inquiry.   See Belliveau, 763 A.2d at 628 n.3.   Thus, Blue Cross' Motion to Dismiss cannot be granted with respect to the tortious interference claims.[16]

V.   Conclusion

Because Steward has alleged sufficient facts to state a plausible claim that Blue Cross engaged in anticompetitive conduct in violation of state and federal antitrust law, and tortuously interfered with existing and prospective contractual relations, Blue Cross' Motion to Dismiss is DENIED.

IT IS SO ORDERED.

_William E. Smith_
Chief Judge
Date:  February 19, 2014

---

[16] The Court declines to credit Blue Cross' argument that Steward has not satisfied the causation element of its tortious interference claims based on the conditions precedent to the Purchase Agreement that remained at the time of the alleged interference.   Resolution of this issue on a motion to dismiss is premature.   See Ed Peters Jewelry Co. v. C & J Jewelry Co., 51 F. Supp. 2d 81, 102 (D.R.I. 1999), aff'd, 215 F.3d 182 (1st Cir. 2000) ("[C]ausation [in tortious interference claims] is generally a matter left to the consideration of the jury.").