IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND


```
* * * * * * * * * * * * * * * * * * * * * * * * * *
STEWARD HEALTH CARE        *   CIVIL ACTION
SYSTEM, LLC, et al         *   13-405S
                           *
VS.                        *   March 13, 2015
                           *
BLUE CROSS & BLUE SHIELD   *   PROVIDENCE, RI
OF RHODE ISLAND            *
* * * * * * * * * * * * * * * * * * * * * * * * * *
```


HEARD BEFORE THE HONORABLE LINCOLN D. ALMOND
MAGISTRATE JUDGE
(Motions)
(Corrected Transcript)


**APPEARANCES**:

```
FOR THE PLAINTIFF:       ROBERT CLARK CORRENTE, ESQ.
                         Burns & Levinson, LLP
                         One Citizens Plaza, Suite 1100
                         Providence, RI  02903

                         MARK S. LEVINSTEIN, ESQ.
                         Williams & Connolly, LLP
                         725 12th Street, NW
                         Washington, DC  20005

FOR THE DEFENDANT:       PATRICIA K. ROCHA, ESQ.
                         Adler, Pollock & Sheehan, P.C.
                         One Citizens Plaza
                         8th Floor
                         Providence, RI  02903

FOR THE INTERESTED PARTY WILLIAM MARK RUSSO, ESQ.
21st Century Oncology    Ferrucci Russo, P.C.
Services, LLC:           55 Pine Street
                         4th Floor
                         Providence, RI  02903

Court Reporter:          Denise P. Veitch, RPR
                         One Exchange Terrace
                         Providence, RI  02903
```

1    13 MARCH 2015 -- 11:00 A.M.

2          THE COURT:  Sorry for being late.  I had to

3    attend a doctor's appointment with a family member, and

4    it got delayed; and I didn't want to reschedule this.

5          All right.  The matter before the Court today is

6    Steward Health Care System, LLC, et al versus Blue

7    Cross & Blue Shield of Rhode Island, Civil Action

8    13-405.

9          The matter is before the Court today on

10    plaintiff's motion to compel production of documents by

11    non-party 21st Century Oncology Services, LLC, and also

12    their opposition to a prior objection or motion to

13    quash filed by the recipient of that document subpoena.

14    It's Document 56.

15          Can the attorneys present for this hearing

16    identify themselves for the record, please.

17          MR. CORRENTE:  Robert Corrente for Steward, and

18    I'm joined by Mark Levinstein from Williams and

19    Connolly.

20          MR. RUSSO:  Mark Russo for 21st Century.

21          MS. ROCHA:  Pat Rocha representing Blue

22    Cross & Blue Shield of Rhode Island.

23          THE COURT:  All right.  Why don't I hear from

24    plaintiffs first.  I've reviewed everything that has

25    been submitted.

1           MR. LEVINSTEIN:  Good morning, your Honor.

2           THE COURT:  Good morning, sir.

3           MR. LEVINSTEIN:  Thank you for taking the time,

4      and thank you again for taking time in December to help

5      us initially with this.

6           As you'll recall, the objection was filed.  We

7      had that hearing.  We thought we could work it out, and

8      we weren't able to.

9           THE COURT:  Yes.

10          MR. LEVINSTEIN:  Basically, as you'll recall,

11     this case is about Steward Health Care's effort to

12     enter the Rhode Island market, and one of the first

13     steps was to purchase Landmark Medical Center and its

14     assets.  And one of the assets of Landmark Medical

15     Center was Landmark's 38 percent interest in the

16     Southern New England Regional Cancer Center, which

17     everyone refers to as SNERCC, so I will do so as well.

18          SNERCC was the cancer center located at

19     Landmark; owned 38 percent by Landmark, owned

20     62 percent by Radiation Services, which became

21     21st Century.  So I will refer to them as

22     "21st Century," even though they weren't that during a

23     lot of this time period.

24          One of the conditions of the Asset Purchase

25     Agreement was that the Special Master was supposed to

1    purchase the 62 percent of SNERCC that was owned by

2    21st Century.  And this deal between 21st Century and

3    Landmark had been in existence since around 2002 when

4    they applied for a Certificate of Need, and the

5    facility had been operating since 2004.  When the

6    Special Mastership started, and Landmark went into this

7    proceeding, SNERCC stopped performing well.  And even

8    though Landmark owned 38 percent of it, they weren't

9    receiving any payments because it wasn't making enough

10   money, was the report of 21st Century, which operated

11   SNERCC.

12        So at the time that Steward made its deal to buy

13   the assets, 21st Century was trying to purchase

14   Landmark's interest.  They wanted to buy the 38 percent

15   that Landmark held.

16        So Steward comes along and wants the opposite to

17   happen.  They want Landmark to buy the 62 percent that

18   21st Century owns.  And the numbers go back and forth,

19   but basically 21st Century was offering $1.1 million to

20   buy Landmark's 38 percent, or, when they discussed

21   selling, they wanted to sell their 62 percent for

22   $12 million.

23        So there was a bit of a disconnect; 38 percent

24   for 1.1, or, if we're going to sell our 62 percent,

25   it's $12 million, and there was lots of back and forth.

