```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF RHODE ISLAND
 2

 3

 4    * * * * * * * * * * * * * CIVIL ACTION
                              * 13-405S
 5    STEWARD HEALTH CARE      *
      SYSTEM, LLC, et al       *
 6                             *
      VS.                      * JUNE 30, 2016
 7                             *
      BLUE CROSS & BLUE SHIELD *
 8    OF RHODE ISLAND          *
                              *
 9    * * * * * * * * * * * * * PROVIDENCE, RI

10

11
                 BEFORE THE HONORABLE LINCOLN D. ALMOND
12
                        MAGISTRATE JUDGE
13
                       (MOTIONS HEARING)
14

15    APPEARANCES:

16    FOR THE PLAINTIFF:        CHRISTOPHER N. DAWSON, ESQ.
                                Whelan, Corrente, Kinder &
17                              Siket
                                100 Westminster Street
18                              Suite 710
                                Providence, RI  02903
19
                                STEVEN R. KUNEY, ESQ.
20                              JAMES H. WEINGARTEN, ESQ.
                                Williams & Connolly
21                              725 Twelfth Street, NW
                                Washington, DC  20005
22

23    FOR THE DEFENDANT:        JOHN A. TARANTINO, ESQ.
                                LESLIE D. PARKER, ESQ.
24                              Adler Pollock & Sheehan
                                One Citizens Plaza, 8th Floor
25                              Providence, RI  02903
```

1                          JUSTIN BERNICK, ESQ.
                           Hogan Lovells
2                          555 Thirteenth Street NW
                           Washington, DC  20004
3

4   Court Reporter:        Denise P. Veitch, RPR
                           One Exchange Terrace
5                          Providence, RI  02903

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    30 JUNE 2016 -- 10:00 A.M.

2              THE COURT:  Good morning.  We're on the record

3    in the matter of Steward versus Blue Cross, Civil

4    Action 13-405S, before the Court today for a hearing on

5    Plaintiff's Motion to Compel, Document Number 102, and

6    Defendant's Motion to Compel, Document Number 111.

7              Can the attorneys participating in this hearing

8    identify themselves for the record, starting with

9    Plaintiff.

10             MR. DAWSON:  Thank you, your Honor, and good

11   morning.  Christopher Dawson from Whelan, Corrente,

12   Kinder and Siket on behalf of the Plaintiffs; and I'd

13   like to introduce to the Court from Williams & Connolly

14   in Washington, D.C., Steven Kuney --

15             MR. KUNEY:  Good morning, your Honor.

16             MR. DAWSON:  -- and James Weingarten.

17             MR. WEINGARTEN:  Good morning, your Honor.

18             THE COURT:  All right.  Who is going to argue

19   today?

20             MR. KUNEY:  I'm going to argue our motion, your

21   Honor, and Mr. Weingarten is going to take the lead on

22   defending the second motion.

23             THE COURT:  Okay.  All right.

24             For the Defendants today?

25             MR. TARANTINO:  Good morning, your Honor.  John

1    Tarantino for Blue Cross.  I will be arguing our

2    motion.

3         And with me, who I believe you've met before,

4    Justin Bernick will be arguing against the Plaintiff's

5    Motion to Compel.  And also with me is my colleague

6    Leslie Parker.  For a minute I was going to say Pat

7    Rocha.

8         THE COURT:  I knew it wasn't Pat.  I knew it was

9    Leslie.

10        All right.  I'd like you to try to summarize

11   your arguments as much as possible.  I think there were

12   well over a thousand pages of briefs and exhibits filed

13   with respect to these motions.

14        And just as a housekeeping matter, hopefully

15   there aren't going to be future disputes; but to the

16   extent there are, it's not helpful to the Court to get

17   post-briefing letters.  It just doesn't work well for

18   our system because everything goes into CM/ECF,

19   everybody knows what the record is, where to look.  If

20   I get letters that come in, if they don't make it to me

21   or they make it to me and they go into a different

22   pile, it's hard to keep everything together; so if you

23   could refrain from that in the future.

24        If you need to file anything beyond the initial

25   motion and memorandum opposition and reply, you can

1    file a motion for leave to file supplemental memoranda,

2    and that's generally granted unless it becomes abusive.

3    So just keep that in mind in the future.

4         Why don't we start out with argument on

5    Plaintiff's motion, which is Document Number 102.

6         MR. KUNEY:  Thank you, your Honor.  And again,

7    I'm Steve Kuney from Williams & Connolly arguing on

8    behalf of the Plaintiffs.

9         THE COURT:  Okay.

10        MR. KUNEY:  I'm going to certainly try to heed

11   your Honor's request that we summarize and synthesize.

12        THE COURT:  Well, you attached to your motion a

13   fairly detailed appendix that tried to summarize these

14   matters.

15        MR. KUNEY:  Yes.

16        THE COURT:  And then the defense sort of did a

17   blow-by-blow response to that in their opposition, so

18   it might be a good road map to use.

19        MR. KUNEY:  Well, let me tell you what I had in

20   mind, and you tell me if you think it would not be

21   helpful.

22        THE COURT:  Yes.  Sure.

23        MR. KUNEY:  Since at least as I read the papers

24   back and forth, a lot of the issue is whether we are or

25   aren't talking about what we have to prove with respect

1  to the conspiracy claims in the Amended Complaint.  I

2  mean, this is all battles about discovery that relates

3  to the Amended Complaint.

4         THE COURT:  Okay.

5         MR. KUNEY:  I thought I would spend just a

6  couple of minutes explaining --

7         THE COURT:  Sure.

8         MR. KUNEY:  -- what we believe we have to prove

9  and where to look in the Complaint to find what we're

10 talking about.

11        THE COURT:  Okay.

12        MR. KUNEY:  Then with respect to the particular

13 requests at issue, what I've tried to do is give the

14 Court my best understanding of what the gap is between

15 the two sides, because on most of them we've asked for

16 something and they've offered something less, --

17        THE COURT:  Yes.

18        MR. KUNEY:  -- and it seems to me what's at

19 issue is that delta, and so I'm going to try to horn in

20 on that to the extent that I can.

21        THE COURT:  Okay.

22        MR. KUNEY:  And I'll try to do it as accurately

23 as I can, but let me just, with your indulgence, take a

24 couple of minutes with the, sort of, what is this

25 Amended Complaint all about and what are we doing here.

1        You know, we started with a case that involved

2    monopolization, a section to the Sherman Act, and last

3    August we amended the Complaint to add two conspiracy

4    counts.  One is a conspiracy to monopolize; the other

5    is a conspiracy in restraint of trade, in violation of

6    Section 1 of the Sherman Act.

7        There's some overlap in what's necessary to

8    prove those with the original claims that we've

9    brought, but there's some distinctive features that

10   relate to those claims.  We have to prove the existence

11   of the conspiracy.  We have to prove the

12   anticompetitive effects that flow from the

13   conspiracies, which may or may not be identical to the

14   anticompetitive effects that flowed from the unilateral

15   conduct we'd alleged in the original Complaint.

16       We also have to show antitrust injury and

17   damages, but I don't think those elements have much to

18   do with the discovery disputes this morning.  I think

19   it's really about the first two.  It's what do we have

20   to -- what would we be doing at trial to prove the

21   conspiracy that we've alleged and to show the requisite

22   anticompetitive effects.

23       And it's no secret to anybody that these days,

24   unless you're doing an antitrust case, which is a

25   follow on to a government and criminal investigation

1    where people have pled guilty, that conspiracies in

2    antitrust cases 95 plus percent of the time are going

3    to be proved by circumstantial evidence, and the courts

4    have spent a lot of time dealing with this.

5         We had this sort of anomaly of a circumstantial

6    proof case getting all the way to the Supreme Court,

7    that happens from time to time, but it typically

8    involves our showing -- our being obliged to show

9    motivations for the conspirators, and the technical

10   legal phrase is conduct that excludes independent

11   action, which usually means some pattern of

12   conspiratorial communications and some conduct that

13   would not be sensible if the parties were not acting

14   pursuant to an unlawful agreement.

15        In this case the motive discussion about the

16   parties is set forth at some length in the Amended

17   Complaint at paragraphs 33 to 37, that the parties all

18   thought they would be, they would be more successful in

19   achieving their anticompetitive purposes if they worked

20   together, that there was some political concern about

21   not wanting to be perceived as the party that was

22   responsible for causing Landmark to fail, and that each

23   had a separate motivation, a separate kind of

24   competition that they were worried about that Steward's

25   entry was a threat to.

1    For Blue Cross's side it was eventually a threat

2    to their insurance monopoly in one of two ways:  Either

3    that Steward would be a vehicle for some other

4    insurance company to come into Rhode Island, or through

5    this beast that you saw discussed a lot in the

6    briefing, the accountable care organization, where

7    especially what happens is providers, the hospitals and

8    doctors take typically some -- at least in Steward's

9    model -- some sort of flat fee, rather than being paid

10   by service, and then it's their job to take care of the

11   patients who are being covered by the policy consistent

12   with the capitation amount that they've been given; so

13   the providers, the hospitals and the doctors, are

14   assuming some of the risk of how sick the patients get,

15   which is a risk historically borne by the insurance

16   companies.  So it really involves the doctors and the

17   hospitals becoming a bit of an insurer in the financial

18   sense, not in the technical regulatory sense.

19        I don't know whether they're present up here,

20   but the kind of Kaiser Permanente organization is one

21   of the first ones nationwide that's sort of been big on

22   this; and radio commercials where I live, they come on

23   and say we've cut out the middleman or the doctor and

24   the insurance company; and that's very much what's

25   going on.

1          And what you can see in some of the exhibits

2     that we've attached is that that was precisely the

3     concern that Blue Cross had, was that this accountable

4     care organization was going to render the traditional

5     insurance company less relevant, less significant in

6     the marketplace, less powerful.

7          So paragraphs 33 to 37 set forth the motivations

8     of the conspirators:  Blue Cross's, Lifespan's,

9     Thundermist's.

10          Paragraph 76 -- and I have to apologize for

11     this; I don't know how this happened, but in our brief

12     we repeatedly called it paragraph 77.  It's not; it's

13     76.  It's where we set forth the anticompetitive

14     effects that we're going to have to prove from the

15     conduct.  And some of them are specific to Steward

16     which, again, excluding Steward from competing in the

17     relevant markets, forcing consumers who wanted to use

18     Steward hospitals to use somebody else.  But some of

19     them are not, because particularly in a Section 1 claim

20     we're obliged not just to prove that we were hurt, but

21     we're obliged to prove that competition in the market

22     in general was hurt and that as a result consumers were

23     hurt.

24          So what you see in paragraph 76 is an

25     enumeration of anticompetitive effects that includes

1     not just keeping Steward out, but limit -- preventing

2     the introduction of lower cost insurance products in

3     Rhode Island, preventing new competition for Blue Cross

4     through the entry of other insurers, increasing the

5     cost of health care, limiting the competition that

6     Lifespan will face from community hospitals, preventing

7     the revitalization of community hospitals; points that

8     go to what will be our burden to show that not just

9     Steward was harmed by the conduct that we've alleged,

10    but the competition was hurt.

11         And that same theme can be found in paragraphs

12    105 and 135 of the Amended Complaint where some might

13    say happily there's a slightly shorter version of the

14    anticompetitive consequences.

15         Those are the two counts under Section 1, and

16    what they say in a kind of summary form is competition

17    was hurt by keeping Steward out, by preventing Steward

18    from facilitating new entry by other insurance

19    companies and by preventing new risk-sharing

20    arrangements between providers and insurers that would

21    have brought new competition to Rhode Island.  And that

22    new risk-sharing arrangement is that accountable care

23    organization that is both a feature of the brief and

24    one of the topics that's sort of in front of us this

25    morning.

