# EXHIBIT I

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

STEWARD HEALTH CARE SYSTEM, et al.

v.                                                      Civil Action No. 2013-405-S

BLUE CROSS & BLUE SHIELD
OF RHODE ISLAND

*AFFIDAVIT OF CHUCK JONES REGARDING RESPONSE OF NON-PARTY
THUNDERMIST HEALTH CENTER
TO SUBPOENA DUCES TECUM DATED OCTOBER 30, 2014*

I, Charles ("Chuck") Jones, being duly sworn, hereby depose and state as follows:

1.      I am the President and Chief Executive Officer of Thundermist Health Center

("Thundermist").

2.      I am duly authorized to make this affidavit, which I make on the basis of my

personal knowledge of the facts set forth herein.

3.      I am over the age of 18.

4.      As to Thundermist, the allegations of the underlying Complaint concern whether

Blue Cross/Blue Shield of Rhode Island ("Blue Cross") discouraged Thundermist from dealing with

Steward, or whether Blue Cross told Thundermist that dealing with Steward might jeopardize

Thundermist's opportunities to engage in future profitable business opportunities with Blue Cross

and Rhode Island's existing hospital networks.

5.      Blue Cross never told Thundermist how to approach its negotiations with Steward or

told Thundermist what to do as to Steward.  Thundermist's decisions regarding Steward were based

solely on the best interests of Thundermist and its patients, and were not influenced by

Thundermist's relationship with Blue Cross or any potential impact of these decisions on Blue

Cross.

6.      There were no discussions, emails or other communications between Thundermist and Blue Cross (or any other entity) regarding any effort to prevent Steward Health Care System from acquiring Landmark Medical Center.

7.      As evidenced by a summary produced to Steward Health Care System, payments to Thundermist from Blue Cross constituted the following percentages of Thundermist's overall annual revenues:

| Year | Percentage |
|------|------------|
| 2008 | 3.3% |
| 2009 | 4.4% |
| 2010 | 3.9% |
| 2011 | 2.9% |
| 2012 | 2.8% |
| 2013 | 3.1% |
| 2014 | 3.9% |

8.      On or around February 4, 2013, Thundermist made a change in its computer systems, including a change in the way incoming and outgoing emails were archived (the "Email Conversion").

9.      The Email Conversion included the direction to a former information technology vendor to migrate all of Thundermist's email files over to a new Thundermist archive.

10.     Thundermist received a Subpoena served on it by plaintiff Steward Health Care System on or before October 30, 2014.

11.     On Thundermist's behalf, I have conducted a diligent search of all paper files that contain, or are believed to have contained, "hard copies" of the documents responsive to the Subpoena.

12.     On Thundermist's behalf, I also performed a search of all documents and communications stored on Thundermist's computer network for any responsive documents (the "Electronic Search").

13.     In the course of the Electronic Search, I learned that the Email Conversion did not accomplish its stated goal of migrating all of Thundermist's emails from the prior email server to Thundermist's new email server.  This left a significant portion of Thundermist's electronic records unsearchable until a recent correction and migration.

14.     Even after the recent correction and migration, however, an unknown quantity of emails dated prior to the date of the Email Conversion are no longer available to Thundermist, either electronically or otherwise.

15.     Following the recent correction and migration, I performed searches for documents from January 1, 2008 through October 30, 2014, the date Thundermist was served with the Subpoena.

16.     The initial searches Thundermist performed to comply with the Subpoena were on the archive, which at the time it was searched, was thought to be complete.

17.     Upon learning it was incomplete, Thundermist took the necessary steps to supplement the archive with emails that ought to have been there in the first instance from (a) the prior email server which were never properly migrated; (b) Thundermist's terminal servers; and (c) personal computers of Thundermist senior leaders.

18.     Later searches Thundermist performed to comply with the Subpoena included these additional emails loaded into the archive.

19.     Thundermist's search included all emails that were sent or received by each employee of Thundermist on or after the Email Conversion, as well as all of the pre-Email Conversion emails that are still available to Thundermist.

