## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

STEWARD HEALTH CARE
SYSTEM LLC, *et al.*,

Plaintiffs,

v.                                                          Case No. 1:13-cv-405

BLUE CROSS & BLUE SHIELD                                    Honorable William E. Smith
OF RHODE ISLAND,                                            Magistrate Judge Lincoln Almond

Defendant.

## BLUE CROSS & BLUE SHIELD OF RHODE ISLAND'S
## MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56 and LR Cv 56, Blue Cross & Blue Shield

of Rhode Island ("Blue Cross") moves for summary judgment on all claims set forth in the

Amended Complaint brought by Steward Health Care System LLC, et al., ("Steward"). The

grounds for Blue Cross' motion are set out in the accompanying Memorandum of Law and

Statement of Undisputed Facts (and exhibits thereto).

DATED: July 14, 2017                          /s/ Patricia K. Rocha
                                              John A. Tarantino (#2586)
                                              Patricia K. Rocha (#2793)
                                              Joseph Avanzato (#4774)
                                              Leslie D. Parker (#8348)
                                              ADLER POLLOCK & SHEEHAN P.C.
                                              One Citizens Plaza, 8th Floor
                                              Providence, RI 02903
                                              Tel: (401) 274-7200
                                              Fax: (401) 351-4607
                                              jtarantino@apslaw.com
                                              procha@apslaw.com
                                              javanzato@apslaw.com

lparker@apslaw.com

N. Thomas Connally, III (*Pro Hac Vice*)
Emily M. Yinger (*Pro Hac Vice*)
Hogan Lovells US LLP
Park Place II, Ninth Floor
7930 Jones Branch Drive
McLean, VA 22102
Tel: (703) 610-6100
Fax: (703) 610-6200
tom.connally@hoganlovells.com
emily.yinger@hoganlovells.com

Robert F. Leibenluft (*Pro Hac Vice*)
Justin W. Bernick (*Pro Hac Vice*)
Hogan Lovells US LLP
555 13th Street NW
Washington, DC 20004
Tel: (202) 637-5600
Fax: (202) 637-5910
robert.leibenluft@hoganlovells.com
justin.bernick@hoganlovells.com

*Attorneys for Blue Cross & Blue Shield of Rhode Island*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 14, 2017, I filed the foregoing Motion through the ECF system and that notice will be sent electronically to the below listed counsel who are registered participants identified on the mailing information for Case No. 13-405-S.

Robert C. Corrente, Esq.
Christopher Dawson, Esq.
Joseph Cooper, Esq.
Whelan, Corrente, Flanders,
Kinder & Siket LLP
100 Westminster St., #710
Providence, RI 02903
rcorrente@wckslaw.com
cdawson@wckslaw.com
jcooper@wckslaw.com

Brendan V. Sullivan, Jr., Esq.
Steven R. Kuney, Esq.
Kevin Hardy, Esq.
Mark S. Levinstein, Esq.
Daniel W. Bell, Esq.
Matthew P. Mooney, Esq.
Frank Lane Heard, III, Esq.
Williams & Connolly LLP
725 12th Street, N.W.
Washington, DC 20005
bsullivan@wc.com
skuney@wc.com
khardy@wc.com
mlevinstein@wc.com
dbell@wc.com
mmooney@wc.com
lheard@wc.com

<u>/s/ Patricia K. Rocha</u>

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

STEWARD HEALTH CARE
SYSTEM LLC, *et al.*,

Plaintiffs,

v.

BLUE CROSS & BLUE SHIELD
OF RHODE ISLAND,

Defendant.

Case No. 1:13-cv-405

Honorable William E. Smith
Magistrate Judge Lincoln Almond

## MEMORANDUM OF LAW IN SUPPORT OF
## BLUE CROSS & BLUE SHIELD OF RHODE ISLAND'S
## <u>MOTION FOR SUMMARY JUDGMENT</u>

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

SUMMARY OF THE UNDISPUTED MATERIAL FACTS ....................................................5

PROCEDURAL HISTORY .................................................................................................10

LEGAL STANDARD .........................................................................................................12

ARGUMENT.....................................................................................................................13

I.     Blue Cross is Entitled to Summary Judgment on Steward's Monopolization
Claims Because Blue Cross Did Not Refuse to Deal With Steward................................13

     A.     Blue Cross Did Not Terminate a Prior Voluntary Course of Dealing. ................17

     B.     Blue Cross Did Not Act Against Its Business Interests to Harm a
Competitor...................................................................................................24

     C.     Blue Cross Did Not Refuse to Sell at Retail Prices. ...........................................28

     D.     Blue Cross Had a Legitimate Business Rationale. ...............................................33

     E.     The Court Should Not Impose on a State-Regulated Insurer a Novel
Antitrust Duty to Purchase Hospital Services. ...................................................34

     F.     Blue Cross Had a Legitimate Business Reason Not to Renew Its
Contract with Steward at Saint Anne's Hospital. ................................................38

     G.     Regulations Required Blue Cross to Take Certain Actions When
Landmark Briefly Went Out-of-Network............................................................39

II.     Blue Cross is Entitled to Summary Judgment on Steward's Conspiracy Claims
Because There is no Evidence of an Agreement With Thundermist or Lifespan
to Refuse to Deal With Steward. ....................................................................................42

     A.     Lifespan's "Treat and Transfer" Model Is Not Evidence of a
Conspiracy to Exclude Steward.......................................................................46

     B.     The Rates Blue Cross Pays Lifespan Are Not Evidence of a
Conspiracy to Exclude Steward.......................................................................47

     C.     Thundermist's Independent Patient Referral and Contracting Decisions
Are Not Evidence of a Conspiracy to Exclude Steward. ....................................49

     D.     Steward Cannot Rely on Circumstantial Evidence or an Inference of Conspiracy Because Steward Concedes that Blue Cross, Thundermist, and Lifespan had Independent And Unilateral Incentives. ...............................50

III.    Blue Cross is Entitled to Summary Judgment on All of Steward's Claims Because Blue Cross Did Not Cause Steward's Alleged Injuries. ....................................54

     A.     ███████████████████████████████
             ████████████████ ....................................................................58

     B.     OHIC Regulations Prevented Blue Cross From Offering The Rates That Steward Demanded. ...................................................................63

IV.    Blue Cross is Entitled to Summary Judgment on All of Steward's Antitrust Claims Because There Was No Harm to Competition. ....................................67

V.    Blue Cross Is Entitled To Summary Judgment On All Of Steward's Claims Because Steward Has Not Mitigated Its Damages And Steward's Damages Model Cannot Distinguish Between Damages From Lawful And Unlawful Conduct. ..............................................................................................................75

VI.    Blue Cross is Entitled to Summary Judgment on All of Steward's Antitrust Claims Under The State Action Doctrine. .........................................................76

VII.   Blue Cross is Entitled to Summary Judgment on Steward's State-law Tort Claims. ........................................................................................................78

CONCLUSION ..................................................................................................................82

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abraham v. Intermountain Health Care, Inc.*,
  394 F. Supp. 2d 1312 (D. Utah 2005), aff'd, 461 F.3d 1249 (10th Cir. 2006) ...................... 18

*Abraham v. Intermountain Health Care Inc.*,
  461 F.3d 1249 (10th Cir. 2006) .................................................................................. 18, 44, 53

*Ace Beer Distrib., Inc. v. Kohn, Inc.*,
  318 F.2d 283 (6th Cir. 1963) ............................................................................................... 71

*Aerotec Int'l v. Honeywell Int'l*,
  836 F.3d 1171 (9th Cir. 2016) ......................................................................................... 16, 31

*Alt. Sys. Concepts, Inc. v. Synopsys, Inc.*,
  374 F.3d 23 (1st Cir. 2004) ................................................................................................. 62

*Am. Motor Inns, Inc. v. Holiday Inns, Inc.*,
  521 F.2d 1230 (3d Cir. 1975) .............................................................................................. 73

*Am. Steel Erectors, Inc. v. Local Union No. 7*,
  815 F.3d 43 (1st Cir. 2016) ................................................................................................. 44

*Amerinet, Inc. v. Xerox Corp.*,
  972 F.2d 1483 (8th Cir. 1992) ............................................................................................ 75

*Anderson v. Liberty Lobby*,
  477 U.S. 242 (1986) ............................................................................................................ 12

*APG, Inc. v. MCI Telecomm. Corp.*,
  436 F.3d 294 (1st Cir. 2006) .......................................................................................... 81, 82

*Argus, Inc. v. Eastman Kodak Co.*,
  801 F.2d 38 (2d Cir. 1986) ................................................................................................. 61

*ASAP Paging Inc. v. CenturyTel of San Marcos Inc.*,
  137 F. App'x 694 (5th Cir. 2005) (per curiam) ................................................................. 16

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
  472 U.S. 585 (1985) .....................................................................................................*passim*

*Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
  459 U.S. 519 (1983) ............................................................................................................ 54

iii

*Atl. Richfield Co. v. USA Petroleum Co. ("ARCO"),*
    495 U.S. 328 (1990) ........................................................................... 68, 69

*Auer v. Robbins,*
    519 U.S. 452 (1997) ................................................................................. 64

*Avilla v. Newport Grant Jai Alai LLC,*
    935 A.2d 91 (R.I. 2007).......................................................................... 79

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ................................................................. 44, 46, 51, 53

*Belliveau Bldg. Corp. v. O'Coin,*
    763 A.2d 622 (R.I. 2000)..................................................................... 79, 80

*Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan,*
    203 F.3d 1028 (8th Cir. 2000) (en banc) ............................................... 44

*Blue Cross & Blue Shield of R.I. v. Caldarone,*
    520 A.2d 969 (R.I. 1987)........................................................................ 37

*Blue Cross & Blue Shield of R.I. v. McConaghy,*
    No. PC 04-6806, 2005 WL 1633707 (R.I. Super. Ct. July 11, 2005) .................................... 37

*Bossian v. Anderson,*
    69 A.3d 869 (R.I. 2013).......................................................................... 79

*Broadcom Corp. v. Qualcomm Inc.,*
    501 F.3d 297 (3d Cir. 2007) ................................................................... 74

*Brown Shoe v. United States,*
    370 U.S. 294 (1962) ............................................................................... 68

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
    429 U.S. 477 (1977) .......................................................................... 68, 70

*Burdett Sound, Inc. v. Altec Corp.,*
    515 F.2d 1245 (5th Cir. 1975) ................................................................ 71

*Ca. Retail Liquor Dealers Ass'n v. Midcal Aluminum,*
    445 U.S. 97 (1980) ................................................................................. 77

*Cadle Co. v. Hayes,*
    116 F.3d 957 (1st Cir. 1997).................................................................. 61

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ............................................................................... 13

*Chicago Prof'l Sports Ltd. P'ship v. Nat'l Basketball Ass'n,*
    95 F.3d 593 (7th Cir. 1996) (Easterbrook, J.).......................................................19

*Christy Sports, LLC v. Deer Valley Resort Co.,*
    555 F.3d 1188 (10th Cir. 2009)..............................................................16

*City of Columbia v. Omni Outdoor Advert.,*
    499 U.S. 365 (1991)..............................................................77

*City of Pittsburgh v. West Penn Power Co.,*
    147 F.3d 256 (3d Cir. 1998) ..............................................................56, 65

*City of Vernon v. S. Cal. Edison Co.,*
    955 F.2d 1361 (9th Cir. 1992)..............................................................75

*Coffey v. Healthtrust, Inc.,*
    955 F.2d 1388 (10th Cir. 1992)..............................................................70

*Comcast Corp. v. Behrend,*
    133 S. Ct. 1426 (2013) ..............................................................75

*Concord Boat Corp. v. Brunswick Corp.,*
    207 F.3d 1039 (8th Cir. 2010) ..............................................................75

*Cosmetic Gallery, Inc. v. Schoeneman Corp.,*
    495 F.3d 46 (3d Cir. 2007) ..............................................................51

*Covad Commc'ns Co. v. Bell Atl. Corp.,*
    398 F.3d 666 (D.C. Cir. 2005)..............................................................16

*Covad Commc'ns. Co. v. BellSouth Corp.*
    374 F.3d 1044 (11th Cir. 2004)..............................................................16

*Diaz Aviation Corp. v. Airport Aviation Servs., Inc.,*
    716 F.3d 256 (1st Cir. 2013)..............................................................13, 14

*Doctors' Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.,*
    123 F.3d 301 (5th Cir. 1997) ..............................................................70

*Duty Free Ams. v. Estee Lauder Cos.,*
    797 F.3d 1248 (11th Cir. 2015)..............................................................16

*ERI Max Entm't, Inc. v. Streisand,*
    690 A.2d 1351 (R.I. 1997) (per curiam)..............................................................13

*Euromodas, Inc. v. Zanella, Ltd.,*
    368 F.3d 11 (1st Cir. 2004)..............................................................45, 51, 53, 70

*Evergreen Partnering Grp., Inc. v. Pactiv Corp.*,
    832 F.3d 1 (1st Cir. 2016) ........................................................................ 53

*Expert Masonry, Inc. v. Boone Cty., Ky.*,
    440 F.3d 336 (6th Cir. 2006) ................................................................... 71

*Exxon Co., U.S.A. v. Sofec, Inc.*,
    517 U.S. 830 (1996) ................................................................................ 55

*Fed. Auto Body Works, Inc. v. Aetna Cas. & Surety Co.*,
    447 A.2d 377 (R.I. 1982) ........................................................................ 80

*Fed. Prescription Serv. Inc. v. Am. Pharm. Ass'n*,
    663 F.2d 253 (D.C. Cir. 1981) ................................................................ 61

*Fed. Trade Comm'n v. Ticor Title Ins. Co.*,
    504 U.S. 621 (1992) ........................................................................ 77, 78

*Four Corners Nephrology Assocs. v. Mercy Med. Ctr.*,
    582 F.3d 1216 (10th Cir. 2009) (Gorsuch, J.) .................................... 16, 71

*Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*,
    711 F.3d 68 (2d Cir. 2013) ..................................................................... 74

*Golden Bridge Tech., Inc. v. Motorola, Inc.*,
    547 F.3d 266 (5th Cir. 2008) ................................................................... 45

*Golf City, Inc. v. Wilson Sporting Goods, Co.*,
    555 F.2d 426 (5th Cir. 1977) ................................................................... 75

*Great Am. Nursing Ctrs., Inc. v. Norberg*,
    567 A.2d 354 (R.I. 1989) ........................................................................ 63

*Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*,
    998 F.2d 391 (7th Cir. 1993) .............................................................. 56, 57

*Gulf States Reorganization Grp., Inc. v. Nucor Corp.*,
    822 F. Supp. 2d 1201 (N.D. Ala. 2011), *aff'd*, 721 F.3d 1281 (11th Cir. 2013) ................... 44

*Holmes v. Sec. Invr. Prot. Corp.*,
    503 U.S. 258 (1992) ................................................................................ 54

*Howard Hess Dental Labs. Inc. v. Dentsply Int'l., Inc.*,
    602 F.3d 237 (3d Cir. 2010) ................................................................... 44

*Huron Valley Hosp., Inc. v. City of Pontiac*,
    666 F.2d 1029 (6th Cir. 1981) ................................................................. 54

vi

*Imperial Irrigation Dist. v Cal. Indep. Sys. Operator Corp.*,
    146 F. Supp. 3d 1217 (S.D. Cal. 2015) ................................................................16

*Infusion Res. Inc. v. Minimed Inc.*,
    351 F.3d 688 (5th Cir. 2003) ...............................................................................75

*In re Adderall XR Antitrust Litig.*,
    754 F.3d 128 (2d Cir. 2014) ................................................................................16

*In re Canadian Import Antitrust Litig.*,
    470 F.3d 785 (8th Cir. 2006) ...............................................................55, 56, 60

*In re Elevator Antitrust Litig.*,
    502 F.3d 47 (2d Cir. 2007) (per curiam) .......................................................16, 20

*In re Musical Instruments & Equip. Antitrust Litig.*,
    798 F.3d 1186 (9th Cir. 2015) .............................................................................44

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
    466 U.S. 2 (1984), *abrogated on other grounds by* 547 U.S. 28 (2006)...............68

*K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*,
    61 F.3d 123 (2d Cir. 1995) ..................................................................................70

*Kartell v. Blue Shield of Mass., Inc.*,
    749 F.2d 922 (1st Cir. 1984) (Breyer, J.) ....................................................*passim*

*Kentucky Ass'n of Health Plans, Inc. v. Miller*,
    538 U.S. 329 (2003) ............................................................................................18

*Kolbe v. BAC Home Loans Servicing, LP*,
    738 F.3d 432 (1st Cir. 2013)................................................................................66

*Kroger Co. v. Sanofi-Aventis*,
    701 F. Supp. 2d 938 (S.D. Ohio 2010)................................................................73

*LiveUniverse, Inc. v. MySpace, Inc.*,
    304 F. App'x 554 (9th Cir. 2008) ........................................................................16

*Loren Data Corp. v. GXS, Inc.*,
    501 F. App'x 275 (4th Cir. 2012) ........................................................................31