1       But the reasons relevant to this case primarily

2   is if Steward had purchased Landmark, and finished,

3   closed on that deal, at least one of three things could

4   have happened:  Landmark or Steward could have bought

5   out 21st Century, bought the 62 percent; Landmark or

6   Steward could have sold the 38 percent to 21st Century;

7   or, Steward could have just waived the condition and

8   been a 38 percent owner of this facility that would

9   have continued to operate under the joint venture,

10  under the LLC agreement.

11      We need to know, have these documents --

12  primarily because it's part of our damage claim.  We

13  need to figure out which of those three would have

14  happened and, under the various scenarios, what the

15  economic consequence would have been for Landmark

16  Medical Center.

17      THE COURT:  How do you figure out which of those

18  three would have happened?

19      MR. LEVINSTEIN:  Well, there were negotiations

20  back and forth.  Part of it is by looking at what the

21  internal documents were saying.  They were taking

22  certain positions.  There was lots of back and forth in

23  the Special Mastership.  We're going to have to have

24  testimony about those possibilities, I mean.  But, at a

25  minimum, we need to know if we'd owned 38 percent, if

1  no deal had been made, what that would have been.

2       And it's possible we'll present three scenarios;

3  you know, here's the price that it was clear they were

4  willing to sell and we were willing to pay; here's the

5  price we were willing to pay and they were willing to

6  sell; or, here's what it would have been when we owned

7  it.  But, under any theory, there has to be some

8  valuation of that asset.

9       So we've not asked for all the financial records

10  of SNERCC; we've simply asked for annual financial

11  statements and cash flows, the things that our experts

12  need, they say they need in order to value this asset.

13       So what do we have in response?  And we've asked

14  for other things, other documents that relate to the

15  business of SNERCC, what its contracts were with its

16  payers, in order to figure out what its business was

17  doing and how it would have done going forward.

18       THE COURT:  Well, the documents you're just

19  talking about now, those would be what?  Document

20  request number 6, possibly 5?  I mean, there are lots

21  of other documents you're asking for as well, aren't

22  there?

23       MR. LEVINSTEIN:  I can -- hold on.

24       THE COURT:  Five goes to valuation of SNERCC.

25  Six are annual financial statements and weekly cash

1    flow analysis for SNERCC from 2008 to 2014.

2          MR. LEVINSTEIN:  Well, first --

3          THE COURT:  I need to decide this in the context

4    of your document request and specific request.  I can't

5    decide it in the context of, We need it for our

6    valuation; We're asking for damages; One of three

7    things could have happened, --

8          MR. LEVINSTEIN:  Okay.

9          THE COURT:  -- et cetera.

10         MR. LEVINSTEIN:  First -- okay.

11         THE COURT:  So I need to get into the weeds,

12    unfortunately.

13         MR. LEVINSTEIN:  I'm happy to do that, although,

14    your Honor, there have been no objections that this is

15    too burdensome.  There have been no objections on those

16    bases.

17         The objections are, one, We've produced all

18    this; which simply isn't true.  And the second

19    objection is, We've got nothing to do with this case;

20    which clearly is not true.  So I can go through the

21    request, but --

22         THE COURT:  So if they say what they've produced

23    or what's been produced in the public domain has

24    already been produced in some other, and you say that's

25    not true, then you must have received something that

1    you're saying is not fully compliant.

2              MR. LEVINSTEIN:  This is what we've received.

3    This is the total production.  What we've received is

4    mostly correspondence back and forth in the Special

5    Mastership proceeding, and pleadings in the Special

6    Mastership proceeding, and a few other documents; the

7    operating agreement, a couple things.  That's all we've

8    received.

9              THE COURT:  All right.  Did the Special Master

10   at some point ask 21st Century or its predecessor for

11   financial information?

12             MR. LEVINSTEIN:  Yes.

13             THE COURT:  Some kind of an investigation --

14             MR. LEVINSTEIN:  Yes.

15             THE COURT:  -- or an analysis?

16             MR. LEVINSTEIN:  He tried and ended up, as

17   attached to the objections, getting very narrow

18   financial information related to a few months.  He got

19   certain documents about patient records for a few

20   months, to see what was going on in the business in

21   those few months.  It wasn't about valuation; it was

22   about questions of whether there was, arguably,

23   misappropriation going on, whether the people

24   running -- whether 21st Century was not fairly

25   compensating Landmark; were they over-expensing things.

1    So it was very targeted to three months in 2011.  It's

2    not what our experts need to value.

3           And what was produced, again, we don't have what

4    was produced because it was given the Special Master.

5    And although some people from Steward may have been

6    able to see it, we don't have it, so I'm not -- just

7    because it was produced in that proceeding, we don't

8    have it and they haven't given to us today.

9           But there's lot of correspondence --

10          THE COURT:  But that's not what you're looking

11   for.

12          MR. LEVINSTEIN:  Right.  And there's lots of

13   correspondence --

14          THE COURT:  So what is it that you're looking

15   for?

16          MR. LEVINSTEIN:  Okay.  Let's go through the

17   request.  First we've asked for, in request number one,

18   documents about us.  So we're looking for documents

19   from internal documents about these negotiations, the

20   positions they were taking, why they were taking them.

21   If they don't have any documents that talk about our

22   people, then there shouldn't be much there.  And

23   there's been no claim of burden, but we've received

24   none of that.