1      So we will have to persuade the fact finder that

2  we have appropriately shown the motivation of the

3  conspirators, that we have shown conduct that excludes

4  independent action because of the degree and nature of

5  their communications and because they're doing things

6  that wouldn't make sense if they were acting alone, and

7  let me just pause on that last one for a minute.

8      That was a big issue in the Judge Smith's

9  opinion on the motion to dismiss, whether Blue Cross

10 had foregone profits for the benefit of keeping Steward

11 out of the market.  If anything, it's even more of an

12 issue here and it appears in the Amended Complaint

13 really in two different places.

14     In paragraph 52 there's a discussion of the

15 money that Blue Cross knew it would lose when it took

16 Landmark out of network and how the dollars that that

17 would lose, expected to lose from taking Landmark out

18 of network, because people would go to places that cost

19 more, and because they would be obliged to pay full

20 rates for people going to a non-network hospital, that

21 that was actually, that extra money it was going to

22 cost them to throw Landmark out of the network was

23 greater than the differential between their contract

24 proposal and Steward's contract proposal.

25     In other words they could have more cheaply met

1    what Steward was asking for than they could have borne

2    the cost of kicking Landmark out as a way of helping to

3    keep Steward out of the marketplace.

4          There's likewise a similar discussion in

5    paragraph 62 about St. Anne's.  St. Anne's, seems to be

6    some question what's St. Anne's got to do with this

7    case; they're not even in Rhode Island.

8          What St. Anne's involvement in the case has to

9    do with is when they're taking care of people who are

10   from Rhode Island, not when they're -- from our

11   perspective, that's our view, that St. Anne's and other

12   border hospitals matter because Rhode Islanders seek

13   care there.  Excuse me.

14         What's happened is that Blue Cross over the

15   years has had contracts with some of these bordering

16   hospitals in the state of Massachusetts precisely

17   because a lot of their subscribers go there.  They've

18   decided to terminate Steward's contract at St. Anne's

19   and instead have their people use St. Anne's under

20   something called the BlueCard Program, which is a

21   program that many of the Blues around the country

22   cooperate in nationwide.  If you're a Blue Cross

23   subscriber in Rhode Island and you're traveling in

24   California and something happens and you need to go to

25   a hospital you can -- there's a lot of hospitals you

1   can attend and you're covered just like you're at home

2   under the BlueCard.

3        Blue Cross has to pay a fee to Massachusetts

4   hospitals to use the BlueCard card, so the subscriber,

5   the ordinary charge is the normal charge for the

6   Massachusetts hospital; so the cost of Blue Cross, if

7   Rhode Islanders who have been going to St. Anne's start

8   going there under the BlueCard Program, it's the

9   Massachusetts rate plus this administrative fee that

10  they have to pay in order to participate as BlueCard.

11       Steward offered to continue the contract for

12  just the Massachusetts rate and save Blue Cross the

13  administrative fee, and they said no.

14       So that's described in paragraph 62 as another

15  example of people doing things that wouldn't be

16  sensible if they were just acting on their own for

17  normal business reasons.

18       We believe, and we think the jury will infer,

19  that they were doing it because of some combination of

20  exclusionary conduct on Blue Cross's own part and

21  conspiratorial conduct with the other parties involved.

22       Now, there's one more level of this, people

23  behaving in a way that wouldn't make sense in

24  competitive markets.  What is going on in a big picture

25  sense between Blue Cross and Lifespan is that they're

1   helping each other become more dominant in the

2   marketplace.

3       The official claim we've brought is against Blue

4   Cross for conspiring to monopolize with others.  In the

5   typical situation a Lifespan, i.e., a hospital network

6   would want more insurance companies competing to buy

7   hospital services from them because the more insurance

8   companies that are trying to buy hospital services,

9   typically the better off they'll do.

10      So it's not a normal competitive motivation for

11  a hospital to want to be dealing with a monopoly

12  insurance company.  That's not how normal competitors

13  in competitive marketplaces behave.

14      Likewise, Blue Cross has throughout the case,

15  including in responding to our -- in their initial

16  motion to dismiss, been concerned about providers

17  having more market power.

18      There's allegations in the Complaint that when

19  Steward was going to come to Rhode Island, one of the

20  things that Steward was concerned about was a then

21  provision in the Hospital Conversion Act that would

22  have required a for-profit entity, upon buying a Rhode

23  Island Hospital, to wait three years before it could

24  get another one.  Because everybody knew Steward wanted

25  to build a network and not just buy one hospital,

1    Steward sought and succeeded in getting that

2    legislation changed.

3        Blue Cross appeared in opposing that legislation

4    and said if you do decide to let Steward or anyone buy

5    more than one hospital, they shouldn't be able to

6    negotiate together as a network.  Why?  Because they

7    have more market power that way and can drive up rates,

8    drive up reimbursement rates.  So typically Blue Cross,

9    acting in a competitive marketplace, would not want

10   Lifespan to be even more powerful as the dominant

11   provider than they already are.

12       But what's alleged in the Complaint is

13   essentially a *quid pro quo* at that level where the two

14   existing dominant firms agree to work together to keep

15   out new entrants who could disturb the present

16   monopolies that they have, monopoly and market power

17   that they have at their respective levels of the

18   marketplace.  And we have to show that.  That's part of

19   our burden.  We will show that.  And we'll show the

20   anticompetitive effects that I outlined before that

21   will follow from those.

22       So, okay; long windup.  What are we fighting

23   about this morning specifically?  And to maybe come

24   closer to your goal of summarizing, I've got the

25   disputed requests into three groups.

1    THE COURT:  Okay.

2    MR. KUNEY:  The first group is the first three,

3    which is requests 2, 4 and 5 from the fourth set of

4    requests, and these are requests that all relate to the

5    motive, to the conduct not being consistent with

6    unilateral self-interest, and to the anticompetitive

7    effects.

8    Request 4-2 we're seeking, Steward is seeking

9    documents that relate to communications, discussions,

10   plans between Blue Cross and Lifespan to get more

11   patients to Lifespan.  Again, ordinarily Blue Cross

12   wouldn't want Lifespan to become even more important in

13   the marketplace than it already is.

14   What I understand they've offered is to produce

15   documents that have to do with Lifespan getting more

16   patients just from Landmark, but not from anybody else.

17   Well, two of the anticompetitive effects alleged in the

18   Complaint that we will be obliged to prove at trial are

19   that the anticompetitive effects included limiting

20   competition between Lifespan and community hospitals,

21   not just Steward, and preventing the revitalization of

22   community hospitals, not just Steward.

23   So the delta between the ask and the demand is

24   whether they should be obliged to produce documents

25   that relate to their efforts to funnel patients to

1    Lifespan generally or more narrowly just from Landmark.

2    And our view is that not only is that broader

3    conspiracy relevant to motive -- and to help the jury

4    understand why are they doing these things -- why are

5    they engaged in this behavior that otherwise seems

6    nonsensical, but it's absolutely pertinent to our

7    burden to prove harm to competition and not just harm

8    to Steward.

9         If you -- and I'm not going to go through the

10   details unless you want, but you can look at Exhibit 11

11   attached to our motion and you'll see an example of the

12   general discussion about Blue Cross proposing things

13   that will help Lifespan thwart outsiders who might want

14   to come into the market.  It doesn't ever say Steward.

15   And as I read what they're proposing to offer, that

16   type of document would not be produced.

17        Now, obviously it's hard for me to describe to

18   you things that we haven't gotten, so what we are

19   looking at is documents that were produced, because

20   they were otherwise responsive, that based on the

21   limitation they've proposed we would not get.  That's

22   4-2.  Okay.

23        And we believe, again, that it's not, shouldn't

24   be unduly burdensome because we don't think there's

25   massive numbers of communications between Blue Cross

1    and Lifespan about this effort to funnel more patients

2    to Lifespan, but that those requests should not be only

3    patients that were going to come from Landmark, because

4    we have to prove more than that, and we expect to prove

5    more than that, and those documents that we're seeking

6    will absolutely help us do that.

7            Request 4-4 is really about why do people go to

8    hospitals -- well, how much and why do people go to

9    hospitals outside of Rhode Island.  This gets back to

10   the St. Anne's issue and the border issue and the

11   market definition issue, candidly.

12           As I understand it, Blue Cross has offered to

13   produce documents sufficient to show how many people go

14   to hospitals outside and documents sufficient to show

15   efforts to bring them back.

16           The delta, if I understand it, is two-fold.

17   One, they don't want to give us any documents about why

18   people go to these other places.  We are --

19           THE COURT:  Explain to me why that's relevant.

20           MR. KUNEY:  Okay.

21           THE COURT:  I assume there's a lot of different

22   reasons.

23           MR. KUNEY:  I assume there are a lot of

24   different reasons, and the question is going to be,

25   well, which of the geographic market is Rhode Island.

1    And I'm just expecting one of the things we're going to

2    hear is, well, you guys know that Rhode Islanders go to

3    hospitals in Massachusetts.  And whether that makes --

4    whether that requires a different market definition

5    will depend not only on how many of them go, but what

6    the reasons are that they go.  Is it the nature of the

7    care?  Is it pricing?  What is it?

8         It also has to do with the fact that a

9    significant aspect of the collaboration to funnel more

10   patients to Lifespan involved repatriating people who

11   are currently going to Massachusetts.  Steward had the

12   misfortune to own two of those hospitals, so that

13   conduct, from our perspective, ended up being directed

14   directly at us.  But it's part of the motive for the

15   conspiracy and it's part of the debate about who is

16   going to have the right answer on what the market

17   should be to know not just how many people are going,

18   but why they're going to hospitals elsewhere.

19        If people are going to hospitals in Boston

20   because they offer treatment that's unavailable in

21   Rhode Island, that has very different implications for

22   market definition than if they're going to a hospital

23   in Boston because they think the quality is better,

24   they think it's cheaper, they like taking side trips to

25   Boston; in other words, if there's not a service

1    differential issue but there's, rather, some other kind

2    of normal competitive reason that may make those

3    Massachusetts hospitals properly part of the relevant

4    market.

5         So to defend the market definition and to prove

6    the market definition, we have to explain and account

7    for the people that are going to Massachusetts

8    hospitals.  And since they have a substantial number of

9    subscribers who go to hospitals, especially those

10   border hospitals in Massachusetts, it's important to

11   the proof of our case.

12        The last reason it's relevant, your Honor, is

13   one of the things that we've seen in their documents is

14   we need to keep Steward out of Rhode Island because

15   after all Steward is from Massachusetts and they're

16   going to send even more people back to Massachusetts.

17        Our view is understanding why those people are

18   going to Massachusetts and understanding how Steward

19   operates, you'd appreciate that that's ridiculous.  But

20   to rebut that anticipated accusation and anticipated

21   from their internal documents, we need, again, what

22   they actually know and believe and have analyzed.

23        THE COURT:  I understand your position.  Move on

24   to number 5.

25        MR. KUNEY:  Okay.  Number 5 is about the

1    accountable care organizations, and the debate is

2    whether they can limit it to just accountable care

3    organizations that mention a few particular entities:

4    Thundermist, Lifespan, Landmark, Steward.  Okay?

5         We've shown you, and this is -- I think the best

6    examples are Exhibits 23 and 20.  These are the

7    documents where Blue Cross explains what the problem is

8    with the accountable care organization.  It could make

9    the insurance company irrelevant.  One of the documents

10   make some reference to it as a substitute for the

11   insurance company.