20.    The search terms I used for all electronic searches for emails responsive to the

Subpoena were:

        a.    "de la Torre";
        b.    "Mark Rich";
        c.    "Guyon";
        d.    "Putter";
        e.    "Landmark" and "Jones";
        f.    "Landmark" and "Montanaro[1]";
        g.    "Landmark" and "bcbsri.org";
        h.    "Steward"
        i.    "BCBSRI" and "Jones";
        j.    "Blue Cross" and "Jones";
        k.    "BCBSRI" and "Montanaro";
        l.    "Blue Cross" and "Montanaro";
        m.    "LMC" and "Jones"; and
        n.    "LMC" and "Montanaro."

21.    These searches returned thousands of "hits."

22.    I reviewed each document and/or email (collectively, the "Documents") to see

whether it was responsive to the Subpoena.

23.    Following are examples of categories of Documents that I culled out as non-

responsive to the Subpoena:

        a.    Thundermist "help desk" tickets, which are emails from Thundermist employees to the Thundermist information technology team regarding technical issues related to Landmark connectivity or communication;

        b.    Changes in coverage or reimbursement relating to Rhode Island's women's cancer screening program;

        c.    Recruitment emails between the relevant organizations or which were sent to either organization by hiring agencies;

        d.    Emails between relatives working at the relevant organizations discussing personal matters;

        e.    Google alerts (emails from Google with links to any new occurrences on the public internet relating to search terms provided to Google by Thundermist), *unless* the alert was forwarded with additional commentary;

        f.    similar distributions of news articles regarding Landmark Medical Center, *unless* the news article was forwarded with additional commentary;

        g.    routine mentions of patient or employee treatment at Landmark (e.g., "[Patient] was taken to Landmark by EMS");

---

[1] Maria Montanaro was my predecessor as President and CEO of Thundermist.

h.     documents where "Landmark" was mentioned in a spreadsheet of patient data related to ongoing care coordination or operations;

i.     emails from community partners who included Landmark addressees and Thundermist addressees in the recipients of, or in the contents of, the emails, which emails were unrelated to the change in hospital ownership or relationship between Thundermist and Landmark;

j.     emergency emails related to public health matters from the Department of Health sent to Landmark addressees and Thundermist addressees;

k.     emails that spoke only of technical setup of interfaces (e.g., RIQI, Beacon project; OpenMRI, eclinicalworks);

l.     internal emails which include "Landmark" in the attachment, but which do not speak specifically to Landmark (e.g., rosters of invitees to Thundermist's annual breakfast, golf tournament and/or auction);

m.     Thundermist staff discussion about the process of sending vaccines to Landmark during weather events to take advantage of the use of Landmark's generator;

n.     Routine payment of bills to/from Landmark as a result of the obstetric coverage relationship prior to December 2011;

o.     Acceptances or declinations of meeting requests generated by Outlook (or similar software);

p.     Documents concerning career fairs;

q.     Documents referencing "Steward-Carney Hospital";

r.     Resume alerts;

s.     Newsletters from the Massachusetts Board of Medicine;

t.     Documents from Boston Benefits partners;

u.     Documents concerning Ken Steward, a consultant for the Executive Office of Health and Human Services for the State of Rhode Island;

v.     Documents referencing "Steward Lunenberg Family Practice";

w.     Documents from or about "Steward Emergency Physicians Group"

x.     Documents concerning patients named "Steward";

y.     Documents from or including jocelyn.steward@uab.edu.; and

z.     Documents that included the term 'putter' but referred to the golf club not the individual.

24.     The remaining documents, even if barely responsive to the requests made in the Subpoena, have been produced unless otherwise indicated to the Court.

25.     I understand that Steward has asked Thundermist to provide a list of "custodians" of Thundermist's administrative (i.e. non-medical) records.

26.     Thundermist does not have any "custodians."

27.    My search of Thundermist's "paper files" and electronic files includes all files – and

all computers – available to be searched by Thundermist with any remote possibility of containing

responsive documents.

_____
CHARLES T. JONES

STATE OF RHODE ISLAND
COUNTY OF *PROVIDENCE*

On this *16th* day of _*April*_, 2015, before me, the undersigned notary public,
personally appeared Charles T. Jones, personally known to the notary to be the person who signed
the preceding or attached document in my presence and who swore or affirmed to the notary that
the contents of the document are truthful and accurate to the best of his knowledge and belief in his
capacity as President and CEO of Thundermist Health Center.

_____
NOTARY PUBLIC No. *5493*
My Commission Expires: *7/2/17*

6