*Mack v. Great Atl. & Pac. Tea Co.*,
    871 F.2d 179 (1st Cir. 1989)................................................................................13

*Mathews v. Lancaster Gen. Hosp.*,
    87 F.3d 624 (3d Cir. 1996) ..................................................................................70

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ......................................................................................*passim*

*Mayor and City Council of Balt. v. Citigroup, Inc.*,
   709 F.3d 129 (2d Cir. 2013) ............................................................................44

*McGlinchy v. Shell Chem. Co.*,
   845 F.2d 802 (9th Cir. 1988) ...........................................................................75

*MCI Commc'ns Corp. v. AT&T*,
   708 F.2d 1081 (7th Cir. 1983) .........................................................................76

*Mesolella v. City of Providence*,
   508 A.2d 661 (R.I. 1986).............................................................................78, 81

*Methodist Health Servs. Corp. v. OSF Healthcare Sys.*,
   859 F.3d 408 (7th Cir. 2017) ......................................................... 18, 30, 48, 70

*MetroNet Servs. Corp. v. Qwest Corp.*,
   383 F.3d 1124 (9th Cir. 2004) ....................................................... 16, 24, 28, 29

*Midwestern Waffles, Inc. v. Waffle House, Inc.*,
   734 F.2d 705 (11th Cir. 1984) (per curiam) ....................................................61

*Military Servs. Realty, Inc. v. Realty Consultants of Va., Ltd.*,
   823 F.2d 829 (4th Cir. 1987) ...........................................................................74

*Minn. Ass'n of Nurse Anesthetists v. Unity Hosp.*,
   208 F.3d 655 (8th Cir. 2000) ...........................................................................74

*Monsanto Co. v. Spray-Ride Serv. Corp.*,
   465 U.S. 752 (1984) ......................................................................................*passim*

*Morales-Villalobos v. Garcia-Llorens*,
   316 F.3d 51 (1st Cir. 2003)...............................................................................55

*Mortg. Guarantee & Title Co. v. Commw. Mortg. Co.*,
   730 F. Supp. 469 (D.R.I. 1990).........................................................................80

*Nat'l Bancard Corp. (NaBanco) v. VISA U.S.A., Inc.*,
   596 F. Supp. 1231 (S.D. Fla. 1984), *aff'd*, 779 F.2d 592 (11th Cir. 1986) ..........................73

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*,
   468 U.S. 85 (1984) ...........................................................................................69

*New Hampshire v. Maine*,
   532 U.S. 742 (2001) .........................................................................................63

*Novell, Inc. v. Microsoft Corp.*,
731 F.3d 1064 (10th Cir. 2013) (Gorsuch, J.)................................................................*passim*

*NYNEX Corp. v. Discon, Inc.*,
525 U.S. 128 (1998) ........................................................................................................69

*Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of R.I.*,
883 F.2d 1101 (1st Cir. 1989) ............................................................................... 31, 79, 82

*Omnicare, Inc. v. UnitedHealth Grp., Inc.*,
629 F.3d 697 (7th Cir. 2011) ........................................................................................45, 51

*Oxbow Carbon & Minerals LLC v. Union Pac. R.R. Co.*,
926 F. Supp. 2d 36 (D.D.C. 2013) ...................................................................................73

*Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*,
555 U.S. 438 (2009) ............................................................................................ 14, 16, 31, 69

*Parker v. Brown*,
317 U.S. 341 (1943) ........................................................................................................76

*Perry v. Blum*,
629 F.3d 1 (1st Cir. 2010)................................................................................................62

*Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*,
507 F.3d 117 (2d Cir. 2007) ............................................................................................16

*Raitport v. Gen. Motors Corp.*,
366 F. Supp. 328 (E.D. Pa. 1973) ....................................................................................29

*Read v. Medical X-Ray Ctr., P.C.*,
110 F.3d 543 (8th Cir. 1997) ...........................................................................................57

*Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*,
28 F.3d 1379 (5th Cir.1994) ............................................................................................74

*Roy v. Woonsocket Inst. for Sav.*,
525 A.2d 915 (R.I. 1987)..................................................................................................78

*Royal Drug Co. v. Grp. Life & Health Ins. Co.*,
737 F.2d 1433 (5th Cir. 1984) ....................................................................................45, 51

*RSA Media, Inc. v. AK Media Grp., Inc.*,
260 F.3d 10 (1st Cir. 2001).........................................................................................*passim*

*S. Motor Carriers Rate Conf. v. United States*,
471 U.S. 48 (1985)...........................................................................................................77

ix

*Santiago-Ramos v. Centennial P.R. Wireless Corp.*,
    217 F.3d 46 (1st Cir. 2000) ........................................................................ 13

*Schor v. Abbott Labs.*,
    457 F.3d 608 (7th Cir. 2006) ..................................................................... 16

*Scott v. Harris*,
    550 U.S. 372 (2007) ................................................................................... 61

*SMS Sys. Maint. Servs., Inc. v. Dig. Equip. Corp.*,
    188 F.3d 11 (1st Cir. 1999) .................................................................. 69, 70

*Spectrum Sports, Inc. v. McQuillan*,
    506 U.S. 447 (1993) ................................................................................... 68

*Springfield Terminal Ry. Co. v. Canadian Pac. Ltd.*,
    133 F.3d 103 (1st Cir. 1997) ..................................................................... 69

*Stamatakis Indus., Inc. v. King*,
    965 F.2d 469 (7th Cir.1992) ....................................................................... 69

*Stein v. Pac. Bell*,
    172 F. App'x 192 (9th Cir. 2006) ............................................................... 16

*Sterling Merch., Inc. v. Nestle, S.A.*,
    656 F.3d 112 (1st Cir. 2011) .............................................................. *passim*

*Steward Health Care Sys., LLC, v. Blue Cross & Blue Shield of R.I.*,
    997 F. Supp. 2d 142 (D.R.I. 2014) .................................................... *passim*

*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*,
    239 F. Supp. 2d 180 (D.R.I. 2003) ............................................................. 13

*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*,
    373 F.3d 57 (1st Cir. 2004) ........................................................... 45, 48, 70

*Sullivan v. Nat'l Football League*,
    34 F.3d 1091 (1st Cir. 1994) ....................................................... 54, 55, 69

*Taylor v. Am. Chem. Council*,
    576 F.3d 16 (1st Cir. 2009) ....................................................................... 12

*Textron Fin. Corp. v. Ship and Sail, Inc.*,
    No. 09-617, 2011 WL 344134 (D.R.I. 2011) ........................................ 79, 80

*Top Markets, Inc. v. Quality Markets, Inc.*,
    142 F.3d 90 (2d Cir. 1998) ....................................................................... 71, 74

*Town of Concord v. Boston Edison Co.*,
   915 F.2d 17 (1st Cir. 1990) (Breyer, C.J.) ..................................................... 36, 38

*United States v. Colgate*,
   250 U.S. 300 (1919) ................................................................................................ 14

*United States v. Giordano*,
   898 F. Supp. 2d 440 (D.R.I. 2012) ...................................................................... 13

*United States v. Mead Corp.*,
   533 U.S. 218 (2001) ................................................................................................ 63

*United States v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001) .............................................................................. 69

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*,
   540 U.S. 398 (2004) ..................................................................................... *passim*

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*,
   549 U.S. 312 (2007) ................................................................................................ 14

*White v. R.M. Packer Co.*,
   635 F.3d 571 (1st Cir. 2011) ......................................................................... 43, 53

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
   395 U.S. 100 (1969) ................................................................................................ 55

**Statutes**

Sherman Act .............................................................................................. *passim*

15 U.S.C. § 15(a) .............................................................................................. 54

R.I. GEN. LAWS § 6-36-5 ............................................................................... 10

R.I. GEN. LAWS § 6-36-2 ............................................................................... 13

R.I. GEN. LAWS § 27-19-6 ............................................................................. 37

R.I. GEN. LAWS § 27-19.2-10 .................................................................. 36, 37

R.I. GEN. LAWS § 42-14.5-1 ......................................................................... 37

R.I. GEN. LAWS § 42-14.5-2 .................................................................... 37, 63

R.I. GEN. LAWS § 42-14.5-3 ......................................................................... 37

R.I. GEN. LAWS § 42-14-17 ........................................................................... 63

**Rules and Regulations**

Fed. R. Civ. P. 56(a) ...................................................................................... 12

Fed. R. Evid. 403 .......................................................................................... 12

Fed. R. Evid. 702 .......................................................................................... 12

42 C.F.R. § 422.111(e) .................................................................................. 41

2011 R.I. REG. TEXT 253203 (Mar. 24, 2011) ............................................... 63

R.I. ADMIN. CODE § 31-1-14 ..................................................................... 40, 41

R.I. ADMIN. CODE § 32-1-2. ........................................................................... 63

**Other Authorities**

Frank H. Easterbrook, *The Chicago School and Exclusionary Conduct*, 31 Harv.
    J.L. & Pub. Pol'y 439, 442 (2008) ........................................................... 16

J. Miles, HEALTH CARE AND ANTITRUST LAW §15B:9 (2017) ...................... 18

P. Areeda & H. Hovenkamp, ANTITRUST LAW (2d ed. 2000) ......................... 53, 55, 68

Restatement (Second) Torts (Am. Law Inst. 1979) ..................................... 81

## INTRODUCTION

Steward Health Care System LLC, et al., ("Steward") blames Blue Cross & Blue Shield of Rhode Island ("Blue Cross") for Steward's own decision to terminate its Asset Purchase Agreement ("APA") to acquire Landmark Medical Center ("Landmark"). Steward claims that Blue Cross is somehow responsible for Steward's decision to abandon the acquisition because Blue Cross would not pay Steward the reimbursement rates Steward demanded for Landmark. But the record shows that:



*See* Statement of Undisputed Facts ("SOUF") ¶¶ 86, 99, 111-18. Moreover,

*Id.* at ¶¶ 122-23.

Steward has tried to spin a tale of anticompetitive conduct and conspiracy around these facts. After millions of pages of produced documents, dozens of depositions, seven experts, and millions of dollars in costs, Steward's claims have *no* basis in fact or law. The undisputed evidence disproves every material allegation Steward asserted in its Amended Complaint. For example:

- Steward alleged that Blue Cross "refus[ed] to negotiate in good faith for reasonable reimbursement rates for Landmark," Am. Compl. ¶ 4, when the record evidence shows that,

  SOUF ¶¶ 58-61, 86.

- Steward alleged that Blue Cross *caused* Steward to abandon the Landmark acquisition, Am. Compl. ¶ 4, Redacted
  ████████████████████████████████████████
  ████████████████████████████████████████
  ████████████████████████████████████████
  ████████████████████████████████████████
  █████████████████ SOUF ¶¶ 111-18.

- Steward alleged that Blue Cross conspired with Thundermist Health Center ("Thundermist") and Lifespan to thwart Steward's purchase of Landmark, Am. Compl. ¶ 37, when there is no record evidence of any such agreement. SOUF ¶¶ 43-44, 65-75.

- Steward alleged that it would *compete* with Blue Cross by selling health insurance in Rhode Island, Am. Compl. ¶ 73, when the record evidence shows Redacted
  ████████████████████████████████████████
  ████████████████████████████████████████
  █████████████████ SOUF ¶¶ 16-20.

- Steward alleged that its failure to buy Landmark harmed Rhode Islanders, Am. Compl. ¶ 76, when the record evidence shows that Redacted
  ████████████████████████████████████████ SOUF ¶¶ 119-30.

Other evidence also exposes Steward's meritless damages claims. Steward's own CEO, Dr.

Ralph de la Torre, Redacted ████████████████████████████████████

████████████████████████████████████████
████████████████████████████████████████
███████

*Id*. at ¶ 91. Redacted ████████████████████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

2

Redacted

███████████████████████████████████████████

████████████ *why did Steward abandon the transaction?* As discussed in Blue Cross' concurrently filed motion to exclude testimony from Steward's damages experts,[1] the antitrust laws bar Steward from recovering a putative Redacted ████████████████████████.

The undisputed evidence shows that Redacted ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ There is no antitrust relief for such a claim.

Blue Cross is entitled to judgment as a matter of law because there is no genuine dispute as to any material fact on several independent—and *dispositive*—issues, all of which render the substantial expense of a trial unnecessary in this case.

***No refusal to deal***. The record shows that Steward refused to *accept*—not that Blue Cross refused to *deal*. Redacted █████████████████████████ *Id*. at ¶ 86. B Redacted ██████████████████████████████████████████████████████████████████████████████

---

[1]      *See* Mot. to Exclude Damages Testimony of Keith Ghezzi and Marc Sherman.

[Redacted] A contrary rule would require the Court to act as a regulator or central planner, determining not only which hospitals Blue Cross must include in its provider network, but also what rates such hospitals must be paid. Moreover, this would require the Court to override decisions by the Rhode Island Office of the Health Insurance Commissioner ("OHIC"), [Redacted] ████████████████████████████████████████████████████████ *Id.* at ¶¶ 4-8, 93.

*No conspiracy*. There is no evidence in the record of a conspiracy against Steward among Blue Cross, Thundermist, and/or Lifespan. [Redacted] ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ Nor can a conspiracy be inferred because there is no evidence that Blue Cross, Thundermist, or Lifespan acted contrary to their respective independent self-interests.

*No causation*. As discussed above, [Redacted] ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████ *Id.* at ¶¶ 93, 111-18. These superseding causes break the chain of causation and preclude Blue Cross' liability as a matter of law.

*No harm to competition*. The antitrust laws protect competition, not disappointed bidders. Replacing one hospital buyer with another does not harm *competition*. Prime stepped in to buy Landmark, [Redacted] ████████████████████████████████████

████████████████████████████████████████████████████████

Redacted

[REDACTED] The antitrust laws encourage such conduct; they do not forbid it.

*No damages*. Steward's claims should be dismissed because Steward's damages model fails to account for mitigable losses, is inconsistent with Steward's liability theory, and cannot distinguish between the effects of lawful and unlawful conduct. *Id*. at ¶¶ 98.

*State action doctrine.* Blue Cross' alleged anticompetitive conduct—Redacted [REDACTED]—is immune under the antitrust laws because it was compelled by binding OHIC regulations. *Id*. at ¶¶ 4-8.

*No tortious interference.* Steward claims Blue Cross interfered with its "prospective" contracts with Landmark and Thundermist. But, for the same reasons discussed above, Steward cannot show that Blue Cross engaged in *any* wrongful conduct to interfere with agreements [REDACTED]

For each of the above reasons, Blue Cross respectfully requests that the Court grant its Motion for Summary Judgment against Steward on all claims in its Amended Complaint pursuant to Rule 56 of the Federal Rules of Civil Procedure and LR Cv 56 of the Local Rules of the United States District Court for the District of Rhode Island.

## SUMMARY OF THE UNDISPUTED MATERIAL FACTS[2]

This case arises from Steward's failed acquisition of Landmark, a financially distressed community hospital in a prolonged court-supervised mastership proceeding. Am. Compl. ¶¶ 22-23. Redacted

[REDACTED]

---

[2] This section provides a summary of the undisputed material facts for background purposes. The Statement of Undisputed Facts, filed contemporaneously with this motion, provides further detail.

Redacted

. *Id.* at ¶ 61.

Redacted

Redacted

Redacted

Redacted

While Steward claims Blue Cross "conspired" with Thundermist and Lifespan, no reasonable juror could find that Blue Cross entered into an agreement with Thundermist and Lifespan to prevent Steward from acquiring Landmark. Redacted

Redacted

Similarly, Blue Cross did not enter into any agreement with Thundermist regarding Steward. Redacted

[Redacted] caused no harm to competition or consumers. Instead, it *benefited* Rhode Islanders in the form of a *revitalized* Landmark hospital [Redacted].

## PROCEDURAL HISTORY

Steward filed its initial complaint against Blue Cross four years ago on June 4, 2013. Dkt. 1. That complaint alleged that Blue Cross "refus[ed] to enter into a contract with Steward providing for reasonable reimbursement rates at Landmark"; "interfere[ed] with Steward's ability to enter into contracts with third parties, such as Thundermist Health Center"; and "terminat[ed] its contracts with Steward at Saint Anne's." *Id.* at ¶ 66. Steward alleged that Blue Cross' *unilateral* conduct violated Section 2 of the Sherman Act and Section 6-36-5 of the Rhode Island Antitrust Act (monopolization and attempted monopolization) and also tortiously interfered with Steward's actual and prospective contracts. *Id.* at ¶¶ 62-114.

Blue Cross filed a Motion to Dismiss on July 15, 2013. Dkt. 16. The motion argued, among other things, that Blue Cross had no duty to deal with Steward under the antitrust laws. The Court denied Blue Cross' motion on February 19, 2014. Dkt. 34. The Court found that, under controlling Supreme Court precedent, the "baseline requirements" of a refusal-to-deal claim are: the "unilateral abandonment of a voluntary course of dealing, forsaking of short-term profits, refusal to transact business with the plaintiff even if compensated at rates set by the defendant, and concomitant inability to provide a legitimate business rationale." *Id.* at 13 (citations omitted). The Court assumed various facts alleged by Steward were true for purposes of Blue Cross' motion to dismiss, including:

- "Steward also sells health insurance." *Id.* at 2.