25          Request number two, we're looking for internal

1     documents about SNERCC and its valuation.  So after

2     Steward didn't buy SNERCC -- I'm sorry.  After Steward

3     didn't buy Landmark and didn't buy the interest in

4     SNERCC, Prime sold -- actually Landmark sold --

5          THE COURT:  So what, so if I'm looking at number

6     two --

7          MR. LEVINSTEIN:  Yes.

8          THE COURT:  -- accurately, then it would seem to

9     me you're asking about the sale to Prime, but any

10    potential sale, any potential suiter, Steward, anyone

11    else who might have been interested in buying.

12         MR. LEVINSTEIN:  The four transactions, I think.

13    There was the original deal when they each got their

14    percentages.  Then there was the back and forth, either

15    buying from Landmark or selling to Landmark.  Then,

16    after Steward dropped out, they bought the 38 percent

17    from Landmark.  And then they sold to other people, I

18    don't know if it's the exact same 38 percent, but they

19    sold an interest to Care New England and CharterCARE.

20    So those are the only transactions that are involved.

21         THE COURT:  So how do those advance the ball on

22    either damages or causation?

23         MR. LEVINSTEIN:  They show valuation.  I mean,

24    they discussed how much this was worth and how to value

25    the assets.  We think they got a ridiculously low deal

1  from Landmark, because Landmark was in receivership or

2  Special Mastership and just wanted to get out and they

3  took the $1.1 million.  We think they sold that for a

4  lot more.

5       So the valuation of what the 38 percent was

6  worth and what they would have paid for it, that's part

7  of that, or what it would have been worth if we owned

8  it.  So that's why we want the valuation documents.

9       The terms of the purchase from Prime, we have

10  that.  We actually have number three.  It was in a

11  document where that's disclosed.

12       THE COURT:  Yes.  That one, I'm aware of that

13  one.

14       MR. LEVINSTEIN:  Okay.  Number four, again, we

15  want to know that just the terms of what they sold it

16  to Care New England and CharterCARE, because that

17  relates to the valuation.  That will show what it was

18  worth and documents about how it was doing not very

19  long afterwards from the purchase.

20       Five, again, documents that talk about the

21  value.  It's about valuation.

22       Six is simply the financial statements so we can

23  understand the business and how it's done.  It didn't

24  do well in 2008 and nine, we've been told.  But, just

25  so you know, from what I can tell the financial

1    statements were never produced.  Despite the fact that

2    Landmark owned 38 percent, they couldn't get the basic

3    annual financial statements, and because they needed to

4    go to the judge to get an order, there was lots of back

5    and forth, but those were never produced.

6           So all we're looking for is, there's no question

7    it's not burdensome to produce their annual financial

8    statements and their cash flow analyses.  That's what

9    our experts say we need in order to value a business.

10          THE COURT:  All right.  Requests seven through

11   12 appear to have a, or 13, appear to have a different

12   twist.

13          MR. LEVINSTEIN:  Yes.

14          THE COURT:  So why don't you lay some context

15   before we get into the weeds on those.

16          MR. LEVINSTEIN:  Okay.  Radiation Services owned

17   multiple facilities in Rhode Island, and they

18   negotiated contracts with payers that covered, we

19   believe, multiple facilities.  And the Special Master

20   asked for the payer agreements and they just -- as far

21   as I can tell they were never produced, because before

22   we ever got to the end of that battle, Steward withdrew

23   and things were dismissed as moot.

24          But there was a belief that when they did a deal

25   with Blue Cross they may have paid or received

1    different reimbursement rates for different facilities,

2    okay?  And here's one facility, I own 62 percent;

3    here's the facility, I own a hundred percent.  I'm

4    negotiating with you about rates.  It's got lots of

5    incentive to agree to different terms with the one that

6    owns a hundred percent, I own a hundred percent of.  I

7    want more from the one I own a hundred percent; I want

8    less from the one that I only own 62 percent of,

9    because I'm not going to get as much of a benefit from

10   that.

11          In addition, this was a facility associated

12   with --

13          THE COURT:  This doesn't make sense to me.  I

14   would assume if you negotiate you just negotiate to

15   maximize your revenue as to each facility.

16          So unless, unless you're saying that there was

17   some movement of rates that should have been provided

18   at SNERCC to others so that they could fraudulently --

19          MR. LEVINSTEIN:  No.  We know --

20          THE COURT:  Just from a pure economics

21   standpoint, I'm not really getting what your point is.

22          MR. LEVINSTEIN:  Well, one, we know that Blue

23   Cross paid higher rates to hospitals that were

24   associated with the major medical centers.

25          THE COURT:  Well, isn't that sort of the norm in

1    this?  Aren't there rates all over the board?  Didn't

2    we talk about that at prior hearings --

3              MR. LEVINSTEIN:  That's what this case is about.

4              THE COURT:  -- about rates being different from

5    hospital to hospital depending on the type of hospital,

6    the arrangement?

7              MR. LEVINSTEIN:  That's what this case is about.

8    The question whether that's reasonable or not and

9    whether that's done because of reasons other than basic

10   economics.

11             THE COURT:  Well, you're saying it was done,

12   back in the substance of this case you're saying it was

13   done for anti-competitive reasons.  But there can be

14   legitimate business reasons why there are different

15   rates.

16             MR. LEVINSTEIN:  Absolutely.  We just want to

17   know what the rates were.  We want to know if they were

18   the same or they were different.  These are radiation

19   facilities that are pretty much the same.

20             THE COURT:  But how is it relevant to this case?

21             MR. LEVINSTEIN:  Because we were going to own

22   38 percent, but we might have owned a hundred percent.