12        Those documents, those particular documents that

13   we've attached don't have the name of any accountable

14   care organization in them.  They're talking about the

15   concept.  That's the concept of who Steward was.

16   Everyone knows Steward was an accountable care

17   organization.  That was the business that they were

18   proposing to bring to Rhode Island.

19        So would those documents that don't name Steward

20   be relevant because they explain the basis of their

21   antipathy to the very form of organization we had?

22   Absolutely they would.  Should they be excused from

23   producing them because they should look at all the ACO

24   documents and say, ah, that one says why we hate ACOs

25   but it doesn't mention Steward; we don't have to give

1    them that one?  I don't think so, your Honor.

2         And frankly it's not a massive document because

3    the time period that's relevant to the case, the

4    accountable care organization was a bit of a new beast.

5    It wasn't every piece of paper in anybody's

6    organization at all.  It was a newbie that was

7    generating a lot of interest and concern, and we

8    believe on Blue Cross's part a lot of anxiety.

9         So those are actually among the most significant

10   documents that we've seen to date, even though they

11   don't mention the entities that Blue Cross proposes in

12   their restriction.

13        Okay.  Second category.  This is happily, I'm

14   sure, most of the remaining requests.  Okay.  Most of

15   the remaining requests have to do with the fact that in

16   establishing anticompetitive effects we will have to

17   deal with the argument that their conduct, which they

18   will say was pro competitive, they're legitimate

19   business reasons that justified the conduct and

20   legitimate business reasons for not dealing with

21   Steward and legitimate business reasons for terminating

22   the St. Anne's contract.

23        In a variety of cases ambulatory surgery

24   centers -- that's request 5-1, that's request 1, the

25   fifth, said use of this BlueCard, that's 5-3, 5-6, the

1    OHIC regulations, that's 5-19 and 5-20, and I believe

2    the quality standards, which is 5-16 and 5-17.  When

3    you talk about the ambulatory surgery center, Saint

4    Anne's Hospital acquired an ambulatory surgery center,

5    which I guess to you and me would mean sort of it's an

6    outpatient stand-alone.  It's not a hospital; it's a

7    stand-alone outpatient surgery.  It's not uncommon that

8    when hospitals buy those, they go through the

9    regulatory process to, in effect, make what used to be

10   the surgery center now part of the hospital.  That has

11   reimbursement consequences because as a general matter

12   hospitals get paid more than stand-alone surgery

13   centers.

14        So part of the St. Anne's Blue Cross dispute was

15   about the financial consequences of St. Anne's

16   acquiring an ambulatory surgery center, converting it

17   to hospital space and as a result collecting higher

18   reimbursement rates.

19        We're not -- Saint Anne's Hospital is not the

20   only hospital within the time frame covered by the case

21   that has converted an ambulatory surgery center to

22   hospital space.  We know that from the documents that

23   we've received.

24        So we have asked for documents about those other

25   episodes.  Why?  Because when they come in and say of

1    course we're justified in terminating the St. Anne's

2    contract, look what they did to us; they converted this

3    ambulatory surgery center to hospital space and jacked

4    up the reimbursement rates.

5          When they argue that that's a legitimate

6    pro-competitive business justification for their

7    conduct, we want to show -- which we'll be able to when

8    we get the documents -- that in fact when other people

9    did that their reaction was completely different.

10         So the mere concern about the change in rates is

11   not the real motivation for the conduct.  The real

12   motivation for the conduct is the anticompetitive

13   animus directed at Steward.

14         Same thing with the BlueCard Program.  I

15   described a few minutes ago how part of what happened

16   with St. Anne's is they converted St. Anne's from

17   contract to BlueCard.  Okay.  We've asked, well, have

18   you thought about doing that for anybody else?  We

19   understand it's -- I think it's only about four or five

20   Massachusetts hospitals with which Blue Cross has a

21   contract, so we've asked for documents that relate to

22   consideration or actually moving those hospitals off a

23   contract and onto BlueCard to, quote, save money, the

24   same way they said they were doing at St. Anne's.

25         They want to only give documents about the

1    episode that involves St. Anne's.  That deprives us of

2    the documents that will show that St. Anne's was

3    treated differently than these other people, and that's

4    what we need to show, that it's not a legitimate

5    business justification at all but rather a pretext.

6           Same issue with respect to the OHIC regulations.

7    That's request number 19 and 20.  They're willing to

8    provide documents about the effect of the OHIC

9    regulations on the Landmark negotiations.  Well, the

10   question we're raising is whether that is a legitimate

11   justification or were you treating Steward/Landmark

12   differently with respect to the OHIC regulations?  So

13   provide the documents that show how and what was said

14   about how OHIC regulations affected your reimbursement

15   rate discussions with other people.

16          I think it's the same dispute about quality.

17   I'm not sure they agree.  We think that we had a lot of

18   debate about the formulation of the quality request.

19   What we're looking for, and we believe was asked for,

20   is how people are treated when they don't meet the

21   quality metrics that are in what has today become Blue

22   Cross's standard quality program.

23          Blue Cross submitted with their opposition an

24   affidavit saying that, well, you know, 2013 everybody

25   was on this standard program so we don't even know what

1   you're talking about.  Well, what we're talking about

2   is that the operative events that matter for our case

3   took place in 2010, '11 and '12, and we know from

4   documents that we've seen that everybody was not

5   participating in a standard quality program.

6       We know in fact that some of the people who were

7   getting paid the highest reimbursement rates were being

8   criticized in Blue Cross's internal documents for

9   having a miserable quality program.

10       So when they come in and say refusing to pay the

11   rates Steward wanted for Landmark was justified because

12   of their unwillingness to participate in the quality

13   program, we want to be able to say wait a minute, how

14   come you let them, them and them not participate in the

15   quality program or have a worse quality control program

16   while you were paying them more money?  So again, the

17   question is do they have to give documents that relate

18   to anybody but just them and us.

19       Okay.  That takes care of all but two, and these

20   I think can be quick.  Request 5-22 is about the Care

21   New England/Lifespan proposed merger.

22       What does that possibly have to do with the

23   case?  One of the most important issues in the case is

24   what does Blue Cross think about the acquisition of

25   provider market power.  They express concern about that

1    with respect to Steward's arrival, potential arrival in

2    Rhode Island.  They were concerned about the

3    acquisition of market power by Steward.

4          Well, the proposed Care New England/Lifespan

5    merger would have been the biggest jump in provider

6    market power ever in this marketplace.  So why do we

7    want to see documents that relate to that?  Because we

8    want to see how Blue Cross discussed their concern

9    about provider market power when the providers at issue

10   were Lifespan and Care New England, rather than

11   Steward.

12         We also want to see whether the market

13   definitions in issue in every merger, just like it is

14   here, we just want to see whether the position that

15   they're going to take in this case is consistent with

16   the position they've taken.  So it's the similarity of

17   issues and our right to test whether --

18         THE COURT:  You're losing me on this one.

19         MR. KUNEY:  Sure.  Okay.

20         THE COURT:  I'm having a hard time tying this

21   back, this one back to the allegations that you make in

22   the Amended Complaint.  It seems a little far afield.

23         MR. KUNEY:  Okay.  The way it ties into the

24   Amended Complaint is the position that we -- the

25   position that we anticipate being articulated, because

1    it's already been articulated, that they were concerned

2    about a Steward network in part because the Steward

3    network would take these previously-struggling

4    community hospitals that were working on their own,

5    build them together into a network so that they would

6    have more push-back, more negotiating leverage, more

7    market power as a provider of hospital services.  And

8    to them as an insurance company, that's a bad thing;

9    that they would be articulating what you sort of think

10   is the normal view of how insurance companies would not

11   necessarily want the providers to have more market

12   share, more negotiating leverage, et cetera.

13        What I said at the beginning is that what we

14   have alleged and will be proving here is that they

15   deviated that with respect to Lifespan in connection

16   with the conspiracy that we've described.

17        We also think they deviated with that from that

18   view in terms of the position that they took with

19   respect to the Care New England/Lifespan merger.

20        So it's kind of a candor test, if you will, your

21   Honor, of when you had a dramatic example of the

22   problem that you're citing as to why you're opposing

23   Steward; what did you say then when it wasn't Steward?

24   Rather, it was Lifespan and Care New England who

25   threatened you with a combination of market power on

1   the provider side way bigger than Steward could do in a

2   thousand years.  That's the connection.  There are

3   different facts, but it's the same issue and the same

4   justification, motivation, to be against Steward.

5        The last one, 5-31, I honestly don't even

6   understand why we have to be here about this.  There

7   are I think, conservatively, hundreds of PowerPoints

8   that have been produced, many of which are charts.

9   These are internal Blue Cross documents.  They are

10  charts that show rate comparisons among hospitals.

11  There are lots of different kinds; comparisons to

12  Medicare, comparisons to each other.  Typically what

13  happens is the chart reduces the rate comparison to a

14  single number.  It will say Landmark was paid

15  104 percent of Westerly, and then there will be these

16  little bar-grams.

17       We asked for the data and the software that was

18  used to compute those, because there's a thousand

19  different ways to take claim data about people and

20  dollars and translate them into a single digit

21  reflecting what reimbursement rates are.  It's the

22  documents that specify how hospitals are reimbursed by

23  insurance companies that look like this.  To turn that

24  into a single number, you're doing something.

25       They said, well, you know, do you need Excel?

1    Is there some kind of problem here?  And we said, no,

2    we don't need Excel.  What we need is the -- when you

3    actually have an Excel file open in front of you, the

4    way the person created it, you don't have to see the

5    numbers that land up in the columns; you see the little

6    formulas at the top that show how the numbers were

7    calculated.  So we said with respect to those

8    PowerPoints that you've already produced, we're

9    entitled to see the Excel file in its original format,

10   in its native format so that we can understand where

11   the numbers came from.

12        In fact, we produced our documents that way.  If

13   we produced a PowerPoint that was based on an Excel, we

14   provided the native version of the Excel file.

15        Their position is the Excel file has to be

16   independently captured by your discovery request.  And,

17   well, a lot of Excel files have primarily numbers, and

18   the way this process works is there's search requests

19   and then there's search terms, and then you look at

20   them and see if they're called for.  Well, search terms

21   are going to leave out most Excel files because they're

22   primarily numbers.

23        So we had a modest number because -- five, six

24   PowerPoints where we said we'd like to have the Excel

25   file that supports this, and they're:  Do you want us

1   to buy you a copy of Microsoft Office?  Which, between

2   you and me, I felt was a level of sarcasm that was a

3   little bit inappropriate for at least what we think is

4   kind of serious business here.

5        We don't want anybody to buy us Excel.  We want

6   to see the version of the Excel file that has the

7   formulas so we know where those numbers actually came

8   from because those numbers are, again, an important

9   part of their -- some of the legends on the charts say

10  things like Landmark's not being underpaid, and then

11  there's this bar graph that shows all these different

12  single digit figures for these hospitals.

13       So we don't understand why they haven't already

14  produced the backup -- it's kind of like producing a

15  family member in connection with e-mails -- so that we

16  can see where these things came from.

17       I'm at the bottom of the list of requests.

18       One other comment I guess I would make in

19  advance is that in Blue Cross's opposition they express

20  concern about our request for unspecified searches, and

21  I just wanted to take 30 seconds and go through how

22  this process is worked throughout the case.

23       Both sides served discovery requests.  The first

24  round of objecting and negotiating and meeting and

25  conferring is about the scope of the discovery request.