- Blue Cross' actions were "contrary to Blue Cross' short-term financial interests." *Id.* at 15.

- "Blue Cross' alleged conduct served to decrease competition by denying Steward access to the Rhode Island market." *Id*. at 24-25.

- Blue Cross' "actions were the proximate cause of the collapse of the Landmark acquisition." *Id*. at 28.

The Court noted that the issues of whether Blue Cross offered "reimbursement rate *increases* at Landmark" and whether Blue Cross rates constituted "unreasonable terms and conditions amounting to a practical refusal to deal" could not be resolved because "there is no record at this early stage of the litigation." *Id*. at 16 (emphasis original). After discovery commenced, Steward filed an Amended Complaint on August 26, 2015, adding claims under Section 1 of the Sherman Act that Blue Cross engaged in the same conduct as part of an alleged conspiracy with Thundermist and Lifespan. Dkt. 90.

Discovery in this case has been extensive. Blue Cross ultimately produced over 2 million pages of documents in response to Steward's five sets of requests for production, which included 167 separate requests. The parties took 46 fact depositions and have submitted five expert reports totaling over 900 pages from seven different experts, each of whom was deposed.[3] Steward's experts and reports include:

- Report of Professor Leemore Dafny ("Dafny Report") (Ex. 29 to SOUF)

- Report of David Eisenstadt ("Eisenstadt Report") (Ex. 132 to SOUF)

- Report of Keith Ghezzi and Marc Sherman ("A&M Report") (Ex. 1 hereto)

Blue Cross' experts and reports include:

---

[3]     Steward submitted its initial reports on March 22, 2017. However, Steward *repeatedly* submitted late expert disclosures after this deadline, including notifying Blue Cross that its experts intended to submit a revised damages model the *night before* its damages expert was to be deposed. Steward did not produce that model until May 30, 2017, over two months after Steward's court-ordered expert disclosure deadline. The revisions to Steward's damages model required Blue Cross to submit revised expert reports for its own experts on June 23, 2017, to accommodate Steward's late disclosures.

- Report of Monica Noether ("Noether Report") (Ex. 25 to SOUF)

- Report of Melvin (Chip) Hurley and J. Mark Abernathy ("BRG Report") (Ex. 24 to SOUF)

Contemporaneously with this Motion for Summary Judgment, Blue Cross has filed two related motions to exclude certain testimony from Dr. Eisenstadt, Dr. Ghezzi, and Mr. Sherman under Rules 403 and 702 of the Federal Rules of Evidence.[4]

The fact and expert record in this matter is robust.[5] As set forth in the accompanying Statement of Undisputed Facts, the documents and testimony also have been entirely consistent, with no genuine dispute on any material fact related to the required legal elements of Steward's antitrust and tort claims, including on those factual issues recognized in the Court's ruling on Blue Cross' Motion to Dismiss.

## LEGAL STANDARD

A court must grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). Although a court must "resolve all reasonable inferences in favor of the non-moving party," it must also "ignore conclusory allegations, improbable inferences, and unsupported speculation." *Taylor v. Am. Chem. Council*, 576 F.3d 16, 24 (1st Cir. 2009) (quotation marks omitted).

---

[4]    *See* Mot. to Exclude Expert Testimony of David Eisenstadt and Mot. to Exclude Damages Testimony of Keith Ghezzi and Marc Sherman.

[5]    Although the parties have generally reached agreement on discovery disputes, Blue Cross was denied discovery regarding Steward's operations in Massachusetts, Dkt. 55, and communications between Steward, Landmark, the Special Master, and others regarding Steward's actual reasons for abandoning the Landmark transaction, Dkt. 154.

The moving party bears the burden of establishing that no genuine dispute of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Once the moving party makes this showing, the nonmoving party must point to specific facts demonstrating a trialworthy issue." *United States v. Giordano*, 898 F. Supp. 2d 440, 447 (D.R.I. 2012) (citation omitted). The nonmovant, however, "may not rest merely upon the allegations or denials in its pleading, but must set forth specific facts showing that a genuine dispute of material fact exists as to each issue upon which it would bear the ultimate burden of proof at trial." *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 53 (1st Cir. 2000) (quotation marks omitted). "[E]vidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial." *Mack v. Great Atl. & Pac. Tea Co.*, 871 F.2d 179, 181 (1st Cir. 1989).

## ARGUMENT

**I.   BLUE CROSS IS ENTITLED TO SUMMARY JUDGMENT ON STEWARD'S MONOPOLIZATION CLAIMS BECAUSE BLUE CROSS DID NOT REFUSE TO DEAL WITH STEWARD.**

Steward sues for monopolization (Counts I, V, IX, and XIII) and attempted monopolization (Counts II, VI, X, and XIV) under Section 2 of the Sherman Act and under the Rhode Island Antitrust Act.[6] To establish unlawful monopolization, a plaintiff must show "(1) possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Diaz Aviation Corp. v. Airport Aviation*

---

[6]      The Rhode Island Antitrust Act must "be construed in harmony with judicial interpretations of comparable federal antitrust statutes insofar as practicable." R.I. GEN. LAWS § 6-36-2(b); *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 239 F. Supp. 2d 180, 186–87 (D.R.I. 2003) ("The provisions of the Rhode Island Antitrust Act mirror those of §§ 1-2 of the Sherman Act … and are construed in the same manner as the federal statutes.") (citation omitted); *ERI Max Entm't, Inc. v. Streisand*, 690 A.2d 1351, 1353 n.1 (R.I. 1997) (per curiam) (same). As a result, if the federal claims fail, the state claims fail too.

*Servs., Inc.*, 716 F.3d 256, 265 (1st Cir. 2013) (quotation omitted).[7] Steward alleges that Blue Cross monopolized, or attempted to monopolize, both the market for the purchase of hospital services and the market for the provision of health insurance. These claims turn on the same alleged conduct: Blue Cross' alleged refusal to deal with Steward at two hospitals, Landmark and Saint Anne's.[8] The record shows that Steward cannot satisfy the required elements of a refusal-to-deal claim as a matter of law, and the Court should grant Blue Cross summary judgment on Steward's Section 2 claims.

The Supreme Court has recognized for over a century that "[a]s a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 448 (2009) (citing *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)). Indeed, "as a general matter, the Sherman Act does not restrict the long recognized right of [a company] engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*, 540 U.S. 398, 408 (2004) (internal quotations omitted). The Supreme Court has been "very cautious" in recognizing exceptions to this general rule, *id.*, and only in "rare instances" is "purely unilateral conduct" by an alleged monopolist ever found unlawful. *Linkline*, 555 U.S. at 448.

---

[7]     The legal standard for attempted monopolization is similar. A plaintiff must show "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Diaz Aviation Corp.*, 716 F.3d at 265. Note that Blue Cross does not concede that Steward can satisfy *any* elements of its antitrust or tort claims, including those like market definition and market power, which are not the subject of this motion.

[8]     Although Steward alleges separate monopolization and monopsonization claims, the claims challenge the same conduct under the same legal analysis. *See, e.g.*, *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 320–22 (2007) (finding that "a monopsony is to the buy side of the market what a monopoly is to the sell side," and that monopsony is simply the "mirror image" of monopoly (citations omitted)).

The contours of the narrow exception to the general rule that a monopolist has no duty to deal with others are set forth in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985). In that case, the defendant owned three of four mountain skiing areas in Aspen, Colorado, while the plaintiff owned the fourth. The defendant cooperated with the plaintiff in a joint venture for more than 15 years to issue a joint ski-lift ticket to all four mountains, but then suddenly terminated the arrangement, refusing to sell the plaintiff ski-lift tickets to its three mountains even at the retail price it offered to consumers. *Id*. at 589-93. The court held that even a monopolist may "reject a novel offer to participate in a cooperative venture," *id*. at 603, but that these unique facts showed that the defendant "was not motivated by efficiency concerns and [] was willing to sacrifice short-run benefits and consumer goodwill in exchange for a perceived long-run impact on its smaller rival," *id*. 610-11.

The Supreme Court has since held that "*Aspen Skiing* is at or near the outer boundary of § 2 liability." *Trinko*, 540 U.S. at 409. Under *Aspen Skiing* and *Trinko*, this Court has summarized the "baseline requirements" of a refusal-to-deal claim as:

- The "unilateral abandonment of a voluntary course of dealing,

- forsaking of short-term profits,

- refusal to transact business with the plaintiff even if compensated at rates set by the defendant, and

- concomitant inability to provide a legitimate business rationale."

*Steward Health Care Sys., LLC, v. Blue Cross & Blue Shield of R.I.*, 997 F. Supp. 2d 142, 153 (D.R.I. 2014). The *Trinko* court applied these requirements and affirmed dismissal of the plaintiff's complaint. *Trinko*, 540 U.S. 410. Numerous courts have followed suit and dismissed

claims at the pleading stage for failure to satisfy the *Trinko* elements.[9] Numerous other courts have entered summary judgment against plaintiffs that have failed to satisfy these elements.[10] Indeed, after being rejected by the Supreme Court twice in *Trinko* and *Linkline*—and by numerous District and Circuit courts since—the unilateral refusal-to-deal doctrine is on its "last gasp." Frank H. Easterbrook, *The Chicago School and Exclusionary Conduct*, 31 Harv. J.L. & Pub. Pol'y 439, 442 (2008).

The extensive evidentiary record in this case shows that Steward cannot satisfy *any* of the four elements that *Trinko* and *Aspen Skiing* require. **First**, Blue Cross did not have a prior course of dealing with *Steward* and Redacted ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████ *Id.*

at ¶ 86(l)-(m). **Second**, Redacted ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████ *Id.* at ¶¶ 122, 123. **Third**, Blue Cross

offered Redacted ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

---

[9]      *See, e.g., Duty Free Ams. v. Estee Lauder Cos.*, 797 F.3d 1248, 1268 (11th Cir. 2015); *Imperial Irrigation Dist. v Cal. Indep. Sys. Operator Corp.*, 146 F. Supp. 3d 1217 (S.D. Cal. 2015); *In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 134–35 (2d Cir. 2014); *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188 (10th Cir. 2009); *LiveUniverse, Inc. v. MySpace, Inc.*, 304 F. App'x 554 (9th Cir. 2008); *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117 (2d Cir. 2007); *In re Elevator Antitrust Litig.*, 502 F.3d 47 (2d Cir. 2007) (per curiam); *Schor v. Abbott Labs.*, 457 F.3d 608 (7th Cir. 2006); *Stein v. Pac. Bell*, 172 F. App'x 192 (9th Cir. 2006); *Covad Commc'ns Co. v. Bell Atl. Corp.*, 398 F.3d 666 (D.C. Cir. 2005); *ASAP Paging Inc. v. CenturyTel of San Marcos Inc.*, 137 F. App'x 694 (5th Cir. 2005) (per curiam); *Covad Commc'ns. Co. v. BellSouth Corp.* 374 F.3d 1044 (11th Cir. 2004).

[10]      *See, e.g., Aerotec Int'l v. Honeywell Int'l*, 836 F.3d 1171, 1183 (9th Cir. 2016); *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1075 (10th Cir. 2013) (Gorsuch, J.); *Four Corners Nephrology Assocs. v. Mercy Med. Ctr.*, 582 F.3d 1216, 1225 (10th Cir. 2009) (Gorsuch, J.); *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1134 (9th Cir. 2004).



**Redacted**

*id.* at

¶¶ 58-61. ***Fourth***, although   **Redacted**

*id.* at ¶¶ 4-8, 86, 93, 99. ***Fifth***, Steward seeks an unprecedented duty to deal with no meaningful limit that would require the Court to act as a regulator, with potentially dire effects on the availability and cost of healthcare services for Rhode Islanders. ***Sixth***, Blue Cross had a clear business rationale for deciding not to renew its contract with Steward at Saint Anne's Hospital—**Redacted**

*Id.* at ¶ 133. ***Finally***, the various other Blue Cross actions alleged by Steward were required by binding state and federal regulations. *Id.* at ¶¶ 104-109. Each of these issues will be discussed in turn.

### A.    Blue Cross Did Not Terminate a Prior Voluntary Course of Dealing.

A refusal-to-deal plaintiff must show a "preexisting voluntary and presumably profitable course of dealing between the monopolist and rival," *Novell*, 731 F.3d at 1074; *accord Trinko*, 540 U.S. at 409–10. Blue Cross did not terminate a prior voluntary course of dealing with Steward because: (1) Blue Cross has *never* had a course of dealing with Steward and **Redacted** SOUF ¶¶ 85, 110, 122; and (2) **Redacted**

*id.* at ¶ 86.

As a threshold matter, it is not only lawful, but *procompetitive* for a health insurer to include less than all hospitals in its provider network. *Id.* at ¶¶ 37-41. According to the Federal Trade Commission, "[t]he ability of health plans to construct networks that include some, but not

all, providers (so called 'selective contracting') has long been seen as an important tool to enhance competition and lower costs in markets for health care goods and services."[11] As both Blue Cross *and* Steward expert economists agreed, Redacted

Redacted

Redacted SOUF ¶ 38.

Steward's expert Dr. Dafny even opined Redacted

Redacted

Redacted

Redacted. *Id.* at ¶ 40. Judge Posner recently affirmed summary judgment for a hospital system where its competitor was excluded from health insurers' networks, reasoning that "an insurance company may get better rates from a hospital in exchange for agreeing to an exclusive contract, as exclusivity will drive a higher volume of business to the hospital." *Methodist Health Servs. Corp. v. OSF Healthcare Sys.*, 859 F.3d 408, 410 (7th Cir. 2017).[12] The implication of Steward's refusal-to-deal claim is that Blue Cross must forego the benefits of selective contracting and contract with *every* hospital in Rhode Island,

---

[11]     SOUF ¶ 37; s*ee also* J. Miles, HEALTH CARE AND ANTITRUST LAW §15B:9 (2017) ("[A] health plan may engage in selective or exclusive contracting, by which it contracts with only a limited set of providers rather than all. Selective contracting is a prominent and important characteristic of managed care to reduce health-care costs.").

[12]     *See also Kentucky Ass'n of Health Plans, Inc. v. Miller*, 538 U.S. 329, 332 (2003) (finding that insurers use selective contracting to "control the quality and cost of health-care delivery"); *Abraham v. Intermountain Health Care, Inc.*, 394 F. Supp. 2d 1312 (D. Utah 2005), aff'd, 461 F.3d 1249, 1254 (10th Cir. 2006) ("Because panel providers accept lower payments for their services to [the payer's] enrollees in exchange for increased patient volumes directed to them as a panel provider, costs may decline and premiums may decrease when provider panels become smaller and more exclusive. Therefore, [the payer] limits the number of health care providers with whom it contracts."); *Kartell v. Blue Shield of Mass., Inc.*, 749 F.2d 922, 932 (1st Cir. 1984) (Breyer, J.) (A health insurer's "independent determination of the terms on which it will deal, of the customers to whom it will sell, and of the suppliers from whom it will purchase is a manifestation of the competitive process, not an effort to suppress or to destroy that process.") (citation omitted).

18

including a [Redacted] It is against this backdrop that Blue Cross' conduct should be judged.

*First*, [Redacted]

[Redacted]

Steward cannot rely on Blue Cross' course of dealing with *Landmark* to show a refusal to deal with *Steward*. In *Aspen Skiing*, the Supreme Court stressed that "the monopolist did not merely reject a novel offer to participate in a cooperative venture that had been proposed by a competitor." 472 U.S. at 603. "Rather, the monopolist elected to make an important change in the *pattern* of distribution that had originated in a competitive market and had *persisted for several years*" and was presumably procompetitive as a result. *Id.* at n.31 (citation omitted) (emphasis added). It was the defendant's decision to "cease participation" in this profitable, long-running joint venture that the Court found "significant." *Trinko*, 540 U.S. at 409. Without a prior course of dealing as a guide, a court must determine the terms of dealing for two parties who have never before dealt with each other. *See Chicago Prof'l Sports Ltd. P'ship v. Nat'l Basketball Ass'n*, 95 F.3d 593, 597 (7th Cir. 1996) (Easterbrook, J.) (reversing district court when its opinion "read[] like the ruling of an agency exercising a power to regulate rates" even though "the antitrust laws do not deputize district judges as one-man regulatory agencies").

Here, Blue Cross did not withdraw from any established business relationship with Steward. Unlike in *Aspen Skiing*, the failure to reach an agreement here "disrupted" no past

19

"pattern of distribution" between Blue Cross and Steward that might have shown anticompetitive intent. 472 U.S. at 603 & n.31 (citation omitted). As a result, "[Blue Cross'] prior conduct sheds no light upon the motivation of its refusal to deal." *See Trinko*, 540 U.S. at 409; *accord In re Elevator Antitrust Litig.*, 502 F.3d 47, 54 (2d Cir. 2007) (per curiam) (affirming dismissal of refusal-to-deal claim when the complaint failed to allege "that defendants terminated a prior relationship with elevator service providers—a change which … could evince monopolistic motives"). The prior course of dealing requirement "keeps courts, too, out of the business of initiating collusion and helps address, at least to some extent, administrability concerns— presumably profitable terms already agreed to by the parties may suggest terms a court can use to fashion a remedial order without having to cook them up on its own." *Novell*, 731 F.3d at 1074–75. But here, with no prior course of dealing, Steward sues Blue Cross for "merely reject[ing] a novel offer." *See Aspen Skiing*, 472 U.S. at 603.