23   And if we'd owned a hundred percent, we wouldn't have

24   been in that same negotiation.  We wouldn't have been

25   in a negotiation with Blue Cross with multiple

1   facilities.  We would have been in an arrangement with

2   Blue Cross just for SNERCC, because that would be a

3   hundred percent owned by us.

4           THE COURT:  Okay.

5           MR. LEVINSTEIN:  So we want to know what --

6           THE COURT:  So that's leverage that somebody who

7   had multiple facilities --

8           MR. LEVINSTEIN:  It would just be a different

9   situation, your Honor.  And so what the rates would

10  have been if you're only negotiating for one, there's

11  lots of situations in which you own multiple

12  facilities, you negotiate with the other side, and you

13  say I want X dollars, and you agree that it's done in a

14  different way.

15          We believe that given the incentives, they were

16  willing to take less at SNERCC than they were at other

17  facilities.

18          If the documents don't show that, if there are

19  no differences, there are no differences.  If it's the

20  same rates across facilities, it's the same rates

21  across facilities.

22          THE COURT:  Well, hold on.  Before you get to

23  that point, explain to me why it's relevant to the

24  claims and defenses in this case.

25          MR. LEVINSTEIN:  Because Blue Cross, as the

1    documents show, knows it's paying less to community

2    hospitals.  It knows those lower rates are threatening

3    to put those hospitals out of business.  And this is

4    just one other aspect of Landmark's business.  This is

5    a facility at Landmark that --

6         THE COURT:  How is that anti-competitive conduct

7    towards Steward?  You're saying they have this strategy

8    of trying to put all community hospitals out of

9    business?

10        MR. LEVINSTEIN:  Your Honor, this is not for the

11   point of claiming that that's a violation of the

12   anti-trust law.  It's a point of valuing the business.

13   It's if we had acquired the facility, what rates could

14   we have negotiated with Blue Cross if we were the ones

15   representing SNERCC alone, because that's going to

16   relate to the valuation of the facility.

17        In the financials it will simply show the

18   numbers; it won't show the basis on which those

19   revenues came.

20        We want the payer contracts so we can get some

21   sense of the basis on which these numbers are being

22   paid to SNERCC, and are they the same as being paid to

23   other facilities.  If we own SNERCC we can go to them

24   and say, Look, you've been paying us --

25        THE COURT:  This seems to have, and I apologize

1     for interrupting you.

2          MR. LEVINSTEIN:  Go ahead.

3          THE COURT:  But I just, I'm having a hard time

4     seeing how this is actually going to be tried when you

5     get to that point because there's layer after layer of,

6     Well, if we were able to complete this deal, then if we

7     got SNERCC we could have bought it, sold it, ran it.

8     Then what would our rate have been.  So SNERCC had a

9     rate, but maybe we would have to negotiate a different

10    rate, so we need to look at all of this.

11         It just seems to me, there just seems to be a

12    lot of tentacles.

13         MR. LEVINSTEIN:  I understand, your Honor.  It's

14    not a simple case.  At the same time we would be

15    owning -- even if we just owned 38 percent, we would

16    have now been actively involved.  We wouldn't have been

17    like the Special Master who didn't have time to focus.

18    We had a right to see the books and records.

19         So what we would have been able to cause the

20    business of SNERCC to be, if we'd come in, owned the

21    hospital, revitalized the hospital, generated more

22    business for the facility, upgraded the facility in the

23    way that we were upgrading the hospital; what the rates

24    were with a major provider, who is defending the case,

25    is an important aspect of what the case is about and

1    what our experts need to value the asset we were going

2    to buy.

3         THE COURT:  So, but you're looking for more than

4    just the reimbursement rates that were negotiated for

5    SNERCC?  You want the reimbursement rates of other

6    21st Century facilities to show what?

7         MR. LEVINSTEIN:  If they were different, if they

8    negotiated them together, if they had different rates

9    for different facilities; the theory behind what they

10   were getting from Blue Cross.  That's what we're asking

11   for.

12        And again, what the case is about also, your

13   Honor, is simply the fact that we know that when

14   Steward tried to enter, Blue Cross did everything it

15   could to prevent that; tried to stop the hospital

16   conversions act from being changed.  It tried to

17   prevent Landmark from, the Special Master from selling

18   to Steward.  It opposed that.

19        Anything it could do, and this is one of the

20   conditions was buying the 62 percent of SNERCC.  They

21   knew that was one of the things Steward had asked the

22   Special Master to do, and that if he didn't do it,

23   Steward could walk and might walk.

24        We believe there was a lot of incentive and

25   likelihood that Blue Cross did anything it could to

1    prevent all the things that Steward wanted to happen.

2         They then took Landmark out of network -- even

3    though they knew that would be devastating to

4    Landmark -- because they thought it would increase the

5    likelihood Steward would walk away from the deal.

6         We have a right to discovery to find out what

7    involvement there was between Blue Cross and SNERCC and

8    21st Century related to this transaction.

9         It was clearly one of the conditions.  One was

10   Thundermist, and another was SNERCC.  And we know there

11   were discussions with Thundermist, and we want to know

12   what there was with 21st Century.  And these requests

13   go to the relationship between Blue Cross.

14        THE COURT:  Let's get in the weeds now and go

15   through each of the requests, please.

16        MR. LEVINSTEIN:  Number seven is just talking

17   about the reimbursement rates that Blue Cross paid

18   them, at their facilities, to see if they're different.