1          Once the discovery request is agreed upon, then

2     there's round two, which is discussion and meeting and

3     conferring about the search terms that will be used to

4     cull from the massive documents once expected to have a

5     chance to respond to the request.

6          Because we never reached agreement on the

7     request, of course we haven't specified the searches or

8     the search terms.  But it's not complicated.  To the

9     extent your Honor grants the Motion to Compel, we'll

10    serve them a set of proposed search terms for those

11    requests tomorrow.  That's not a big deal.

12         So the fact that they're unspecified is simply

13    the fact that we got the process truncated because they

14    sort of head this off at step one, and so we never had

15    that discussion about what search terms might be used.

16    So we don't have any aspiration, any aspiration to have

17    broad search terms used at this point of the case.

18         I think, as they know, and I think you may have

19    gathered from our discussion about the other issues

20    that have come up recently, we're not interested in

21    prolonging the scheduling here.  We know that we're

22    going to have to see Judge Smith soon about putting in

23    place a new schedule.  We want it to be as short as we

24    possibly can.

25         We don't think the issue here is that we're

1  looking for a vast volume of documents.  We think the

2  documents that we're looking for are terribly important

3  to the elements that we have to prove with respect to

4  the new claims that we introduced in the case through

5  the Amended Complaint.  It may be a hundred documents

6  total, it may be 150, but they're documents that

7  matter; and that's why we've basically troubled the

8  Court with this motion.

9         THE COURT:  All right.

10        MR. KUNEY:  Thanks, your Honor.

11        THE COURT:  I'll hear from Blue Cross.

12        MR. BERNICK:  Thank you, your Honor.

13        I think the first thing to note is that we agree

14  with Mr. Kuney on the high bar that would be necessary

15  for Steward to satisfy in this case to establish a

16  conspiracy, and we'd submit that's a bar that they will

17  be unable to meet, but that's a dispute for another

18  day.  That's not a dispute for today where the dispute

19  really relates to discovery motions and the gap, as

20  Mr. Kuney put it, between the parties' positions.

21        I will just note though in passing, given the

22  long preamble to Mr. Kuney's argument, that there's

23  nothing in the record that has been submitted that

24  establishes any, as Mr. Kuney put it, *quid pro quo*

25  related to Blue Cross, Lifespan or Thundermist that

1    shows any meeting of the minds between the parties in

2    trying to exclude Steward.  It just doesn't exist, and

3    that's because the conspiracy doesn't exist.  But

4    again, that's not the dispute for today.  The dispute

5    is over the gap.

6            The primary point, and I think I can cut most of

7    this short because it's becoming glaringly obvious to

8    me where the disconnect is.  It's almost as though

9    there's ships passing in the night.

10           Mr. Kuney is reading each of these requests in

11   isolation as though we haven't already agreed to

12   produce literally millions of pages of documents in

13   response to 167 other requests that Steward has served,

14   167 requests.

15           And just to give you some sense of what Blue

16   Cross has done in this case to date, because it has

17   expanded since the papers were filed, Blue Cross has

18   collected 35 million documents.  We've collected eight

19   terabytes of information.

20           To put that in comparison, the entire printed

21   works in the Library of Congress is often estimated to

22   be between 10 and 15 terabytes, and we've collected

23   eight terabytes.  That's about 600 million pages or

24   maybe 8,000 truckloads of documents.  Blue Cross has

25   produced 1.7 million pages, or 237,000 documents.  We

1    have reviewed documents for 25,000 hours.  That's

2    12 years of man-hours spent reviewing documents for

3    this case.  We've searched for 26 hundred search terms

4    and dozens of additional search terms since these

5    papers were filed, again, trying to find documents

6    responsive to those 167 requests.

7          And to cut to the chase, your Honor, the biggest

8    areas of disconnect appear to be, again, that it's

9    reading each one of these requests in isolation without

10   considering the other requests.

11         Blue Cross from the get-go, long before the

12   Amended Complaint was filed, agreed to produce

13   essentially all documents related to Steward, all,

14   across the board -- assuming they're not privileged --

15   all documents related to Landmark, assuming they're not

16   privileged; all documents related to negotiations or

17   discussions with business relationships of Rhode Island

18   hospitals, all, including Lifespan.  And they've gotten

19   thousands and thousands of these documents.  Every

20   single document from the files of the provider

21   contracting team related to discussions with these

22   hospitals they've received.

23         That covers the vast majority of the information

24   that Mr. Kuney came up here and described that they

25   need for their case.

1          In our view it's far broader than what would be

2     required to satisfy our obligation to produce documents

3     relevant to the claims or offenses in the case, but we

4     wanted to hopefully avoid the need to come in front of

5     the Court on these issues and agreed to produce all of

6     these documents.

7          Similar, with respect to Thundermist, another of

8     the other alleged co-conspirators, we've agreed to

9     produce all documents related to business relationships

10    regarding Thundermist.

11         So, your Honor, if you take those as a given,

12    that lurking in the background here is the fact that

13    we've agreed to produce literally hundreds of thousands

14    of pages of documents related to these issues, and

15    they're cherry-picking particular requests to say, oh,

16    we didn't agree to produce this; it's entirely subsumed

17    by other requests that we've agreed to produce

18    documents to.

19         What's really in dispute here is whether we

20    should go back and unwind what searches we've already

21    done, rerun new searches to hopefully find new and

22    cumulative information on some fishing expedition to

23    find nuances that fit into their conspiracy theory.

24    And that's where we have drawn the line, because our

25    original searches have just been so broad.

1    And I'll direct the Court's attention to the

2    papers that we submitted because I think it covers

3    those issues fairly well, unless there are requests

4    that we think cover these.

5    But I think it is worth taking a moment just to

6    focus on the categories that Mr. Kuney discusses

7    because I think I can maybe flag for the Court where

8    these documents come from and where we believe we've

9    produced the documents; and there essentially is no

10   gap, and we don't really understand why we're here

11   today.

12   First, though, I would split off a separate

13   category, and that's a category where we have no

14   documents, and we've submitted declarations to your

15   Honor explaining why we have no documents -- because

16   Steward didn't believe us when we told them and

17   persisted to bring the motion in any event -- and

18   that's related to the quality program and rate

19   comparisons.

20   We submitted a declaration from Mark Wagner, the

21   head of provider contracting, that attested that there

22   had been no hospitals that had failed or refused to

23   participate in the quality program.  Steward's requests

24   only relate to hospitals that failed or refused to

25   participate.

1    Mr. Kuney stood up here and is attempting to

2    rewrite the request to mean something different about

3    whether or not hospitals are treated different with

4    respect to the quality program.  But like I told your

5    Honor, Blue Cross is searching for every document

6    related to negotiations with hospitals and that

7    includes documents related to quality.

8    Specifically in response to these requests,

9    because we understood that Steward had it wrong, we

10   made an offer, a voluntary offer, even though it was

11   not covered by the request, to produce documents

12   showing the different quality metrics of the hospitals

13   and how the hospitals compared with those metrics.  And

14   we're standing by that commitment.  That provides a

15   full response to everything that Mr. Kuney stood up

16   here to request.

17   Similar with respect to rate comparisons, your

18   Honor, we're producing all of the spreadsheets in

19   native format, as Mr. Kuney requested.

20   I'm very confused here.  I think originally

21   Steward thought there must be some sort of fancy

22   computer algorithm or program that was used to generate

23   these comparisons, and unfortunately it's not; it's

24   Mr. Fragney (phonetic), who sits in his office with

25   Microsoft Excel and pulls data out of the claims data,

1    which we have produced in full.

2         Even though Steward has not produced their

3    claims data, Blue Cross has produced all of their

4    claims data.  And we've produced Mr. Fragney's

5    spreadsheets in native format so that all the values

6    and all the formulas can be revealed, as well as all

7    the PowerPoint presentations.

8         So at least for those buckets of information,

9    your Honor, there is nothing left to produce, and I see

10   no dispute.  Nothing more exists beyond what we've

11   agreed to produce that's responsive to the request.

12        Your Honor, taking the next couple of categories

13   here, I think the first category that Mr. Kuney covered

14   related to the conspiracy theories that he described

15   early on, requests 2, 4 and 5 in the fourth set of

16   requests for production.  Really those all are subsumed

17   within the categories of documents I was describing

18   earlier.  You know, Mr. Kuney said they wanted

19   communications with Lifespan about shifting patient

20   volume.  We're giving them all the documents in terms

21   of the discussions with Lifespan about business

22   arrangements.  They have all those documents.

23        They talked about wanting to know why patients

24   go elsewhere for care.  This one might require a little

25   bit more elaboration, your Honor, because again we've

1    agreed to produce all of our claims data, every single

2    health insurance claim for every single Blue Cross of

3    Rhode Island subscriber going back years that shows

4    where they're from, what ZIP Code, where they went,

5    whether it's Massachusetts or Rhode Island, why they

6    went there, the procedure that they received; and from

7    that information, the information that's used in these

8    antitrust cases to calculate market definition, they

9    will be able to draw whatever conclusions they want

10   about subscriber preferences for care.

11        But Blue Cross didn't stop there.  We agreed to

12   produce documents about hospital service areas in

13   response to other requests, subscriber demographics and

14   documents specifically talking about geographic market

15   definition.

16        In our view it's a fool's errand to try to go

17   and conduct some additional broader search beyond what

18   we've agreed to produce.  There's going to be far more

19   information than would be necessary to evaluate

20   geographic market definition or Steward's conspiracy

21   theories.

22        We also agreed to produce documents going to the

23   very specific issue about efforts to move patients from

24   Massachusetts to Rhode Island.  That seems to be the

25   crux of the issue.  We agreed to produce those

1    documents.  It's all very confusing.

2         In relation to ACOs, we specifically agreed to

3    conduct a search for ACOs related to Steward, Lifespan,

4    Thundermist and Landmark, the specific entities that

5    are involved and the conspirators that are involved.

6         But again, your Honor, we didn't stop there.  In

7    response to multiple requests, we agreed to produce

8    documents related to competition at large with insurers

9    and providers, including those insurers and providers

10   that might formulate ACOs.  The reason why Steward is

11   seeing these documents in the production to bring to

12   your attention is that they've been produced.  We're

13   producing all these documents relating to competition,

14   and we just don't understand why further or additional

15   burdensome searches are necessary, particularly given

16   that everyone seems inclined to move this along, given

17   the volume of documents we've produced so far.  So

18   that covers Mr. Kuney's first bucket, I would say.

19        The second bucket, which I think they call in

20   their papers pretext, essentially it comes down to

21   this.  Looking at whether or not Blue Cross is treating

22   other people differently than it's treating Steward, I

23   think, to summarize it very simply, that's what they're

24   looking for.

25        And we recognize that you could go on

1    ever-expanding circles to try to untangle various

2    situations where Blue Cross might have treated somebody

3    differently; and, you know, looking at documents

4    related to the merger strikes us as particularly far

5    afield in that regard.  But let's stick to where we

6    think we have agreed with that, those demands.

7         Again, with respect to ASCs, we're producing all

8    documents related to negotiations with hospitals or our

9    reimbursement rates.  The hospital is negotiating on

10   behalf of an ambulatory surgery center in the way that

11   Mr. Kuney described, that's all swept into those

12   documents, brought to bear.

13        But it's also worth noting that Steward itself

14   refused to produce documents about its own ASCs.

15   There's another -- and we briefed this and I'm not

16   going to drill down too far, but there's a clear double

17   standard permeating quite a few of these RFPs where

18   we've agreed to go far more broadly than Steward has.