 ***Second***, even if there had been a prior voluntary course of dealing between Steward and Blue Cross, there is no evidence that Blue Cross "abandoned" or "terminated" it. *See Trinko*, 540 U.S. at 409. Redacted





Redacted

*Id.* at ¶¶ 86, 102-110, 122. The above undisputed evidence regarding Redacted
is sufficient—by itself—to defeat Steward's refusal-to-deal claims.

Yet there is more. Steward's internal correspondence and deposition testimony reveal that
Redacted

In contrast, the documents produced in discovery show that Redacted

Redacted

---

[13] Redacted

Redacted

Redacted

There is no legal precedent for a refusal-to-deal claim where Redacted

No reasonable juror could conclude that Blue Cross is liable for a unilateral refusal to deal under such circumstances.

**B.    Blue Cross Did Not Act Against Its Business Interests to Harm a Competitor.**

Steward's refusal-to-deal claim must fail because there is no evidence of Blue Cross' "willingness to sacrifice short-term benefits in order to obtain higher profits in the long run from the exclusion of competition." *See MetroNet Servs. Corp.*, 383 F.3d at 1132 (citation omitted). Steward cannot satisfy this standard because: (1) Blue Cross' conduct was consistent with its business interests and (2) Steward was not a competitor of Blue Cross and Redacted

*First*, Blue Cross' conduct was consistent with its business interests. As discussed above,

Redacted

Redacted

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████. *See Kartell*, 749 F.2d at 931

("[C]ourts at least should be cautious—reluctant to condemn too speedily—an arrangement that,

on its face, appears to bring low price benefits to the consumer.") (citation omitted).

Redacted

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████ *Id.* at ¶ 355. This makes no sense.

Redacted

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

Redacted

In contrast, Redacted

**Second**, Blue Cross' conduct was not aimed at harming a competitor because Steward

does not compete with Blue Cross Redacted . Steward sells healthcare services; it

---

14   Redacted

does not sell insurance. Although Steward alleged that Blue Cross' conduct denied Steward "entry into the Rhode Island markets for the sale of commercial health insurance," *Steward*, 997 F. Supp. 2d at 148-49, <span style="color:red">Redacted</span>

SOUF ¶ 10.

Steward's fallback theory is that its "narrow-network" products or "risk-based" contracts with insurers were competitive threats to Blue Cross. As for narrow-network products, the record shows that <span style="color:red">Redacted</span>

*Id.* at ¶¶ 86, 93, 99.

<span style="color:red">Redacted</span>

Redacted

### C.   Blue Cross Did Not Refuse to Sell at Retail Prices.

*Trinko* and *Aspen Skiing* require Steward to establish that "Blue Cross offered a product or service for sale to the public at a retail price that it then refused to provide to Steward on the same terms." *Steward*, 997 F. Supp. 2d at 155. This requirement is important because it ensures an administrable remedy. "If the defendant already sells the product in an existing market to certain customers but merely refuses to sell to its competitors, the court can impose a judicial remedy that does not require the court to assume the day-to-day controls characteristic of a regulatory agency." *MetroNet*, 383 F.3d at 1133 (quotation omitted). "The court can simply order the defendant to deal with its competitors on the same terms that it already deals with others in the existing retail market, without setting the terms of dealing." *Id.* But "if the defendant does not already provide the product in an existing market or otherwise make it available to the public, the court will have to delineate the defendant's sharing obligations, and an antitrust court is unlikely to be an effective day-to-day enforcer of these detailed sharing obligations." *Id.* (quotation omitted).

As a threshold matter, Steward seeks to impose on Blue Cross an antitrust duty to *buy* hospital services, rather than the narrow duty to *sell* that the case law recognizes. There is no legal basis for a "refusal to buy" claim, particularly here. As in *Aspen Skiing*, a court may be able

28

to infer a "distinctly anticompetitive bent" from a defendant's unwillingness to *sell* commodity products at the retail prices made available to others. *Trinko*, 540 U.S. at 409. But no such inference can be made from a defendant's unwillingness to *buy* highly differentiated services that the defendant neither wants nor needs. *See, e.g.*, *Raitport v. Gen. Motors Corp.*, 366 F. Supp. 328, 331 (E.D. Pa. 1973) ("[N]othing in the Sherman Act is designed to require a manufacturer to purchase goods from any particular supplier."). This is particularly true with hospital services where, as discussed above, Redacted

[Redacted]

A court cannot infer a "distinctly anticompetitive bent" from a breakdown in contract negotiations over the purchase of such services. *See Trinko*, 540 U.S. at 409.

Steward's response, accepted as true for purposes of Blue Cross' Motion to Dismiss, was that "Blue Cross refused to purchase similar services from Steward that it purchased from other providers, at prices significantly below what Blue Cross was willing to pay those other providers." *Steward*, 997 F. Supp. 2d at 156. Namely, Steward alleges that it demanded rates that were "5% less than the average rates Blue Cross was paying to other providers in Rhode Island." *Id*. at 150. Redacted

29

Redacted

███████ SOUF ¶¶ 58-60.

No two hospitals are identical. A particularly stark divide exists, however, between "community hospitals" (that offer routine primary and secondary care) and "academic medical centers" that offer much "more extensive services" (such as tertiary and quaternary care). *OSF Healthcare*, 859 F. 3d at 410; *see also* SOUF ¶¶ 31-33. Redacted

██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████████████████ is similarly

unreasonable in Rhode Island.

Steward would have the Court believe that the rates that Blue Cross offered were so unreasonable that Blue Cross *practically* refused to deal with Steward. *Cf. Steward*, 997 F. Supp. 2d at 154. As a threshold matter, courts have rejected refusal-to-deal claims when, as here, there is no refusal to deal at all and the plaintiff simply wants better terms than the defendant offers. *See, e.g., Linkline*, 555 U.S. at 450 (rejecting unilateral refusal-to-deal claim because monopolist "certainly has no duty to deal under terms and conditions that the rivals find commercially advantageous").[15] Indeed, "a policy of insisting on a supplier's lowest price ... tends to further competition on the merits and, as a matter of law, is not exclusionary." *Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of R.I.*, 883 F.2d 1101, 1110-11 (1st Cir. 1989) ("[A] health insurer's unilateral decisions about the prices it will pay providers do not violate the Sherman Act ... even if the insurer is assumed to have monopoly power in the relevant market. ... [T]he insurer—like any buyer of goods or services—is lawfully entitled to bargain with its providers for the best price it can get.") (citations omitted).

While alleged "unreasonable" rates provide no legal basis for a claim, the claim also fails for want of any evidence that the rates were, in fact, "unreasonable." The undisputed evidence shows  Redacted

---

[15]     *See also Aerotec*, 836 F.3d at 1184 (affirming summary judgment for defendant on refusal to deal claim where the plaintiff "simply did not like the business terms offered by" the defendant); *Loren Data Corp. v. GXS, Inc.,* 501 F. App'x 275, 283 (4th Cir. 2012) (rejecting unilateral refusal to deal claim where defendant "proposed terms for a commercial relationship" and plaintiff was simply "not satisfied with its terms").



. None of this evidence is disputed. Accordingly, no reasonable juror could

find that Blue Cross refused to *buy* services from Steward at *non-retail* rates that are lower than

those Blue Cross paid to other sellers for similar services.

**D.**     **Blue Cross Had a Legitimate Business Rationale.**

Blue Cross had a legitimate business rationale for its contract negotiating position with Steward. The uncontroverted evidence in the record demonstrates two things: (1) Blue Cross' business interest would have been served by Redacted

*id*. at ¶¶ 86, 122.

Redacted



Redacted

as discussed above.

*Id.* at ¶ 86. But just because Blue Cross chose to engage in negotiations with Steward does *not* mean that Blue Cross had a duty to pay whatever rates Steward demanded. Blue Cross was not Redacted

It is clearly in Blue Cross' independent economic interest, and in the interest of its subscribers, to keep hospital rates as low as possible because higher rates result in higher premiums. And, as discussed above, Blue Cross' approach Redacted

*Id.* at ¶¶ 122-23. Given these uncontested facts, no reasonable juror could find that Blue Cross' conduct lacked business justification.

**E.    The Court Should Not Impose on a State-Regulated Insurer a Novel Antitrust Duty to Purchase Hospital Services.**

A court threading "the narrow-eyed needle of refusal to deal doctrine," *Novell*, 731 F.3d at 1074, should proceed "very cautious[ly] … because of the uncertain virtue of forced sharing and the difficulty of identifying and remedying anticompetitive conduct by a single firm,"

34

*Trinko*, 540 U.S. at 408. "[T]he antitrust laws rarely impose on firms—even dominant firms—a duty to deal with their rivals." *Novell,* 731 F.3d at 1067. The rationale is straightforward: "If the law were to make a habit of forcing monopolists to help competitors by keeping prices high, sharing their property, or declining to expand their own operations, courts would paradoxically risk encouraging collusion between rivals and dampened price competition—themselves paradigmatic antitrust wrongs, injuries to consumers, and the competitive process alike." *Id.* at 1073.

In this case, Steward asks the Court to find that Blue Cross had an *antitrust* duty to accept *particular* reimbursement rates proposed by the acquirer of a failing Rhode Island hospital. Steward's legal theory is unprecedented. Particularly given the nature of the highly regulated healthcare industry in Rhode Island, the Court should "apply mainstream antitrust doctrine, which allows a buyer or seller freedom to bargain for price, rather than … seek analogies with more unusual cases that do not." *Kartell,* 749 F.2d at 930. Two interrelated reasons explain why the Court should reject such a dramatic expansion of the refusal-to-deal doctrine.

***First***, the Court cannot rule in favor of Steward without assuming the role of a regulator of health insurer provider networks. The Supreme Court has cautioned that "[n]o court should impose a duty to deal that it cannot explain or adequately supervise. The problem should be deemed irremedia[ble] by antitrust law when compulsory access requires the court to assume the day-to-day controls characteristic of a regulatory agency." *Trinko*, 540 U.S. at 415 (quotation omitted). Moreover, "[e]nforced sharing also requires antitrust courts to act as central planners, identifying the proper price, quantity, and other terms of dealing—*a role for which they are ill suited.*" *Id*. at 408 (emphasis added). Here, a finding that Blue Cross had a duty to accept the rates Steward proposed would create a new duty to deal with no meaningful limit; Blue Cross

35

would be subject to judicial oversight whenever it rejected an excessive rate proposal in negotiations with a provider. The Court would be called upon to determine not only the particular hospitals (and other providers) Blue Cross must include in its network, but also the particular rates and other terms of dealing that must be included in contracts with such providers. It would be impossible for the Court to assume this role and equally impossible for Blue Cross to carry out its state mandate to provide affordable health insurance for Rhode Islanders under such circumstances. R.I. GEN. LAWS § 27-19.2-10(3)–(4).

*Second*, imposing the expansive duty to deal that Steward requests would upset the delicate balance that OHIC and Blue Cross strike when fulfilling their public interest missions. In regulated industries, "the additional benefit to competition provided by antitrust enforcement will tend to be small, and it will be less plausible that the antitrust laws contemplate … additional scrutiny." *Trinko*, 540 U.S. at 412. "Just as regulatory context may in other cases serve as a basis for implied immunity, it may also be a consideration in deciding whether to recognize an expansion of the contours of § 2." *Id.* As in *Trinko*, "[t]he regulatory framework that exists in this case demonstrates how, in certain circumstances, regulation significantly diminishes the likelihood of major antitrust harm."[16] *Id.* (quotation marks omitted).

Blue Cross is a nonprofit, charitable, hospital-service, and medical-service corporation under state statute. *Blue Cross & Blue Shield of R.I. v. Caldarone*, 520 A.2d 969, 970 (R.I. 1987). Numerous obligations spring from its unique status.[17] In addition, like other insurers, Blue

---

[16]    "[A]ntitrust analysis must sensitively recognize the distinctive economic and legal setting of the regulated industry to which it applies." *Town of Concord v. Boston Edison Co.*, 915 F.2d 17, 22 (1st Cir. 1990) (Breyer, C.J.) (quotation marks omitted). After all, "[a]n antitrust rule that seeks to promote competition but nonetheless interferes with regulatory controls could undercut the very objectives the antitrust laws are designed to serve." *Id.*

[17]    Blue Cross must, for example, "[e]mploy pricing strategies that enhance the affordability of health care coverage" and "[p]rotect the financial condition of [its] nonprofit hospital and/or

Cross premiums must be approved by OHIC, the Rhode Island state agency that "oversee[s] the health insurance industry."[18] *Blue Cross & Blue Shield of R.I. v. McConaghy*, No. PC 04-6806, 2005 WL 1633707, at *1 (R.I. Super. Ct. July 11, 2005); R.I. Gen. Laws § 42-14.5-1 *et seq*. Established in 2004, OHIC is the nation's first and only state agency "dedicated solely to health insurance oversight."[19] Blue Cross must satisfy OHIC that "the rates proposed to be charged are consistent with the proper conduct of its business and with the interest of the public." *Id.* § 27-19-6(d)(1). Certain rate increases are subject to notice and a public hearing. *Id.* § 27-19-6(b). After the hearing, OHIC must "approve, disapprove, or modify the rates proposed to be charged." *Id.* § 27-19-6(d).

OHIC also has authority under its enabling statute to regulate the rates that Blue Cross pays hospitals—*the very rates that Steward challenges in this case. Id.* §§ 42-14.5-3; 42-14-17. Consistent with that authority, OHIC issued regulations that prohibited Blue Cross from offering Steward the unconditional rate increases Steward demanded, as discussed below. When a "price system" is "supervised by state regulators[,] … it suggests that strict antitrust scrutiny is less likely to be necessary to prevent the unwarranted exercise of monopoly power." *Kartell*, 749 F.2d at 931. Even though "administrative regulation is a highly imperfect process … regulation by judicial decree is not necessarily preferable." *Id.* Supplanting OHIC regulations under the

---

medical service plan." R.I. Gen. Laws § 27-19.2-10(3)–(4). Blue Cross also serves as the State's "insurer of last resort": Rhode Island law requires Blue Cross—and Blue Cross alone among health insurers—to "offer products in the individual market." *Id.* § 27-19.2-10(2).

[18]     Under Rhode Island law, OHIC is required to "[g]uard the solvency of health insurers"; "[p]rotect the interests of consumers"; "[e]ncourage fair treatment of health care providers"; "[e]ncourage policies and developments that improve the quality and efficiency of health care service delivery and outcomes"; and "encourage and direct insurers towards policies that advance the welfare of the public through overall efficiency, improved health care quality, and appropriate access." *Id.* at § 42-14.5-2(1)-(5).

[19]     Office of the Health Insurance Commissioner, State of Rhode Island, "About OHIC," *available at* http://www.ohic.ri.gov/ohic-about.php.

guise of a novel antitrust duty to deal would constitute antitrust "pioneering," *id.*, of the sort that risks the "[m]istaken inferences and resulting false condemnations" that the Supreme Court has urged the federal judiciary to avoid, *see Trinko*, 540 U.S. at 414. A "generalist antitrust court" is not equipped for the "daunting task" of determining the rates Blue Cross should pay for hospital services. *See id.*; *accord Town of Concord*, 915 F.2d at 25 ("How can the court determine [a 'fair'] price without examining costs and demands, indeed without acting like a rate-setting regulatory agency, the rate-setting proceedings of which often last for several years?"). Healthcare "is an area of great complexity where more than solely economic values are at stake." *Kartell*, 749 F.2d at 931. "How to provide affordable, high quality medical care is much debated," a fact that "warrants judicial hesitancy to interfere." *Id.* The Court should refrain from expanding the refusal-to-deal doctrine beyond the contours of *Trinko* and *Aspen Skiing* because of these compelling considerations.

F.   **Blue Cross Had a Legitimate Business Reason Not to Renew Its Contract with Steward at Saint Anne's Hospital.**

Steward's claims related to Saint Anne's hospital appear to be an afterthought; it is not clear how Saint Anne's—a *Massachusetts* hospital—relates to Steward's theory that Blue Cross refused to deal with Steward in *Rhode Island*. Redacted

Redacted

Steward argues that Blue Cross' decision to let the Saint Anne's contract lapse was inconsistent with its business interests because Steward subsequently offered Blue Cross a new contract at Saint Anne's, supposedly at BCBSMA rates, but without the fees associated with the BlueCard program. *Steward*, 997 F. Supp. 2d at 154. As a threshold matter, Redacted

*Id.* No reasonable juror could find that Blue Cross' decision to let its Saint Anne's contract lapse was inconsistent with its business interests.