19   If they're all the same, they're all the same.

20        Number eight is just documents that discuss the

21   differences with respect to Blue Cross.  If they're all

22   the same, there won't be any.  If there are no

23   differences between what they're paid for doing the

24   same thing at two different facilities, there will be

25   no documents in response to eight.  If there are

1        differences, we want to know why.

2              Number nine is simply trying to show how

3        important Blue Cross was to them, documents sufficient

4        to show the number of patients covered by; so we want

5        to know what the relationship, importance of Blue Cross

6        was to them.

7              Number 10 was, there's some question about

8        whether -- because they owned a hundred percent of

9        other facilities and they owned 62 percent of SNERCC --

10       did 21st Century try to get patients to go to other

11       facilities instead of SNERCC.  Okay?  Follow me?  I own

12       a hundred percent --

13             THE COURT:  I follow you.

14             MR. LEVINSTEIN:  Okay.

15             THE COURT:  I follow what you're saying, but I'm

16       not following the connection to the claims and defenses

17       in this case because the claims, you're not suing

18       21st Century here.

19             MR. LEVINSTEIN:  It's a valuation.  If we owned

20       SNERCC, we wouldn't be sending patients somewhere else.

21             We're trying to find out why this facility was

22       doing so badly.  Its numbers were so bad it was

23       worse -- we understand there was a Special Master

24       procedure, proceeding.  We understand that Landmark was

25       down as a result.  But SNERCC was down dramatically,

1    and we want to know why.  And it relates to the

2    valuation because, presumably, if we owned SNERCC, or

3    we revitalized Landmark, that might have been reversed.

4         And if the answer is they didn't encourage

5    patients to go anywhere else, there will be no

6    documents.  If there are documents showing they were

7    trying to send patients somewhere else, there will be

8    documents responsive to 10.

9         Eleven, there was a management contract.  This

10   is -- since 21st Century had the majority share, it ran

11   the management of the facility and it paid itself

12   first.  So there were profits, well, there were

13   revenues, of course, at the facility.  But they were

14   paying themselves; 21st Century was running it and

15   paying 21st Century for being the manager and saying

16   there's nothing left after that.

17        So we simply want documents that discuss the

18   management contract and how they were computing how

19   much they were owed, which Landmark was entitled to

20   anyways.  But in order to see if they were somehow

21   increasing the costs and finding a way not to pay,

22   because we're going to own 38 percent perhaps, we want

23   to know if, in the future, whether that would generate

24   profits.  You know, how did the management contract

25   work, how did they compute it, how were they able to

1  only pay themselves and give nothing to the person who

2  owns 38 percent.

3        And if there are no documents that discuss that,

4  then there are no documents.  But if there are

5  documents that discuss how they ran their management

6  contract, that's what we're seeking there.

7        Number 12 is whether there are discussions about

8  their fiduciary duty to the facility.  Maybe they

9  didn't write about that, but we're thinking there may

10  have been documents where they said, Gee, we have a

11  fiduciary duty to this partnership and so on and there

12  are issues about how we're allocating expenses.  If

13  they don't write anything about that, there will be no

14  responsive documents.

15        And 13, they tie, in the negotiations, the

16  purchase of or the sale of their interest in SNERCC to

17  whether they could open a facility in Rhode Island, in

18  Bristol.  Those were tied together, and we just want to

19  know if there were discussions with Blue Cross at this

20  point in time about the Blue Cross rates at Bristol and

21  how those would compare to what they were getting.

22        THE COURT:  Run that by me again.

23        MR. LEVINSTEIN:  Okay.  They offered,

24  21st Century offered to buy -- sorry -- offered to sell

25  at 62 percent.  One condition in that deal was --

1          THE COURT:  Offered to sell at 62 percent to the

2    Special Master?

3          MR. LEVINSTEIN:  Correct.

4          THE COURT:  Or Steward to the Special Master?

5          MR. LEVINSTEIN:  Well, to the Special Master,

6    but Steward was obviously in those negotiations because

7    the amount was coming from Steward.

8          In those negotiations, one of the conditions of

9    the deal was, that they proposed, that 21st Century

10   proposed was this is all contingent on us getting our

11   Certificate of Need to open our facility in Bristol.

12   And we want to know if there were discussions related

13   to that activity with Blue Cross at the same time,

14   because we believe that's where some discussions may

15   have taken place about Blue Cross's interest in Steward

16   not being able to acquire the 62 percent of SNERCC.

17   Because that was a condition of the deal, we think Blue

18   Cross didn't want that to happen.

19         There may be no documents about this, but the

20   thought is if there are discussions with Blue Cross

21   about what they were going to pay at Bristol, we think

22   those discussions may relate to the transaction

23   involving Steward.

24         THE COURT:  Okay.  And what's the basis for

25   that?  Is there any factual premise for that?

1          MR. LEVINSTEIN:  Just that those two

2     transactions were linked in the documents; whether they

3     were going to be able to successfully get that

4     Certificate of Need, and open that facility in Bristol,

5     was tied.  That's the basis for that.  It's the same

6     time; it's contemporaneous; it's a setting in which

7     they're talking to Blue Cross at the same time as

8     they're negotiating with us over whether they're going

9     to sell or buy the interest in SNERCC.

10          THE COURT:  All right.  Anything else you want

11     to add before I hear from Mr. Russo?