19   They still demand more and demand specifically what

20   they have refused to produce to us.  They have a

21   business strategy with respect to ASCs going in, buying

22   the ambulatory surgery center, changing the wallpaper

23   and increasing the price by $12 million.

24        In our view that's a problem, and in Blue

25   Cross's view that's a good reason to start sending your

1    patients elsewhere, to protect consumers in Rhode

2    Island from high prices.

3         They've refused to produce documents discussing

4    how that strategy permeates their business model in

5    other ASCs and, you know, we think that's relevant to

6    the case.  But they want to see all of our documents

7    related to ASC negotiations.  Again, we've agreed to

8    offer those up to the extent they relate to the

9    hospital negotiations.

10        BlueCard is similar.  They came -- BlueCard was

11   a pretext.  You know, again, your Honor, we're

12   producing all documents related to negotiations with

13   hospitals found in Rhode Island.  We're also producing

14   all documents related to the BlueCard situation at

15   St. Anne's and Southern New England Surgery Center.

16        We're going further than that, your Honor.

17   We're producing all of the contracts for Massachusetts

18   hospitals.  We're producing all of the claims data,

19   whether the subscribers are treated in Rhode Island or

20   not.  So in other words they have all information to

21   evaluate exactly how much hospitals in Massachusetts

22   were being paid, whether there was a direct contract or

23   not and how that compares to Steward's rates.

24        Going on a wild goose chase for additional

25   e-mail related to negotiations with these Massachusetts


1   hospitals is just cumulative and unduly burdensome in

2   light of the fact that we've given them the information

3   necessary to evaluate that core issue as to whether or

4   not we're treating St. Anne's the same as other

5   hospitals in Massachusetts.

6          But even beyond that, your Honor, we have

7   offered, in response to another RFP that Mr. Kuney

8   ignores, to produce documents discussing switching a

9   hospital from a direct contract to BlueCard.  We've

10  already agreed to produce that.  That seems to be the

11  core of the issue.  But they've ignored it and instead

12  cherry-pick this particular RFP, where we don't believe

13  that we need to conduct a broader or more fulsome

14  search.

15         Finally with respect to OHIC regulations, your

16  Honor, they're regulations that cap the amount of

17  reimbursement rate increases that Blue Cross can

18  provide to hospitals at the consumer price index plus a

19  percentage ranging up to one percent.  It's a binding

20  regulation on Blue Cross.  There's some ability to

21  increase that reimbursement for quality performance

22  measures; but again Steward refused to tie any of the

23  reimbursement rates to quality metrics, and so Blue

24  Cross was constrained by these OHIC guidelines.

25         It's absolutely true that Blue Cross was bumping

1    up against those guidelines, Steward was demanding

2    more, and Blue Cross just couldn't do it; it's bound by

3    these regulations.

4         So we agree that it's a relevant issue, but

5    again, your Honor, we're producing all of the documents

6    related to hospital negotiations of other Rhode Island

7    hospitals.

8         To the extent OHIC regulations are an issue for

9    those other hospitals, they're going to be produced.

10   It's a wide goose chase to add new search terms to try

11   to find other things with OHIC regulations when we've

12   already agreed to search for documents that subsume the

13   category at issue.

14        And then I guess finally, your Honor, and I

15   saved this one for last because I think you indicated

16   that this was a difficult pill to swallow as well with

17   the Care New England-Lifespan merger.

18        If we extend discovery to the Care New

19   England-Lifespan merger, we could essentially come up

20   with any creative theory to tie any event in the health

21   care market in Rhode Island to this case.

22        There's no allegations in the Complaint about

23   this merger.  There's no allegations that Steward had

24   anything to do with this merger.

25        We understand Mr. Kuney's point that Blue

1    Cross's position with respect to market definition and

2    market power and competition and negotiations with

3    providers are relevant to the case.  That's why we've

4    agreed to produce those documents.

5         But to go one step further and require us to

6    produce all documents, all documents related to the

7    merger regardless of whether they have to do with those

8    issues is beyond the pale, your Honor.

9         We've agreed to produce documents related to

10   market definition, market power issues, competition

11   from hospitals, negotiations from hospitals.  We're not

12   going to be withholding those documents to the extent

13   they deal with the merger.  In fact, many of those

14   documents have been produced.

15        What we're saying here is we see no reason for

16   an additional wild goose chase into an event that had

17   nothing to do with the fact pattern in this case to try

18   to untangle other information beyond what Mr. Kuney

19   identified to the issues in the case.

20        So, your Honor, I think hopefully I've gone

21   through this quickly and given you a sense of where we

22   are.

23        Again, the fundamental gap here appears to be

24   that they're reading each one of these requests as

25   though it somehow limits our prior production, that we

1    haven't already agreed to produce literally hundreds of

2    thousands of pages of documents in response to these

3    other requests that cover precisely these issues that

4    they're discussing.

5         We believe that we have produced all the

6    documents relevant to the claims in this case or agreed

7    to produce all of those documents, and this has been a

8    massive, massive discovery undertaking.  We don't

9    believe that we should reopen it on the basis of issues

10   that Mr. Kuney has identified, particularly given that

11   we're all covered by what we've already produced.

12            THE COURT:  All right.  Thank you, sir.

13            MR. KUNEY:  Two minutes, your Honor.

14            THE COURT:  Two minutes, no more.

15            MR. KUNEY:  We do have a disconnect, your Honor.

16        When we got discovery requests served on us that

17   we thought we had already responded to, we said that.

18   Just take the Mr. Fragney example that Mr. Bernick

19   talked about.  He said, gee, we've already given them

20   those spreadsheets.

21        That's not what their opposition or their

22   response said.  Their response said we'll only give you

23   the spreadsheet if it's independently requested.  If

24   those spreadsheets that we've asked about were already

25   in the production, I assume they would have done what

1    we did, which is written a letter saying here's the

2    Bates number, look them up, the documents are already

3    in there.

4         Second and last point.  There's a difference

5    between documents that are negotiation documents and

6    analytical documents at Blue Cross about the issues

7    that might arise in those negotiations.

8         Their definition of what's a negotiation

9    document, so take the ASC example, well, we've given

10   them negotiations with hospitals that acquired ASCs.

11   Whether there's going to be discussion in the

12   negotiations about the acquisition about the treatment

13   of the ASC, who knows; we should go find that.  We

14   said, well, these are discrete events.  There aren't

15   that many of them.  It's not a wild goose chase, nor is

16   it a massive task to find them, so that we can both

17   tell readily, easily, obviously, whether the Steward

18   acquisition of an ASC was treated differently.

19        The pretext argument is a real one.  It's easily

20   dealt with.  If the answer was we've already given you

21   all that stuff, that could have been their answer.

22   Instead what their answer has been is we're only going

23   to tell you about Steward, whether it's OHIC, ASC,

24   whether it's the quality issue, we're just going to

25   tell you about Steward, Landmark, St. Anne's; not,

1      don't worry, it's already in there.

2            It's not a wild goose chase, your Honor.  It's a

3      targeted addition to the document production to date to

4      cover things that are new allegations and new

5      requirements of proof that roll out of the Amended

6      Complaint.  That's all we're seeking.

7            It's interesting to me to hear it called

8      cherry-picking, because we made an effort to limit the

9      number of requests on which we filed our motion this

10     morning.  It's not cherry-picking.  It's finding the

11     ones that we thought were sufficiently important to our

12     proof requirements to burden the Court with bringing a

13     motion this morning.

14           Thank you, your Honor.

15           THE COURT:  Thank you, sir.

16           Let's move on to Blue Cross's motion.  That's

17     Document Number 111.

18           Mr. Tarantino.

19           MR. TARANTINO:  Thank you, your Honor.  With the

20     Court's permission what I'd like to do to try to narrow

21     and focus the argument is, with the exception of what I

22     may say at the very end, everything that we're talking

23     about, this really has to do with two issues.  One is

24     the common interest privilege --

25           THE COURT:  Yes.

1          MR. TARANTINO:  -- and that's what I want to

2     spend the time arguing about.  That's sort of the

3     substantive legal issue.

4          And the other has to do with whether Steward's

5     responses to various categories of discovery requests,

6     and they're listed, 7 through 13, 23, 25 through 27,

7     and 38 of the first set of requests for production of

8     documents, and then requests 2 and 4, whether those

9     have been adequately responded to.

10          I'm not going to spend time repeating the

11     arguments that we've put in the papers, because I think

12     we've done a good job explaining why we believe that it

13     is implausible, based on the responses that those

14     documents don't exist, based on other documents we

15     have, responses to requests for admissions and the

16     like.  But we've already argued that.

17          THE COURT:  Yes.

18          MR. TARANTINO:  What I would like the Court to

19     do is to focus on not only what we say in those

20     arguments, but we have said if in fact you don't have

21     these documents, they don't exist; no matter how

22     implausible it seems to us that they don't, then give

23     us the kind of certification that Mr. Wagner gave.

24     Give us a certification and a declaration so that it

25     can be used to the extent relevant and appropriate in

1    the case.

2            So I don't want to burden the Court further on

3    those issues.  You can read them.  You already have.

4            THE COURT:  I have, yes.

5            MR. TARANTINO:  But I do want to focus on the

6    legal issue here, which I think is a very important

7    issue.

8            And I also heard the Court about the

9    post-briefing letters, but I want to focus on something

10   that is there because I think it's important to

11   understand, again in our view, why there cannot be a

12   common interest between Steward and the Special Master

13   in this case.

14           Let me talk about masterships and receiverships.

15   I'm not a bankruptcy lawyer or a mastership or

16   receivership attorney, but the nature of my practice is

17   I have litigated and had to litigate many matters,

18   adversary proceedings in those three types of courts,

19   including having to litigate an adversary proceeding

20   with respect to the Special Master and Blue Cross

21   before Judge Silverstein.  So I was involved.  I was

22   not Blue Cross's principal counsel in that case, but I

23   was involved.  I was Blue Cross's litigation adversary

24   proceeding counsel in that case for the case that

25   ultimately was dismissed brought by the Special Master.

1   But the letter, the letters focus immediate on this

2   issue.

3          One thing that a Special Master, a receiver --

4   they're principally the same thing -- but one thing

5   that he or she has to do based on the role that he or

6   she plays, is they have to ask the court for

7   instruction and direction; and if they want to do

8   something because they're acting as a fiduciary for the

9   benefit of the estate and for the benefit of the

10  creditors of the estate, if they want to do something

11  beyond the ordinary, beyond what has been set forth in

12  the order appointing them as a receiver, they have to

13  ask the court for instructions.  They can make a

14  recommendation to the court of how they would like to

15  act, but they have to ask the court for instructions

16  and permission.  And we know that happened here because

17  there are documents, there are written agreements

18  between Steward and the Special Master.

19         Each time Steward wanted to do something beyond

20  what was granted -- I'm sorry -- the Special Master

21  wanted to do something with Steward or vice versa that

22  was going to go beyond the generalized order of what

23  the Special Master could do, they had to go to Judge

24  Silverstein and ask permission to do so.

25         For example, they wanted to enter into an

1    agreement for advisory services.  This is at WW,

2    Exhibit WW to our Motion to Compel.  And in order to

3    enter into that agreement, they had to ask for Judge

4    Silverstein's approval to do so, and there's a docket

5    entry where this happens and it gets approved.  And

6    that agreement says, among other things, it says that

7    these parties are to be treated as independent

8    contractors of each other.  And it says the Special

9    Master and Steward -- Steward is defined as the company

10   in the document -- specifically disclaim any fiduciary

11   or confidential relationship between them, whether

12   stated or implied by law.