### G.   Regulations Required Blue Cross to Take Certain Actions When Landmark Briefly Went Out-of-Network.

Steward alleges that, apart from its contract negotiations with Steward, Blue Cross took various steps against Landmark "in order to deter Steward from closing on its acquisition," Am. Compl. ¶ 82, including filing a "material modification" application with the Department of Health, sending letters to subscribers and physicians informing them that Landmark might go

out-of-network, and making payments directly to subscribers instead of Landmark once Landmark was out-of-network, *id.* at ¶¶ 49, 53. All of these allegations are makeweight. As a threshold matter, Steward has conceded—and this Court has recognized—that the material modification application and other alleged government petitioning[20] is immune from the antitrust laws under the *Noerr-Pennington* doctrine. *Steward*, 997 F. Supp. 2d at 163. In addition, as discussed below, *all* of the conduct is compelled by state regulation and ▮▮▮Redacted▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ SOUF ¶¶ 102-110.

    ▮Redacted▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮ Department of Health regulations require health insurers to "notify the Department prior to the implementation of any substantial systemic change" to a health plan, also known as a "material modification." R.I. ADMIN. CODE §§ 31-1-14:21.4(E); 31-1-14:21.3(A)(17). A material modification cannot go into effect without prior approval from the Department. *Id.* § 31-1-14:21.4(E). The Department has 90 days to review the material modification application. *Id.* § 31-1-14:21.4(C), (E). ▮Redacted▮▮▮▮▮▮▮▮▮▮

---

[20]     For example, Steward also alleges that Blue Cross lobbied against the passage of the Hospital Conversion Act, which would permit Steward to acquire more than one Rhode Island hospital in a three-year period. Am. Compl. ¶ 43. The Court has recognized that this conduct is immune from the antitrust laws under the *Noerr-Pennington* doctrine. *Steward*, 997 F. Supp. 2d at 163. ▮Redacted▮▮▮▮▮▮▮▮▮
        ▮Redacted▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Redacted

SOUF ¶ 104.

Redacted

*Id*. In addition, under federal regulations, a Medicare Advantage insurer "must make a good faith effort to provide written notice of a termination of a contracted provider at least 30 calendar days before the termination effective date to all enrollees." 42 C.F.R. § 422.111(e). Redacted

Redacted

R.I. ADMIN. CODE § 31-1-14:21.4(E). Redacted



Redacted consistent with regulatory guidance. Redacted

were required by state and federal regulations and therefore cannot be the basis for Steward's antitrust claims.

## II.   BLUE CROSS IS ENTITLED TO SUMMARY JUDGMENT ON STEWARD'S CONSPIRACY CLAIMS BECAUSE THERE IS NO EVIDENCE OF AN AGREEMENT WITH THUNDERMIST OR LIFESPAN TO REFUSE TO DEAL WITH STEWARD.

Recognizing the weaknesses in its unilateral refusal-to-deal claim, discussed above, Steward amended its complaint to add claims for conspiracy in restraint of trade (Counts IV, VIII, XII, and XVI) and conspiracy to monopolize (Counts III, VII, XI, and XV) under Sections 1 and 2 of the Sherman Act[23] and analogous provisions of the Rhode Island Antitrust Act.[24] But Steward's attempt to buttress its flawed unilateral claims with conspiracy theories fares no better. Steward's conspiracy claims boil down to the same baseless claim discussed above: that Blue

---

[21]    To the extent Steward's antitrust claims are based on the Special Master's decision to settle the lawsuit against Blue Cross, Redacted

[22]    To the extent Steward's antitrust claims are based on Blue Cross' decision to send the July 2012 letters, those claims fail for an additional, independent reason. Redacted

[23]    Although Steward alleges separate conspiracy-to-monopolize and conspiracy-to-monopsonize claims, the claims challenge the same conduct under the same legal analysis. *See supra* note 8.

[24]    If the federal conspiracy claims fail, the state conspiracy claims fail too. *See supra* note 6.

Cross unlawfully conspired with Lifespan and Thundermist to prevent Steward from acquiring Landmark. *See* Am. Compl. ¶ 1. Notably, Steward has chosen *not to sue* the other two alleged co-conspirators, targeting only Blue Cross with its false claims.

To prove its conspiracy claims, Steward must establish "a meeting of minds in an unlawful arrangement." *Monsanto Co. v. Spray-Ride Serv. Corp.*, 465 U.S. 752, 764 (1984). To survive summary judgment, "there must be direct or circumstantial evidence that reasonably tends to prove that [the parties] had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Id.* at 768. In other words, "a plaintiff seeking damages for a violation of §1 must present evidence that tends to exclude the possibility that the alleged conspirators acted independently." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986) (quotation omitted). If the alleged conspirators "had no rational motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy." *Matsushita*, 475 U.S. at 596-90 (citation omitted). Moreover, mere "evidence showing defendants have a plausible reason to conspire does not create a triable issue as to whether there was a conspiracy." *White v. R.M. Packer Co.*, 635 F.3d 571, 582 (1st Cir. 2011) (citation and quotation omitted). Various courts have applied this standard and rejected conspiracy claims at the motion to dismiss[25] and summary judgment

---

[25]      *See, e.g.*, *Mayor and City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 138 (2d Cir. 2013) (complaint dismissed where plaintiffs failed "plausibly to suggest that this parallel conduct flowed from a preceding agreement rather than from their own business priorities"); *Howard Hess Dental Labs. Inc. v. Dentsply Int'l., Inc.*, 602 F.3d 237, 255 (3d Cir. 2010) ("[S]imply because each Dealer, on its own, might have been economically motivated to exert efforts to keep Dentsply's business and charge the elevated prices Dentsply imposed does not give rise to a plausible inference of an agreement among the Dealers themselves."); *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1995 (9th Cir. 2015) (complaint dismissed because it did not plausibly allege antitrust conspiracy as opposed to "self-interested independent parallel conduct").

stages.[26] *See, e.g., Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) (affirming dismissal of conspiracy claim under *Monsanto* and *Matsushita*).

Steward alleges several agreements, but none of them reflect "a meeting of minds in an unlawful arrangement" among Blue Cross, Thundermist, and/or Lifespan to prevent Steward from acquiring Landmark. *See Monsanto*, 465 U.S. at 764. Blue Cross, Thundermist, and Lifespan necessarily enter into *numerous* agreements with participants in the healthcare industry—including each other—in order to provide healthcare services to Rhode Islanders. The mere existence of such contracts or agreements *unrelated* to excluding Steward is not sufficient for Steward's conspiracy claims to survive. *See, e.g., Gulf States Reorganization Grp., Inc. v. Nucor Corp.,* 822 F. Supp. 2d 1201, 1224 (N.D. Ala. 2011), *aff'd*, 721 F.3d 1281 (11th Cir. 2013) (rejecting challenge to "facially neutral contract" because "the joint meeting of the minds must incorporate the illegal restraint and, thus, those elements are inextricably intertwined. … [The plaintiff's] assertion that any 'concerted activity' can be deemed a Section 1 violation without evidence of a conscious commitment to an unlawful objective is, quite simply, not just off the market's not the law.").[27] Evidence that Blue Cross, Thundermist, and Lifespan each had

---

[26]     *See, e.g.*, *Am. Steel Erectors, Inc. v. Local Union No. 7*, 815 F.3d 43, 65 (1st Cir. 2016) (affirming summary judgment for the defendants because "[t]here [wa]s no evidence that th[ey] relinquished independent, competitive decision-making"); *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 714 (7th Cir. 2011) (affirming summary judgment because the evidence did not show the defendants' behavior was collusive as opposed to independently motivated and rational); *Abraham v. Intermountain Health Care Inc.*, 461 F.3d 1249 (10th Cir. 2006) (affirming summary judgment for a managed health care system because its exclusion of optometrists from its panel of providers did not amount to an antitrust conspiracy given its independent incentives); *Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*, 203 F.3d 1028, 1037 (8th Cir. 2000) (en banc) (affirming summary judgment when the evidence could not "be construed as an act against self-interest").

[27]     *See also Euromodas, Inc. v. Zanella, Ltd.*, 368 F.3d 11, 20-21 (1st Cir. 2004) (no conspiracy when a "manufacturer took sides as between two dealers and chose the more lucrative of them"); *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 65-66 (1st Cir. 2004) (no conspiracy when two health insurers agreed to let each other's pharmacies be

*independent* reasons to harm Steward is likewise not sufficient. *See Golden Bridge Tech., Inc. v. Motorola, Inc.*, 547 F.3d 266, 272 (5th Cir. 2008) ("[C]ommon dislike is not the same as an explicit understanding to conspire."). Instead, the evidence must show an *actual agreement to exclude Steward*. Here, the uncontroverted evidence shows that none of the purported agreements among Blue Cross, Thundermist, and/or Lifespan were aimed at this "unlawful objective." *See Monsanto*, 465 U.S. at 768.

  *First*, Steward alleges that Blue Cross, Thundermist, and Lifespan agreed to an alternative "treat and transfer" plan for Lifespan to acquire Landmark, Am. Compl. ¶ 33, but Redacted

Redacted *Second*, Steward alleges that Lifespan agreed to lower reimbursement rates from Blue Cross in exchange for greater patient volume, Am. Compl. ¶ 34, but there is again Redacted

Redacted *Third*, Steward alleges that Thundermist stopped referring obstetric patients to Landmark and rejected a MOU with Steward, Am. Compl. ¶ 39, but the evidence shows that Redacted

Redacted

Redacted *Finally*, given the complete lack of direct evidence of conspiracy, Steward cannot rely on circumstantial evidence or an "inference" of conspiracy to survive summary judgment because Steward alleges, and b Redacted

Redacted *See Twombly*,

---

part of their closed networks); *Royal Drug Co. v. Grp. Life & Health Ins. Co.*, 737 F.2d 1433, 1437 (5th Cir. 1984) (no conspiracy when Blue Shield of Texas and three pharmacies created a prepaid prescription drug program).

550 U.S. at 566 ("[T]here is no reason to infer that [defendants] had agreed among themselves to do what was only natural anyway.").

    **A.**    **Lifespan's "Treat and Transfer" Model Is Not Evidence of a Conspiracy to Exclude Steward.**

Redacted

Steward's claim that the "treat and transfer" plan proposed by Lifespan and Thundermist is some sort of antitrust conspiracy fails at the threshold because *there is no evidence that Blue Cross was part of the plan.* Redacted

46



*Id.* at ¶ 70.

Even more importantly, there is no evidence whatsoever that the plan had anything to do with preventing Steward from acquiring Landmark. First, Steward's theory makes no sense

Steward simply (and incorrectly) *assumes* an antitrust conspiracy must exist because there was another plan on the table for Landmark, but there is no evidence from which a reasonable juror could infer such a conspiracy.

> **B.** **The Rates Blue Cross Pays Lifespan Are Not Evidence of a Conspiracy to Exclude Steward.**

Steward alleges that Lifespan offered lower rates to Blue Cross in exchange for additional patient volume, *see* Am. Compl. ¶ 34, in an attempt to suggest that Lifespan effectively paid Blue Cross to keep Steward (a competing hospital system) out of the state. Such an agreement, however, makes no sense. Blue Cross has no *incentive* to try to reduce potential competition between Lifespan and Steward, both suppliers of hospital services, because, as a buyer of hospital services, it benefits from such competition. *See Stop & Shop Supermarket Co.*, 373 F.3d at 66 ("[I]t is not in the long-term interest of the [health insurance] company . . . to

drive out of business competitors of [its pharmacy suppliers].”). Not surprisingly, no evidence whatsoever supports the claim. Steward’s entire argument is premised on a document that states that Redacted ██████████████████████████████████████████████████████████

██████████████████████████████████████████ As discussed above, this is the *quid pro quo* that underlies virtually *every* contract between *every* health insurer and *every* healthcare provider. *See, e.g., OSF Healthcare*, 859 F.3d at 410 (“[A]n insurance company may get better rates from a hospital in exchange for agreeing to an exclusive contract, as exclusivity will drive a higher volume of business to the hospital.”). Redacted ████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████ It is not an antitrust violation.

Although Redacted ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████ was aimed at the “unlawful objective” of preventing Steward from acquiring Landmark. *See Monsanto*, 465 U.S. at 768. Redacted ████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

42. Given the lack of any evidence to the contrary, the outcome of these contentious negotiations in a particular year says nothing about the existence of any conspiracy against Steward.

### C.   Thundermist's Independent Patient Referral and Contracting Decisions Are Not Evidence of a Conspiracy to Exclude Steward.

Steward alleges that Blue Cross conspired with Thundermist with respect to two particular decisions. First, Thundermist made the decision to move its obstetric patient referrals from Landmark to Women & Infants Hospital in 2011. Steward claims that this decision was somehow motivated by a desire to impede Steward's acquisition of Landmark. But the uncontroverted evidence shows that ███████████████████████████████████████ ███████████████████████████████████████████████████████████. *Id.* at ¶¶ 54-56, 72. This included ████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████. *Id.* Thundermist's CEO, Chuck Jones, testified that ████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ████████. *Id.*

Second, Thundermist made the decision ██████████████████████████████ ███████████████. Steward again claims that this decision was the result of an agreement with Blue Cross based on nothing more than Thundermist's change in position on the MOU during negotiations. But the record is clear that ███████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████. *Id.* at ¶ 74. Again, Mr. Jones testified that he made this ███████████████████████████████████████████



. *Id.*

Blue Cross necessarily communicated with Thundermist (like any healthcare provider) about matters of mutual concern. Indeed, ████████████████████████████████████ ████████████████████████████████████████████████████████████. *Id.* Steward takes these ordinary course communications completely out of context. ████ ████████████████████████████████████████████████████████████ ████████████████████████████████ during this time period. The documents and testimony show that, at most, ████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████, *id.* at ¶ 75. There is no suggestion in any of these communications of an actual "meeting of minds in an unlawful arrangement" to prevent Steward from acquiring Landmark. *See Monsanto,* 465 U.S. at 764.

**D.    Steward Cannot Rely on Circumstantial Evidence or an Inference of Conspiracy Because Steward Concedes that Blue Cross, Thundermist, and Lifespan had Independent And Unilateral Incentives.**

As described above, there is no direct evidence—no documents, testimony, or other records—showing any agreement among Blue Cross, Lifespan, and Thundermist to prevent Steward from acquiring Landmark. Steward also cannot rely on circumstantial evidence—or an *inference* of conspiracy—██████████████████████████████████████████ ████████████████████████████████████████████

On summary judgment, "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." *Matsushita*, 475 U.S. at 588. "[C]onduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Id.* (citation omitted). "If the evidence shows conduct that is as

consistent with lawful competition as it is with illicit conspiracy, it cannot be said to support an inference of concerted action." *Euromodas*, 368 F.3d at 19, 20 ("Any other inference necessarily would require building an antitrust claim on ambiguous evidence—a practice that the Supreme Court has forbidden.") (citation omitted). A court may not infer a conspiracy from conduct that is just as consistent with independent action because "there is no reason to infer that [defendants] had agreed among themselves to do what was only natural anyway." *Twombly*, 550 U.S. at 566 ("[I]f alleging parallel decisions to resist competition were enough to imply an antitrust conspiracy, pleading a § 1 violation against almost any group of competing businesses would be a sure thing."). Thus, a plaintiff seeking to rely on circumstantial evidence must show that defendant's actions were *contrary* to defendants' individual economic interests.[28]

Here, Steward affirmatively alleges that Blue Cross' conduct was consistent with its unilateral self-interest. Indeed, Steward originally brought this claim solely as a *unilateral* claim. In its Amended Complaint, Steward concedes that Blue Cross "could have through unilateral actions excluded Steward from Rhode Island." Am. Compl. ¶ 36. Steward also describes in detail Blue Cross' supposed *unilateral* incentives to prevent Steward from acquiring Landmark. *Id.* at ¶ 32. Steward's experts similarly concede that B███████████████████████████████
███████████  ███████████████████████████████████

---

[28]    *See, e.g., Omnicare*, 629 F.3d at 714 (affirming summary judgment because the defendant's conduct was not "necessarily … contrary to its economic interest and thus exclusive of independent conduct"); *Cosmetic Gallery, Inc. v. Schoeneman Corp.*, 495 F.3d 46, 54-55 (3d Cir. 2007) (affirming summary judgment because there was "insufficient evidence to show that refusal to sell [to the plaintiff] was contrary to [the defendants'] economic interest"); *Royal Drug*, 737 F.2d at 1437 (affirming summary judgment because the evidence did not show defendants' conduct was "contrary to their economic self-interest so as not to amount to a good faith business judgment").

[29]    Dafny Dep. at 239; Dafny Report at ¶¶ 309-43; *cf.* Deposition of David Eisenstadt ("Eisenstadt Dep.") (May 30, 2017) (Ex. 3 hereto) at 79 (███████████████████████████
███████████████████████████████████████████████████████

conspiracy.[30] These concessions doom Steward's conspiracy claims because "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *See Matsushita*, 475 U.S. at 588 (citation omitted).