12          MR. LEVINSTEIN:  No, your Honor.  I think that's

13     it.

14          THE COURT:  Thank you.  Mr. Russo, sir.

15          MR. RUSSO:  Thank you, your Honor.

16          THE COURT:  You're welcome, sir.

17          MR. RUSSO:  Your Honor, if it please the Court,

18     I'd like to just provide a little context before going

19     into the individual document requests.

20          THE COURT:  Sure.

21          MR. RUSSO:  First of all, I think it's important

22     for the Court to focus on, my brother kept mentioning

23     he might buy the 38 percent.  The original Asset

24     Purchase Agreement that Steward entered into with the

25     Special Master for this particular transaction did, in

1  fact, indicate that they wanted to purchase the Special

2  Master's interest in SNERCC.

3      We then had some back and forth with the Special

4  Master on that issue, because we had a right of first

5  refusal under the operating agreement, and they chose

6  to amend their APA and make the contingency a purchase

7  of the entire membership of SNERCC.

8      So I don't have any say in how this will be

9  tried, but they withdrew and waived their, that

10  component of their agreement to buy the 38 percent.

11      So we're just talking about a contingency, which

12  we thought was strange at the time, asking the Special

13  Master to have to go out and acquire an asset the

14  Special Master didn't own.  So I think that's important

15  context.

16      Next, your Honor asked the question about the

17  issue of, allegedly, mismanagement and financial

18  information that was given, and my brother responded.

19      We've provided the documents in that.  There was

20  a whole procedure before the Special Mastership Court,

21  Judge Silverstein, where he appointed an independent

22  examiner who collected all the financial information,

23  shared it with both sides, and there was a specific

24  finding that 21st Century had done nothing of the sort

25  of these allegations being made:  Did you steer

1    patients; did you suppress revenues; did you not share

2    profits.  That was all hashed out at that point in

3    time.  And the reason that was done, your Honor, and I

4    think it's very clear, is the Special Master and

5    Steward were trying to pressure 21st Century to sell

6    the 62 percent that you heard about.  So those

7    allegations were made at that time.

8         The next piece of context I'd like to provide

9    for your Honor is a question that you asked twice and

10   my brother answered, and that is when it goes to

11   relevance, because that was our overriding objection to

12   each of these things, even though we've tried under

13   Rule 37 to provide some documents, and I'll go through

14   that in a moment.

15        But one of the things that we took the position

16   is, there is no relevance with regard to 21st Century,

17   because you've made allegations in this case.  You

18   heard my brother say it; he wants to know if there was

19   a connection between Blue Cross/Blue Shield and

20   21st Century not selling their 62 percent to the

21   Special Master so that he could pass it on to Steward.

22        I would, I don't know what's happened in this

23   case, but I would bet there's probably been some

24   documents produced by Blue Cross/Blue Shield in this

25   case.  And the question you asked specifically were do

1    you have any facts to base a statement that there might

2    be some connection that Blue Cross/Blue Shield said

3    don't sell them the 62 percent, we don't want them

4    here.

5         I'll represent to the Court, and I represented

6    to my brother in the Rule 37 exchanges that we had,

7    there are no such documents because there were no such

8    communications.  None of that ever happened.  So based

9    on relevance, none of this should be produced.

10        So with that context, I just wanted to go

11   through --

12        THE COURT:  Well, isn't the way that that would

13   normally be handled is either, if you tender an

14   objection you can accompany that objection with, And,

15   by the way, there are no responsive documents.

16        MR. RUSSO:  I did that, your Honor.  I did that.

17        THE COURT:  All right.

18        MR. RUSSO:  So if we now go through the document

19   request, I think, your Honor, and my brother properly

20   characterized one through four.  We view those requests

21   as asking for the documents that were -- went back and

22   forth during the negotiations.

23        There were negotiations that took place where

24   there were discussions to sell the 62 percent to the

25   Special Master, and we provided all that.  And my

1    brother, in his papers --

2            THE COURT:  Provided it to them directly, or

3    it's been provided within some other proceeding and you

4    think they have it?

5            MR. RUSSO:  No, no.  I've provided it.  It's

6    part of what I gave them.  I gave them all the

7    documents that went back and forth relative to

8    negotiations between the Special Master --

9            THE COURT:  Okay.

10           MR. RUSSO:  -- and 21st Century.  And what they

11   say at Page 5 of their objection is, well, we want

12   those documents to see what was the, what were the

13   rationale behind those negotiations, what were those

14   negotiations.

15           And I'll represent to the Court that there are a

16   series of documents that begin in May of 2012 and go

17   through June of 2012 which make it absolutely clear

18   that the rationale from 21st Century was we will sell

19   you the 62 percent, Mr. Special Master, but it has to

20   be for a price that would enable us to acquire another

21   facility so that we can continue to have a statewide

22   network.  And that's where we came up with the price,

23   and we came up with a price of 12 million.

24           The Special Master, through Steward, came back

25   to us at 8.5 million, and we worked over the course of

1    two months to try to narrow that, and, in fact, at one

2    point got it very, very, very close.

3            So it wasn't a situation of Blue Cross/Blue

4    Shield saying, like Darrelle Revis, No, no, no, not

5    here.  It was a situation which they didn't want to

6    spend the money.

7            They have all the financial information.  What

8    my brother said with regard to five and six of the

9    document request is, We only got for a couple of

10   months.