13        That is the condition upon which Judge

14   Silverstein approved this document, because there is a

15   basis, an adversarial relationship between a purchaser,

16   prospective purchaser and the Special Master who is

17   acting on behalf of the estate and the creditors of the

18   estate.  It is not a common interest.

19        Now they can work cooperatively to attempt to go

20   forward with that, but it is in basis an adversarial

21   relationship, and that only makes sense.

22        Steward is out to do the best deal it can for

23   itself.  The Special Master has a fiduciary, and here a

24   fiduciary who is specifically disclaiming any such

25   relationship or confidential relationship with Steward

1    has a different set of duties.

2         So what does that mean for a common interest

3    approach?  We're talking about, and this is important,

4    we're talking about legal common interest.  The cases,

5    we've cited them, and Steward has as well.  The cases

6    make distinctions between the business common interest

7    and a legal common interest.

8         In order to protect documents or other

9    information from disclosure in a litigation context, it

10   must be a legal common interest.  Parties can always

11   have business common interests, but it has to be a

12   legal common interest.

13        What does it mean here with respect to the

14   approximately 3,000 documents that have been withheld

15   from production in this case based on a common interest

16   theory?

17        First, we know, we know that there is no written

18   common interest agreement.  How do we know that?  Well,

19   none was produced.  But we also know that because if

20   there were to be such an agreement, it would have to be

21   presented and approved by Judge Silverstein because --

22   why?  Because if there were such an agreement, that

23   would limit the kinds of things that the Special Master

24   could do.  The Special Master would now have a

25   different kind of relationship with Steward, a common

1   legal relationship with Steward, and it would allow one

2   or both of these parties to claim the common interest

3   approach.

4        That would have to be presented to Judge

5   Silverstein, just as the other kinds of agreements were

6   presented to Judge Silverstein for approval.

7        You might say, well, do you have to have a

8   written agreement in order to have a common interest

9   privilege?  The answer is generally no.  But the same

10  agreement, WW that I read from, that specifically

11  disclaims any such relationship, says the agreement may

12  not be amended or modified orally, and no amendment,

13  modification, or attempted waiver shall be valid unless

14  in writing and signed by both parties and approved by

15  the court after notice and hearing.

16        So if they're saying this is an implied common

17  interest privilege -- doesn't have to be in writing,

18  doesn't have to be signed, the law sometimes recognizes

19  oral common interest agreements -- this agreement is

20  saying you don't have such a relationship, and it may

21  not be amended or modified orally.  You can't do that.

22  And if you do want to amend it, you've got to come

23  back, it's got to be in writing, and you're to come

24  back to Judge Silverstein; again, because that type

25  agreement, a common interest, legal common interest

1    agreement limits what the Special Master may do.  The

2    Special Master isn't free to do whatever he wants.

3    He's limited by a common interest approach.

4         None of that ever happened here.  So separate

5    and apart for all of the other reasons that courts, we

6    believe, say here there can be no common interest

7    privilege because at base it's an adversary

8    relationship.  We know this was never presented to

9    Judge Silverstein, and we know that the document that

10   was presented to Judge Silverstein he approved

11   disclaiming any such fiduciary or confidential

12   relationship, whether stated or implied by law.

13        I want to again focus on what's the Special

14   Master doing here; and this is extremely important.  If

15   a party -- whether it's the Special Master, whether

16   it's Steward, whether it's Blue Cross -- if a party

17   believes that some document or some discovery request

18   is privileged, the response would be privileged, the

19   law says that the party has to claim the privilege

20   first.  You claim the privilege.  And when you claim

21   the privilege, ultimately if it is challenged you have

22   to show two things:  It has been appropriately claimed,

23   and there has been no waiver.

24        But the first thing is it must be claimed.

25   Courts don't -- you don't know what the judge says; I'm

1    going to look to see on my own *sua sponte* if there

2    might be some documents that somebody in this case

3    might think are privileged and then I'm going to tell

4    those parties, you know, I think this document might be

5    privileged, any takers for a claim of privilege?  That

6    doesn't happen.  It's not the court's role.  It is the

7    role of the party claiming the privilege to claim it

8    and then, if claimed and challenged, to show it has not

9    been waived.

10        Why am I making this point?  Because there were

11   orders entered by Judge Silverstein where the Special

12   Master said with respect to the production it was

13   making or he was making in this case, there were

14   privileges that he wanted to claim, and he said what

15   they were.

16        Attorney-client privilege, and there were

17   attorney-client privileges of two types:  One, there

18   was an attorney-client privilege between the Special

19   Master not acting as a Special Master, but a Special

20   Master is a lawyer, and other clients of his law firm.

21   He was concerned that inadvertently when running search

22   terms documents might be produced that would be

23   otherwise protected by the attorney-client privilege

24   that his law firm had with their other clients.  So he

25   claimed that, and he said I'm going to -- I shouldn't

1  have to be able to produce -- shouldn't be required to

2  produce any documents and I'm claiming that privilege.

3      The second privilege was the attorney-client

4  privilege between the Special Master and his lawyer.

5  Again, not uncommon.  Special Masters/receivers hire

6  their own attorneys, even if they are attorneys.  They

7  hire an attorney to represent them in their capacity as

8  Special Master.  And Mr. Savage did that, and

9  Mr. Savage retained lawyers in his firm, but they had

10  to be approved, again, by Judge Silverstein.  And you

11  present and you say this is who I want to hire, this is

12  the rates that they will be paid, this is what they're

13  going to do and the like.  And he claimed that

14  privilege.

15      The third privilege that he claimed was work

16  product, meaning his attorneys and his work product

17  because, as I just said, there were at least one

18  adversary proceeding.  There were other clear disputes

19  that I wasn't involved in, but there clearly was an

20  adversary proceeding between Blue Cross and the Special

21  Master acting on behalf of Landmark where there was

22  litigation and he claimed the work product privilege

23  with respect to that.  That's between Blue Cross and

24  the Special Master.

25      Never is there a mention of common interest

1    privilege, never.

2         Then Steward claims the common interest

3    privilege, and we get a production of documents from

4    the Special Master that do not include any Steward

5    communications between Steward and the Special Master.

6         Ms. Parker writes to the counsel for the Special

7    Master and says was this intentional?  Are you

8    intentionally withholding communications between

9    Steward and the Special Master?  And Mr. Halperin

10   writes back and says no, you should have gotten those;

11   I will look into that.

12        That's during the course of our briefing.  And

13   so we read that since it hadn't been claimed, and he

14   said you will be getting those documents, we read that

15   as saying he's not claiming -- not only did he not do

16   it before, but he's not claiming now that there is an

17   alleged common interest between the Special Master and

18   Steward.

19        Steward, in a letter, challenges our

20   interpretation of that and so again, again I know

21   you're not key on the letters, but the letters tell

22   a --

23        THE COURT:  No; they are what they are.  I was

24   just talking about in the future.

25        MR. TARANTINO:  Okay.  So Ms. Parker writes back

1  and says, Are you claiming a common interest privilege
2  with Steward?
3          Mr. Halperin is a very good lawyer.  What
4  Mr. Halperin says in effect -- you can read it, I'm
5  going to let the Court decide that -- I'm just saying
6  I'm not waiving any privilege that may exist.
7          Well, again, that's just not the way it works.
8  You can't say, in a piece of litigation, I really don't
9  know if this is attorney-client privilege or not,
10  Judge Almond; I'm going to produce the document, but I
11  just want to let you know I'm not waiving it if you
12  ultimately determine it is attorney-client privilege.
13  I'm not going to claim it's privileged, but if you
14  determine it is, I'm not waiving that privilege.
15          And the reason why I think that's being said is
16  we know it wasn't claimed, and he had a number of
17  chances to claim it, opportunities.  But again, I think
18  his view is I have to be a little concerned here
19  because there is nothing going to Judge Silverstein
20  about common interest.  But if, for example,
21  Judge Almond were to determine there is a common
22  interest and now it's been determined I've waived it,
23  that means, as Special Master or counsel to the Special
24  Master, I have given up some right that the Special
25  Master otherwise had.  So this is a hedging your bets

1    response.  And that may be okay in negotiations or

2    things along those lines, but basic privilege law is

3    you don't get to the issue of waiver without the claim

4    of privilege in the first instance.  That must occur

5    first.  Only then is there a determination of whether

6    there has been a waiver of that privilege.

7           So what do we know here?  We know this wasn't

8    addressed and the only documents that appear to be on

9    point say, my reading, say the opposite of what Steward

10   is claiming now.

11          We know that -- and Steward was involved in the

12   negotiations of those orders, just as we were, meaning

13   the Special Master's claimed privileges.  Steward

14   didn't say, well, what about the common interest

15   privilege, Special Master?  The Special Master doesn't

16   say it; Steward doesn't say it.  The orders get

17   entered, approved by everybody.

18          So this common interest privilege, in our view,

19   came way after the fact, way after the fact, and it

20   was, we believe, set forth as a way to withhold

21   documents that we believe may be the categories of

22   documents that -- this is the tie-in to the other

23   aspect of this motion now -- that where are they?

24   Where are these documents that we say are implausible

25   not to exist?  Well, if they're all privileged, it

1      doesn't mean they don't exist.  It means you don't have

2      an opportunity to get them because of a common interest

3      or some other privilege.

4              I can't tell the exact nature of the documents

5      that Steward has listed, the almost 3,000 documents,

6      but some of them just by the description appear to be

7      just communications between the lawyer for Steward and

8      the lawyer for the Special Master about drafting an

9      asset purchase agreement, drafting this agreement for

10     advisory services.

11             How can that be a legal common interest?  I

12     don't see how it's possible that it could be.  But

13     that's the kind of document that is withheld from

14     production here.

15             I can't tell as clearly based on the

16     descriptions of the other documents, but their

17     communications with the Special Master and people at

18     Steward, their communications with lawyers between the

19     two of them, again this is an adversarial relationship;

20     their communications between the Special Master and a

21     consultant who is supposedly acting on behalf of the

22     Special Master to help sell Landmark and Steward.

23             And the other thing that we point out is even if

24     for some reason all of this could fit nicely into one

25     or more of these cubbyholes, there can't be -- and

1    there could have been, let's say there could have been

2    at some point in time a common legal interest.  Even

3    Steward says, because I think they have to, that if and

4    when those interests diverge, the common interest

5    privilege no longer exists.  And we have set forth in

6    our papers the time frames.  We've shown you in the

7    papers, based on documents that were produced by

8    Steward and others, that there came a point in time

9    long before Steward pulled out where those -- it's

10    clear Steward was going to pull out.  It was clear the

11    Special Master knew Steward was going to pull out.  And

12    they were communicating about that.

13          Now, we don't have what those communications

14    were because they're claimed to be common interest

15    privilege, but one of the defenses that we have to this

16    case -- Mr. Bernick is the antitrust lawyer.  I'm the

17    trial lawyer.  He can talk about all the legal things

18    that -- and Mr. Kuney did as well -- what needs to be

19    proved and what those defenses are.

20          I'm going to be much more centralized saying

21    what is the jury going to believe or not believe.  And

22    if Steward's position is we didn't go forward with the

23    Landmark transaction because we were in effect

24    prohibited from doing so by Blue Cross and its

25    anticompetitive actions, that's what they want to argue

1    and they can talk about what the legal issues are and

2    figure out what gets to the jury or not.