Ample fact and expert witness testimony attempts to untangle the potential competing incentives of Blue Cross, Lifespan, and Thundermist with respect to Steward. This all should be moot given the lack of any evidence of an actual agreement and the ███████████████████████ ██████████████████████████████████████. But there is one piece of noteworthy evidence related to Blue Cross' incentives: ███████████████████████ ████████████████████████████████████████. Indeed, as Steward's expert Dr. Eisenstadt explained, ████████████████████████ ███████████████████████████████████████████████████████ █████████████████████████ ████████████████████ █████████████████████████████████████ and therefore his testimony on this issue should be excluded, for the reasons set forth in Blue Cross' contemporaneously filed motion.[32]

---

████████████████████████████████████████████████████").

[30]   Dafny Dep. at 211-12 (███████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████").

[31]   Eisenstadt Report at ¶ 9 (███████████████████████████ ████████████████████████████████████████); Eisenstadt Dep. at 101-02.

[32]   *See* Mot. to Exclude Expert Testimony of David Eisenstadt.

However, as discussed above, ████████████████ ██ ████████████████████████████████████████████ ███████████████████████████████████████████ ██████████████. Noether Report at ¶¶ 184-92. In other words, there is no evidence that ███████████████████████████ was contrary to Blue Cross' independent economic interests, and therefore no reason to infer a conspiracy. *See Matsushita*, 475 U.S. at 588. █████████████████████████████ thus disproves *both* Steward's unilateral and conspiracy claims because "there is no reason to infer that [defendants] had agreed among themselves to do what was only natural anyway." *See Twombly*, 550 U.S. at 566; *see also Euromodas*, 368 F.3d at 19 (affirming summary judgment because defendants' conduct was consistent with their independent interests); *Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 832 F.3d 1, 10-13 (1st Cir. 2016) (rejecting conspiracy claim where each defendant would have "incur[red] additional costs" by dealing with the plaintiff); *Abraham*, 461 F.3d 249 (rejecting conspiracy claim where health insurers' exclusion of providers was consistent with independent interests). Because there is no evidence of a "meeting of minds in an unlawful arrangement" to prevent Steward from acquiring Landmark, the Court should enter summary judgment against Steward on its conspiracy claims. *See Monsanto,* 465 U.S. at 764.

---

[33] Although Steward's other expert economist, Dr. Dafny, attempted to show ██████ ████████████████████████████████████████████ ███████ Dafny Dep. at 211-12. Indeed, mere interdependent pricing is not sufficient, without more, to establish the existence of an antitrust conspiracy. *Twombly*, 550 U.S. at 554 (given "[t]he inadequacy of showing parallel conduct or interdependence, without more," an antitrust plaintiff must present "evidence tending to exclude the possibility of independent action") (citation omitted); *White*, 635 F.3d at 580 ("Mere parallelism . . . does not even create a prima facie conspiracy case."); *see also* P. Areeda & H. Hovenkamp, ANTITRUST LAW ¶ 1433(a) (2d ed. 2000) ("The courts are nearly unanimous in saying that mere interdependent parallelism does not establish . . . conspiracy").

## III.   BLUE CROSS IS ENTITLED TO SUMMARY JUDGMENT ON ALL OF STEWARD'S CLAIMS BECAUSE BLUE CROSS DID NOT CAUSE STEWARD'S ALLEGED INJURIES.

Although Steward claims that Blue Cross prevented Steward from acquiring Landmark, the record evidence shows that other ███████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████, SOUF ¶¶ 111-18; and (2) ████████████████████████████████

██████████████, *id.* at ¶¶ 4-8, 86, 93, 99. Because these factors entirely explain Steward's failure to acquire Landmark, Steward's claims related to highly speculative and derivative injuries from failure to establish a "network" of hospitals and to sell "commercial health insurance" in Rhode Island fail as well.[34]

Under the Sherman Act, a plaintiff must show that its injury was caused "by reason of" the defendant's anticompetitive conduct. 15 U.S.C. § 15(a). This requirement incorporates common-law principles of both but-for and proximate cause. *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 531–33 & nn.24–28 (1983); *accord Holmes v. Sec. Invr. Prot. Corp.*, 503 U.S. 258, 268 (1992); *Sullivan v. Nat'l Football League*, 34 F.3d 1091, 1103 (1st Cir. 1994) ("An antitrust plaintiff must prove that … there is a causal connection between the illegal practice and the injury.").[35] The general rule is that a plaintiff

---

[34]     The record shows that ████████████████████████████████████████
████████████. SOUF ¶ 28. The record also shows that █████████████████
██████████████████████ *Id.* at ¶¶ 10, 29. *See, e.g., Huron Valley Hosp., Inc. v. City of Pontiac*, 666 F.2d 1029, 1033 (6th Cir. 1981) (describing evidence of preparations for entry necessary in order for plaintiff to survive summary judgment).

[35]     "Causation" is one of six factors that must be satisfied in order for an antitrust plaintiff to have antitrust standing. Those factors include: "(1) the causal connection between the alleged antitrust violation and harm to the plaintiff; (2) an improper motive; (3) the nature of the plaintiff's alleged injury and whether the injury was of a type that Congress sought to redress with the antitrust laws 'antitrust injury'); (4) the directness with which the alleged market

must prove that the defendant's antitrust violation was a "material cause" of plaintiff's injury. *Sullivan*, 34 F.3d at 1103 (quotation marks omitted). However, when an injury "[i]s attributable to … other factors independent of" the challenged conduct, a plaintiff has "not … met its burden." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 126–27 (1969). This principle is analogous to the common-law "doctrine of superseding cause," which applies when "the [plaintiff's] injury was actually brought about by a later cause of independent origin that was not foreseeable." *Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 837 (1996) (quotation marks omitted). Under this framework, Steward cannot establish causation as a matter of law for at least two reasons.



**First**, ██████████████████████████████████████████ ███████ ██████████████████████████████████████. SOUF ¶¶ 111-18. ████████████████████████████████████████ ████████████████████████████████████████ ███████████████████████████████ *Id*. The record thus shows that "a force other than the antitrust violation fully accounts for the plaintiff's injury." *In re Canadian Import Antitrust Litig.*, 470 F.3d 785, 791–92 (8th Cir. 2006) (quoting P. Areeda & H. Hovenkamp, ANTITRUST LAW ¶ 338 (2d ed. 2000)); *see also RSA Media, Inc. v. AK Media Grp., Inc.*, 260 F.3d 10, 15 (1st Cir. 2001) (plaintiff's injury was "unrelated to [defendant's] exclusionary conduct").

---

restraint caused the asserted injury; (5) the speculative nature of the damages; and (6) the risk of duplicative recovery or complex apportionment of damages." *Sterling Merch., Inc. v. Nestle, S.A.*, 656 F.3d 112, 120–121 (1st Cir. 2011) (citations omitted); *accord Morales-Villalobos v. Garcia-Llorens*, 316 F.3d 51, 55 (1st Cir. 2003).

**Second**, Steward alleges that the rates Blue Cross offered Steward at Landmark were too

low, ██████████████████████████████████████████████████████ and

therefore those regulations—not Blue Cross—caused Steward's alleged injury. SOUF ¶¶ 4-8, 86,

93, 99. *See RSA Media*, 260 F.3d at 15 (affirming summary judgment for defendant when

plaintiff was excluded from market not because of defendant's conduct but "because of the

Massachusetts regulatory scheme"); *In re Canadian Import Antitrust Litig.*, 470 F.3d at 791

(affirming dismissal of complaint when absence of competition was "caused by the federal

statutory and regulatory scheme adopted by the United States government, not by the conduct of

defendants"); *City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256, 265 (3d Cir. 1998)

(affirming dismissal of complaint when "any injury suffered by the [plaintiff] did not flow from

the defendants' conduct, but, rather, from the realities of the regulated environment in which [the

parties] were actors").

Although ████████████████████████████████████████████████████

████████ even those independent and superseding causes cannot be viewed in isolation. The record

is replete with "numerous intervening economic and market factors which … may have been the

actual cause of the … injuries," such that the Court may "find that as a matter of law [the]

plaintiff[] … failed to show with a fair degree of certainty that the antitrust violation was a

material and substantial factor causing [its] alleged injuries." *Greater Rockford Energy & Tech.

Corp. v. Shell Oil Co.*, 998 F.2d 391, 402 (7th Cir. 1993) (affirming summary judgment for

defendant). These intervening factors include Steward's own acts or failure to act. *See Read v.

Medical X-Ray Ctr., P.C.*, 110 F.3d 543, 546 (8th Cir. 1997) (affirming judgment as a matter of

law for defendant when plaintiff, a potential market entrant, failed to "take reasonable steps to

compete head-to-head"). Indeed, a number of other superseding forces also demonstrate how

Blue Cross' alleged failure to agree to "reasonable reimbursement rates at Landmark," Am. Compl. ¶ 82, could not have caused Steward's injury. For example:



- *Steward's failure to mitigate caused its injury.* ████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████, SOUF ¶¶ 98. In other words, if Steward's damages experts are correct, then there is no support for the allegation that Blue Cross' proposed rates were the cause of Steward's decision to walk away from Landmark and ██████████████████████ ████████.

- ████████████████████████████████████ *caused Steward's injury.* The record shows that ████████████████████ ████████████████████████████████████, *id.* at ¶¶ 89-92, a ████████████████████████████████████████████ ████████" *id.* at ¶¶ 50-56.

- ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████, and was never alleged in the Amended Complaint. If this is truly what Steward required, then the conduct alleged in the Amended Complaint did not cause Steward's alleged injury.

"Standing alone one of these alternative causes of [Steward's] injuries might be insufficient to put causation-in-fact in question." *See Greater Rockford*, 998 F.2d at 404. But taken together with the two additional, independent causes described below, the record demonstrates that Steward has "failed to show with a fair degree of certainty that 'but for' the alleged antitrust violation, [it] would not have suffered the injuries of which [it] complains." *See id.* Against this backdrop, Steward's causation theory fails to raise a triable issue.

**A.** █████████████████████████████████████████
███████████

Blue Cross did not cause Steward's injury because ████████████████████████
████████████████████████████████████████, regardless of a favorable
Blue Cross contract. SOUF ¶¶ 111-18. ████████████████████████████████
████████████████. ████████████████████████████████████████████
██████. *Id.* at ¶ 78 ████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████ ████████████████████████
████████████████████████████████ *Id.* at ¶ 80. Rather, ████████████
████████████████████████████████████████████████████████████
██████████████████████████████████████ *Id.* at ¶ 81(a).
Steward witnesses, including its General Counsel, testified that ████████████████
████████████████████████████████████████. *Id.* at ¶ 79.
████████████████████████████. *Id.* ████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████ Thundermist, for
example, is the largest primary-care provider in Woonsocket, and ████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████



*Id.* at ¶ 117.

*Id.* at ¶ 118.



Because they "fully account[] for [Steward's] injury," *see In re Canadian Import Antitrust Litig.*, 470 F.3d at 791–92 (quotation marks omitted), Steward cannot prove causation as a matter of law.

Years after the fact, ████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████   ████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

████████████████████████████ is never mentioned in the Amended Complaint or contemporaneous documents.[37] There is no contemporaneous evidence that Steward even

---

[36]     Deposition of Ralph de la Torre ("de la Torre Dep.") (March 2, 2017) (Ex. 14 to SOUF) at 117-119 (██████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████.

[37]     Dr. de la Torre said that  his ████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

████████████████████████ *Matsushita*, 475 U.S. at 587. Steward has no such evidence.

██████████████████████████████████████. SOUF ¶¶ 111-18. "It
is thus a telling blow" to Steward's current theory that "contemporaneous accounts for the
reasons for its economic ailments consistently contradict its present position." *See Argus, Inc. v.
Eastman Kodak Co.*, 801 F.2d 38, 42 (2d Cir. 1986) (affirming grant of summary judgment for
lack of causation). One "conclusory statement[] by [a plaintiff's] officer[]" is not enough for a
genuine fact dispute when it is "unsupported by documentary or other concrete evidence" and
viewed "in light of the evidence to the contrary." *Id*. at 45.[38]

Remarkably, ████████████████████████████████████████
███████████████████████[39] Steward, however, is judicially estopped from taking a
different position now from the ██████████████████████[40] Judicial estoppel prevents
litigants from "playing fast and loose with the courts" by "pressing a claim that is inconsistent

---

[38] Indeed, "establishing a genuine issue of material fact requires more than effusive rhetoric and optimistic surmise." *Cadle Co. v. Hayes*, 116 F.3d 957, 960 (1st Cir. 1997).

*See also Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."); *Midwestern Waffles, Inc. v. Waffle House, Inc.*, 734 F.2d 705, 714 (11th Cir. 1984) (per curiam) ("Self-serving statements by a plaintiff's corporate officers are not, alone, substantial enough evidence of antitrust injury for a plaintiff to survive a motion for summary judgment.") (citation omitted); *Fed. Prescription Serv. Inc. v. Am. Pharm. Ass'n*, 663 F.2d 253, 270 (D.C. Cir. 1981) (given contrary record evidence, "[i]t would thus take far more detailed proof than the *ipse dixit* of [the plaintiff's executives] to show that there was a causal connection between [the defendant's] participation in [an alleged conspiracy] and injury to [the plaintiff]").

[39] de la Torre Dep. at 127-28, 133 (█████████████████████████████████
████████████████████████████████████████████████████████████").

[40] "When a corporation takes a litigation position, [it is] both sensible and fair to impute to it the knowledge of its chief executive officer." *Synopsys, Inc.*, 374 F.3d at 35.

with a position taken … in a prior legal proceeding." *Alt. Sys. Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23, 33 (1st Cir. 2004) (quotation marks omitted). "[T]wo conditions must be satisfied before judicial estoppel can attach." *Id.* First, the different positions taken must be "directly inconsistent." *Id.* And second, "the responsible party must have succeeded in persuading a court to accept its prior position." *Id.* Both elements are satisfied here. *First*, arguing that Steward

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████ SOUF ¶¶ 114-16. *Second*, the record clearly shows that Justice Silverstein relied on

████████████████████████████████████████████████████████████

██████████████████. *Id.*[41] Either Justice Silverstein was "misled" when Steward ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████ *See Synopsys, Inc.*, 374 F.3d at 33. Judicial estoppel prevents parties from "carrying out [such] a game of bait and switch." *Id.* at 35 (affirming application of judicial estoppel on summary judgment). The same is true here. To hold otherwise would allow Steward to benefit from "deliberately changing positions according to the exigencies of the moment." *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (quotation marks omitted).

---

[41]     Although Justice Silverstein ultimately ████████████████████ ████████, the law is clear that "a party need not show that the earlier representation led to a favorable ruling on the merits of the proceeding in which it was made, but must show that the court adopted and relied on the represented position either in a preliminary matter or as part of a final disposition." *Perry v. Blum*, 629 F.3d 1, 11 (1st Cir. 2010).

**B.      OHIC Regulations Prevented Blue Cross From Offering The Rates That Steward Demanded.**

Steward alleges that Blue Cross violated the antitrust laws by refusing to offer "reasonable reimbursement rates at Landmark." Am. Compl. ¶ 82. The record shows, however, that  SOUF ¶¶ 4-8, 86, 93, 99. Because ███████

████████████████████████████████, Steward's alleged injuries from "unreasonable" reimbursement rates were caused by those regulations—not Blue Cross.

OHIC has authority to "promulgate such rules and regulations as are necessary and proper to carry out the duties assigned to [it]."[42] R.I. GEN. LAWS §§ 42-14-17; 42-14.5-1. Under this statutory authority, OHIC issued regulations in 2006 that set out its "powers and duties." R.I. ADMIN. CODE § 32-1-2 *et seq.* Those regulations included OHIC's interpretation of its statutory mandate to promote affordable health insurance. *Id.* § 32-1-2:9; R.I. GEN. LAWS § 42-14.5-2(4)–(5). In 2011, OHIC proposed amendments to its regulations containing four criteria known as the "affordability standards." 2011 R.I. REG. TEXT 253203 (Mar. 24, 2011). The fourth standard concerned cost-effective contracting with hospitals and imposed hospital-contracting conditions that "[e]ach health insurer shall include in its hospital contracts." *Id.* (currently codified at R.I. ADMIN. CODE § 32-1-2:10(d)(4)).

Two of these conditions are important here. SOUF ¶¶ 4-8. First, the OHIC regulations capped the rate increases that an insurer could offer a hospital: "[h]ealth insurer contracts with

---

[42]      When, as here, a statute authorizes an agency "to engage in the process of rulemaking or adjudication that produces regulations or rulings … [i]t is fair to assume generally that [the legislature] contemplates administrative action with the effect of law." *United States v. Mead Corp.*, 533 U.S. 218, 229–30 (2001); *Great Am. Nursing Ctrs., Inc. v. Norberg*, 567 A.2d 354, 356–57 (R.I. 1989).

hospitals in Rhode Island shall ... *[l]imit average annual effective rates of price increase* for both inpatient and outpatient services to a weighted amount equal to or less than the Centers for Medicare and Medicaid Services (CMS) National Prospective Payment System Hospital Input Price Index." *Id.* at ¶ 6. Second, the regulations allowed an insurer to exceed the limit only by tying those increases to the hospital "attaining mutually agreed-to performance levels," including "nationally accepted clinical quality, service quality or efficiency-based measures." *Id.*

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████ *Id.* at ¶¶ 4-8. ███████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████ █ ████████████████████████████████

████████████████████████████████████████████████████

*Id.* at ¶ 93. ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████ *Id.* at ¶ 94.