11           Well, we've received a letter, which I've

12   produced, from the Special Master, dated October of

13   2011, which outlined exactly what the Special Master

14   wanted to see.  It's October 28, 2011.  It's in the

15   stuff that we produced.  And this was a request that

16   was designed by Steward's then CFO, that they wanted to

17   sample various months so that they could tell what this

18   facility was capable of producing by way of revenues.

19           Now, let's get further into the weeds on five

20   and six.  It doesn't matter, our financial information

21   really doesn't matter, because we're a stand-alone

22   facility, which means we get different reimbursement

23   rates from the payers.  As soon as Steward would buy

24   it, it would become part of a hospital, so they would

25   be reimbursed on hospital rates.  So again, none of

1   this would be relevant.

2          And, in fact, as directed by Judge Silverstein,

3   he sat with Steward's CFO, our CFO, in a meeting at

4   Landmark Hospital and went through all this, and they

5   acknowledged, oh, yes, we would get reimbursed

6   differently because we're going to be a hospital-based

7   facility; this really doesn't apply.

8          So when my brother says they never got the payer

9   contracts, what Judge Silverstein did is said, all

10  right, I'm not going to require the payer contracts to

11  be produced because some of that may be subject to

12  confidentiality on other facilities, but give them the

13  reimbursement rates and show that in the financials,

14  which we gave them.

15         And they know full well that we got the same

16  reimbursement rates at all the facilities.  This is

17  like revisionist history of the third time we've been

18  through this with Steward, because they also objected

19  to every step we took at Bristol.  So none of this is

20  new.

21         So our position on one through four is that the

22  only thing that's relevant were the negotiations

23  between the Special Master and 21st Century relative to

24  the 62 percent, because that's what you amended your

25  APA to acquire.  And if there were any communications

1   between Blue Cross and 21st Century, that would have

2   been the transaction; not some supposed transaction for

3   38 percent or some supposed partnership that -- my

4   brother outlined three potential options. I don't know

5   what he's talking about. There was only one potential

6   option in their APA, and that was to purchase the

7   62 percent. So we've given all the documents relative

8   to those negotiations.

9         Now, when we went to the financials, we've given

10  you financial information that shows what that facility

11  was capable of generating for revenue based on patient

12  visits at that time. What the facility did three years

13  later, after we took it over and ran it for three years

14  after, has no relevance whatsoever to what it might

15  have been worth to them. I have no idea what they

16  would do with the facility, and they wouldn't even be

17  reimbursed in the same rates.

18        Then, with regard to document requests seven

19  through 12, I view, I view seven, eight, and nine

20  really going to our reimbursement rate system as a

21  stand-alone facility, which was uniform across all of

22  our facilities, and I see it having nothing to do

23  whatsoever with what Steward might tell a trier of fact

24  in this case as to what profit they may have made from

25  the facility, had they purchased it. It would be a

1    completely different reimbursement rate structure.  It

2    would be a hospital-based facility.

3         Then, Number 10, when I responded, I told my

4    brother in that response, although we objected, there

5    are no documents that show any efforts to redirect

6    patients.

7         In the documents that I did produce, that same

8    allegation was made during the Special Mastership, and

9    there were three patients that they pointed out, after

10   going through all the records, and we provided them the

11   explanations as to why those patients had to go to

12   different facilities.  And that's all in what I

13   produced, and that's probably why the independent

14   examiner found that their allegations were completely

15   and totally baseless at that time.  And they're

16   baseless again.

17        Number 11, 12 and -- Number 11 and 12 go to some

18   allegations that, I don't know what it has to do with

19   this case, that somehow we may have breached our duties

20   by keeping management fees or breach of fiduciary

21   obligations to our then partner.  That has nothing to

22   do with this case.  And again, that was found to be

23   completely and totally baseless in the Special

24   Mastership, and I produced the documents to my brother,

25   which demonstrate that.

1          And then finally, Number 13, negotiations with

2     Blue Cross/Blue Shield in Bristol.  Again, Bristol has

3     nothing whatsoever to do with Landmark.  I just don't

4     see any relevance whatsoever.  And I don't, I mean I

5     can check with --

6          THE COURT:  When he said that getting, that the

7     sale was made contingent on getting approval to open in

8     Bristol, is that accurate?

9          MR. RUSSO:  When I exchanged my negotiations

10    with the Special Master in May, we said that a closing,

11    a closing would not take place until we received the

12    CON in Bristol.  That is accurate.  And I produced all

13    those documents.

14         But that's got nothing to do with what

15    reimbursement rates we might receive at Bristol, if it

16    ever got up and running.  It's not even built.  We're

17    there still in the Supreme Court, battling us on a

18    petition for writ of certiorari.

19         So I don't know what discussions we would have

20    had with Blue Cross about a facility that hasn't even

21    been built yet.

22         THE COURT:  All right.  Anything further,

23    Mr. Russo?

24         MR. RUSSO:  No, your Honor.

25         THE COURT:  Does Blue Cross wish to be heard?

1        MS. ROCHA:  No, your Honor.  I'm just an

2    interested observer.

3        THE COURT:  That's what I thought.

4        MS. ROCHA:  But I would echo Mr. Russo's

5    comments on the lack of relevance.

6        THE COURT:  All right.  Anything you want to

7    reply to briefly?