3          I'm much more basic in saying if there are

4    documents between you and the Special Master that talk

5    about other reasons why you don't want to go forward

6    with this deal, such as maybe Landmark isn't what we

7    thought it was, maybe the quality of care isn't what it

8    was represented to be, maybe we've got this issue,

9    maybe we've got that issue; and we do have documents

10   talking about this.

11         But I want to see, as the trial lawyer I want to

12   see what was being said, what was being talked about by

13   Steward and the Special Master about the reasons why

14   this deal was going to fall apart.  And they can

15   explain it, they can put it into context, they can do

16   whatever they want.  I've got to do the job to convince

17   the jury that it's going to help my case, and they've

18   got to do the job to convince the jury I'm wrong about

19   that.

20         But if I never get to see them, if they're

21   protected by a common interest privilege then, you

22   know, talk about pulling the curtain.  I want to see

23   behind the curtain, and I think I have an opportunity

24   to see behind the curtain because the only reason that

25   they're being withheld -- not because they're not

1   responsive -- they're being withheld on this alleged

2   common interest privilege.

3        And I want to finish up by asking you -- now

4   that you've heard why I don't believe the common

5   interest privilege can apply here -- if you take into

6   account those arguments I made in the papers in here,

7   and now you look at the three categories of documents,

8   A, B and C, we set forth, how the three -- I'm sorry,

9   how the various what we say are deficient discovery

10  responses fall into three different categories, I think

11  it will really help place into context our arguments

12  about how those documents must exist somewhere.  Maybe

13  they exist somewhere among those 3,000 documents or

14  somewhere else on the many, many more.  I think there

15  were 19,000 withheld documents on some claim of

16  privilege.  The only thing before you is the common

17  interest privilege alleged between Steward and the

18  Special Master.

19       So for those reasons, your Honor, we believe

20  that there is no common interest privilege.

21       But even, more importantly, even if there could

22  have been one here, it never was presented to Judge

23  Silverstein, he never approved it, and what he did

24  approve seems to totally undercut the argument.

25       And then even when the Special Master was given

1    other opportunities to claim such a privilege, both in

2    the order relating to the production and then in the

3    e-mail communications, it never was done.

4         THE COURT:  Thank you, sir.

5         Mr. Weingarten.

6         MR. WEINGARTEN:  Good morning, your Honor.

7    Thank you very much.  James Weingarten for the

8    Plaintiffs.

9         THE COURT:  Good morning, sir.

10        MR. WEINGARTEN:  I think I'd like to respond to

11   Mr. Tarantino by taking a level down from this

12   incredibly general place where he's put it and actually

13   discuss the scope of the claim of common interest that

14   Steward has made in its login before the Court and made

15   hopefully clear in its papers.

16        Steward asserted a common interest doctrine over

17   otherwise privileged communications between it, its

18   lawyers, that would have been held to have been waived

19   because they were given to the Special Master; but the

20   common interest is not a stand-alone privilege.

21   Mr. Tarantino keeps calling it a privilege.  It's an

22   exception to the waiver rule.

23        The exception applies where the people who were

24   involved in the communication share a common legal

25   interest, and a common legal interest means something

1    like they have a common legal problem and they are

2    sharing otherwise attorney-client protected

3    communications to resolve that problem.

4          Mr. Tarantino doesn't seem to recognize the fact

5    that after the APA was signed -- and there were two of

6    them -- during those periods Steward ceased to be a

7    potential bidder, a potential acquirer, and became

8    imbedded inside the operations of Landmark.

9          During the period of the second asset purchase

10    agreement there was a Steward employee who was called a

11    consultant in the asset services agreement who sits at

12    Landmark.  He is involved in all the myriad legal

13    decisions that go about with running a hospital.  And

14    Steward and Landmark share a legal interest in the

15    outcome of many of those discussions and they are the

16    routine daily legal matters of running a hospital.

17          Some of them relate to the APA; for example,

18    getting regulatory approval so that Steward can

19    consummate its acquisition of Landmark.  Now that's an

20    area where the two sets of lawyers and Steward and the

21    Special Master are working together with a shared legal

22    issue how to gain regulatory approval for this

23    acquisition, and they share a common legal interest in

24    the outcome.  They want it approved.

25          So Mr. Tarantino's blanket assertion that this

1    process was adversarial and that the Special Master and

2    Steward cannot be working together in a common interest

3    is both too generalized and simply not true.

4         We pointed out in our papers there's no support

5    in the case law for any understanding that a Special

6    Master cannot have a common interest with another

7    entity, and in fact we argue it would be bad public

8    policy and it would harm the ability of the Special

9    Master to carry out his instructions from the judge if

10   he could not have common interests with other entities.

11        I want to make it very clear Steward is not

12   asserting a common interest privilege that is a blanket

13   cover for all of its communications with the Special

14   Master.  Stuart has asserted that otherwise privileged

15   communications are not waived as to the privilege

16   simply because they are shared with the Special Master

17   in those narrow circumstances where Steward and the

18   Special Master/Landmark share a common interest in the

19   outcome of a legal problem.  And again those

20   problems --

21        THE COURT:  So for what period of time did they

22   share that common interest?

23        MR. WEINGARTEN:  Your Honor, we tried to be as

24   narrow as we could, so in our view it was when the

25   asset purchase agreements were in place, August 27,

1    2010 to December 7th, 2010 and May 26, 2011 to

2    September 27th, 2012.

3         Even within that period, your Honor, I want to

4    be very clear.  If there were communications that were

5    adversarial or they did not share a common interest, we

6    produced them.  So this was not a blanket assertion.

7         Mr. Tarantino raised the issue of, well, I see

8    here there's discussions on the law about the asset

9    purchase agreement; if they were negotiating the asset

10   purchase agreement, I want those.

11        He has them.  We did not claim a common interest

12   as to adversarial discussions.

13        We claimed a common interest privilege or a

14   common interest doctrine applied where the discussions

15   were about shared legal concerns where they wanted to

16   come out the same way.  That's the basis of the common

17   interest doctrine.  Lawyers should be able to advise

18   their clients and the privileged advice should not be

19   waived because a third party who also has a shared

20   interest in that legal outcome is involved.

21        I think, your Honor, that this doctrine arises

22   out of the criminal context.  Co-defendants can have a

23   common interest in a joint defense.  They don't need,

24   as Mr. Tarantino admitted, a written agreement to have

25   a common defense.  The criminal defendants can share

1      with each other information on common issues of

2      interest that is protected; even if at the same time

3      there are other issues on which their interests

4      diverge.

5              So Mr. Tarantino wants to keep this at some very

6      high level and say that there could never be an

7      interest in common because they're adversarial

8      inherently.  And we want to assure the Court that we

9      didn't do it at that level.  We took it at a document

10     by document, communication by communication level to

11     determine if the communication in question was about an

12     otherwise attorney-client privilege communication that

13     the Special Master was brought into because they had a

14     shared legal interest in the outcome of that

15     discussion.

16             And some of it is about regulatory approval,

17     some of it is the quotidian work of, gosh, we're going

18     to hire a physician group for the hospital, we need the

19     following paperwork in place; what do Steward's lawyers

20     think about how to get that paperwork in place.

21             Those are legal questions that go to how to run

22     a hospital and they were discussing amongst each other

23     because Steward was imbedded in the hospital.

24             So we reject the notion, your Honor, we're

25     making some overbroad claim here.  And we especially

1   reject the idea that we're doing so to sort of hide any

2   papers or any documents.  I'll get to the document

3   question in a second.

4       Now, Mr. Tarantino said the Special Master has

5   to ask the Court for instructions and directions, and

6   we would point your Honor to many of the exhibits that

7   were attached to the letters.  The reason we initiated

8   the letter correspondence was simply because we felt

9   the record needed to be clarified.

10      The Special Master got guidance from the court,

11  and the court's order has explained the Special

12  Master -- and I'll let Mr. Dawson speak to any further

13  questions because he's the one who had the discussions

14  with Preston Halperin about the Special Master's

15  representations.

16      But those orders speak for themselves.  We don't

17  need to go into who said what to whom.  The Special

18  Master was ordered to produce all his documents, and

19  there was an elaborate clawback procedure in case

20  anything privileged was released.

21      I want to be very clear.  It's not just

22  Steward's privileged information that's at issue here.

23  The Special Master's privileged discussions -- which

24  Mr. Tarantino described all the different categories of

25  privilege discussions the Special Master might have --

1    those could be subject to a common interest doctrine as

2    well.

3          So if Mr. Halperin is advising the Special

4    Master or the people of Landmark on a legal issue and

5    brings Steward in because they have a common interest,

6    well, the Special Master was protected from that being

7    a waiver because it's a common interest.  And his

8    production of documents in this case was pursuant to a

9    court order that said you've got to produce everything,

10   and if you have any troubles or something privileged

11   comes up, you can claw it back.

12         The distinction Mr. Tarantino draws saying,

13   well, they didn't mention the magic words "common

14   interest privilege," don't apply here.

15          First of all, it's not called a common interest

16   privilege.  It's not something you have to assert

17   separately and along as this is my privilege.  It's an

18   exception to the waiver for the attorney-client

19   privilege.

20         And I think it would be unfortunate if the

21   Special Master, contrary to the orders in Rhode Island,

22   were held to have waived a massive amount of

23   attorney-client privilege material that's his privilege

24   because he didn't use the magic words, oh, and the

25   common interest doctrine, which is just a background

1    rule of how the privilege operates.

2         We agree, your Honor, that this had to be a

3    legal interest and we think that that was the case

4    here.  Again, it's an otherwise privileged document

5    that is not a waiver, because the person who is being

6    brought into the document shares that legal interest in

7    the outcome.

8         We released over 12 hundred documents.  There

9    are communications with the Special Master as to which

10   there's no privilege, no common interest.  And that's

11   all the business stuff.  The cash flow reports, the

12   correspondence about how they're going to have a

13   working capital loan, financial information for

14   Landmark, business decisions about how to bill, about

15   contracts, about scheduling meetings, communications

16   plans, how we're going to roll out the patients, what

17   we're talking about here.  We produced the draft

18   termination letters that they were discussing when they

19   decided they had to terminate the APA.

20        All of that got produced, your Honor, because it

21   was business discussion or adversarial.  So again,

22   there's a huge amount of information that Mr. Tarantino

23   wants that he got, if it exists.

24        Now, Mr. Tarantino discusses the advisory

25   services agreement and he says, well, that agreement

1  has a section at Section 1.4 that says, well, we're

2  disclaiming any fiduciary or special confidential

3  relationship.

4        He correctly points out that's in the section

5  that's discussing how they're not going to be

6  independent contractors of each other.  And we would

7  submit, your Honor, it would be implausible to read

8  that language so broadly as to exclude the ability of

9  the Special Master to have a common legal interest with

10  any entity simply because they're not fiduciaries of

11  each other.  That language has a specific purpose.

12  It's to make sure that they are not implied

13  fiduciaries.

14        But just as in a criminal context,

15  co-defendants, their attorneys are not implied

16  fiduciaries of each other.  Very clearly, in fact, they

17  owe their fiduciary duty to their own individual

18  clients.  They still have, excuse me, common legal

19  interests.

20        So we don't think that language can be read that

21  way, and we certainly don't think it would be sensible

22  for this Court to hold that the disclaiming that you're

23  independent contractors forbids you from claiming a

24  common interest going forward.  We don't think the

25  language supports that interpretation.

1          I'll also note Section 9.1 of the agreement says

2     in performing their respective duties hereunder,

3     company, that's Steward, and owners, that's Landmark,

4     and the Special Master, shall conduct themselves in

5     full accordance with all applicable laws.