---

[43]     *Id.* Because the hospital-contracting conditions interpreted OHIC's affordable-health-insurance requirements—which were themselves "a creature of the [Commissioner's] own regulations"—the agency's further "interpretation of [them] is … controlling unless plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (quotation omitted).

The proposals the parties exchanged in the summer of 2012 further reflect their different approaches to the OHIC regulations. 

*Id.* at ¶¶ 86(o), 111-18. Thus, any injuries from Steward's failure to negotiate a contract for Landmark with Blue Cross "did not flow from [Blue Cross'] conduct, but, rather, from the realities of the regulated environment in which [both Steward and Blue Cross] were actors." *West Penn Power Co.*, 147 F.3d at 265.

The First Circuit's decision in *RSA Media*, is instructive. The defendant, AK Media ("AK"), controlled 92% of Boston's billboards. *RSA Media*, 260 F.3d at 12. Each billboard required a state-issued permit and license. *Id.* The plaintiff, RSA Media ("RSA"), sought to compete with AK. RSA alleged that when it sought to negotiate with landlords who rented to AK, AK told the landlords that it would tear its own billboards down if they signed a new lease with RSA. *Id.* at 12–13. RSA alleged that this conduct violated Section 2 of the Sherman Act. The district court granted summary judgment for AK, finding no causal link between its conduct and the injury RSA alleged. *Id.* at 13. The First Circuit affirmed, finding that RSA's argument

---

44 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* at ¶ 122-23. Nearly all Rhode Island hospitals participate in the program.

that landlords would have contracted with it absent AK's interference was speculative in light of the regulatory environment: any landlord who would have "spurn[ed] AK for RSA" would have risked "the prospect of receiving no rent if RSA [were] unsuccessful in obtaining a [state] permit." *Id.* at 15. The First Circuit concluded that "RSA was not excluded from the market for outdoor billboards because of AK's threats; it was excluded because of the Massachusetts regulatory scheme that prevents new billboards from being built." *Id.* Like the plaintiff in *RSA Media*, Steward was excluded from Rhode Island (if at all) because of state regulations that, according to Steward, made it "extremely difficult, if not impossible," for Steward to achieve the contract terms it desired. *See id.* at 12.

To the extent ███████████████████████████████████████████, that argument cannot defeat summary judgment and is an issue that should be resolved by the Court. *See, e.g., Kolbe v. BAC Home Loans Servicing, LP*, 738 F.3d 432, 443 (1st Cir. 2013) ("[I]nterpreting regulatory text in light of government purposes is a matter of law that is emphatically the province of judges, not juries.") (collecting cases). ███████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████ *Id.* At bottom, Steward seeks to impose antitrust liability on Blue Cross for *following* state regulations instead of trying to *avoid* them. Even if an exemption were possible *in theory*, it would be impossible *in fact* "to assess the likelihood" of such an exemption being granted.[45] *See RSA Media*, 260 F.3d at 15 (rejecting argument that occasional granting of "variances" from regulations was sufficient to survive summary judgment); *accord Matsushita*, 475 U.S. at 586 (to survive a summary judgment motion, a plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts"). There is no fact dispute that the OHIC regulations fully account for the injury Steward alleges.

## IV.   BLUE CROSS IS ENTITLED TO SUMMARY JUDGMENT ON ALL OF STEWARD'S ANTITRUST CLAIMS BECAUSE THERE WAS NO HARM TO COMPETITION.

All of Steward's antitrust claims (Counts I-XVI) should be dismissed for the independent reason that there is no evidence that Blue Cross' alleged conduct harmed competition or consumers. Steward's alleged lost profits (if any) from its failed bid to acquire Landmark have no remedy under the antitrust laws because merely switching the *owner* of a hospital does not reduce the number of competitors or otherwise harm competition or consumers. Moreover, Prime's acquisition of Landmark *benefited* competition and consumers because ████████ ███████████████████████████████████████████████████████████.

SOUF ¶¶ 123-30.

---

[45]    Furthermore, Steward may argue that its ██████████████████████████████ ████████████████████████████████████████████████. However, there is no legal authority to support the proposition that insurers could evade the OHIC hospital-contracting regulations with a ████████████████. Nor has Steward shown a legal basis for its assumption that ████████████████████████—like Saint Anne's and Morton—that are located in other states.

"The antitrust laws … were enacted for 'the protection of competition not competitors.'" *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)). A plaintiff "must prove more than injury causally linked to [defendant's conduct]. Plaintiffs must prove *antitrust injury*,[46] which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Id.* at 489 (emphasis added). In other words, "a plaintiff can recover only if the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior." *Atl. Richfield Co. v. USA Petroleum Co. ("ARCO")*, 495 U.S. 328, 344 (1990) (emphasis in original). "Without a showing of actual adverse effect on competition, [the plaintiff] cannot make out a case under the antitrust laws." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 31 (1984), *abrogated on other grounds by* 547 U.S. 28 (2006).

The bar for proving harm to competition is particularly high when, as here, the plaintiff asserts *unilateral* antitrust claims because, in such cases, it is "difficult to distinguish robust competition from conduct with long-term anticompetitive effects." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458-459 (1993) (citation omitted). Additionally, as a result of "the difficulty of identifying and remedying anticompetitive conduct by a single firm," the Supreme Court has been "very cautious" in such cases. *Trinko*, 540 U.S. at 408. "To be condemned as exclusionary, a monopolist's act … must harm the competitive *process* and thereby harm

---

[46]      "Antitrust injury" is a threshold requirement in order for a plaintiff to have antitrust standing. *See, supra*, note 35; *see also Sterling Merch.*, 656 F.3d at 121. This standard requires *both* harm to competition and injury to the plaintiff *caused* by that harm to competition. *See* P. Areeda & H. Hovenkamp, ANTITRUST LAW ¶ 337a (2d ed. 2000) ("[N]umerous decisions find lack of 'antitrust injury' when they really mean that there was no injury to competition, which of course entails that there was no violation of the antitrust laws at all."). Steward's antitrust claims fail because it cannot satisfy the antitrust injury requirement, and also because it cannot show the predicate harm to competition. *Id.* ("To say that the plaintiff has not shown any injury to competition is to conclude that the antitrust laws have not been violated at all.").

consumers." *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) (emphasis in original).[47]

In order to establish harm to competition, a plaintiff must show "a *reduction in output* and an *increase in prices* in the relevant market." *Sterling Merch., Inc. v. Nestle, S.A.*, 656 F.3d 112, 121 (1st Cir. 2011) (quoting *Sullivan*, 34 F.3d at 1097) (emphasis original).[48] Conversely, where, as here, ███████████████████, plaintiffs cannot carry their burden of establishing harm to competition. *Kartell*, 749 F.2d at 931 ("[T]he Congress that enacted the Sherman Act saw it as a way of protecting consumers against prices that were too *high,* not too low. … [C]ourts at least should be cautious—reluctant to condemn too speedily—an arrangement that, on its face, appears to bring low price benefits to the consumer.") (emphasis in original).[49] Harm to a *competitor*—unaccompanied by a reduction in output or an increase in price—is never sufficient. "[H]arm does not mean a simple loss of business or even the demise of a competitor but an impairment of the competitive structure of the market." *Stop & Shop Supermarket Co.,* 373 F.3d at 66. Courts routinely grant summary judgment for defendants for failure to show anything more than harm to a competitor. *See, e.g.*, *id.* at 66-69 (affirming a

---

[47]    *See also NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 139 (1998) (same); *SMS Sys. Maint. Servs., Inc. v. Dig. Equip. Corp.*, 188 F.3d 11, 24-26 (1st Cir. 1999) (similar); *Springfield Terminal Ry. Co. v. Canadian Pac. Ltd.,* 133 F.3d 103, 107-108 (1st Cir. 1997) (similar).

[48]    *See also Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.,* 468 U.S. 85, 104–07 (1984) ("Restrictions on price and output are the paradigmatic examples of restraints of trade."); *Stamatakis Indus., Inc. v. King,* 965 F.2d 469, 471 (7th Cir.1992) ("The [Supreme Court's] antitrust injury doctrine ... requires every plaintiff to show that its loss comes from acts that reduce output or raise prices to consumers.") (quotation omitted).

[49]    *See also Linkline*, 555 U.S. at 451 ("To avoid chilling aggressive price competition, we have carefully limited the circumstances under which plaintiffs can state a Sherman Act claim by alleging that prices are too low. Specifically, to prevail on a predatory pricing claim, a plaintiff must demonstrate that: (1) 'the prices complained of are below an appropriate measure of its rival's costs'; and (2) there is a 'dangerous probability' that the defendant will be able to recoup its 'investment' in below-cost prices"); *ARCO*, 495 U.S. at 329 ("Low prices benefit consumers regardless of how they are set. So long as they are above predatory levels, they do not threaten competition and, hence, cannot give rise to antitrust injury.").

directed verdict because the plaintiff offered no "proof" that conduct did more than harm the plaintiff's business).[50]

Steward faces a daunting threshold problem[51] because merely substituting one *potential* buyer of a Rhode Island hospital (Steward) for another *actual* buyer (Prime) is of no inherent consequence under the antitrust laws. *See, e.g., Brunswick*, 429 U.S. at 487 (Every acquisition "has the potential for producing economic readjustments that adversely affect some persons. But Congress has not condemned [acquisitions] on that account; it has condemned them only when they may produce anticompetitive effects."). This might have been a different case if Landmark had failed or exited the market. But harm to a single company is not harm to competition, and that is *especially* true when one market participant is merely replaced by another.[52] The logic is

---

[50]    *See also Euromodas*, 368 F.3d at 21 (affirming summary judgment because the plaintiff "tendered evidence of its own losses" but not "an injury to competition"); *SMS Sys.*, 188 F.3d at 25-26 (affirming summary judgment because "[t]hat SMS may have lost business … is not, in and of itself, a concern of the antitrust laws"); *K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.,* 61 F.3d 123, 128 (2d Cir. 1995) (affirming summary judgment where the plaintiff "failed to come forward with any evidence that defendants' actions adversely affected service, quality, or price market-wide"). This is just as true in healthcare cases and in cases from other industries. *OSF Healthcare,* 859 F.3d at 410 (affirming summary judgment because there was "no evidence" that a hospital's exclusive arrangement with an insurer impaired "competition in health services" broadly); *Mathews v. Lancaster Gen. Hosp.,* 87 F.3d 624, 641 (3d Cir. 1996) (affirming summary judgment where the "evidence [did] not support the existence" of any effect on "prices, quantity, or quality of goods or services" beyond harm to the orthopedist's "own welfare") (quotation omitted).

[51]    From the start, Steward faces an uphill battle in asserting injury to competition because Blue Cross is a *purchaser* of hospital services and stands to directly *benefit* from any increase in competition among Rhode Island hospitals. *Compare Stop & Shop Supermarket Co.*, 373 F.3d at 66 ("[I]t is not in the long-term interest of the [health insurance] company … to drive out of business competitors of [its pharmacy suppliers].").

[52]    *See, e.g., Doctors' Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 123 F.3d 301, 303, 308-310 (5th Cir. 1997) (finding that insurer switching one participating hospital for another was not a harm to competition); *Coffey v. Healthtrust, Inc.,* 955 F.2d 1388, 1393 (10th Cir. 1992) (finding that hospital replacing exclusive anesthesiologist with another was a reshuffling of competitors that did not affect the market more broadly); *Burdett Sound, Inc. v. Altec Corp.,* 515 F.2d 1245, 1249 (5th Cir. 1975) (finding that substituting one distributor for another does not harm competition "even if the effect … is to seriously damage the former distributor's

straightforward: "even if [the] plaintiff were hindered from competing, nothing [ ] in the relevant product market [changed] from the consumer's perspective." *Top Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 96 (2d Cir. 1998). Indeed, "disappointed" bidders like Steward cannot satisfy the antitrust injury requirement based on their withdrawn bid. *See, e.g., Expert Masonry, Inc. v. Boone Cty., Ky.,* 440 F.3d 336, 346-48 (6th Cir. 2006) ("To allow any auction, bidding, or other competitive sales process to be challenged whenever one potential supplier is distraught … would be to outlaw competition … For the courts to entertain such antitrust cases would require the courts themselves to substitute their own business judgment for that of the companies involved.").[53]

Even if switching Steward and Prime could theoretically constitute harm to competition, the undisputed evidence shows that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. SOUF ¶¶ 122-23. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Indeed, Steward's expert on competitive effects, Dr. Eisenstadt, concedes that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

---

business") (citations omitted); *see also Four Corners Nephrology Assocs.*, 582 F.3d at 1221-26 (2009) (a hospital's investing in a nephrology practice and limiting of privileges to one provider, to the exclusion of another nephrologist that wanted to "shar[e] its facilities," did not harm competition).

[53]    *See also Burdett Sound,* 515 F.2d at 1249 ("[I]t is simply not an antitrust violation for a manufacturer to contract with a new distributor, and as a consequence, to terminate his relationship with a former distributor, even if the effect of the new contract is to seriously damage the former distributor's business.") (citations omitted); *Ace Beer Distrib., Inc. v. Kohn, Inc.,* 318 F.2d 283, 287 (6th Cir. 1963) ("The substitution of one distributor for another in a competitive market ... does not eliminate or materially diminish the existing competition of distributors of other beers, is not an unusual business procedure and, in our opinion, is not an unreasonable restraint of trade.") (citations omitted).

Noether's report. Noether Report at ¶¶ 352-62. ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████. *Id*. at ¶ 128. The lack of any evidence showing that

████████████████████████████████████████████████████

████████████████████████—prevents Steward from demonstrating any harm to

competition or antitrust injury. *See Sterling Merch.,* 656 F.3d at 121.

That is not all: Prime has benefited competition and consumers in Rhode Island even

████████████████. Prime has been in the business of turning around distressed hospitals

longer than Steward, and currently owns 45 hospitals, with 43,500 employees, in 14 states.

SOUF ¶¶ 120. Prime has achieved numerous awards for its high quality performance, investing

over $1 billion in improving its hospitals. *Id*. at ¶ 121. It is no wonder that, in approving the sale

of Landmark to Prime, Justice Silverstein found that █████████████████████

████████████████████████████████████████████████████.

*Id*. at ¶ 124. ████████████████ was justified. Prime ███████████████

████████████████████████████████████████████. *Id*. at ¶¶ 126-27.

Blue Cross' expert, Mr. Hurley, analyzed Prime's ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████. *Id.* at ¶ 130. No reasonable juror could find that Prime's acquisition of Landmark has *harmed* competition or consumers under these circumstances.

Because Prime's acquisition of Landmark clearly did not *harm* competition and in fact *benefited* consumers, Steward is left to argue that Steward's acquisition of Landmark would have benefited competition even *more* because of Steward's supposedly superior business model. Not only is this pure speculation, it is not the proper inquiry: the law requires evidence of *actual harm* to competition in the form of increased prices or reduced output, not speculation conjured up by attorneys and their experts about whether a hypothetical different outcome might ultimately benefit consumers *more*. *Trinko,* 540 U.S. at 415-16 (The antitrust laws "do[] not give judges *carte blanche* to insist that a monopolist alter its way of doing business whenever some other approach might yield greater competition."); *see also Nat'l Bancard Corp. (NaBanco) v. VISA U.S.A., Inc.*, 596 F. Supp. 1231, 1257 (S.D. Fla. 1984), *aff'd,* 779 F.2d 592 (11th Cir. 1986) ("[T]he relevant question is not whether the challenged practice is the *most* competitive device that can be imagined, or the 'least restrictive,' but simply whether it is reasonable; i.e., not 'unduly' restrictive of competition.") (quotation omitted) (emphasis in original).[54] A contrary rule would permit *any* disappointed bidder to bring an antitrust claim on the theory that, years down the road, its supposedly superior business model ultimately would have been better for

---

[54]     *See also Kroger Co. v. Sanofi-Aventis*, 701 F. Supp. 2d 938, 959 (S.D. Ohio 2010) ("The antitrust laws are not designed to ensure the most productive competition or the most procompetitive agreement that could be reached, they are designed to ensure a market free from inappropriate restraints on competition."); *Am. Motor Inns, Inc. v. Holiday Inns, Inc.,* 521 F.2d 1230, 1249 (3d Cir. 1975) (requiring businesses to enter into the most procompetitive agreements possible would improperly make businesspeople "guarantors that the imaginations of lawyers could not conjure up some method of achieving the business purpose in question which would result in a somewhat lesser restriction of trade"); *Oxbow Carbon & Minerals LLC v. Union Pac. R.R. Co.*, 926 F. Supp. 2d 36, 47 (D.D.C. 2013) (rejecting an antitrust claim premised on the notion that defendant "failed to take procompetitive actions," such as "increas[ing] capacity . . . [through a greater] invest[ment] in infrastructure").

consumers. This type of speculation is not a sufficient basis for a finding of harm to competition. *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 321 (3d Cir. 2007) ("The prospective harm to competition [similarly] must not … be speculative."); *Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*, 28 F.3d 1379, 1385 (5th Cir.1994) ("[S]peculation about anticompetitive effects is not enough.").[55]

But here, the actual *evidence*, as opposed to speculation about the future effect of Steward's business plans, shows that ████████████████████████████████████████ ██████████████████████████████████████.[56] SOUF ¶ 123. Moreover, as set forth in the Statement of Undisputed Facts, ████████████████████████████████████, and certainly not to the level claimed by its damages experts. *Id.* at ¶¶ 18-27. Because Prime's acquisition of Landmark did nothing more than replace one owner with another—and the

---

[55]     *See also Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 79 (2d Cir. 2013) ("Gatt has not plausibly alleged that in the absence of the alleged scheme, its bids—rather than the bids of some other party—would have prevailed. … Gatt offers no reason why it would have been more certain than these entities to win the contracts."); *Minn. Ass'n of Nurse Anesthetists v. Unity Hosp.*, 208 F.3d 655, 662 (8th Cir. 2000) (plaintiff failed to show "concrete evidence" of "increased prices for anesthesia services, or a decline in either the quality or quantity of such services"); *Top Markets*, 142 F.3d at 96 (plaintiff's demonstration of "*potentially* higher prices," without proof that "prices were *actually* higher," was insufficient to prove harm to competition) (emphasis added); *Military Servs. Realty, Inc. v. Realty Consultants of Va., Ltd.*, 823 F.2d 829, 832 (4th Cir. 1987) (similar).