8        MR. LEVINSTEIN:  Yes, your Honor.  They haven't

9    searched.  We tried to have a meet-and-confer.  We've

10    heard, No responsive documents.  They didn't say, We'll

11    look; we'll conduct a search, and we'll tell you.  They

12    said, We're not going to look; we'll give you what's

13    public.  There's been no search whatsoever of any

14    document that was not exchanged publically with

15    Steward.

16        That's not how discovery works.  We don't have

17    to take what they said in their filings to the Special

18    Master.  We have a right to see what their documents

19    show.

20        No internal documents whatsoever, not a single

21    internal e-mail, not a single internal document, not a

22    single document, and not even confirmation they've

23    produced every document they exchanged with third

24    parties; only the ones that were given to the Special

25    Master.  So that's one.

1          Second, just by -- if a hospital owns a hundred

2     percent, it does not become hospital rates.  A hospital

3     wants to convert something -- that's one of the issues

4     at Saint Anne's.  I'm no expert on health care law, but

5     you don't get higher rates just because the hospital

6     buys the best of the interest, unless you change the

7     facility.  If you change the facility to meet hospital

8     standards, then an ambulatory surgery center can become

9     a hospital.  But a separate cancer center doesn't

10    automatically change rates because it becomes a

11    hospital.

12          And I think if you look at the documents he

13    submitted, he told you that the Special Master decided

14    that payer contracts didn't have to be produced.

15    That's just not true.  I mean, I wasn't there, he was,

16    but the Exhibit B to his pleading shows a letter to

17    Mr. Russo asking for certain things that was subject to

18    the motion to compel.

19          Item number four on the second set of items,

20    under additional data requested, is copies of all payer

21    contracts.

22          Then the order that he submitted as an Exhibit C

23    says that motion is granted.  So they were ordered to

24    give those payer contracts.

25          Now, this thought that we keep hearing that

1    Steward saw it all or whatever?  In fairness, I wasn't

2    there.  I don't know what someone might have looked at

3    in some setting.

4         They weren't given to us.  They were given to

5    the Special Master with strict restrictions.  Mr. Russo

6    required that they could look at them and who could

7    look at them, what was restricted.  It was all in the

8    context of Landmark and the Special Master getting

9    those documents.

10        We don't have them, and this idea that there was

11   some proceeding that decided all this; there's a

12   one-sentence consent agreement with the guy who was

13   hired to do the investigation, saying there are no

14   findings adverse to 21st Century.

15        I have no idea what he did.  I have no idea how

16   far that went.  It all was just dismissed by consent

17   because Steward was gone, so it didn't matter anymore.

18   And he relies this, that these have all been litigated

19   and solved.  Nothing was resolved in that Special

20   Master proceeding.  There was back and forth positions

21   taken all different ways.

22        He also says that the only possibility was that

23   Steward would have bought a hundred percent.  No.  That

24   was a condition that Steward could waive.  It was clear

25   they were going to buy the 38 percent, because that was

1    part of the Asset Purchase Agreement.  They, as part of

2    the deal, said, Special Master, you've got to go out

3    and buy that 62 percent, or we don't have to close; but

4    if you can't get it at a reasonable price, we can

5    either walk away or we can buy anyways.

6         And one of -- this is another thing.  One of

7    Blue Cross's arguments is these are the problems that

8    caused Steward not to buy Landmark; it was these

9    problems with buying SNERCC and other things.  That's

10   one of their defenses.

11        THE COURT:  Yes.

12        MR. LEVINSTEIN:  And our argument is, no, if he

13   worked that with Blue Cross, it would have been got

14   back to business and found some way to resolve this,

15   either keeping the 38 percent, agreeing to a sale, or

16   buying the rest of it.  And so, again, that's what this

17   case is about.

18        You know, I keep hearing, We've produced all

19   that.  If they say, We'll agree to conduct a search,

20   and produce responsive documents, that's fine.  But

21   what I hear is, We object, and we're not looking, and

22   we don't have any.

23        That's not how discovery works, in my

24   understanding.  They're supposed to go do a search, and

25   if there's a request, I mean, for example, Bristol;

1  they said there would be no documents with Blue Cross

2  because we haven't even finished the facility.  Fine.

3  They do a search, and they find there are no documents,

4  there are no documents.

5      But that's not what we've been told.  We've not

6  been told anybody is going to look.  We've not been

7  told there's going to be any search, and we know

8  there's been no search.  We've simply been told, We

9  object; because we say we're not going to find

10  anything, we don't have to look.  That's just not how

11  discovery works, so.

12      THE COURT:  All right.

13      MR. RUSSO:  Your Honor, may I, just for the

14  purpose of the record, it's attached to my objection as

15  exhibit, I think it's Exhibit A, a February 2nd, 2015,

16  response to the request where I indicate my objections,

17  and, notwithstanding the objections, I detail what I

18  produced.  We put it on a CD and produced it all and we

19  indicated where there were no documents.

20      THE COURT:  All right.  I'll take a look at it.

21  I'm going to take the matter under advisement and go

22  through this in more detail and get you a ruling as

23  soon as possible.  Thank you for your arguments.

24      Court will be in recess.

25      (ADJOURNED)

C E R T I F I C A T I O N

      I, Denise P. Veitch, RPR, do hereby certify that the foregoing pages are a true and accurate transcription of the electronic recording in the above-entitled case.


/s/ Denise P. Veitch

_____

Denise P. Veitch, RPR




March 20, 2015

_____

Date