6          Well, your Honor, the function of the privilege

7     is to help people get legal advice so that they can

8     conduct themselves in accordance with the laws, and we

9     don't think it would make a lot of sense to read one

10    section as saying, yeah, you're supposed to conduct

11    yourself in accordance with the laws, but because you

12    didn't use magic words about common interest in this

13    other section, all your legal advice, if you're working

14    together to fulfill your obligation to follow the law,

15    no more privilege there; you're not entitled to a

16    common interest to protect your interest.

17         I also want to address, your Honor, the

18    discussion about if our interests diverge, your Honor,

19    and I want to be very clear again that to the extent

20    the communications at issue show a divergence of

21    issues, we've produced those documents.  So if they

22    were in an adversarial place, we produced those.

23         I want to address briefly, your Honor, this

24    question about, well, when interests diverge, when do

25    we know that.  So we took a document by document

1    approach, which we think is the appropriate approach

2    when dealing with privilege and when dealing with the

3    common interest.  The briefing in this that Blue Cross

4    submitted seems to suggest that -- you'll remember

5    there's an entire section on, well, certain e-mails

6    show that certain Steward executives had misgivings

7    about the deal and once they started having misgivings

8    about the deal there could no longer be a common

9    interest.

10         That's not a document by document discussion,

11   your Honor.  That's at a level of generality that

12   simply does not make sense.  There is no case holding

13   that just because some executives at a company have

14   e-mail discussions questioning a deal they can't have a

15   common interest.  And I think that's very important,

16   and I think Mr. Tarantino basically walks away from

17   that position because he knows that there cannot be a

18   rule that based on cherry-picked e-mails the common

19   interest doctrine falls apart and there can never be a

20   common interest.

21         Again, his concern about missing documents, your

22   Honor, there are 60,000 documents we produced in this

23   case that have the word Landmark or LMC, an

24   abbreviation for Landmark, in them.  They've got the

25   documents.

1          Mr. Tarantino says, well, all I want is a

2     certification, an affidavit, just like what we put in.

3     First of all, there's a difference between a

4     court-ordered certification, which language I'm not

5     sure about and they haven't proposed any, and a

6     self-serving affidavit that an attorney crafts for his

7     client to sign.

8          Second, there's no basis in this case for

9     requiring such.  There's two reasons why there's no

10    basis.  One, we said to them, we've said in our

11    papers -- and I'm saying to you now, your Honor -- that

12    we conducted a very diligent search that we looked over

13    26 custodians, we searched millions of documents, we've

14    produced 120,000 documents.  Blue Cross was privy and

15    agreed to our custodian list and our search terms.

16    There's no basis for finding, Judge, that we've been

17    somehow dilatory in our search process.

18          And the cases that Blue Cross cites saying,

19    well, courts do order people to sign certifications, we

20    point out in our brief.  Those are cases where people

21    either failed to comply with a previous motion to

22    compel that was granted, or there's some external

23    indicia of something going on; for example, e-mails

24    that say here's the attachment and there's no

25    attachment.  Or deponents give testimony saying, oh,

1    yeah, I made documents, and the documents weren't in

2    the case file or discovery record.

3         There's nothing like that here, your Honor.  And

4    I'm sorry that Blue Cross thinks certain documents

5    should exist, but they don't.  And we point out in our

6    opposition we even went back and conducted a

7    reinvestigation on some of these categories.

8         And you'll see in the opposition where we said,

9    well, they said there's no board minutes.  Here are the

10   board minutes that we produced.

11        They said there's no discussions with Cerberus,

12   the private equity firm that owns Steward.  Here's all

13   the documents with Cerberus that we produced.

14        Oh, by the way, they looked at the Cerberus

15   production and didn't point out to your Honor or to us

16   a single document where it says from Cerberus to

17   Steward, hey, Steward, why didn't you have that in your

18   production?  There's none of that either.  No missing

19   document that a third party produced.  They'll even be

20   an indicia that maybe your process was flawed.  All

21   they say is, well, you and Cerberus talk a lot about

22   hospitals, you'd think there would be more that you're

23   talking about Landmark.

24        At the end of the day regarding the documents,

25   your Honor, this was unfolding in realtime.  They have

1    all the business discussions about the negotiations

2    with Blue Cross, about the negotiations with

3    Thundermist, about what's going on.  And it's unfolding

4    in realtime to the point that the participants know

5    what they're thinking and are expressing that to each

6    other, and they have all the non-privileged documents

7    about that.

8         And so if the thrust of their memo and their

9    motion there ought to have been a giant summary formal

10   memorandum or presentation explaining all the reasons

11   why the deal didn't come through, there is no such memo

12   or presentation.  We've re-investigated the issue and

13   we're confident it does not exist.  And the reason it

14   does not exist is because this was unfolding in

15   realtime.

16        They have all the documents showing all the

17   different issues that were coming up and all the

18   discussion between Steward executives about their

19   reactions to Blue Cross's proposals; this makes sense,

20   this doesn't, this is going to kill the deal, this

21   won't.  They have that, if it's not privileged.  And

22   there's no basis for their assertion that we're using

23   our privilege claims to hide key documents in this

24   case, simply none.

25        So again, your Honor, I'm happy to answer any

1    questions.

2          But our view is we need to keep this at the

3    level of what kind of common interest did Steward

4    claim.  It's not a separate privilege.  It's a

5    protection against a waiver.  We went document by

6    document.  We appropriately asserted where there were

7    shared legal interests.  And Mr. Tarantino's

8    representations about how special masters are

9    inherently adversarial of potential merger partners

10   just simply don't apply.  Once the APA is signed,

11   Steward is imbedded in that organization and they are

12   participating in a host of legal issues with a common

13   legal strategy; and there's no basis for your Honor to

14   overturn the discovery orders, the clawback provisions

15   that were agreed to in the Rhode Island court.

16          I'd like to just add one more thing.  There's

17   one little e-mail here, your Honor.  I shouldn't say

18   little.  There's an e-mail from Mr. Tarantino that they

19   attached, February 26th, it's attached to one of their

20   letters.  Mr. Tarantino says:  We believe that Blue

21   Cross and Steward should continue to adhere to the

22   court's multiple orders.  If a party locates a

23   privileged document, it should follow the agreed-upon

24   court orders to allow the Special Master to implement

25   the clawback provision.

1          That's Mr. Tarantino's e-mail.  So he's well

2    aware that when the Special Master, who is resource

3    constricted, is ordered by the court to produce all the

4    documents, that there's a clawback provision to be

5    implemented if privileged documents gets released.  And

6    we think this correspondence otherwise speaks for

7    itself.  Again, if you ever any particular questions on

8    that, Mr. Dawson had the direct conversations.

9          But I think, your Honor, that's where we stand.

10    If you have any questions for me, otherwise --.

11          THE COURT:  No questions.

12          MR. WEINGARTEN:  All right.  Thank you, your

13    Honor.

14          THE COURT:  Thank you.

15          MR. TARANTINO:  A few minutes (unintelligible).

16          THE COURT:  Sure.

17          MR. TARANTINO:  The first thing is I don't know

18    how we could have done a document by document

19    determination when we don't have the documents on the

20    privilege log.

21          What we did is we pointed to the documents that

22    we did have produced by Steward or some third party to

23    make the arguments.

24          THE COURT:  I didn't think he said that you

25    should have done that.  He said we did when we were

1    determining what to claim as privileged.

2            MR. TARANTINO:  He criticized -- he said I'm up

3    here.  All I'm saying is this can't be.  It needs to be

4    a document by document review.  Well, I don't have the

5    documents.

6            The second thing is, and he cut the quote short

7    from the agreement for advisory services.  I want to

8    read the full quote.  He cut it short at fiduciary

9    relationship.  This is the full quote:  The Special

10   Master and company, Steward, specifically disclaimed

11   any fiduciary or confidential relationship.  It's

12   fiduciary relationship or a confidential relationship,

13   whether stated or implied by law.

14           Even if you accept the argument that, well, this

15   really is talking about waiver and not privilege, it's

16   the same thing with respect to work product.  Work

17   product is called doctrine, too, and so is common

18   interest doctrine.  They're -- typically cases talk

19   about work doctrine privilege, work product doctrine,

20   common interest privilege, common interest doctrine.

21   It's the same thing.

22           But if there was -- in order for there --

23   there's a case called *United States v.  Textron* that I

24   tried before judge Torres here.  I won it before Judge

25   Torres on the work product issue and whether documents

1  were protected by work product and with whom and to

2  whom they may be shared.  Judge Torres ruled in my

3  favor on this.  Initially I won in the First Circuit

4  two to one affirming Judge Torres, and the First

5  Circuit *en banc* reversed four to three.

6      And just like common interest work product,

7  there's a body of law that does say you can share

8  certain documents with others if there is that kind of

9  confidential relationship in certain circumstances.

10  It's not typical, but in certain circumstances, but not

11  when you disclaim there is such a relationship.

12      If there's a document that disclaims the

13  relationship, I don't know how you can then say if it

14  falls within the exception of sharing a privilege

15  document with someone who is supposed to be in that

16  confidential relationship with you.  And if after the

17  fact they wanted to be able to share such

18  communications, attorney-client privileges, then they

19  should have gone back to Judge Silverstein, because

20  that would be something either stated or implied by

21  law.

22      So I understand the argument, I understand that

23  there can be circumstances where you can argue there

24  should be no waiver, even if an attorney-client

25  privilege communication was shared with someone else

1    because there was some kind of confidential

2    relationship with that someone else, but I don't see

3    how you can do that in this case where it has been by

4    contract approved by Judge Silverstein, disclaimed that

5    any such relationship exists or is allowed to exist.

6          And the last thing that I would say, your Honor,

7    is again you can look.  You cannot tell from that log,

8    you cannot tell what it is based on the descriptions,

9    what's the nature of the document that is being

10   withheld; you can't.  And this would be an extremely

11   broad net.  Let's assume that the agreement for

12   advisory services didn't even exist.  It would be an

13   extremely broad net to be able to say Steward could

14   share not only with the Special Master, but with

15   consultants and with others, and somehow say that's not

16   a waiver of whatever they want to call the privilege,

17   whether it's work product or whether they want to call

18   it attorney-client.  That would be extremely broad

19   anyway.

20         But in the context of this case where it is

21   defined in my view not to exist, I don't see how

22   Steward could do that.  It's not like Steward wasn't a

23   party to this agreement.  If we were trying to argue

24   there was an agreement between two other folks and

25   Steward said, well, but it shouldn't affect us, we

1    weren't a party to it.  They were a party to this.

2          So I agree there are cases, there is authority

3    in certain circumstances where there can be a sharing,

4    where there is a particular kind of relationship

5    demonstrated, and that's the burden on the party

6    claiming that privilege.  But I don't understand how it

7    can exist here based on the circumstances of this case

8    and in the face of that explicit language in the

9    agreement for advisory services.

10         THE COURT:  All right.  Thank you.

11         I'll take the matter under advisement.  I'll try

12   to get you a ruling as soon as possible so we can keep

13   this case moving along.

14         Court will be in recess.

15         (Adjourned)

16

17

18

19

20

21

22

23

24

25

1         C E R T I F I C A T I O N

2

3

4

5

6         I, Denise P. Veitch, RPR, do hereby certify

7    that the foregoing pages are a true and accurate

8    transcription of my stenographic notes of the audio

9    recording in the above-entitled case.

10

11

12

13              /s/ Denise P. Veitch
                Denise P. Veitch, RPR
14

15
                July 7, 2016
16                  Date

17

18

19

20

21

22

23

24

25