[56]     Steward's expert economist, Dr. Eisenstadt, falls into the same flawed reasoning. Although his analysis is defective for numerous reasons, *see* Noether Report at ¶¶ 347-417, it suffers from the more fundamental problem that ███████████████████████████ █████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████████ ████████ Eisenstadt Dep. at 66-67, 69-70, 178-79. But speculating about some hypothetical *benefit* from Steward's ownership of Landmark is not the same as proving actual competitive *harm* from Prime's ownership of Landmark, in the form of higher prices or lower output. *See Sterling Merch.*, 656 F.3d at 121.

███████████████████████████████████████████—Steward cannot

demonstrate antitrust injury or harm to competition.

## V.   BLUE CROSS IS ENTITLED TO SUMMARY JUDGMENT ON ALL OF STEWARD'S CLAIMS BECAUSE STEWARD HAS NOT MITIGATED ITS DAMAGES AND STEWARD'S DAMAGES MODEL CANNOT DISTINGUISH BETWEEN DAMAGES FROM LAWFUL AND UNLAWFUL CONDUCT.

As discussed in Blue Cross' motion to exclude the testimony of Dr. Ghezzi and Dr.

Sherman, Steward's damages model should be excluded because Steward could have mitigated

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████.[57] Because Steward's damages model is inadmissible,

Steward has no evidence of damages, and the Court should grant summary judgment to Blue

Cross. *See, e.g.*, *City of Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361, 1371-73 (9th Cir. 1992)

(affirming summary judgment where damages model failed to disaggregate between lawful and

unlawful conduct); *Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483, 1493-98 (8th Cir. 1992)

(same); *see also Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1056-57 (8th Cir.

2010) (same); *Infusion Res. Inc. v. Minimed Inc.*, 351 F.3d 688, 695 (5th Cir. 2003) (same);

*McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 806 (9th Cir. 1988) (same).

Under the antitrust laws, plaintiffs have a duty to mitigate their losses. *See, e.g., Golf

City, Inc. v. Wilson Sporting Goods, Co.*, 555 F.2d 426, 436 (5th Cir. 1977). In addition, "any

model supporting a plaintiff's damages case must be consistent with its liability case, particularly

with respect to the alleged anticompetitive effect of the violation." *Comcast Corp. v. Behrend*,

133 S. Ct. 1426, 1433 (2013) (quotation omitted). Moreover, if the plaintiff's damages model

"improperly attributes all losses to a defendant's illegal acts, despite the presence of significant

---

[57]   *See* Mot. to Exclude Damages Testimony of Keith Ghezzi and Marc Sherman.

██

other factors, the evidence does not permit a jury to make a reasonable and principled estimate of the amount of damage. This is precisely the type of 'speculation or guesswork' not permitted for antitrust jury verdicts." *MCI Commc'ns Corp. v. AT&T*, 708 F.2d 1081, 1162-63 (7th Cir. 1983) (citation omitted).

Here, Steward could have mitigated all but, . SOUF ¶ 98. Moreover, Steward's damages model asserts damages

*Id.* at ¶ 88. But Steward did not—and cannot—allege that failure to

Deposition of Keith Ghezzi ("Ghezzi Dep.") (May 17, 2017) (Ex. 92 to SOUF) at 180, 202, 216. The Court should therefore grant summary judgment against Steward on all of its claims.

## VI.   BLUE CROSS IS ENTITLED TO SUMMARY JUDGMENT ON ALL OF STEWARD'S ANTITRUST CLAIMS UNDER THE STATE ACTION DOCTRINE.

Steward's antitrust claims also are barred by the state action doctrine because the supposedly unreasonable rates that Blue Cross offered Steward at Landmark that form the basis of Steward's claims were compelled by state regulation. Am. Compl. ¶ 66. The state action doctrine immunizes conduct that is the intentional or foreseeable result of state or local government policy. *See Parker v. Brown*, 317 U.S. 341, 351 (1943) (finding that Congress did not intend for the Sherman Act to override state sovereignty). Conduct compelled by state action is immune if two criteria are satisfied: (1) the restraint must be "one clearly articulated and

affirmatively expressed as state policy," and (2) "the policy must be 'actively supervised' by the State itself." *Ca. Retail Liquor Dealers Ass'n v. Midcal Aluminum*, 445 U.S. 97, 105 (1980) (citation omitted). With respect to the "clear articulation" prong, all reasonably foreseeable results of state policy are immune from challenge under the antitrust laws. *City of Columbia v. Omni Outdoor Advert.*, 499 U.S. 365, 372 (1991). The purpose of the "active supervision" prong is to:

> determine whether the State has exercised sufficient independent judgment and control so that the details of the rates or prices have been established as a product of deliberate state intervention, not simply by agreement among private parties. Much as in causation inquiries, the analysis asks whether the State has played a substantial role in determining the specifics of the economic policy. The question is not how well state regulation works but whether the anticompetitive scheme is the State's own.

*Fed. Trade Comm'n v. Ticor Title Ins. Co.*, 504 U.S. 621, 634 (1992). Where, as here, a defendant's rates are set pursuant to state regulation, such rate-setting is immune under the state action doctrine, even where the rate-setting is "authorized, but not compelled, by the States." *S. Motor Carriers Rate Conf. v. United States*, 471 U.S. 48, 50, 60 (1985) ("The federal antitrust laws do not forbid the States to adopt policies that permit, but do not compel, anticompetitive conduct by *regulated* private parties.") (emphasis in original).

The state action doctrine criteria are satisfied here. As discussed above, pursuant to the authority given to OHIC by the Rhode Island legislature, █████████████████████████

███████████████████████████████████████████████████████████████

█████ *See supra* Part III. W███████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

█████████████████████—a situation even more deserving of state action immunity than *Southern*

77

*Motor Carriers*, where the rate-setting was merely "authorized, but not compelled." 471 U.S. at 50. Moreover, OHIC clearly exercised "independent judgment and control" over the prescribed rate of increase, determining that state public policy would be best served by limiting hospital rate increases to an established price index, and by refusing to approve a health insurers' premiums if they did not agree to abide by these hospital rate restrictions. *See Ticor,* 504 U.S. at 634. Steward cannot use the antitrust laws to overturn sovereign decisions of the state of Rhode Island regarding the rate increases that health insurers may provide to hospitals, and therefore the Court should grant summary judgment against Steward on its antitrust claims.

## VII.   BLUE CROSS IS ENTITLED TO SUMMARY JUDGMENT ON STEWARD'S STATE-LAW TORT CLAIMS.

Steward's state law claims (Counts XVII and XVIII) fail for the same reasons as its antitrust claims. The elements of Steward's tortious interference claims[58] include: "(1) the existence of a business relationship or expectancy, (2) knowledge by the interferor of the relationship or expectancy, (3) an intentional act of interference, (4) proof that the interference caused the harm sustained, and (5) damages to the plaintiff."[59] *Roy v. Woonsocket Inst. for Sav.,* 525 A.2d 915, 919 (R.I. 1987). Steward's tortious interference claims against Blue Cross fail because the evidence shows that Blue Cross (a) did not *improperly interfere* with Steward's potential agreements with Landmark or Thundermist; and (b) in any event, Blue Cross' conduct did not *cause* the failure of those agreements.

***First***, the record evidence shows that Blue Cross' conduct was not improper interference, for the same reason that such conduct does not violate the antitrust laws: Blue Cross' conduct

---

[58]     These elements apply to claims for tortious interference with either prospective or existing contractual relationships. *Mesolella v. City of Providence,* 508 A.2d 661, 670 (R.I. 1986).

[59]     Steward's tortious interference claims related to its failure to reach an agreement with Thundermist fail for the additional reason that Steward's damages experts have identified no damages arising from such failure.

was consistent with its business interests. Under Rhode Island law, it is not enough that a defendant interfered with the plaintiff's agreement, the defendant must have done so "intentionally and improperly." *Avilla v. Newport Grant Jai Alai LLC*, 935 A.2d 91, 98 (R.I. 2007) (quotation omitted); *accord Bossian v. Anderson*, 69 A.3d 869, 877 (R.I. 2013) ("[A] plaintiff must show that the interference is not only intentional, but also *improper*.") (citation omitted) (emphasis in original). In order to show that the interference was "improper," there must be evidence that defendant was motivated by "legal malice" or the "intent to do harm without justification." *Belliveau Bldg. Corp. v. O'Coin*, 763 A.2d 622, 627 (R.I. 2000). In other words, the "aggrieved parties must . . . prove not only that the putative tortfeasors intended to do harm to the contract but that they did so *without the benefit of any legally recognized privilege or other justification*." *Id.* (emphasis added). Where conduct does not violate the antitrust laws, the conduct also is not tortious as a matter of law because "antitrust law provides the best available barometer—indeed the only available barometer—of whether or not Blue Cross' conduct can be found to be 'wrongful' or 'illegitimate'—and, hence, tortious." *Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of R.I.*, 883 F.2d 1101, 1114 (1st Cir. 1989).

A defendant does not act "improperly" or without "justification" when the evidence shows that the defendant's conduct was consistent with its business interests. *See Textron Fin. Corp. v. Ship and Sail, Inc.*, No. 09-617, 2011 WL 344134, at *5 (D.R.I. 2011) ("Rhode Island courts have adopted the Restatement (Second) of Torts" approach, which "provides that there is no interference where a party asserts 'in good faith … that his interest may otherwise be impaired or destroyed.'") (quoting Restatement (Second) Torts § 773 (Am. Law Inst. 1979))).

Courts routinely reject tortious interference claims where the defendant had a valid business explanation for its conduct.[60]

With respect to Steward's APA to acquire Landmark, 

*Id.* at ¶¶ 4-8, 58-60, 86, 93, 99.

Similarly, there is no evidence in the record that

. *Id.* at ¶ 75. Steward's tort claims fail because Blue Cross did not demonstrate any "legal malice" or "intent to do harm without justification" with respect to either potential agreement, *Belliveau Building Corp*, 763 A.2d at 627 (citation omitted), and Blue Cross' conduct was perfectly consistent with its business interests.

---

[60]     *See, e.g.*, *Mortg. Guarantee & Title Co. v. Commw. Mortg. Co.*, 730 F. Supp. 469, 472 (D.R.I. 1990) (defendants did not tortiously interfere with the plaintiff's business prospects when they "legitimately s[ought] to protect their own financial interests" and decided not to accept plaintiff's title insurance policies); *Fed. Auto Body Works, Inc. v. Aetna Cas. & Surety Co.*, 447 A.2d 377, 380 & n.5 (R.I. 1982) (Aetna's policy of requiring that damaged vehicles be inspected before and after Federal's repairs was not an "improper" interference with Federal's goodwill and prospective contracts because "Aetna has a financial interest that it protects in inspecting a damaged vehicle"); *Belliveau*, 763 A.2d at 630 (defendants' recording of notices conveying their Right of First Refusal to plaintiff's properly was not improper because they were "protecting their valid property interest"); *Textron*, 2011 WL 344134, at *5-6 ("Textron hung signs on the collateral to give notice to potential buyers of its security interest" and thus "protected its financial interest in an appropriate manner").

**Second**, the record evidence shows that Blue Cross did not *cause* ███████████████████ ████████████████████████████████████ Causation is a necessary element of a claim for tortious interference with contract under Rhode Island law. *See Mesolella*, 508 A.2d at 671 (adopting the causal standard that "but for the [defendant's] interference the relationship there would have been a relationship"); *APG, Inc. v. MCI Telecomm. Corp.*, 436 F.3d 294, 304 (1st Cir. 2006) ("Under Rhode Island law, [the plaintiff] must prove either that 'but for' [the] interference, it would not have suffered injury, or that 'it is reasonably probable that but for the interference' [it would] not have been injured," and even the lesser causal standard requires that the outcome be "reasonably definite") (citations omitted).

With respect to Steward's APA to acquire Landmark, the record also shows that Steward's failure to acquire Landmark was not caused by Blue Cross. SOUF ¶¶ 4-8, 86, 93, 99, 111-18. Importantly, ███████████████████████████████████████████████ ████████████████ *Id.* at ¶ 80. ██████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ██████████████████████████. *Id.* at ¶ 98.

Likewise, the record evidence—including the sworn testimony of Mr. Jones—████████ ███████████████████████████████████████████████ █████████████████████████████████████ *Id.* at ¶ 74. There is no evidence from which a reasonable juror could conclude that it is "reasonably definite" that, "but

for" Blue Cross' conduct, Steward's agreements with ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ "would have

been established." *APG*, 436 F.3d at 305. Steward's tortious interference claims ring just as

hollow as its antitrust claims, and fail for the same reasons. *See Ocean State*, 883 F.2d at 1114.

## CONCLUSION

For the reasons set forth above, Blue Cross respectfully requests that the Court grant its

Motion for Summary Judgment and enter judgment against Steward on all claims in its Amended

Complaint.


DATED: July 14, 2017

/s/ Patricia K. Rocha
John A. Tarantino (#2586)
Patricia K. Rocha (#2793)
Joseph Avanzato (#4774)
Leslie D. Parker (#8348)
ADLER POLLOCK & SHEEHAN P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903
Tel: (401) 274-7200
Fax: (401) 351-4607
jtarantino@apslaw.com
procha@apslaw.com
javanzato@apslaw.com
lparker@apslaw.com

N. Thomas Connally, III (*Pro Hac Vice*)
Emily M. Yinger (*Pro Hac Vice*)
Hogan Lovells US LLP
Park Place II, Ninth Floor
7930 Jones Branch Drive
McLean, VA 22102
Tel: (703) 610-6100
Fax: (703) 610-6200
tom.connally@hoganlovells.com
emily.yinger@hoganlovells.com

Robert F. Leibenluft (*Pro Hac Vice*)
Justin W. Bernick (*Pro Hac Vice*)
Hogan Lovells US LLP
555 13th Street NW

Washington, DC 20004
Tel: (202) 637-5600
Fax: (202) 637-5910
robert.leibenluft@hoganlovells.com
justin.bernick@hoganlovells.com

*Attorneys for Blue Cross & Blue Shield of
Rhode Island*

## CERTIFICATE OF SERVICE

I hereby certify that on July 14, 2017, I filed the foregoing Motion through the ECF system and that notice will be sent electronically to the below listed counsel who are registered participants identified on the mailing information for Case No. 13-405-S.

Robert C. Corrente, Esq.
Christopher Dawson, Esq.
Joseph Cooper, Esq.
Whelan, Corrente, Flanders,
Kinder & Siket LLP
100 Westminster St., #710
Providence, RI 02903
rcorrente@wckslaw.com
cdawson@wckslaw.com
jcooper@wckslaw.com

Brendan V. Sullivan, Jr., Esq.
Steven R. Kuney, Esq.
Kevin Hardy, Esq.
Mark S. Levinstein, Esq.
Daniel W. Bell, Esq.
Matthew P. Mooney, Esq.
Frank Lane Heard, III, Esq.
Williams & Connolly LLP
725 12th Street, N.W.
Washington, DC 20005
bsullivan@wc.com
skuney@wc.com
khardy@wc.com
mlevinstein@wc.com
dbell@wc.com
mmooney@wc.com
lheard@wc.com

/s/ Patricia K. Rocha