UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

```
_____
                                  )
STEWARD HEALTH CARE SYSTEM, LLC;  )
BLACKSTONE MEDICAL CENTER, INC.,  )
f/k/a STEWARD MEDICAL HOLDING     )
SUBSIDIARY FOUR, INC.; BLACKSTONE )
REHABILITATION HOSPITAL, INC.,    )
f/k/a STEWARD MEDICAL HOLDING     )
SUBSIDIARY FOUR REHAB, INC.,      )
                                  )   C.A. No. 13-405 WES
          Plaintiffs,             )
                                  )
     v.                           )
                                  )
BLUE CROSS & BLUE SHIELD OF       )
RHODE ISLAND,                     )
                                  )
          Defendant.              )
_____ )
```

**OPINION AND ORDER**

WILLIAM E. SMITH, Chief Judge.

I.   Background[1]

In this antitrust action, Plaintiffs Steward Health Care
System, LLC, Blackstone Medical Center, Inc., f/k/a Steward
Medical Holding Subsidiary Four, Inc., and Blackstone
Rehabilitation Hospital, Inc. (collectively, "Steward") claim
Defendant Blue Cross & Blue Shield of Rhode Island ("Blue Cross")
unlawfully blocked Steward from entering the Rhode Island health

---

[1]   This factual discussion, as well as the facts noted
throughout this opinion, are taken from the parties' statements of
undisputed and disputed facts, as well as the attached exhibits;
where disputed, inferences are drawn in favor of the nonmoving
party, Steward.

care and health insurance markets, by thwarting its attempt to purchase a failing community hospital in receivership, Landmark Medical Center ("Landmark"), in Woonsocket, Rhode Island. (Pls.' Corrected Statement of Disputed Facts ("SDF") ¶ 49, ECF No. 171-1.)

This is a complicated case, and the area of antitrust law governing the claims is, to put it kindly, confused and opaque. As explained in detail below, the Court's view on the outcome of this motion has changed as a result of careful and complete review of the record and the law; and without question, this is a close case – one that highlights the difficulty of applying less-than-clear antitrust doctrines and precedents to one of the most complicated and volatile sectors of the national economy. In the end, the analysis below has convinced the Court that a trial is required on all counts of Steward's Amended Complaint (ECF No. 90), and therefore Blue Cross's Motion for Summary Judgment (ECF No. 157) will be denied in full (Counts I-XVIII).

A.   Landmark

Landmark Medical Center ("Landmark") is a "community based" hospital that has served northern Rhode Island since 1988.  <u>See</u> Landmark Medical Center, <u>History</u>, https://www.landmarkmedical.or g/About-Us/History.aspx (last visited Apr. 16, 2018).  In 2008, facing increasingly difficult financial straits, Landmark entered receivership under the supervision of the Rhode Island Superior

Court. (SDF ¶¶ 53, 62.) After entering receivership, Landmark operated under a court-appointed Special Master. (Id. ¶ 62.) Justice Michael Silverstein of the Rhode Island Superior Court oversaw the receivership proceedings and appointed attorney Jonathan Savage as Special Master. (Id. ¶ 63.) Special Master Savage solicited bids for Landmark from prospective buyers, including hospital systems Lifespan, Prime, and Steward. (Id. ¶ 64.)

As early as 1996, Lifespan sought to potentially acquire Landmark. (Id. ¶ 65.) Lifespan's interest resurfaced in the context of Landmark's receivership proceedings in April 2009 when the Special Master requested that Maria Montanaro, then-CEO of Thundermist Health Center ("Thundermist"),[2] "outline a plan for how health services would be delivered in Woonsocket in the event

_____

[2] Thundermist is a "major primary care provider" with a large group of primary care physicians that serves many patients in the Woonsocket area. (Pls.' Corrected Statement of Disputed Facts ("SDF") ¶ 47, ECF No. 171-1; id. ¶ 83; Dep. of Robert E. Guyon 94:8-9, SDF Ex. 5, ECF No. 206-5 (explaining Thundermist is key source of prospective patients for area hospitals)). Thundermist provides care to many people who are poor and historically uninsured or underinsured. Few of Thundermist's patients are commercially insured. (See, e.g., SDF Ex. 128, ECF No. 160-29; see also Thundermist Health Center, About Us, http://www.thunder misthealth.com/AboutUs/AboutUsOverview.aspx (last visited Apr. 16, 2018) ("Thundermist Health Center's goal is to bring healthcare to the people who need it most. . . . Nearly 40% of Thundermist's 42,000 patients in 2013 were uninsured. In 2014, we provided $6.6 million in unreimbursed care."). "Thundermist wanted a future for health care delivery in which it would play a significant role." (Pls.' Statement of Additional Undisputed Facts ("SAUF") ¶ 155, ECF No. 177-1; SAUF Ex. 50, ECF No. 177-51.)

that Landmark were to close." (SDF ¶ 66; Dep. of Maria Montanaro ("Montanaro Dep.") at 38-39, SDF Ex. 27, ECF No. 206-27.) The plan devised by Montanaro "called for the elimination of inpatient acute care at Landmark, and for the facility to provide primarily urgent care, emergency services, and outpatient surgery." (Id. ¶ 67; SDF Ex. 101, ECF No. 210-13; Dep. of Mary Wakefield ("Wakefield Dep.") at 31:1-6, SDF Ex. 30, ECF No. 206-30; Montanaro Dep. at 42:1-45:3, SDF Ex. 27; Dep. of George Vecchione ("Vecchione Dep.") at 14:8-14:14, SDF Ex. 29, ECF No. 206-29.) Underlying the plan was the idea that "a viable way to sustain Landmark hospital given its current financial and operational burdens [did] not appear to exist." (SDF ¶ 69.)

B.  The Steward Model

Steward is a for-profit hospital system,[3] which owns and operates multiple hospitals in neighboring Massachusetts.[4] (Id. ¶¶ 9, 11.) In its contracts with Massachusetts health insurance companies, Steward receives compensation on a per-member-per-month ("PMPM") basis rather than a fee based on individual service(s) performed. (Id. ¶ 15.) As Steward describes it, this is a "risk-based" model, in which Steward shoulders "some amount of financial

---

[3]  Cerberus Capital Management, LP owns a majority and controlling interest in Steward. (SDF ¶ 9.)

[4]  At its inception in 2010, Steward owned six hospitals in Massachusetts; by 2012, it owned eleven hospitals. (SDF ¶ 11.)

risk of providing healthcare services to the health insurers' members." (Id.) To be successful, such a relationship requires a "working, constructive business relationship that involves the sharing of information and other cooperation" between health insurers and Steward.[5] (Id. ¶ 16.) Moreover, the success of Steward's healthcare vision requires that "the payer and provider must together develop a system for sharing the health-care and health-expense history of the insured patient population, also develop an analytic for total medical expense ('TME') of that population, and agree on reasonable grounds for reducing TME and improving the quality of care." (Pls.' Statement of Additional Undisputed Facts ("SAUF") ¶ 196, ECF No. 177-1.)

Steward's vision was to offer a new, atypical health-care-provider model to Rhode Island. (SDF ¶ 35.) This model was premised on "(1) right-siting care, such that community-based, routine services are performed in community settings, whether hospitals, urgent care centers, ambulatory services centers, or physicians' offices; (2) improving the quality of care provided in the community; [and] (3) negotiating on behalf of an integrated network of physicians and hospitals to drive lower premiums." (SDF

---

[5] Steward's risk-based-contract model also contemplates that Steward would compete to an extent with health insurers "for the same premium dollars and Steward performs some functions traditionally performed by insurers." (SDF ¶ 16.)

¶ 40.) In exchange for participation in its own "narrow network,"
Steward would accept lower reimbursement rates. (Id.)

As a part of Steward's vision, its executives believed it
could turn around the quality problems Landmark faced; indeed,
"that was the fundamental premise of Steward's turnaround plan for
the hospital." (SDF ¶ 54.) "Landmark quality of care is generally
good, although it has room for improvement." (Id.)

Steward's long term goals extended beyond Landmark; it wanted
to acquire more hospitals in Rhode Island. (SDF ¶ 28.) To this
end, Steward petitioned the state legislature to amend the Rhode
Island Hospital Conversion Act "to eliminate a three-year waiting
period between hospital acquisitions by for-profit hospitals,
which would have allowed Steward to buy more than one Rhode Island
Hospital in a three year period." (SAUF ¶ 139.)

C.   The Caritas and Steward Bid To Acquire Landmark

In August 2010, over one year after the receivership
commenced, Caritas, Steward's predecessor, submitted a bid to
acquire Landmark.[6] (SDF ¶ 76.) A contract with Blue Cross was a
precondition to Caritas's proposed Asset Purchase Agreement
("APA"). (Id. ¶ 77.) Feeling that it lacked the essential
partners, including Blue Cross, for a successful transaction over

---

[6] Steward's acquisition of Caritas was finalized in November
2010. (SDF ¶ 13.)

Landmark, Caritas withdrew its bid in December 2010. (Id. ¶ 78.)
In a press release following the failed transaction, the Special
Master "indicated critical discussions related to reimbursement
rates with Blue Cross/Blue Shield of Rhode Island did not produce
tangible results." (Id.) He added, "To date, this has been our
biggest hurdle. Unfortunately, attempts to address our inadequate
reimbursement rates with Blue Cross were not productive and in
fact stalled our negotiations with Caritas." (Id.)

In May 2011, Steward submitted a new bid to acquire Landmark.
(SDF ¶ 79.) An APA was proposed, and although amended fifteen
times, this mostly extended the closing deadlines. (Id. ¶¶ 79,
81, 82.) While the various APA versions included numerous
conditions, "[n]ot all important matters were included as
conditions in the APA, nor were all conditions in the APA clearly
'important.'" (Id. ¶ 79.) Rather than rigid requirements, Steward
considered the conditions to be "flexible leverage points for
negotiations," or even "window dressing." (Id. ¶¶ 79, 82.)
Indeed, after realizing certain conditions could not be met,
Steward nevertheless plowed ahead in attempting to acquire
Landmark. (Id. ¶ 79.)

For example, the APA submitted in March 2012 included the
following conditions: "An agreement to purchase 100% of Rhode
Island Specialty Hospital" ("RISH"); a Memorandum of Understanding
("MOU") with Thundermist; and "[a]n agreement to purchase the

interest of 21st Century Oncology ('21st Century') in Southern New England Regional Cancer Center ('SNERCC'), a cancer treatment facility owned jointly by 21st Century and Landmark."[7] (SDF ¶ 81.) Steward made clear that it would consider waiving the Thundermist and SNERCC conditions if and when it became necessary, if that meant Steward would successfully acquire Landmark. (Id. ¶ 82.) ("You know, at the end of the day, it's us and Blue Cross that need to come to an agreement.").

The key to Steward's effort to acquire Landmark was an acceptable arrangement with Blue Cross on reimbursement rates, because, as with all Rhode Island hospitals, this was the primary source of income for services rendered at Landmark. (See id. ¶ 98; SAUF ¶ 173.) For about a year from September 2011 to September 2012, with the assistance of various facilitators, Steward and Blue Cross exchanged numerous and detailed reimbursement-rate proposals for Landmark. (SDF ¶ 86.) Over the course of these negotiations, Steward saw Blue Cross as "moving backwards" because its offers of rate increases always included "quality targets that were unrealistic, given Landmark's condition." (Id.) Blue Cross would not discuss modifying these targets, even though it had done so for other providers. (Id. ¶ 88.) In one of the last mediation

---

[7] The conditions with respect to Thundermist and SNERCC, however, were later omitted from the May 2011 APA and the first seven amendments to the APA. (SDF ¶ 82.)

sessions the parties had with the Rhode Island Attorney General, the Attorney General informed Steward executives that Blue Cross "just do[es]n't want you to do business in this state." (Id. ¶ 86.)

Steward believed Blue Cross's proposed quality metrics (a part of Blue Cross's Standard Quality Program) were unattainable, so over the long course of negotiations, it proposed quality metrics different than those Blue Cross advanced, but which it believed to be achievable. (SDF ¶ 100.) For example, in September 2011, Steward introduced a proposal for quality metrics "based on year-over-year improvement at Landmark, as opposed to targets based on national averages." (Id.) At every turn, Blue Cross rejected Steward's proposals and refused to stray from its Quality Program's methodology.[8] (Id.)

Beyond the financial issues, Steward needed and wanted Blue Cross to be a "'willing partner.'" (Id. ¶ 88.) After all, the viability of Steward's proposed model turned on a "non-hostile relationship" with Blue Cross. (Id.) Although not expressly set out as an APA condition, everyone involved understood that an

---

[8] Such provisions were eventually included in the agreed-upon quality program between Blue Cross and Prime, which eventually acquired Landmark. (SDF ¶ 100.) Additionally, "Blue Cross made changes in its quality program for Prime that it had refused to make for Steward, including measuring certain quality metrics against Landmark's past performance and not against national averages." (Id. ¶ 101.)

agreement with Blue Cross was essential for a successful contract over Landmark. (SDF ¶ 112.)

On August 6, 2012, negotiations being facilitated by the Attorney General came to an acrimonious stop when Steward's team walked away in response to what it viewed as an unproductive, obstinate negotiating approach by Blue Cross. (Id. ¶ 86.) Steward's decision to walk away was met with considerable anger because at the time, some viewed Steward as petulantly abandoning a process that so many people had invested in deeply.[9] Nonetheless, with some prodding, the parties reengaged. (SDF ¶ 87.)

On September 4, 2012, Steward sent a letter to Justice Silverstein that offered two, alternative paths to finalizing the Landmark acquisition. (SDF ¶ 114.) One path consisted of "satisfying the three conditions, with or without an agreement with Blue Cross." (Id.) The other required an agreement with Blue Cross but waived the RISH and Thundermist conditions, and allowed Steward to "deal with SNERCC later." (Id.) A final mediation session with retired Chief Justice Frank Williams of the Rhode Island Supreme Court occurred on September 12, 2012. (Id.

---

[9] This ire was best reflected in a letter sent to Steward by the Attorney General. (SDF Ex. 207, ECF No. 204-10.) This letter was met with a fiery and pointed response from Dr. de la Torre, Steward's CEO, summarizing what Steward viewed as Blue Cross's bad faith tactics and the Attorney General's bias and intimidating behavior. (Def.'s Statement of Undisputed Facts ("SUF") Ex. 102, ECF No. 169-33.)

¶ 89.) Alas, this mediation too was unsuccessful. (See id.)
Steward publicly announced its decision to withdraw its Landmark
bid on September 27, 2012. (Id.) Steward announced,

> In order to move forward with Steward's model of care
> several conditions needed to be met. These conditions
> were clearly spelled out in the Asset Purchase Agreement
> and accepted by the Court. These conditions have not
> been met. When we were notified that these conditions
> could not be met, we presented a second path by which we
> would waive two of these conditions. This alternate
> condition was also not met.

(Id. ¶ 117.) The difference between Steward's and Blue Cross's
rate proposals is the subject of considerable dispute, but, as
calculated by Steward, was $3 million. (See SDF ¶ 97.)

D.    The "Red Team"

Blue Cross's Chief Financial Officer ("CFO") Michael Hudson,
an individual involved in Steward negotiations from August to
September 2012, spearheaded what Blue Cross called the "Red Team"
in July 2012. (SDF ¶ 87.) The Red Team was a group of Blue Cross
employees charged with identifying and analyzing potential
competitive threats. (SDF ¶ 87; SAUF ¶ 142.) One of those
employees was Linda Winfrey, an Assistant Vice President at Blue
Cross responsible for gauging "risks to the enterprise up to and
including disruption of services." (SDF ¶ 87.) AVP Winfrey had
been considering these issues for Blue Cross since at least May
2012, when she circulated (and later presented at an executive
leadership meeting) a document that highlighted Blue Cross's most

11

pressing threats; at the top of that list was the "potential of new competitors entering the market including Accountable Care Organizations (ACO)," which could "result in significant enrollment losses and could negatively affect our long term viability as a health plan." (Id.) In a similar presentation in July 2012, "Competition in the Post-PPACA World," "ACO: Supplier Leverage" and "Limited Network Carrier (Steward/Fallon?)" were pinpointed as "new threats" with a high "likelihood of entry to RI market" and a substantial "adverse impact on BCBSRI." (Id.) AVP Winfrey also approved the idea of analyzing Steward's prospective threat in the first round of the Red Team's analysis. (Id.) In that analysis, the Red Team included "a map to show just how well positioned [Steward is] in the southeast part of MA . . . they have St. Anne's, Good Sam's, Morton, Norwood . . . they basically have RI bordered. Then Landmark would be the tip of the spear." (Id.)

Blue Cross expressed concern about ACOs and risk-based contracting, which could strip some or all of an insurance company's traditional functions, and the profits associated with insurance companies bearing risk. (See, e.g., SAUF ¶ 146; SAUF Ex. 35, ECF No. 177-36 at 12 ("[T]he possibility exists for the ACO to develop a level of integration that makes an outside insurer redundant"); Dep. of Dorothy Coleman ("Coleman Dep.") at 435:3-13, 437:18-438:5, SAUF Ex. 7, ECF No. 214-7 (highlighting risk

that ACO might team up with an insurance company, which could severely test Blue Cross's relevance)). Blue Cross viewed these issues, referred to as "disintermediation," and the process of "providers becoming payers," as existential threats. (See SAUF ¶ 146.) Blue Cross CEO Peter Andruszkiewicz testified in his deposition that "disintermediation," i.e., "providers becoming payers" and "eliminat[ing] the intermediary known as the payer" "was a concern among my team, me, and every health insurance executive in the United States at this time frame." (Dep. of Peter Andruszkiewicz ("Andruszkiewicz Dep.") at 93, SAUF Ex. 6, ECF No. 214-6.) Likewise, Mark Waggoner, a member of Blue Cross's Executive Leadership Team ("ELT") and a key participant in Caritas discussions, recalled "discussion at Blue Cross at about this same time about the possibility that the ACO model or integrated delivery system could in some sense replace a conventional insurance company" because "you saw some of that happening in some parts of the country" and disintermediation was the "trend in [nationwide] conversations at that point in time." (Dep. of Mark Waggoner ("Waggoner Dep.") at 298, SAUF Ex. 11, ECF No. 214-11.)

The Red Team also analyzed other prospective scenarios, including one in which Prime entered Rhode Island. (SAUF ¶ 147; SAUF Ex. 37, ECF No. 177-38; SAUF Ex. 38, ECF No. 177-39.)

E.   Blue Cross's Contract with Landmark

Under the twelfth amendment to Landmark's Hospital Participation Agreement with Blue Cross, the Landmark-Blue Cross contract was set to expire July 16, 2012.  (SDF ¶ 102.)  With negotiations faltering, on May 21, 2012, Blue Cross filed an application for a material modification with the Rhode Island Department of Health ("DOH"), which included draft notice letters informing Blue Cross's subscribers and providers that Landmark might go "out of network."  (Id. ¶ 104.)  Upon receipt of Blue Cross's material-modification application, the DOH informed Blue Cross that it should send "revised member and physician notification letters" detailing "that until the Department completes its review of this potential change and issues its determination, members will be able to continue to receive covered services at [Landmark and RHRI] at the in-network benefit level, if [the material modification] is not approved prior to the termination of the contract."  (Id. ¶ 105.)

This material modification request sent shock waves through the receivership players.  On July 2, 2012, Special Master Savage, noting the critical stage of negotiations between Steward and Blue Cross, sought a temporary restraining order ("TRO") from Justice Silverstein to stop Blue Cross from putting Landmark out of network and distributing the letters to subscribers and providers.  The Superior Court denied the TRO on July 6, 2012; and on July 9, 2012,

Blue Cross mailed letters to providers and subscribers explaining that Landmark might soon be "out of network."[10]  (Id. ¶¶ 107-08.) On July 16, 2012, Blue Cross's contract with Landmark terminated; thereafter Blue Cross compensated subscribers directly for healthcare services provided at Landmark. (Id. ¶ 109.)  Landmark remained out of network until August 31, 2012, when Blue Cross and Landmark agreed to extend the terms of their participation contract until three months after a buyer acquired the hospital. (Id. ¶ 110.)  In agreeing to extend the Landmark contract with Blue Cross as part of a settlement approved by Justice Silverstein, the Special Master felt he had no choice but to bend to Blue Cross's will given the hopsital's precarious condition.  With court approval, on September 12, 2012, Landmark was officially back in network. (Id.)

In June 2012, Blue Cross's contracting group considered the risks facing Blue Cross if it chose not to renew any of its contracts with various community hospitals, including Landmark.

---

[10]  Although Blue Cross had from time to time filed paperwork to initiate the material-modification process during lagging negotiations with other hospitals, this move was unprecedented: "at no time before the Landmark situation had it ever sent out letters to subscribers and doctors alerting them that any other hospital was about to be out of network." (SAUF ¶ 175.)  "Nor had Blue Cross ever before stopped payments to a hospital that was still officially 'in network' and instead directed payments to the subscribers, leaving to the hospital the difficult burden of collecting the monies due from the patients themselves." (Id. ¶ 176.)

(SAUF ¶ 179.)  Blue Cross knew that removing a hospital from its network could substantially cost Blue Cross because it would force its subscribers to access other, more expensive, in-network hospitals (such as Rhode Island Hospital, Miriam Hospital, or Women's & Infants Hospital).  (Id.)  Blue Cross also knew that without a contract, Landmark might be forced to close.  (Id.)  Steward suggests, and Court accepts as true for purposes of this motion, that "Blue Cross knew that the material modification process typically took 4-6 months, and that the cost of being out of contract with [Landmark/]Steward in advance of DOH approval would cost Blue Cross an estimated $3 million per month."  (Id. ¶ 180.)  Even without contemplating this cost, Steward adds, it would cost Blue Cross much more to remove Landmark from its network than "what Steward was then seeking in terms of reimbursement rate increases."  (Id. ¶ 181.)  Nevertheless, in spite of knowing full well the short term costs of its decision, Blue Cross concluded that the "path forward for Landmark was to 'hold our position since the material modification ha[d] already been filed.'"  (Id.)

Steward states:  "Despite the financial risk to Blue Cross of pursuing the material modification, Blue Cross' demands in exchange for a swift resolution on the material modification were those that it believed were necessary to end Steward's bid for the hospital.  As Mike Hudson, Blue Cross' CFO and then lead negotiator with Steward explained, he was not going to even talk further with

16

Steward until he learned whether Landmark accepted Blue Cross'
terms, since those terms '[c]ould force Steward's hand — if they
[Landmark] agreed to the contract, <u>then Steward is likely out</u>."
(<u>Id.</u> ¶ 184.)

    F.    Blue Cross Reaches a Deal with Prime over Landmark

    Once Steward withdrew from the process, Prime[11] submitted a
proposed APA for Landmark to the Special Master on September 26,
2012.  (SDF ¶ 119.)  After lengthy negotiations, Prime acquired
Landmark on December 31, 2013.  (<u>Id.</u> ¶¶ 122, 125.)  The quality
program Blue Cross reached with Prime included provisions that it
would not accept when presented by Steward, namely evaluating
Landmark "based on improvement in Landmark's performance against
past performance" rather than national averages.  (<u>Compare</u> SDF Ex.
195 at 6–7, ECF No. 203-16, <u>and</u> SDF Ex. 198 at 14, ECF 204-1 ("Blue
Cross Blue Shield of Rhode Island Hospital Quality Program 2014")
("BCBSRI compares each hospital . . . to the threshold targets
established using the national average results from a selected
comparison measurement period . . . unless otherwise determined by
contract."), <u>with</u> SDF Ex. 197 at 11, ECF No. 203-18 (Blue Cross
and Prime agreement over Landmark) ("Both parties to establish
mutually agreeable improvement targets based on Landmark's own

_____

    [11]    With forty-four hospitals and 43,500 employees, in
fourteen states, Prime has substantial experience in the business
of reviving distressed hospitals.  (SDF ¶ 120.)

baseline CY 2013 data . . . .")).  Although Prime has succeeded to some degree in righting the ship for Landmark by increasing patient volume and revenue, (see SDF ¶ 127), it is hotly disputed whether Prime brought efficiency and innovation to Rhode Island through Landmark.  (See id.; SDF Ex. 37 at 25, ECF No. 171-38 (noting Landmark's operating expenses under Prime increased from $109.3 million in 2013 to $130.6 million in 2015 and $130.4 million in 2016.  Indeed, Prime has not developed an ACO, a significant physician network, or risk-based contracts.  (See SAUF ¶ 197; Prime 30(b)(6) Dep. of Richard R. Charest ("Charest Dep.") at 74:10-76:5, 85:10-15, SAUF Ex. 14, ECF No. 214-14 ("We don't have risk-based contracts."); SAUF Ex. 102 at 3, ECF No. 215-27 (Jones of Thundermist recalling meeting with Prime CEO, where "it was clear to me that the Prime model does not consider health care efficiency as an overall goal.")).  Although at Landmark now "[t]here's a nice piano in the entrance" and "[i]t's looking nicer," Prime has not made substantive improvements "in terms of quality or community partnership."  (SAUF ¶ 201; Dep. of Charles "Chuck" Jones ("Jones Dep.") 286:18-287:4, SAUF Ex. 12, ECF No. 214-12.)

G.   Procedural History

Steward filed its first complaint against Blue Cross on June 4, 2013, in which Steward alleged that Blue Cross's unilateral conduct violated Section 2 of the Sherman Act and Section 6-36-5 of the Rhode Island Antitrust Act.  (Compl. ¶¶ 62-114, ECF No. 1.)

On July 15, 2013, Blue Cross moved to dismiss Steward's complaint (ECF No. 16); this Court denied Blue Cross's motion on February 19, 2014 (ECF No. 34); see also Steward Health Care Sys., LLC v. Blue Cross & Blue Shield of R.I., 997 F. Supp. 2d 142 (D.R.I. 2014) ("Steward I"). Following the commencement of discovery, Steward filed an amended complaint on August 26, 2015, adding claims under Section 1 of the Sherman Act, suggesting Blue Cross's conduct was part of a conspiracy with Lifespan and Thundermist to keep Steward out of Rhode Island.

On July 14, 2017, Blue Cross moved for summary judgment on all counts of Steward's amended complaint. Steward filed a response in opposition (ECF No. 172) on August 11, 2017, to which Blue Cross replied (ECF No. 219) on August 25, 2017. The Court heard oral argument by the parties on September 26, 2017 (ECF No. 229). With a firm trial date approaching in January 2018, on November 29, 2017, the Court issued a Notice Regarding Defendant's Motion for Summary Judgment (ECF No. 338) indicating that it tentatively had decided to grant Blue Cross's summary-judgment motion on all counts, and cancelling the trial date. The Court noted that an Opinion and Order would be forthcoming. Since that Notice, the Court's assessment of Blue Cross's motion has evolved; this Opinion and Order sets forth the reasons for the Court's determination that summary judgment should be denied.

II. Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Evergreen Partnering Grp., Inc. v. Pactiv Corp., 832 F.3d 1, 7 (1st Cir. 2016) (quoting Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-86 (1986)). The Court "draws all reasonable inferences in favor of the non-moving party while ignoring conclusory allegations, improbable inferences, and unsupported speculation." Id. (quoting Alicea v. Machete Music, 744 F.3d 773, 778 (1st Cir. 2014)).

The onus is on the moving party to demonstrate that no genuine dispute of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "Once the moving party makes this showing, the nonmoving party must point to specific facts demonstrating a trialworthy issue." United States v. Giordano, 898 F. Supp. 2d 440, 447 (D.R.I. 2012). Rather than rest "upon the mere allegations or denials in the pleading," the nonmovant "must set forth specific facts showing that there is a genuine issue of material fact as to each issue upon which [it] would bear the ultimate burden of proof at trial." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 53 (1st Cir. 2000). "[E]vidence

illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial." <u>Mack v. Great Atl. & Pac. Tea Co.</u>, 871 F.2d 179, 181 (1st Cir. 1989).

III. Discussion

    A.   The Refusal-To-Deal Claim (Counts I, II, V, VI, IX, X, XIII, and XIV)[12]

In 1980, Judge Keith of the Sixth Circuit Court of Appeals complained that the question of when "a monopolist ha[s] a duty to deal . . . is one of the most unsettled and vexatious in the antitrust field." <u>Byars v. Bluff City News Co.</u>, 609 F.2d 843, 846 (6th Cir. 1980). Although nearly forty years of ink has spilled on the topic – including the Supreme Court's – Judge Keith's lament

---

    [12]  To the extent that Steward asserts claims under the Rhode Island Antitrust Act, as opposed to the Sherman Act, this Court, like the parties, analyzes the claims together, here and throughout this Opinion (including Steward's conspiracy claims). <u>See</u> R.I. Gen. Laws § 6-36-2(b); <u>Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.</u>, 239 F. Supp. 2d 180, 186-87 (D.R.I. 2003) ("The provisions of the Rhode Island Antitrust Act mirror those of §§ 1-2 of the Sherman Act . . . and are construed in the same manner as the federal statutes."). For similar reasons, the Court likewise does not separate out Steward's monopsonization and attempted monopsonization claims from Steward's monopolization and attempted monopolization claims. <u>See</u> <u>Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.</u>, 549 U.S. 312, 320-22 (2007) ("The kinship between monopoly and monopsony suggests that similar legal standards should apply to claims of monopolization and to claims of monopsonization.").

is as apt today as it was when Jimmy Carter was President.[13]  As

one commentator succinctly put it, "There is a problem with Section

2 of the Sherman Act:  nobody knows what it means."  Thomas A.

Lambert, Defining Unreasonably Exclusionary Conduct:  The

"Exclusion of a Competitive Rival" Approach, 92 N.C. L. Rev. 1175,

1177 (2014).  Nevertheless, this Court must resolve the difficult

(and admittedly close) Sherman Act section 2 question posed by

this case:  has Steward raised a triable issue as to whether Blue

Cross engaged in a predatory refusal to deal by blocking Steward

from entry into the Rhode Island health care and health insurance

markets?  While the question is close – and indeed the Court was

initially inclined to grant summary judgment – careful

consideration of the case law, facts, and the applicable antitrust

policy objectives, has convinced the Court that the answer is yes,

and therefore Blue Cross's motion must be denied.

     Section 2 of the Sherman Act makes it unlawful to "monopolize,

or attempt to monopolize . . . any part of the trade or commerce

---

[13]   Indeed, one recent law review article recounts various
descriptions for the standard to discern exclusionary conduct in
a manner that this Court can appreciate.  See Katharine Kemp, A
Unifying Standard for Monopolization:  "Objective Anticompetitive
Purpose", 39 Hous. J. Int'l L. 113, 115 (2017) ("The standards
applicable to the second element, exclusionary conduct, have been
variously described as 'vacuous,' 'uncertain,' 'elusive,'
'unclear,' 'unsettled,' 'oxymoronic,' 'in substantial disarray,'
'in dire need of correction,' and plagued by 'serious definitional
inadequacies.'" (citations omitted)).

among the several States, or with foreign nations." 15 U.S.C. §
2. "The elements of monopolization are '(1) possession of monopoly
power in the relevant market and (2) the willful acquisition or
maintenance of that power as distinguished from growth or
development as a consequence of a superior product, business
acumen, or historic accident.'"[14] Diaz Aviation Corp. v. Airport
Aviation Servs., Inc., 716 F.3d 256, 265 (1st Cir. 2013) (quoting
United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966)).
"In the absence of any purpose to create or maintain a monopoly,
the act does not restrict the long recognized right of trader or
manufacturer engaged in an entirely private business, freely to
exercise his own independent discretion as to parties with whom he
will deal . . . ."[15] United States v. Colgate & Co., 250 U.S. 300,
307 (1919). "However, '[t]he high value that we have placed on
the right to refuse to deal with other firms does not mean that

---

[14] Blue Cross's monopoly power – which is "typically proven
by defining a relevant market and showing that the defendant has
a dominant share of that market" – has been assumed by the parties
for purposes of this motion. Diaz Aviation Corp. v. Airport
Aviation Servs., Inc., 716 F.3d 256, 265 (1st Cir. 2013) (citing
Coastal Fuels of P.R., Inc. v. Caribbean Petroleum Corp., 79 F.3d
182, 196-97 (1st Cir. 1996)).

[15] The Supreme Court in Verizon Commc'ns Inc. v. Law Offices
of Curtis V. Trinko, LLP, 540 U.S. 398, 408 (2004) quoted this
passage from United States v. Colgate & Co. but left out the key
qualifying language, "In the absence of any purpose to create or
maintain a monopoly[.]" 250 U.S. 300, 307 (1919). Although this
omission perhaps reflects the Supreme Court's narrowing of Section
2 liability in Trinko, the qualifying language in Colgate has never
been countermanded and appears to remain the standard.

the right is unqualified.'" _Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP_, 540 U.S. 398, 408 (2004) (quoting _Aspen Skiing Co. v. Aspen Highlands Skiing Corp._, 472 U.S. 585, 601 (1985)). That is, "[u]nder certain circumstances, a refusal to cooperate with rivals can constitute anticompetitive conduct and violate § 2." _Id._; _see also_ _Pacific Bell Tel. Co. v. Linkline Commc'ns, Inc._, 555 U.S. 438, 448 (2009) ("[T]here are rare instances in which a dominant firm may incur antitrust liability for purely unilateral conduct.").

The two leading cases in this area – _Aspen Skiing_ and _Trinko_ – are well-known, often-cited, and require detailed discussion. _Aspen Skiing_ involved the Aspen ski area, which comprised four distinct mountains. The defendant owned three mountain areas, and the plaintiff owned the fourth. For more than fifteen years, the parties had arranged to issue a joint-ski pass for access to all four mountains. So when the defendant suddenly terminated the joint-ski-pass agreement, the plaintiff – concerned that skiers would no longer frequent its mountain without a joint-ski pass available – "tried a variety of increasingly desperate measures to re-create the joint ticket, even to the point of in effect offering to buy the defendant's tickets at retail price." _Trinko_, 540 U.S. at 408-09 (citing _Aspen Skiing_, 472 U.S. at 593-94). The defendant steadfastly refused to recreate the joint-ski-pass arrangement. _Aspen Skiing_, 472 U.S. at 594. The issue before the _Aspen Skiing_

Court was whether defendant Ski Co., in terminating its four-mountain ticket with plaintiff Highlands, was "attempting to exclude rivals on some basis other than efficiency." Id. at 605. The Court concluded that there was sufficient evidence to suggest that the defendant "was not motivated by efficiency concerns and that it was willing to sacrifice short-run benefits and consumer goodwill in exchange for a perceived long-run impact on its smaller rival," and therefore upheld a jury verdict for the plaintiff. Id. at 610-11.

Several years later, in Trinko, the Court reconsidered Aspen Skiing and distinguished it. 540 U.S. at 408-11. Trinko involved firms regulated under the Telecommunications Act of 1996, which required that incumbent local exchange carriers ("ILECs"), like defendant Verizon, share (i.e., "unbundle") aspects of its network with prospective entrants, competitive local exchange carriers ("CLECs"). 540 U.S. at 402. The plaintiff lodged a class action pursuant to § 2 on behalf of CLECs, which complained that Verizon filled rivals' orders in a slow and discriminatory manner so as to discourage customers from choosing its competitors' services. Id. at 404-05. The Court held that the facts of Trinko were not comparable to those in Aspen Skiing. Id. at 408-11. In doing so, it noted that the Aspen Skiing Court "found significance in the defendant's decision to cease participation in a cooperative venture," adding that the "unilateral termination of a voluntary

25

(and thus presumably profitable) course of dealing suggested a willingness to forsake short-term profits to achieve an anticompetitive end." "Similarly, the defendant's unwillingness to renew the ticket even if compensated at retail price revealed a distinctly anticompetitive bent." Id. at 409.

Both Aspen Skiing and Trinko provide significant guidance on what a refusal-to-deal claim might (Aspen Skiing) – or might not (Trinko) – look like. But neither dictated what such a claim must look like. As this Court reads these cases, they do not specify granular factual predicates that must be present for a refusal-to-deal claim to move forward; rather, the Supreme Court identified facts that, in the circumstances of each case, pointed toward conduct that may or may not be characterized as "exclusionary" or "anticompetitive." Aspen Skiing, 472 U.S. at 603-04. In Aspen Skiing, the Supreme Court concluded "Ski Co.'s decision to terminate the all-Aspen ticket" could "fairly be characterized as exclusionary . . . ." 472 U.S. at 604. When the Court discussed and distinguished Aspen Skiing in Trinko, it noted that "[t]he Court there found significance in the defendant's decision to cease participation in a cooperative venture." 540 U.S. at 409 (citing 472 U.S. at 608, 610-11); the Court added, "[t]he unilateral termination of a voluntary . . . course of dealing suggested a willingness to forsake short-term profits to achieve an anticompetitive end." Id. (emphasis added); and finally, "the

26

defendant's unwillingness to renew the ticket <u>even if compensated</u> <u>at retail price</u> <u>revealed</u> a distinctly anticompetitive bent." <u>Id.</u> (second emphasis added). The Court's descriptive, provisional language makes clear that it regarded <u>Aspen Skiing</u> as a paradigmatic example of – not a paint-by-numbers kit for – unlawful refusals to deal. <u>See</u> <u>Trinko</u>, 540 U.S. at 411 ("Antitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue.").

Much of the confusion over <u>Aspen Skiing</u> and <u>Trinko</u> results from courts of appeals that either misread or deliberately extend the holdings of these cases, construing them in a rigid fashion to <u>require</u>, for example, an explicit prior course of dealing.[16] <u>See,</u> <u>e.g.</u>, <u>Novell, Inc. v. Microsoft Corp.</u>, 731 F.3d 1064, 1074 (10th Cir. 2013) ("First, as in <u>Aspen</u>, there <u>must be</u> a preexisting voluntary and presumably profitable course of dealing between the monopolist and rival.") (emphasis added); <u>In re Elevator Antitrust</u> <u>Litig.</u>, 502 F.3d 47, 52 (2d Cir. 2007) (requiring "alleg[ation]

---

[16] Indeed, at the motion-to-dismiss stage, this Court may well have implied that Steward must meet what the Court described as the "baseline requirements" of a refusal-to-deal claim: the "unilateral abandonment of a voluntary course of dealing, forsaking of short-term profits, refusal to transact business with the plaintiff even if compensated at rates set by the defendant, and concomitant inability to provide a legitimate business rationale . . . ." <u>Steward I</u>, 997 F. Supp. 2d at 153. After a more careful review of the cases, however, the Court is of the view that to require, without exception, each of these factors to make out a refusal-to-deal claim (as Blue Cross would have it) is to misconstrue <u>Aspen Skiing</u> and <u>Trinko</u>.

that defendants terminated any prior course of dealing" as "the sole exception to the broad right of a firm to refuse to deal with its competitors"); Covad Commc'ns Co. v. BellSouth Corp., 374 F.3d 1044, 1049 (11th Cir. 2004) ("Trinko now effectively makes the unilateral termination of a voluntary course of dealing a requirement for a valid refusal-to-deal claim under Aspen."). Novell (authored by now-Justice Gorsuch) and In re Elevator Antitrust Litigation, in particular, use emphatic language to describe the "mandatory" holding of Trinko; Covad uses less strident words ("effectively makes . . . unilateral termination . . . a requirement"). But without sugar-coating it, Aspen Skiing and Trinko just do not say what these courts say they do. And while there may be antitrust policy reasons that support pulling back the reins on refusal-to-deal claims, it is up to the Supreme Court to take this step. Until then, Aspen Skiing and Trinko, in this Court's view, should be applied as written, in concert with the instructive holdings of the First Circuit.[17]

---

[17] A policy reason against requiring the termination of a prior course of dealing is that to do so would be to discourage new, mutually beneficial market arrangements, thereby entrenching the status quo. See Olympia Equip. Leasing Co. v. W. Union Tel. Co., 797 F.2d 370, 376 (7th Cir. 1986) (Posner, J.) ("[T]he law would be perverse if it made Western Union's encouraging gestures the fulcrum of an antitrust violation.").

The First Circuit has not had occasion to interpret Trinko, but what it has said about Aspen Skiing is instructive. In Data General Corp. v. Grumman Sys. Support Corp., the court interpreted Aspen Skiing as "casting serious doubt on the proposition that the Court has adopted any single rule or formula for determining when a unilateral refusal to deal is unlawful." 36 F.3d 1147, 1183 (1st Cir. 1994), abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick, 559 U.S. 154 (2010). Indeed, the court recognized that under Aspen Skiing "a monopolist's unilateral refusal to deal" may arise "in . . . very different situation[s]." Id.

Other Courts have likewise acknowledged that refusal-to-deal law generally – and Aspen Skiing and Trinko specifically – is concerned with harm to competition without a valid business justification, which can manifest itself in myriad ways. See, e.g., In re Thalomid & Revlimid Antitrust Litig., No. 14-6997 (KSH) (CLW), 2015 WL 9589217, at *15 (D.N.J. Oct. 29, 2015) ("[The defendant] reads Aspen Skiing and Trinko too narrowly. The termination of the dealing between Ski Co. and Highlands was used as circumstantial evidence of Ski Co.'s demonstrated anti-competitive motivation, along with its lack of legitimate business justifications for doing so."); Helicopter Transp. Servs., Inc. v. Erickson Air-Crane Inc., No. CV 06-3077-PA, 2008 WL 151833, at *9 (D. Or. Jan. 14, 2008) ("That Erickson and HTS had no prior course of dealing is immaterial. The Supreme Court has never held that

termination of a preexisting course of dealing is a necessary element of an antitrust claim. It was merely one of several facts in Aspen Skiing that supported a finding that the refusal to deal was intended to exclude competition rather than to advance a legitimate business interest.").[18]

The question this Court must decide on summary judgment, then, is whether a genuine and material factual dispute exists as to whether Blue Cross's conduct, which Steward characterizes as a unilateral refusal to deal with Steward, amounts to illegal exclusionary conduct as opposed to lawful, vigorous competition. Data General provides a rubric to assess this question. There,

---

[18]    Indeed, commentators more-or-less agree that the Supreme Court has chosen not to enunciate an all-encompassing framework for refusal-to-deal liability. See, e.g., James A. Keyte, The Ripple Effects of Trinko: How It Is Affecting Section 2 Analysis, 20 Antitrust 44, 49 (Fall 2005) ("Lower courts . . . have not read Trinko as even attempting to construct a generalized predation test or endorsing any particular analysis . . . ."); Robert A. Skitol, Three Years After Verizon v. Trinko: Broad Dissatisfaction with the Whole Thrust of Refusal to Deal Law, 6 Antitrust Source 1, 1 (2007) ("Today, after more than three years of experience with lower courts' applications of the Court's ruling, Trinko has proven to be among the least satisfactory antitrust opinions of the Supreme Court in the past three decades. It has unsettled more than it has settled; made the law less rather than more predictable; and exacerbated more than resolved the most contentious controversies in monopolization and attempted monopolization cases."); Edward D. Cavanagh, Trinko: A Kinder, Gentler Approach to Dominant Firms Under the Antitrust Laws?, 59 Me. L. Rev. 111, 126 (2007) ("The question of when non-price exclusionary behavior by a monopolist is unlawful is complex. The Court in Trinko chose not to articulate a bright-line rule.").

the court set forth a burden-shifting framework that requires a plaintiff to prove a prima facie case that includes showing "a monopolist's unilateral refusal to deal with its competitors (as long as the refusal harms the competitive process)." <u>Data General</u>, 36 F.3d at 1183. Once proved, the monopolist "may nevertheless rebut such evidence by establishing a valid business justification for its conduct."[19] <u>Id.</u> at 1183. The court added:

> In general, a business justification is valid if it relates directly or indirectly to the enhancement of consumer welfare. Thus, pursuit of efficiency and quality control might be legitimate competitive reasons for an otherwise exclusionary refusal to deal, while the desire to maintain a monopoly market share or thwart the entry of competitors would not. In essence, a unilateral refusal to deal is prima facie exclusionary if there is evidence of <u>harm</u> to the competitive process; a valid business justification requires proof of countervailing <u>benefits</u> to the competitive process.

<u>Id.</u> (internal citations omitted).

Blue Cross has not structured its summary judgment argument to correspond to the <u>Data General</u> burden shifting rubric; it has instead directed its argument almost exclusively at Steward's

---

[19] The D.C. Circuit Court of Appeals endorsed a similar burden-shifting framework in <u>United States v. Microsoft Corp.</u>, 253 F.3d 34, 58-59 (D.C. Cir. 2001). There, recognizing the difficulty in "stating a general rule between exclusionary acts, which reduce social welfare, and anticompetitive acts, which increase it," the court laid out a five-step framework to decide "[w]hether any particular act of a monopolist is exclusionary, rather than merely a form of vigorous competition." <u>Id.</u> at 58-59. The <u>Microsoft</u> five-step framework, while not binding, may be useful at trial in framing instructions for the jury.

theory at the prima-facie stage, while peppering its argument here and there with legitimate business reasons for its behavior. Likewise, the Court will not attempt to frame its analysis along a strict Data General framework, but will deal with the arguments, essentially as presented by Blue Cross. The bottom line is that the evidence Steward has presented meets its prima facie burden, and Blue Cross's claim of legitimate business reasons – to the extent the Court can identify them[20] – is sufficiently rebutted by Steward.

Aspen Skiing and Trinko, properly read, provide useful guidance as to whether Blue Cross's conduct amounted to a refusal to deal motivated by anticompetitive animus. While the indicators of anticompetitive animus here vary somewhat from what the Supreme Court identified in Aspen Skiing and Trinko, those differences are reflective of the very different marketplaces at issue (healthcare and health insurance as opposed to ski resorts and regulated telecommunications). Potentially anticompetitive behavior by market participants is bound to manifest itself differently in different markets. See Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451, 466-67 (1992) ("Legal presumptions that rest

_____

[20] Blue Cross's argument rests primarily upon a theory that it did not, as a matter of law, refuse to deal with Steward in violation of Section 2. Its legal argument is incorrect for the reasons explained.

on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law.").

Here, Steward sets forth an abundance of evidence that points toward a "distinctly anticompetitive bent," which could in turn persuade a reasonable jury that Blue Cross unlawfully monopolized the relevant markets by excluding Steward from Rhode Island.

Some of the evidence that supports Steward's theory, viewed in the light most favorable to Steward, is as follows.[21] The first category of evidence that points toward exclusionary conduct concerns Blue Cross's conduct with respect to Landmark itself and whether Blue Cross terminated its prior course of dealing with Landmark to keep Steward out of Rhode Island. The evidence suggests that Blue Cross terminated a longstanding, presumably profitable course of dealing with Landmark in order to block Steward. It is of no consequence that Blue Cross did not have or terminate a prior course of dealing directly with Steward at Landmark, for the reasons discussed above; the critical question is how Blue Cross dealt with Landmark in the context of the effort by Steward to purchase it.

---

[21] As with the factual background presented at the outset of the Opinion, this review of Steward's evidence is not intended to be exhaustive. Rather, it simply highlights a sample of Steward's factual presentation, which is sufficient under Rule 56 to raise a genuine and material factual dispute requiring a trial.

It is undisputed that Blue Cross and Landmark entered into a hospital-participation agreement in 2006, which had been routinely extended multiple times. (SDF ¶ 57.) That all ended when Blue Cross allowed its contract with Landmark to expire on July 16, 2012. (See id. ¶¶ 102, 109.) In May 2012, while in the midst of difficult negotiations with Steward in connection with Steward's bid to acquire Landmark through the receivership, Blue Cross filed the necessary papers with the DOH for a "material modification" – i.e., official permission to remove Landmark from its provider network. (SDF ¶ 104; SDF Ex. 202, ECF No. 212-45.) This step was not necessarily unusual, as Blue Cross had, on other occasions, taken steps to institute the material modification process with the DOH when negotiations with other hospitals stalled. (SAUF ¶ 175.) Blue Cross, however, did not stop there. Although it had not yet received DOH approval, on July 9, 2012, Blue Cross informed subscribers via letter that the Landmark contract would expire on July 16, and "[i]f the [DOH] approves the network change, Landmark Medical Center will be considered out of network on August 1, 2012 . . . ." (SAUF Ex. 84 at 2, ECF No. 215-9.) Blue Cross added, "Despite our continued efforts to resolve the current situation, we feel it's important to notify our members that a resolution is doubtful at this time." (Id.)

Never before had Blue Cross mailed a letter to doctors and subscribers notifying them of the immediate and impending removal

of a member hospital from its network.  To be clear, it was not just the notification that was remarkable; never before or since has Blue Cross kept true to its initial material modification application promise by actually allowing a hospital to go "out of network."[22]

---

[22]    Deposition testimony of Blue Cross employees is enlightening.  Blue Cross's CFO Michael Hudson testified:

> Q. Has it been Blue Cross's experience that when it sends out letters announcing that hospitals are going to be out of network after a certain date, that those letters have no impact on usage of the hospital?
>
> A. I don't have data that indicate that one way or the other.  I would say that the point is, no hospital's ever been out of network. . . .  But in the time I was there, with no hospital that I was aware of, nor any, you know, significant medical group have they ever actually gone nonparticipating.
> . . .
> Q. Can you remember any other occasion during your tenure at Blue Cross where, with respect to one of the hospitals in Rhode Island, you sent out letters to people saying, On such-and-such a date, Westerly or South County or whoever it might be, is going to be out of network?
>
> A. Not in the time I worked there.

(Dep. of Michael Hudson ("Hudson Dep.") 146:2-16, 148:4-10, SAUF Ex. 9, ECF No. 214-9.)

And Shawn Donahue, Blue Cross's Director of Government Relations, had a consistent recollection:

> Q. So since 2012, has Blue Cross sent out letters to members informing them that a hospital will be removed from its network?
> A. . . . I don't recall that I'm aware of any such letters.

The consequences of Blue Cross permitting a hospital to - for the first time ever - go "nonparticipating," and of sending a letter to members about it were significant; so significant, in fact, that the Special Master tried to put a halt to it and to extend Blue Cross's contract with Landmark. (SDF ¶ 103; SDF Ex. 90, ECF No. 210-2; SDF Ex. 219, ECF No. 213-14.) On July 2, 2012, the Special Master moved for an emergency TRO "to preserve the status quo by restraining Blue Cross . . . from notifying subscribers or the public that it has filed a request for material modification of health insurance plans in order to remove Landmark Medical Center . . . from its provider network." (SAUF ¶ 177; SAUF Ex. 83 at 3, ECF No. 215-8.) In that filing, the Special Master argued that, "[s]ending a letter to subscribers and providers notifying them that LMC and RHRI will be out-of-network providers after August 6, 2012 is premature and very likely misleading and inaccurate. . . . [g]iven the hurdles that Blue Cross must overcome to obtain DOH approval and such additional federal approvals that may be needed." (SAUF Ex. 83 at 5-6.) He added, "Injunctive relief is further warranted to protect Landmark, patients and physicians from the chaos and confusion that will result from a letter that incorrectly advises them that

---

(Dep. of Shawn Richard Donahue ("Donahue Dep.") at 310:5-9, SAUF Ex. 8, ECF No. 214-8.)

[Landmark] and RHRI will be out-of-network providers as of August 6, 2012."[23]  (Id. at 9.)

Blue Cross's conduct in removing Landmark from its network and prematurely notifying subscribers about such a possibility strayed far from its ordinary course of dealing with Landmark, or any other hospital for that matter.  A reasonable jury could conclude that Blue Cross's uniquely hard-core approach with respect to Landmark, just as negotiations with Steward were at a critical stage, was not a legitimate business decision, but was designed to kill the Steward acquisition.  Indeed, Blue Cross itself implicitly recognized this in its application for material modification to the DOH:  "Despite our best efforts to provide Steward with a fair and reasonable rate . . . we are concerned that we may not be able to come to an agreement with Steward . . . . If we are not able to come to agreement with Steward by [July 16, 2012], Landmark will then become non-participating in the BCBSRI network."  (SDF Ex. 202 at 2.)[24]  It

_____

[23] It is of little consequence that Justice Silverstein did not grant the TRO; the important point is that the Special Master perceived this move by Blue Cross as a potentially catastrophic economic event.

[24] Other evidence the jury may have to consider includes the Attorney General's comment to Steward officials at a negotiation session that, Blue Cross "just do[es]n't want you to do business in this state." (SDF ¶ 86 (quoting Dep. of Joseph Maher at 182:21-183:17, SDF Ex. 7, ECF No. 206-7; see also Dep. of Ralph de la Torre at 167:17-23, SDF Ex. 1, ECF No. 206-1 ("The message is Blue Cross is going to do anything to keep you out.  They literally cut

is undisputed that Landmark remained out of network until August 31, 2012, at which point the Special Master and Blue Cross agreed to extend the terms of the hospital participation contract until three months after a buyer acquired Landmark. (SDF ¶ 110.) The Special Master agreed to this settlement, however, only because Landmark's condition once removed from network left him no other choice but to accept whatever terms Blue Cross demanded. (SDF Ex. 205 at 3, 4, ECF No. 204-8 (in Special Master's emergency petition to superior court for instructions on September 6, 2012, explaining that Landmark going out of network caused "the cash receipts of Landmark" to "decline[] precipitously" and "a substantial loss of patients" and "The Special Master believes that the very survival of Landmark and RHRI is at stake and that he had no other alternative but to execute the MOU on the conditions imposed by Blue Cross . . . ."); Dep. of Jonathan N. Savage at 143:4-5, SDF Ex. 28, ECF No. 206-28 (Special Master describing his agreement to Blue Cross's MOU as "an absolute and total capitulation" to Blue Cross's terms)).

Blue Cross knew how its demands could impact Steward. As Blue Cross CFO (and then-lead negotiator) Mike Hudson made clear in an email leading up to Landmark moving back in network and in

---

off funds to a hospital that is going bankrupt, and the Special Master is powerless to change it. The judge, he's kind of there, kind of not. It's another body shouting a clear message that, 'They just don't want you.'").

the midst of the Blue Cross-Steward negotiations: "Landmark asked the judge to have us pay them instead of the member and was willing to accept the prior contracted rates. . . . Could force Steward's hand – if [Landmark] agree[s] to the contract, <u>then Steward is likely out</u>." (SDF Ex. 91, ECF No. 210-3.) And it appears that's precisely what happened.

Next, and perhaps most importantly, Steward presents plethora evidence that Blue Cross sacrificed short-term profits for the longer-term benefit of eradicating potential competition from Steward. For example, in June 2012, Blue Cross conducted a "Contract Renewal Risk Analysis & Strategic Assessment," in which it "identif[ied] and weigh[ed] the risks to BCBSRI and [its] members associated with the failure to reach agreement [with] four community hospitals currently in negotiation" including Landmark.[25] (SAUF Ex. 71 at 2-3, ECF No. 214-71.) Blue Cross identified a number of financial "risks" in the event of non-renewal or termination of a community-hospital contract, including "[f]inancial exposure of non-participation status and flow of services to other entities." (<u>Id.</u> at 3.) These financial exposure risks included: (1) "payment to full charge exposure upon non-

---

[25] The objective of this assessment by Blue Cross was to "provide recommendations taking into account the relevant considerations and how best to strategically proceed." (SAUF Ex. 71 at 3, ECF No. 214-71.)

participation," i.e., having to pay hospitals at regular, undiscounted rates for patients who still used the now out-of-network hospital; and (2) the cost of "moving services to higher cost hospitals," i.e., having to pay higher reimbursement rates at the other in-contract hospitals where subscribers would now seek care because Blue Cross removed their previous top-choice hospital from the network. (Id.) This latter category was most potentially impactful because, Blue Cross recognized, "[a]ll" of the four community hospitals with contracts set to expire in 2012 (including Landmark) "are in dire financial trouble and all are likely to fail if their BCBSRI agreement is not renewed." (Id.)

In its internal analysis, Blue Cross calculated exactly how much it would cost to pay the reimbursement rate increases Steward was seeking (i.e., the "[p]osition [v]ariance based on current [negotiation] positions") and compared it to how much it would cost to allow Landmark to go out of network, and likely shut its doors. (Id. at 4-5.) Blue Cross estimated that Landmark going out of network and/or closing would cost Blue Cross $9.8 million. (Id. at 5.) This exceeded by over $4 million the amount Blue Cross estimated it would lose if it accepted the rate increases proposed by Steward for Landmark, which would cost $5.4 million.[26] (Id. at 4.)

_____

[26] And, Steward contends there is more. This loss does not include the pre-material modification costs estimated to be $3

In one presentation slide titled "Risk Factors Integrated View," Blue Cross uses a graphic to assess and value the various "risk factors" for each of the four community hospitals, assigning each risk factor a value between one and four points. (Id. at 8.) In the "Financial Impact" category evaluated by Blue Cross, Landmark was the only hospital of the four to receive a full four points. (Id.) With respect to the three other community hospitals, Blue Cross assessed that "[b]ecause of [the] significant risk," it would consider additional rate increases and work toward achieving contracts to keep these hospitals in network. (See id. at 9.) Despite identifying an out of contract or closed Landmark as its most serious risk, Blue Cross elected to stay the course: "We recommend that we continue to hold our position with Landmark since the material modification has already been filed." (Id.) Blue Cross had on occasion before filed papers to initiate material modification for negotiation leverage when discussions with other hospitals lagged, but in those instances Blue Cross always reached an agreement before taking the extreme and unusual step of announcing to its members that a hospital would be out-

---

million per month, over a period of four to six months. (SAUF ¶ 180; SAUF Ex. 71; Dep. of Mark Waggoner at 184:12-185:3, SAUF Ex. 11, ECF No. 214-11.). Notably, even Blue Cross's estimate that Steward's proposal would cost $5.4 million is disputed. Steward suggests it would have cost $3 million, (see SDF ¶ 97; DSUF Ex. 102, ECF No. 169-33 (de la Torre letter to Attorney General)), which, if true, would make this loss even greater.

of-network and allowing a contract to terminate. (See SAUF ¶ 175; Hudson Dep. at 146:21-148:16, SAUF Ex. 9; Donahue Dep. 310:2-13, SAUF Ex. 8 ("There's been contentious negotiations adversarial, but they generally get resolved before they get to this phase.")).

This evidence more than suffices to create a trial-worthy issue as to whether Blue Cross sacrificed short-term profits (by letting the Landmark contract lapse) for the long-term benefit of keeping Steward out of Rhode Island. And if more were needed, which it is not, Steward's experts confirm this point. (See SAUF ¶ 182; Expert Report of Professor Leemore Dafny, SAUF Ex. 22 at 13, ECF No. 214-22 ("[T]hese analyses corroborate BCBSRI's contemporary analyses showing that rejecting Steward's offers was costly to BCBSRI.")).

Steward also presents evidence to suggest that the proposals made and rejected by Blue Cross amounted to a refusal to deal, because Blue Cross negotiated in bad-faith. This evidence is complicated in light of what both parties acknowledge is the "complex and highly differentiated" aspect of hospital services, (see Def.'s Mem. in Supp. of Mot. for Summ. J. ("Def.'s Mem.") 29, ECF No. 157); Pl.'s Resp. in Opp'n to Def.'s Mot. for Summ. J. ("Pls.' Resp.") 32, ECF No. 172-1); but Blue Cross cannot hide behind this complexity to escape the material factual disputes that Steward has effectively uncovered. For present purposes, the Court need not decide the proper methodology to assess appropriate

hospital reimbursement rates (indeed, both parties have different takes on this subject, which itself suggests it is a matter for trial). It is sufficient that Steward has sufficiently created a factual dispute as to whether Blue Cross refused to deal with Steward over Landmark by proposing rates below the averages it paid to other Rhode Island hospitals, and rejecting proposals consistent with what it accepted for other hospitals, essentially negotiating in bad faith with Steward.

The evidence Steward sets forth is as follows. It is not disputed that Blue Cross pays a range of reimbursement rates to various hospitals in Rhode Island. In 2010 when Caritas (Steward's predecessor) first attempted to acquire Landmark, an OHIC study titled "Variations in Hospital Payment Rates by Commercial Insurers in Rhode Island" reported that the rates paid to Landmark were twenty-two percent below the average for all Rhode Island hospitals, and even farther below the rates that some Lifespan and CNE-affiliated hospitals received. (SDF Ex. 67 at 16 & Fig. 10, ECF No. 208-11.) Steward argues the highest rate increase it proposed to Blue Cross (in May 2012) was for Landmark to be reimbursed at ninety-five percent of the average Blue Cross paid to all hospitals in Rhode Island, with an option to receive an additional five percent based on quality, which practically

amounted to about a fifteen percent rate increase.[27] (See SAUF Ex. 106, ECF No. 215-31; SAUF ¶ 203.) What is important is that Steward has produced evidence that it proposed reimbursement rates for Landmark at a level lower than what Blue Cross was paying other hospitals (based on averaging the rates).

Blue Cross argues that "the undisputed evidence shows that the rates Blue Cross offered Steward at Landmark were higher than the rates Blue Cross paid comparable hospitals for comparable services." (Def.'s Mem. 29-30.) At summary judgment this Court need not accept at face value what Blue Cross contends are the appropriate hospital comparators. Indeed, Blue Cross undermines its own position on this point in its brief: after suggesting what the proper hospital-rate comparison should be, i.e., which hospitals Landmark can and cannot be compared to for calculating reimbursement rates, in other parts of its brief it argues that because hospital services are so different, no two hospitals can really be compared for these purposes at all. (See id.) Then, remarkably, Blue Cross pivots again to argue that the appropriate

---

[27] Steward also offered Blue Cross a lower rate increase for Landmark of 7.4% per year for two years, to be offset by significant reductions in Blue Cross's payments to Steward's St. Anne's hospital. (See SDF Ex. 157 at 5, ECF No. 199-12.)

comparison is actually between Steward and Prime, the entity that ultimately acquired Landmark.[28]  (See, e.g., id. at 34.)

Regardless of what it now asserts for purposes of this motion, Blue Cross's own evidence and analysis supports the premise that Blue Cross had been comparing Landmark to other hospitals – including Lifespan and CNE hospitals that Blue Cross more generously reimbursed – because patients would be leaving Landmark for those hospitals upon Landmark's closure.  (See, e.g., SAUF Ex. 71.)  The upshot is that, at trial, Steward and Blue Cross will have the opportunity to argue which hospitals Landmark should and should not properly be compared to for rate-increase purposes. While Blue Cross's view of this world of rate setting may ultimately persuade a jury that it was operating in good faith and not refusing to deal, summary judgment is not appropriate.

Although the Court is satisfied that the above discussion explains why Steward's refusal-to-deal claim must advance to trial, Blue Cross has raised several additional arguments to rebut Steward's Section 2 claim.  None of these arguments change the outcome.

First, Blue Cross argues that it could not have refused to deal because "it was Steward that walked away from negotiations

---

[28]    Blue Cross may ultimately be correct that the terms on which it eventually agreed with Prime are relevant for some purpose at trial, but the Court need not decide that question on this motion.

and refused to deal." (Def.'s Mem. 17.) As a matter of law, it does not matter that Steward "walked away" from the negotiating table, if Blue Cross made an offer that it knew could not be accepted. See MetroNet Servs. Corp. v. Qwest Corp., 383 F.3d 1124, 1132-33 (9th Cir. 2004) ("An offer to deal with a competitor only on unreasonable terms and conditions can amount to a practical refusal to deal."). Blue Cross's own belief in its good faith and its suggestion that it invested "enormous effort to try to get a deal done with Steward at Landmark," (Def.'s Mem. 20), is not dispositive at summary judgment; the record contains sufficient evidence from which a reasonable juror could conclude otherwise, i.e., that Blue Cross was moving backwards in negotiations with Steward, including imposing knowingly unattainable quality metrics on Steward. Specifically, Steward contends that Blue Cross responded to Steward's proposals with counter-proposals that moved backwards then requested a response, effectively attempting to force Steward to bargain against itself. (See, e.g., SDF Ex. 155, ECF No. 211-12; SDF Ex. 179, ECF No. 212-22; SDF Ex. 180, ECF No. 212-23; see also Rich Dep. 193:24-194:6, SDF Ex. 11, ECF No. 206-11 ("I think this is part of the fundamental problem in Mark [Waggoner's] email, his last sentence. . . . 'We welcome a proposal.' We had already bid. They gave us a bid that was effectively lower, and they're asking us for a counter, what we believe to be [bargaining] against ourselves."). Next, Steward

cites comments by Andruszkiewicz in an August 6, 2012 Providence Business News article, indicating that Blue Cross might offer a "limited-network" product that could exclude certain hospitals, including Landmark. (See SDF Ex. 181, ECF No. 212-24.) And finally, Steward points to an email from Mark Hudson of Blue Cross to Mark Rich of Steward – both lead negotiators for the respective entities – in which Hudson writes,

> You reiterated your demand that Landmark be included in all BCBSRI products, including those that may have a limited or tiered network. In the event BCBSRI offers products with tiers in the future, the tiers will be determined based on cost and quality. Granting preferred status to providers who otherwise wouldn't qualify would impair the quality of any tiered product, especially when granting such status was made to an organization that refuses to participate in quality improvement initiatives.

(SDF Ex. 182 at 3, ECF No. 212-25.) A jury will have to decide if this was, as Steward contends, bad faith, backward negotiations, or as Blue Cross says, just good business.

Next, Blue Cross argues that in order for Steward's claim to move forward, this Court must "impose on a state-regulated insurer a novel antitrust duty to purchase hospital services." (Def.'s Mem. 34.) In suggesting that Steward's legal theory is "unprecedented," Blue Cross argues that "Steward asks this Court to find that Blue Cross had an antitrust duty to accept particular reimbursement rates proposed by the acquirer of a failing Rhode Island hospital." (Id. at 35.) This is melodrama, as are Blue

47

Cross's unsubstantiated assertions that to allow Steward's claim to clear summary judgment requires the Court to "assum[e] the role of a regulator of health insurer provider networks," and thus "upset the delicate balance that OHIC and Blue Cross strike when fulfilling their public interest missions." (Id. at 35-36.)

It is simply incorrect to say that to recognize the possibility of a refusal-to-deal by Blue Cross requires the Court to impose a "novel antitrust duty" by requiring that Blue Cross accept the reimbursement rates that Steward proposed. The law does not impose, and this Court may not dictate, the precise terms that Blue Cross must accept; but the law does impose a duty on Blue Cross to compete fairly, and specifically to not forego short term profits for the purpose of blocking competition and maintaining a monopoly. And in order to enforce this duty, the Court – in fact the jury – must consider the parties' conduct in the context of the particular markets at issue. Town of Concord v. Bos. Edison Co., 915 F.2d 17, 22 (1st Cir. 1990) (Breyer, C.J.) ("[A]ntitrust analysis must sensitively recognize and reflect the distinctive economic legal setting of the regulated industry to which it applies." (internal quotations and citations omitted)). If the jury finds in favor of Steward, it will need to consider the question of damages (discussed below), but none of this equates to the result Blue Cross purportedly fears.

In addition, Blue Cross overstates the role of OHIC regulations and the supposed "delicate balance" that enforcing the antitrust laws would upset in this case. Indeed, the meager regulatory context at play here is far different from what the Supreme Court recognized – and underscored – in <u>Trinko</u>. OHIC's role is distinguishable from the FCC's regulatory function in <u>Trinko</u>, both in scope and effect.

In <u>Trinko</u>, the Supreme Court emphasized "[t]he specific nature of what the 1996 [Telecommunications] Act compels," which included "statutory restrictions upon Verizon's entry into the potentially lucrative market for long-distance service." 540 U.S. at 409, 412. "Authorization by the FCC require[d] state-by-state satisfaction of § 271's competitive checklist, which as [the Court has] noted includes the nondiscriminatory provision of access to UNEs." <u>Id.</u> at 412.

There is nothing even close to this enforced infrastructure sharing arrangement in the OHIC scheme. The RI OHIC regulatory scheme is essentially a rate setting mechanism, one that ensures that rates will not increase too much in a given year without good reasons and approval.[29]

_____

[29] The 2012 Rate Approval Conditions provided,

Upon written request of an issuer, supported by the hospital's written agreement with the issuer's request, the Commissioner may approve exceptions to the index limit for those hospital contracts which the issuer

Further, the "Office of Health Insurance Commissioner" does not regulate health care providers or doctors nor the prices they charge for services; instead, as its name suggests, it regulates health insurers and insurance. (Dep. of former OHIC Commissioner Chris Koller ("Koller Dep.") at 225:22-226:3, SDF Ex. 26 ("Q. If a hospital had requested a waiver, would you have considered it? A. We have no jurisdiction over hospitals.").

So rather than present "a regulatory structure designed to deter and remedy anticompetitive harm," Trinko, 540 U.S. at 412, in which circumstances "the additional benefit to competition provided by antitrust enforcement will tend to be small," id., here, as in similar cases, "[t]here is nothing built into the regulatory scheme which performs the antitrust function," id. (alteration in original) (quoting Silver v. N.Y. Stock Exch., 373

---

demonstrates, to the Commissioner's satisfaction, align significant financial responsibility for the total costs of care for a defined population and set of services in manners generally consistent with the alternative Medicare payment mechanisms proposed under the Affordable Care Act. Issuers are encouraged to file such requests.

(SDF Ex. 43 at 2, ECF No. 206-43.) And former OHIC Commissioner Chris Koller testified: "[W]e would consider and possibly approve exceptions to the index limit and the quality incentives. In other words . . . this was a wide-open area if the hospital and the issuer -- the insurer -- wanted to do something different." (Dep. of Chris Koller ("Koller Dep."), SDF Ex. 26 at 235:16-21, ECF No. 206-26.)

U.S. 341, 358 (1963)).  Thus, "the benefits of antitrust are worth

its sometimes considerable disadvantages."  Id.

For all the reasons discussed above, Steward's refusal-to-

deal claims for unlawful monopolization and monopsonization clear

the summary-judgment bar.  Blue Cross's motion for summary judgment

with respect to these counts will therefore be denied.[30]

---

[30]     One final point:  Steward also points to Blue Cross's
conduct toward St. Anne's and Morton – two Steward-owned hospitals
in the area of Massachusetts bordering Rhode Island with which
Blue Cross had direct, prior dealings – as evidence of its
anticompetitive bent toward Steward/Landmark.   This too is
complicated, but in summary, Blue Cross proposed shifting patients
who used St. Anne's and Morton to the "BlueCard" program, which
allowed Blue Cross to pay the reimbursement rates negotiated
between Blue Cross Blue Shield of Massachusetts ("BCBSMA") and
Steward, rather than renegotiating new contracts with new rates
with these hospitals.  Blue Cross forecasted that this move would
annually save it $3.2 million.  But it would lose about half of
that because the BlueCard Program imposed a hefty administrative
fee.  (SAUF Ex. 89 at 4; SAUF Ex. 90.)  So Steward offered Blue
Cross a better deal:  a new direct contract with St. Anne's at the
same rates paid by BCBSMA, but without the administrative fee.
(See SDF ¶ 136.)  Steward's proposal offered Blue Cross the added
benefit that its Medicare Advantage program subscribers could
continue to access these hospitals, whereas under the BlueCard
program, they could not.  (See SAUF Ex. 89; SAUF ¶ 187.)  Blue
Cross rejected these entreaties as well, arguably forsaking short
term profits for the purpose of further impeding Steward's effort
to break into Rhode Island.

B.   The Conspiracy Claims

1.  Conspiracy in Restraint of Trade (Counts IV, VIII, XII, and XVI)

Blue Cross also moves for summary judgment with respect to Steward's conspiracy claims.[31]   Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States."  15 U.S.C. § 1.  A conspiracy is born when "two or more entities that previously pursued their own interests separately . . . combin[e] to act as one for their common benefit." Copperweld Corp. v. Indep. Tube Corp., 467 U.S. 752, 769 (1984). "Section 1 by its plain terms reaches only 'agreements'— whether tacit or express."  White v. R.M. Packer Co., 635 F.3d 571, 575 (1st Cir. 2011) (emphasis added) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 553 (2007)).

Importantly, "at the summary judgment stage a § 1 plaintiff's offer of conspiracy evidence must tend to rule out the possibility that the defendants were acting independently." Twombly, 550 U.S. at 554 (2007) (citing Matsushita, 475 U.S. at 574).[32]  "It does

---

[31]   Like Steward's refusal-to-deal claim, the Court analyzes Steward's conspiracy counts brought under the Rhode Island Antitrust Act together with Steward's conspiracy counts brought under the Sherman Act.  (See supra note 13.)

[32]   The law of conspiracy, like refusal-to-deal law, is no model of clarity for trial courts trying to make sense of – and apply – its standards.  See, e.g., 1 John J. Miles Health Care and

not reach independent decisions, even if they lead to the same anticompetitive result as an actual agreement among market actors." R.M. Packer Co., 635 F.3d at 575. "In addition, the Supreme Court has 'limit[ed] the range of permissible inferences from ambiguous evidence in a § 1 case,' holding that, at summary judgment, 'conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy' that allows plaintiffs' evidence to reach a jury." Id. at 577 (alteration in original) (emphasis added) (quoting Matsushita, 475 U.S. at 588). But this evidence will reach the jury when it shows 'parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties.'" Id. (quoting Twombly, 550 U.S. at 557 n.4).

Steward builds its case around circumstantial evidence, so it must rely on "plus factors" as "proxies for direct evidence of an agreement." Evergreen Partnering Grp., Inc. v. Pactiv Corp., 720 F.3d 33, 46 (1st Cir. 2013) (quoting In re Flat Glass Antitrust

Antitrust Law § 2A:6 (2018) ("The line between permissible inference and impermissible speculation is not clear and never will be."); William H. Page, Tacit Agreement Under Section 1 of the Sherman Act, 81 Antitrust L.J. 593, 594 (2017) ("The outcomes on these motions depend in large part on what the courts think a Section 1 agreement is. Even after 125 years of Section 1 litigation, however, the meaning of that fundamental concept remains uncertain.").

_Litig._, 385 F.3d 350, 359-60 (3d Cir. 2004)).  Plus-factor evidence is "evidence pointing toward conspiracy," _R.M. Packer Co._, 635 F.3d at 577, that is, evidence "tend[ing] to rule out the possibility that the defendants were acting independently," _Twombly_, 550 U.S. at 554.

Courts have identified – and the First Circuit in _Evergreen_ and _R.M. Packer Co._ countenanced – a non-exhaustive list of three Section 1 plus factors:  "(1) evidence that the defendant had a motive to enter into a[n] [antitrust] conspiracy; (2) evidence that the defendant acted contrary to its interests; and (3) 'evidence implying a traditional conspiracy.'"  _In re Ins. Brokerage Antitrust Litig._, 618 F.3d 300, 321-22 (3d Cir. 2010) (quoting _Flat Glass_, 385 F.3d at 360); _cf._ _Twombly_, 550 U.S. at 557 ("A statement of parallel conduct . . . needs some . . . further circumstance," or "further factual enhancement" to plead a plausible § 1 claim).  "The third factor, 'evidence implying a traditional conspiracy,' consists of 'non-economic evidence "that there was an actual, manifest agreement not to compete,"' which may include 'proof that the defendants got together and exchanged assurances of common action or otherwise adopted a common plan even though no meetings, conversations, or exchanged documents are shown.'"  _In re Ins. Brokerage Antitrust Litig._, 618 F3d at 322 (quoting _Flat Glass_, 385 F.3d at 361); _see also_ _In re High Fructose Corn Syrup Antitrust Litig._, 295 F.3d 651, 661 (7th Cir. 2002); 6

Phillip E. Areeda & Herbert Hovenkamp, <u>Antitrust Law</u> ¶ 1434b (2017).

Before delving into the evidence, a few other fundamental principles are worth noting. The first concerns "conspiracy." Blue Cross tries hard to raise the bar on Steward, suggesting that an illicit "agreement" requires explicit evidence that minds have met. (<u>See</u> Def.'s Mem. 42-45.) This is not correct. A tacit understanding or a wink and a nod can be sufficient.[33] <u>See</u> <u>United States v. Beaver</u>, 515 F.3d 730, 738 (7th Cir. 2008) ("Although the

---

[33] Blue Cross is wrong to suggest that the law forbids only outright confessions of anticompetitive animus. <u>See</u> 3B Areeda & Hovenkamp, <u>supra</u>, ¶ 308. The Seventh Circuit has persuasively addressed this issue:

> [N]o single piece of the evidence that we're about to summarize is sufficient in itself to prove a price-fixing conspiracy. But that is not the question. The question is simply whether this evidence, considered as a whole and in combination with the economic evidence, is sufficient to defeat summary judgment. . . . We tried in <u>Troupe v. May Department Stores Co.</u>, 20 F.3d 734, 736-37 (7th Cir. 1994), to straighten out the confusing (and, as it seems to us, largely if not entirely superfluous) distinction between direct and circumstantial evidence. The former is evidence tantamount to an acknowledgment of guilt; the latter is everything else including ambiguous statements. These are not to be disregarded because of their ambiguity; most cases are constructed out of a tissue of such statements and other circumstantial evidence, since an outright confession will ordinarily obviate the need for a trial.

<u>In re High Fructose Corn Syrup Antitrust Litig.</u>, 295 F.3d 651, 661-62 (7th Cir. 2002).

existence of . . . an agreement is the essence of the government's § 1 conspiracy allegation . . . . the government was required only to establish that the [defendants] had a tacit understanding based upon a long course of conduct to limit their discounts." (internal quotation marks and citations omitted)); Am. Tobacco Co. v. United States, 328 U.S. 781, 810 (1946) ("Where the circumstances are such as to warrant a jury in finding that the conspirators had a unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement, the conclusion that a conspiracy is established is justified."); Esco Corp. v. United States, 340 F.2d 1000, 1007 (9th Cir. 1965) ("[I]t is well recognized law that any conspiracy can ordinarily only be proved by inferences drawn from relevant and competent circumstantial evidence, including the conduct of the defendants charged. A knowing wink can mean more than words." (citation omitted)).

Second, and perhaps more important for dealing with Blue Cross's motion, the Supreme Court long ago dispensed with the notion that a court can slice and dice the record in a way that scrutinizes each individual piece of evidence for conspiratorial motive. Rather, the Court must evaluate the evidence based on its aggregate effect, and draw reasonable inferences from the evidence as a whole. Cont'l Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 699 (1962) ("In cases such as this, plaintiffs should be given the full benefit of their proof without tightly

compartmentalizing the various factual components and wiping the slate clean after scrutiny of each."); <u>United States v. Patten</u>, 226 U.S. 525, 544 (1913) ("It hardly needs statement that the character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." (citations omitted)); <u>Evergreen</u>, 720 F.3d at 47 ("While each of [plaintiff's] allegations of circumstantial agreement standing alone may not be sufficient to imply agreement, taken together, they provide a sufficient basis to plausibly contextualize the agreement necessary for pleading a § 1 claim.").

With these principles guiding its analysis, the Court finds in the record substantial evidence that, for conspiracy purposes,[34]

---

[34] At the outset, Steward's monopolization and conspiracy claims are not mutually exclusive. The Court rejects Blue Cross's suggestion that because Steward argues Blue Cross had unilateral, illicit motives to exclude Steward, it necessarily acted "consistent with its unilateral self-interest" and thus could not have illegally conspired against Steward. To be clear, behavior consistent with unilateral self-interest refers to <u>lawful</u> independent conduct that furthers competition. <u>See</u> <u>In re Flat Glass Antitrust Litig.</u>, 385 F.3d 350, 360-61 (3d Cir. 2004) ("Evidence that the defendant acted contrary to its interests means evidence of conduct that would be irrational assuming that the defendant operated in a competitive market."). There is no discernable reason why an antitrust plaintiff cannot assert both a unilateral monopolization claim and a conspiracy claim; and indeed, the case law supports that these claims can coexist. <u>See, e.g.</u>, <u>Microsoft Corp.</u>, 253 F.3d at 70 (rejecting defendant's argument that "the District Court's holding of no liability under § 1 necessarily precludes holding it liable under § 2."); <u>United States v. Dentsply Int'l, Inc.</u>, 399 F.3d 181, 197 (3d Cir. 2005) ("[A] finding in favor of the defendant under Section 1 of the Sherman Act . . . [does] not 'preclude the application of evidence of . . . exclusive dealing to support the [Section] 2

tends to exclude an inference of independent conduct. In marshalling the evidence, Steward highlights four separate but related episodes: (1) the "treat-and-transfer" model developed by Lifespan and Thundermist, with Blue Cross's encouragement, for a failed Landmark; (2) rate concessions offered by Lifespan to Blue Cross in exchange for additional patient volume; and Thundermist's decisions to (3) shift OB patients and (4) reject an MOU with Steward (including a proposal that Thundermist itself had proposed). (See Pl.'s Resp. 43-67.)

First, a reasonable juror could conclude that part of the agreement between Blue Cross, Lifespan, and Thundermist to block Steward from Rhode Island was premised on the treat-and-transfer plan proposed as an alternative to Steward acquiring Landmark. The treat-and-transfer model, which sought to make Landmark "less than a full-service, acute-care hospital," (Wakefield Dep. at 32:1-6, SDF Ex. 30), was conceived in April of 2009 by Maria Montanaro, then-CEO of Thundermist, in a letter to Special Master Savage.[35] (See SDF Ex. 101). Landmark was placed in receivership

_____

claim.' . . . A court's refusal to accept one theory rather than another [does not] undermine[] the claim as a whole . . . [and] the [plaintiff] can obtain all the relief to which it is entitled under Section 2 and has chosen to follow that path without reference to Section 1 . . . ." (quoting LePage's Inc. v. 3M, 324 F.3d 141, 157 n.10 (3d Cir. 2003))).

[35] It appears undisputed that this plan was conceived prior to Steward coming into the picture. This simple fact does not, however, defeat the powerful inference gleaned from the evidence

in 2008, (see SDF ¶ 62), around the same time Caritas emerged as

a prospective acquirer of the hospital. (See SDF Ex. 102 at 4-5,

ECF No. 210-14.)  In May 2009 in a letter to Justice Silverstein,

Montanaro detailed her concerns regarding Landmark's "possible

affiliation with Caritas Christi." (Id.)  She wrote,

> To me, this should not be about the survival of an
> institution, but rather about how to best deliver the
> highest quality, most cost-effective care in northern
> RI.  It is possible, that the most sustainable model of
> high quality, cost effective care would be one that does
> not include a full service, licensed hospital.

(Id. at 5.)

The evidence also supports the inference that Blue Cross was

in on the plan for treat-and-transfer as the alternative to a

Caritas/Steward-owned Landmark.  In the fall of 2010, Caritas took

part in discussions and meetings with Blue Cross over acquiring

Landmark.  (SDF Ex. 108, ECF No. 210-20; SDF Ex. 109, ECF No. 210-

21.)  On November 18, 2010, Mark Waggoner of Blue Cross reported

to Blue Cross's ELT that then-Blue Cross CEO Jim Purcell wanted

Blue Cross to occupy a greater role over Landmark's future.  He

stated:

> Jim Purcell called me earlier this week to chat about
> Caritas/Landmark.  He seems to be leaning more towards
> to wanting to step off of the sideline and play more of
> a broker role in a local solution to Landmark.
> Apparently, he had a conversation earlier in the week
> with M. Montan[a]ro of Thundermist . . . that may have

---

that the treat-and-transfer model resurfaced with Steward in mind,
once it entered the picture.

influenced his thinking a bit about the role we might play.

(SDF Ex. 105 at 2, ECF No. 210-17.) Before getting back to Caritas, Purcell touched base with Lifespan and Thundermist to convey his reaction to the Caritas proposal and a plan for Lifespan and Thundermist to meet with Justice Silverstein to discuss treat-and-transfer: "Maria [Montanaro (Thundermist)] and George [Vecchione (Lifespan)] know we'll send our letters this Wednesday [the rejection letter to Caritas and the Special Master], and they will ask for a meeting with the Judge." (SDF Ex. 107 at 2, ECF No. 210-19.) Lifespan and Thundermist conferred about how to keep Blue Cross happy and on board: "It is important to BCBSRI to head in this direction [integrated service delivery networks], and would give them further reasons to support our work together on the model we are proposing." (SDF Ex. 111 at 3, ECF No. 210-23.)

Before meeting with the judge, Blue Cross first huddled with Lifespan and Thundermist. (SDF Ex. 113 at 2, ECF No. 210-25.) Notes from that meeting indicate that discussion topics included: (1) undermining Caritas's efforts to acquire Landmark; and (2) underscoring treat and transfer as the preferred alternative. (See SDF Ex. 117 at 2, ECF No. 210-29.) In 2012, CEO Peter Andruszkiewicz of Blue Cross (Purcell's successor) and CEO George Vecchione of Lifespan discussed the treat-and-transfer plan in the context of Andruszkiewicz's calculation that Landmark would not go

to Steward.  (See SDF Ex. 118, ECF No. 210-30.)  Montanaro, who by
then had left Thundermist to become a Blue Cross consultant,
reported to Chuck Jones, her successor as Thundermist CEO:

> Peter [Andruszkiewicz] tells me that he believes Steward
> will fail to acquire here in RI.  He has no intention of
> giving into their demands.  He has talked with George
> [Vecchione], who has told him "with as much certainty as
> he has ever heard George use" that Lifespan WILL step in
> and take over the hospital, following the model we
> developed with them years ago.  Peter wants to see Care
> NE then do the OB piece.  He talked with George and his
> leadership about this yesterday.

(SDF Ex. 118 at 2.)  Montanaro concluded her email with a
prediction about Landmark:  "Peter thinks it will be Lifespan."
(Id.)  An internal Lifespan email, sent a few weeks later adds
more.  Lifespan's new CEO Timothy Babineau (Vecchione's successor)
wrote to his leadership team:

> Peter [Andruszkiewicz] called me yesterday to update me
> on a 5 hour meeting he had on Monday with the AG, Steward
> (Ralph himself!) and George Nee trying to mediate an
> agreement.  At the end of the day, BCBSRI put an offer
> on the table that Peter described as still being within
> OHIC's guidelines.  He did not elaborate and I did not
> ask.
>
> They are meeting again next Monday (5 hours scheduled)
> during which Steward is supposed to react/accept/counter
> BCBSRI most recent offer.
>
> The real reason for the phone call was for Peter to let
> me know that he told the AG that it was his (Peter A's)
> understanding that Lifespan would be willing/interested
> to re-engage in discussions with Landmark should Steward
> pull out.  He indicated the AG heard that but seemed (in
> Peter's words) "underwhelmed".  I affirmed that this was
> still our position but offered no specifics.  **Question**-
> --is it worth a call to the AG to re-affirm our position,
> or should we remain on the sidelines at this point?

(SDF Ex. 120 at 2, ECF No. 210-32.)  Lifespan's CFO clarified, "Peter's saying, you know, there's another alternative; you don't have to come so hard after me."  (Wakefield Dep. 181:13-15. SDF Ex. 30.)

The above evidence, when stitched together, makes clear that a reasonable juror could conclude that the treat-and-transfer model for Landmark was one part of an understanding between Blue Cross, Lifespan, and Thundermist aimed at keeping Steward out of Rhode Island.

The next conspiratorial "episode" cited by Steward concerns the link between rate concessions for Blue Cross by Lifespan in exchange for increased patient volume, which presumably would come from Landmark.  Steward concedes that Thundermist is not directly implicated in this chapter of the conspiracy saga.[36]

First, Steward offers evidence to make sense of why Lifespan would suddenly retreat from what had been otherwise highly contentious negotiations with Blue Cross.  (See SAUF Ex. 77, ECF

---

[36] Although Thundermist is not directly linked to this part of Steward's theory, it does not have to be.  See Pinkerton v. United States, 328 U.S. 640, 646 (1946) (no requirement that each conspirator actively participate in each act in furtherance of the conspiracy); United States v. Barker Steel Co., 985 F.2d 1123, 1129-30 (1st Cir. 1993).  This makes sense, especially in light of the directive that this Court view the evidence in totality rather than isolation.

No. 215-2; SAUF ¶ 170 (Lifespan demanding rate increases in excess of six percent and adjusting its position only nominally over several months)). Lifespan informed Blue Cross that it would only back down on its rate demands in exchange for additional patients: "Lifespan is willing to consider more substantive reductions to their position only if Blue Cross can provide additional service volume." (SAUF Ex. 78 at 5, ECF No. 215-3.)

Now, Steward asks, where might Blue Cross come up with more patient volume to satisfy Lifespan? A reasonable juror could conclude that the answer was Landmark. It was no secret that Lifespan would be the primary beneficiary of a weakened or defeated Landmark. (See SAUF Ex. 75 at 9, ECF No. 182-15 (Blue Cross noting subscribers in vicinity of Landmark used Lifespan hospitals, Miriam and RIH); (SAUF Ex. 71 at 6) (evaluating effect of Blue Cross's failure to renew Landmark contract: "Rhode Island and Miriam would see an influx of the majority of medical/surgical and outpatient services"); SAUF Ex. 22 at Fig. 35 (predicting Landmark going "out of network" would cause nearly forty-five percent of previous-Landmark patients to use a Lifespan hospital). Indeed, Lifespan mapped out Landmark's impact on RIH and Miriam, whether it thrived under Steward's ownership or failed if "Steward bails." (SAUF Ex. 69, ECF No. 214-69.) Unsurprisingly, Lifespan predicted a vast financial reward in the event that Landmark went under, and

it forecasted a significant financial blow if Steward acquired Landmark. (Id.)

But that's not all. Steward also cites the June 2012 Blue Cross Contract Analysis in which Blue Cross identified the hefty cost of failing to renew community hospitals like Landmark because patients dispersing to costlier hospitals came with an added financial sting to Blue Cross. In this context, Blue Cross's analysis recommended "[w]ith Lifespan and CNE facilities as a primary recipient of the service migration, we would engage discussions with these systems to establish a longer term plan to develop service capacity at favorable payment levels." (SAUF Ex. 71 at 9 (emphasis added)). Blue Cross added, "[b]y doing so, we would be in a better position to manage the impact to the network and more strategically leverage options that currently do not exist." (Id.) In an update to that same July 2012 presentation, Blue Cross added that "in order to address the potential movement of services to other hospitals in the future, we have initiated discussions with Lifespan on opportunities involving additional volume and the impact on payment levels." (SAUF Ex. 76 at 7, ECF No. 215-1.) In August 2012, Blue Cross documented that "Lifespan is willing to consider more substantive reductions to their position only if Blue Cross can provide additional service volume." (SAUF Ex. 78 at 5.)

Seemingly out of the blue, in September 2012, at the same time negotiations with Steward were cratering, Lifespan's rate demands declined to 4.8% for commercial. (SAUF Ex. 79 at 3, ECF No. 215-4) (email summarizing Lifespan's proposal). According to Blue Cross documents, Steward asserts, this pivot saved Blue Cross nearly $12 million, and was in stark contrast to the ordinary course of highly contentious Lifespan-Blue Cross negotiations that preceded it. (Compare SAUF Ex. 80, ECF No. 215-5 (showing total savings (loss) with respect to Lifespan as "$11,862,139"); with SAUF Ex. 81, ECF No. 215-6 (email from Blue Cross CFO Coleman to Andruszkiewicz and Waggoner regarding 2011 Lifespan negotiations) ("BCBSRI achieved (almost) Lifespan's original request of $24 [million] in additional revenue. Just a friendly reminder of how much we gave to the cause."). A reasonable juror could conclude that Blue Cross secured rate concessions from Lifespan in exchange for added patient volume, which could only come from Landmark, once Steward was removed from the picture.

The next chapter of Steward's conspiracy claim colors the alleged role played by Thundermist. Steward contends that Thundermist's decisions to (1) move OB patient referrals from Landmark to Women & Infants Hospital in 2011 and (2) to not sign an MOU to be an affiliated provider with Steward/Landmark were similarly motivated by exclusionary goals.

With respect to Thundermist's shift of OB patients, a reasonable juror could conclude that it was one piece of the larger plan to exclude Steward. First, in November 2011, Jones of Thundermist sought "for Lifespan to commit to support publicly our shared vision of health care in Northern Rhode Island in the face of a threatened or actual Steward departure." (SDF Ex. 125, ECF No. 210-37.) In other words, before pulling the trigger on a shift of patients, Jones needed cover and support from Lifespan:

> I remain inclined to move Thundermist's OB service to [Women & Infants hospital, part of Care New England]. I therefore need to take Jon Savage and Steward at their words and prepare to defend my decision against a Steward announcement to abandon Landmark and publicly blame Thundermist for the decision.
>
> In this context it will be important for me to be able to point to Lifespan's interest in developing an appropriate care model for Northern Rhode Island. Given the timeframe involved, I believe a letter to me (or press release if you prefer) describing the model of care Lifespan would be willing to support publicly, with Thundermist, in Northern Rhode Island.

(Id.) Remarkably, in spite of the fact that Thundermist's patients would be sent to CNE - Lifespan's primary competitor - Lifespan agreed to annually pay Thundermist $150,000, which replaced annual payments from Landmark that would cease upon terminating the Landmark arrangement. (SDF Ex. 125; Jones Dep. at 109:7-110:14, 115:7-18, SDF Ex. 24, ECF No. 206-24 ("Q. Okay. So because the Women and Infants deal wasn't going to include Thundermist being paid for that, you told Lifespan that by moving to Women and

Infants, you were going to lose the $135,000 that you were getting from Landmark and you wanted their help in making that up? A. Yes.").

The explanations provided by Thundermist and Lifespan do little to clear the air about this strange payment. In his deposition, Jones suggested that this "[f]inancial support" was "to support development of these more closely integrated networks of care." (SDF Ex. 125.) Lifespan's George Vecchione in turn said: "It wasn't just to fill a loss, a gaping hole, and no prospects for benefit. Frankly, I viewed it as an investment." (Vecchione Dep. 140:4-12, SDF Ex. 29.) And, as noted above, in an email to Jones, Montanaro wrote that Blue Cross's Peter Andruszkiewicz "want[ed] to see Care NE then do the OB piece." (SDF Ex. 118 at 2.) These explanations raise more questions than answers, and at least give the appearance of Blue Cross acting as a puppet-master distributing the spoils. And the payment persisted for six consecutive years. (Wakefield Dep. 172-174, SDF Ex. 30.) In her deposition, CFO Wakefield could not pinpoint another circumstance, with the exception of unions, where Lifespan "supported" an organization to the tune of $150,000. (Id. at 174. But see Vecchione Dep. 139-140, SDF Ex. 29 (recalling two grants from Lifespan, one to Thundermist and another to Providence Health, but noting, "There's not many of them")). Curiously, Lifespan did not keep track nor inquire of what purpose Thundermist put the

67

$150,000, and there were no real conditions imposed on how Thundermist disbursed Lifespan's generous donation. CEO Jones testified that the payment had no strings attached:

> Q. And under this agreement, besides reporting and keeping track of things, what is Thundermist required to do in return under the public health grant agreement?
> A. Continue to provide charity care for our community.
> Q. Do you do the same things you had to do anyways?
> A. Yes.
> Q. So there's no new obligations imposed by this?
> A. No.
> Q. This was just giving you 150,000 and you have to meet certain reporting requirements for legal purposes?
> A. Yes.
> Q. And was reporting to Lifespan required?
> A. No.
> Q. And did you do any reporting to Lifespan about what you did with the money?
> A. No.

(Jones Dep. at 127:19-128:16, SDF Ex. 24.) And Lifespan CEO George Vecchione testified consistently:

> Q. And did she [Montanaro], in fact, put some of the money to that use, to your knowledge?
> A. I don't . . . recall. What she did with the money, I don't know. It's not that I don't recall, I don't know.
> Q. Meaning that you don't think you ever knew?
> A. Correct.
> Q. Part of the grant process is not some sort of follow-up by the recipient to say, Gosh, here's the great things we do with your money?
> A. Correct. Um-hm.
> Q. Can you – I take it you can't point to some particular thing that Thundermist did thanks to the grant money that you were providing, or can you?
> A. I can't.

(Vecchione Dep. at 141:3-19, SDF Ex. 29.) Although early on in the Lifespan-Thundermist negotiations, Lifespan's grant had been

incorporated into the two entities' Partnership Model, (see SDF Ex. 128, ECF No. 210-40), the funds were later buried in a different "Public Health Grant Agreement," which unlike the former, was never disclosed to the DOH. (Jones Dep. at 129-130, SDF Ex. 24.) Moreover, in the context of anticipating Thundermist's prospective relationship with Steward if it acquired Landmark, Jones detailed how he saw the interplay between OB patients and a Steward presence:

> I think if they stay, whether or not we move OB, our relationship with Steward becomes more complicated . . . . If they stay and we don't want to cooperate with them, I believe they could do some damage or at least make life difficult for us to do anything but cooperate. So although I wouldn't be happy about the scenario where we move OB and Steward decides to stay, I don't think it's that much different from the scenario where we do nothing, and they decide to stay. Either way, Thundermist's ability to make independent decisions in the best interests of our patients could be compromised by a Steward presence. That threat only goes away entirely if we move OB.

(SDF Ex. 126, ECF No. 210-38.)

And what role did Blue Cross play in all of this? In addition to Lifespan, Jones looked to Blue Cross to provide assurances that they too would stand behind his decision to shift patients. Prior to making the OB-patient-shift announcement, Jones intended to "set up [a] meeting between Peter A [of Blue Cross] and George [of Lifespan] to get commitments on a common communications plan." (SDF Ex. 129, ECF No. 210-41.) Soon-to-be consultant for Blue Cross and former CEO of Thundermist, Montanaro, offered a helping

hand to Thundermist. (SDF Ex. 130, ECF No. 210-42 ("Nice talk with Peter A. He thinks you should walk away from Landmark and let them close. He said [to] call him and he will talk to you about it, if you want."; see also Andruszkiewicz Dep. at 270:4-5, SDF Ex. 12, ECF No. 206-12 ("I supported his decision.")). This was the support Jones wanted and needed to move forward with the shift – and Blue Cross delivered. (See SDF Ex. 131, ECF No. 210-43 ("Chuck felt supported by Peter's earlier call.")). At the end of the day, rather than an "independent" decision by Thundermist, a reasonable juror could conclude that Thundermist's shift of OB patients from Landmark to Women & Infants, and the concomitant payment from Lifespan, was all part of an understanding to keep Steward out of Rhode Island.

The final, and perhaps most glaring part of Steward's conspiracy story concerns Thundermist's abrupt rejection of an MOU with Steward. Throughout the time period that treat and transfer and OB patient shifting was being discussed, Thundermist was also in talks with Steward. Jones had been working with Steward on an MOU that considered, among other things, patient referrals and certain areas of exclusivity with Steward/Landmark. (See SDF Ex. 133, ECF No. 210-45; SDF Ex. 134, ECF No. 210-46.) Although Thundermist and Steward traded various MOU proposals, on May 11, 2012, Jones met with Steward and indicated that he was no longer willing to enter any agreement. Perhaps most illuminating, Jones

would not even sign the April 30 proposal that he had himself proposed to Steward.

And indeed, the evidence indicates that Jones did not come to this epiphany on his own; behind the scenes, Jones surveyed a wide range of opinions in approaching his talks with Steward. He "talked with Peter A (BCBSRI) and Dennis Keefe (CNE). These conversations, and discussions with just about every other health leader in RI, have helped me clarify a bit." (SDF Ex. 135, ECF No. 210-47.)

But it was Blue Cross that had Jones all eyes and ears. Jones's follow-up notes from the May 11 meeting with Steward recount why he did not sign the MOU: "[y]ou're asking me to give up participation with an organization that has 70% market share?" (SDF Ex. 139, ECF No. 210-51.) Jones's reaction to Blue Cross's apparent pressure is even more peculiar given the few commercially insured patients Thundermist had, and the fact that Thundermist's capacity would not have been affected by either version of the proposed MOU. (See Jones Dep. at 292, SDF Ex. 24 ("Q. [I]s there anything that the agreement would have prevented you from doing with an insurer that you've now done? A. No, I don't think so. I can't think of anything."). Later, Jones erased any doubt about Blue Cross's influence on his approach to an MOU with Steward. (See id. at 216:2-13 ("Q. 'You have no market share in Rhode Island. You're asking me to give up participation with an

organization that has 70 percent market share?' That's a reference to Blue Cross. Correct? A. Yes. Q. And that was the concern that the deal with Steward would give you -- give up your opportunity to have participation with Blue Cross. Correct? A. As an example of the – yes, of what could happen."). In the aftermath of his Steward meeting, Jones calculated how he would – and would not - broach the subject with the press: "If we respond, we cannot avoid the statement that we have not reached agreement with Steward. I wouldn't even say that 'we have not yet reached agreement' because that infers an agreement is possible." (SDF Ex. 140, ECF No. 210-52.) He added, "[o]ur close partners know what our position is and inferring in a public statement that there's still hope for an agreement seems disingenuous." (Id.)

Jones's "close partners," namely Blue Cross by way of Montanaro, also played a role in making sure Jones was prepared for his Steward meeting. (SDF Ex. 141 at 3, ECF No. 210-53 (Interoffice Memorandum from Montanaro to Blue Cross executives) ("Chuck Jones continues to seek m[y] advice on issues with Steward Healthcare."). And when Jones offered to pay Montanaro for the "long meeting" in which she helped Jones craft "talking points," she insisted that would not be necessary: "No need to bill you I was on BCBS's dime and spent the time with their full support. They think very highly of you and were happy to contribute me to the cause today." (SAUF Ex. 51 at 2, ECF No. 214-51; see also id.

(email from Montanaro to Jones) "Nice job taking it in and pushing some of the points. I am impressed. I thanked Peter [Andruszkiewicz] for you in hosting the meeting at BCBS today. He said he ran into Constantino,[37] who was saying he thinks the 'air is coming out of Steward[']s balloon.'"). Montanaro even drafted a proposed letter to be sent from Jones to Steward with a list of reasons to resist Steward. (SAUF Ex. 55, ECF No. 214-55.) She instructed Jones: "As groups line up and pick sides, so will Thundermist need to do the same . . . . This will be true as you deepen your relationship with payers and with some, but not all of the hospitals with which you currently have referral relationships." (emphasis added). Jones heard the message loud and clear, which explains his eventual refusal to sign any version of a Steward MOU, including the version he had crafted. (SDF Ex. 139.) A reasonable juror could conclude that, instead of an independent action by Thundermist, Jones's choice was to align with Blue Cross (and Lifespan) to keep Steward out of Rhode Island.

---

[37] This is a reference to former State Representative and House Finance Committee Chairman, Steven Costantino, then-Secretary of Health and Human Services, with significant involvement in the Rhode Island health care and insurance marketplace. See Ian Donnis, Steven Costantino Appointed To Head Vermont Insurance Program, Rhode Island Public Radio (Feb. 9, 2015), http://ripr.org/post/steven-costantino-appointed-head-vermont-insurance-program. Constantino is now commissioner of the Department of Vermont Health Access. See id.

Finally, in cases where acts against self-interest are not fully explained, traditional evidence of conspiracy, i.e., conversations, assurances, and swapping value among the alleged conspirators, prove instructive. See R.M. Packer Co., 635 F.3d at 583. And as the aforementioned evidence makes clear, the indicators pointing to a conspiracy are numerous in this case. The record is replete with assurances, conversations, and exchanges of value. Ultimately, Steward has provided more than enough evidence that tends to exclude the inference of independent conduct; and a reasonable juror could conclude that the conduct of the players here amounted to an illicit agreement to keep Steward out of Rhode Island. For these reasons, Blue Cross's motion with respect to Steward's conspiracy claims must be denied.

2. Conspiracy To Monopolize/Monopsonize (Counts III, VII, XI and XV)

Section 1 of the Sherman Act prohibits conspiring to restrain trade whereas Section 2 forbids conspiring to attain or maintain a monopoly.[38] Blue Cross's argument on summary judgment is that "conspiracy claims under Section 1 and Section 2 will both fail if . . . the record does not show an unlawful agreement," (see Blue Cross's Reply in Supp. Mot. for Summary J. 30 n.16); see also W.

---

[38] For purposes of this motion, the Court need not separately discuss Steward's conspiracy-to-monopolize and conspiracy-to-monopsonize claims, as the relevant analysis is the same.

<u>Penn Allegheny Health Sys., Inc. v. UPMC</u>, 627 F.3d 85, 99 (3d Cir. 2010) ("To prevail on a section 1 claim or a section 2 conspiracy claim, a plaintiff must establish the existence of an agreement . . . ."). As discussed <u>infra</u>, the Court disagrees with Blue Cross about what the record shows on this point, i.e., a reasonable juror could find an illicit agreement between Blue Cross, Lifespan, and Thundermist on these facts. Beyond this common requirement of agreement, a Section 1 conspiracy has different elements than a Section 2 conspiracy. <u>See, e.g.</u>, <u>Lenox MacLaren Surgical Corp. v. Medtronic, Inc.</u>, 847 F.3d 1221, 1231 (10th Cir. 2017); <u>Invamed, Inc. v. Barr Labs., Inc.</u>, 22 F. Supp. 2d 210, 217 (S.D.N.Y. 1998) ("While section 1 of the Sherman Act forbids contracts or conspiracies in the restraint of trade or commerce, section 2 'addresses the actions of single firms that monopolize or attempt to monopolize, as well as conspiracies and combinations to monopolize.'" (quoting <u>Spectrum Sports, Inc. v. McQuillan</u>, 506 U.S. 447, 454 (1993))). Yet Blue Cross – as the movant – has not sufficiently parsed these substantive differences, nor has it specifically challenged Steward's Section 2 conspiracy claim by attacking the presence of specific intent to enable or maintain a monopoly or monopsony position between Blue Cross, Lifespan, and Thundermist. <u>See</u> <u>In re Zinc Antitrust Litig.</u>, 155 F. Supp. 3d 337, 382 (S.D.N.Y. 2016) ("The specific intent to monopolize, rather than the power to exclude competitors, is the

key element of a conspiracy to monopolize claim."); <u>Oxbow Carbon</u>
<u>& Minerals LLC v. Union Pac. R.R. Co</u>, 926 F. Supp. 2d 36, 47
(D.D.C. 2013) (dismissing Section 2 conspiracy claim that lacked
factual allegations about "how the defendants used the agreement
to monopolize the rail freight market").  While Steward appears to
have mustered little evidence to support Blue Cross may ultimately
merit judgment as a matter of law on Steward's conspiracy to
monopolize/monopsonize claims, for now it survives summary
judgment because Blue Cross has not specifically addressed it,
beyond unsuccessfully arguing that there was no evidence of
agreement.  Therefore, summary judgment is denied on Counts III,
VII, XI, and XV.

C.    State-Law Tort Claims (Counts XVII and XVIII)

Much of Blue Cross's argument on Steward's state law claims
is built on the proposition that, "[w]here conduct does not violate
the antitrust laws, the conduct also is not tortious as a matter
of law because 'antitrust law provides the best available barometer
— indeed the only available barometer — of whether or not Blue
Cross'[s] conduct can be found to be "wrongful" or "illegitimate"
—and hence, tortious.'" (<u>See</u> Def.'s Mem. 79 (quoting <u>Ocean State</u>
<u>Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of R.I.</u>,
883 F.2d 1101, 1114 (1st Cir. 1989))).  Because the Court has found

that Steward's antitrust claims are viable, it follows that Steward's state-law-tort claims survive summary judgment.[39]

D.   Blue Cross's Remaining Arguments

Blue Cross makes several independent and substantial arguments to support its summary judgment motion, all of which fail, but which require some discussion.

1.   Causation

Blue Cross suggests that other superseding causes are responsible for Steward's alleged injuries, namely (1) Steward's apparent inability to satisfy the APA conditions unrelated to Blue Cross; and (2) the OHIC regulations that allegedly cabined the rates that Blue Cross could offer Steward.

To prove causation, a Sherman Act plaintiff must demonstrate that its injury was caused "by reason of" the defendant's anticompetitive conduct. 15 U.S.C. § 15(a). The parties agree that a plaintiff "need not prove that the antitrust violation was

_____

[39] Incidentally, the Court rejects Blue Cross's spin on Ocean State Physicians. A close reading of that opinion makes clear that, although it may be sufficient, it is not necessary for a plaintiff to lodge a successful antitrust claim in order to prove a claim for tortious interference with contractual relations or interference with prospective contractual relations. Ocean State Physicians, 883 F.2d at 1114 ("To be sure, not all business torts are 'exclusionary' under the antitrust laws. In an appropriate case, a plaintiff might fail to establish an antitrust violation but still establish that certain torts had been committed." (citation omitted)); see also Kartell v. Blue Shield of Mass., Inc., 749 F.2d 922, 933-34 (1st Cir. 1984) (highlighting possibility that Blue Shield's conduct – though not an antitrust violation – "might amount to minor business torts").

77

the sole cause of [its] injury, but only that it was a material cause." Sullivan v. Nat'l Football League, 34 F.3d 1091, 1103 (1st Cir. 1994). Causation is a factor that establishes antitrust standing. See Sterling Merch., Inc., v. Nestlé, S.A., 656 F.3d 112, 120-21 (1st Cir. 2011). The law recognizes that when an injury "[i]s attributable to . . . other factors independent of" the challenged conduct, a plaintiff has "not . . . met its burden." Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 126-27 (1969).

As this Court said at the motion-to-dismiss stage, "[A]ntitrust laws have been interpreted to incorporate common law principles of causation." Steward I, 997 F. Supp. 2d at 158 (quoting R.I. Laborers' Health & Welfare Fund ex rel. Trs. v. Philip Morris, Inc., 99 F. Supp. 2d 174, 187 (D.R.I. 2000) (alteration in original)). "'Contingencies, conjecture, and speculation will not support a finding of proximate cause,' and will, therefore, not support a finding of antitrust liability." Id. (quoting Philip Morris, Inc., 99 F. Supp. 2d at 187).

Steward has presented sufficient evidence to survive summary judgment and to place the causation question before the jury. Specifically, there is a material factual dispute about whether failure to reach a deal with Blue Cross caused Steward to abandon the Landmark negotiations, in the form of (1) testimony of Steward

witnesses; (2) conduct of Steward players; and (3) conduct of other key players.

Blue Cross asserts that a "force other than the antitrust violation fully accounts for" Steward's alleged injury because Steward would not waive and could not satisfy three conditions in the APA: (1) the RISH condition (the May 2011 APA encompassed a condition for Landmark's purchase of 100% of RISH); (2) the Thundermist condition (a MOU with Thundermist); and (3) the SNERCC condition (that Landmark attain a majority interest in SNERCC, owned by 21st Century). (Def.'s Mem. 55 (quoting In re Canadian Import Antitrust Litig., 470 F.3d 785, 791-92 (8th Cir. 2006))). Steward's evidence sufficiently calls into question whether each or any of these conditions were requirements, or more akin to bargaining chips in Steward's quest to reach an acceptable agreement with Blue Cross over Landmark.

Just a sample of Steward's evidence makes the point: Steward highlights extensive testimony that reaching a deal with Blue Cross was the only dispositive condition for Steward. (See, e.g., Dep. of Ralph de la Torre ("de la Torre Dep.") at 45-46, SDF Ex. 1, ECF No. 206-1 ("A. I firmly believe at every stage of this agreement, and still believe now, that there is only one predicate condition to success in that area in caring for the totality of the patient, and that's Blue Cross Blue Shield, okay. . . . So that was the only truly predicate condition."); id. at 49-50 ("I mean,

conditions can be on a document, but at the end of the day, I think everybody understood that it was Blue Cross . . . the AG never called in 21st Century Oncology. They never called in Thundermist. It was always Blue Cross. Again, actions speak louder than words. That's pretty clear to me that everybody understood that it was us and them at the end."); Dep. of Joshua Putter at 98:2-11, SDF Ex. 9, ECF No. 206-9 ("[S]o the cancer center wasn't like a go, no-go type of thing. We were going to acquire Landmark and figure out the cancer center strategy. We wanted to acquire it. That wasn't a, if we don't acquire all of it, we're not going to do it type of decision. . . . [W]e, Steward, abandoned the Landmark deal because of the Blue Cross rates, not because of the cancer center.")).

As to the first two conditions (RISH and Thundermist), Steward set forth, for instance, a letter to Justice Silverstein on September 4, 2012, in which Steward informed the court that, "progress on the three conditions has been fleeting" and "as an alternative, [Steward] proposed that if BCBSRI is able to execute a participation agreement with Steward, Steward Health Care will waive conditions (i) [MOU with Thundermist] and (ii) [100% interest in RISH] . . . ." (SDF Ex. 144 at 3, ECF No. 210-56.) Similarly, Steward sets forth evidence that it was willing to waive the SNERCC condition. (See, e.g., de La Torre Dep. at 122-123, SDF Ex. 1 ("Q. . . . [D]id Steward, to your knowledge, ever express to anyone, mediator, attorney general, Jon Savage, Justice

Silverstein, anybody, that Steward would waive condition (iii), meaning an agreement with 21st Century where Steward would own 100 percent of SNERCC?    A.  Absolutely."); id. at 123 ("A.  I can unequivocally tell you that I expressed it to Savage, unequivocally.  And I'm pretty sure that I said to the judge, 'With the appropriate contract, we could even waive [the SNERCC condition,]' but that's harder to come by.")).

As to Blue Cross's second causation argument (that OHIC regulations capped what Blue Cross could offer Steward and therefore caused Steward's alleged injury) Steward sets forth sufficient evidence to create a jury question.  As discussed supra, the OHIC regulations themselves and communications by OHIC belies Blue Cross's rigid reading of the regulations.  Blue Cross reluctantly acknowledges this when it states, "[u]nder certain narrow circumstances, OHIC considered waivers from these regulations from other insurers."  (Def.'s Mem. 66.)

It is not dispositive (even if true, which Blue Cross can attempt to show at trial) that Steward "never discussed any such exception with OHIC."  (Id.)  Steward advances sufficient evidence to suggest it was Blue Cross – and not Steward – that had the burden to raise such exceptions with OHIC.  (See SDF Ex. 43 at 2, ECF No. 206-43 ("Issuers [insurers] are encouraged to file such requests [for exceptions].")).  After all, as discussed above, OHIC regulates health insurers – not hospitals and doctors.

Moreover, the facts suggest that Blue Cross never viewed the OHIC regulations as inflexible as it now casts them, (see Def.'s Mem. 66.), and that Steward did in fact raise the issue of approaching OHIC for an exception, in the context of bundling rate increases and quality metrics with Steward's other hospitals in Massachusetts and Landmark. Steward proposed "bundling" reimbursement agreements for Landmark, St. Anne's, and Morton whereby Steward would accept a lower increase for St. Anne's and Morton hospitals to achieve higher rates at Landmark, while still satisfying OHIC. And Blue Cross recognized the potential viability of this approach in spite of OHIC. (See, e.g., BCBSRI/Steward Proposal Summary August 5, 2012 3, SDF Ex. 186, ECF No. 212-29 ("BCBSRI agrees with Steward's proposed concept of bundling several of its hospitals in a way that creates value and will allow BCBSRI to justify additional increases at Landmark for 2012; while aligning with the OHIC Hospital Contracting Conditions.")).

Moreover, Steward's evidence refutes, or at least creates a factual dispute, with respect to Blue Cross's suggestion that "[t]he other major insurers in Rhode Island—Tufts and United" understood too that "the OHIC regulations were binding." (Def.'s Mem. 66; see also 2011 OHIC Standards 16, SDF Ex. 44 ("Too much prescriptiveness may encourage an excessive focus on compliance and discourage the kind of payment reform and innovation which was intended."); id. (suggesting OHIC approved contracts involving

United and Tufts where OHIC conditions were not fully complied with); Dep. of Todd Whitecross at 120, SDF Ex. 31, ECF No. 206-31 (suggesting Tufts offered rate increases above OHIC cap because at that time, it "didn't have a formal relationship with [Prime]")).

It will be for the jury to decide the extent OHIC regulations entered into the parties' negotiations calculus and whether they or something else caused Steward's alleged injury. This is not simply a question, as Blue Cross suggests, of "interpreting regulatory text in light of government purposes," a matter of law reserved for this Court, (see Def.'s Mem. 66 (quoting Kolbe v. BAC Home Loans Servicing, LP, 738 F.3d 432, 443 (1st Cir. 2013))); instead, it is a factual question of what caused Steward's attempted acquisition of Landmark to fail, as to which Steward will bear the ultimate burden of proof at trial. See Addamax Corp. v. Open Softward Found., Inc., 152 F.3d 48, 54 (1st Cir. 1998) (In the context of an alleged Sherman Act injury, "whether the defendants' assumed conduct had been a substantial or material cause of the losses claimed by [plaintiff]" was properly a "factual determination" for jury).

2. Harm to Competition

Blue Cross claims summary judgment should also enter because there is no evidence that Blue Cross's alleged conduct harmed competition. It argues: (1) merely swapping out one potential buyer (Steward) for another actual buyer (Prime) is of no inherent

consequence under the antitrust laws; and (2) Prime's acquisition of Landmark benefited consumers (and thus competition) because Prime charges lower prices than those Steward would have charged. This argument is a silver bullet aimed at the wrong target.

To create a jury question on harm to competition in this circuit, "evidence of actual, present competition is not necessary as long as the evidence shows that the potential for competition exists." Sullivan, 34 F.3d at 1100. The Sullivan court's discussion of harm to competition is particularly instructive. There, defendants the National Football League and multiple organizations that owned NFL franchises (collectively, "NFL"), appealed a jury finding that the NFL had harmed competition and therefore violated the antitrust laws by prohibiting member-football-team owners from offering public stock in their teams. Id. at 1094. The plaintiff, a former owner of the New England Patriots, prevailed at trial after challenging the NFL's policy that required him to sell his team to a private buyer rather than to the public. Id. In asserting there was inadequate evidence of harm to competition, the NFL endorsed a narrow conception of competition, suggesting "that the alleged effect of its ownership policy [was] to reduce prices of NFL team ownership interests, rather than to raise prices which is normally the measure of an injury to competition." Id. at 1101. The court rejected the NFL's tapered vantage point and declared, "The Supreme Court has

emphasized, however, that overall consumer preferences in setting output and prices is more important than higher prices and lower output, _per se_, in determining whether there has been an injury to competition." <u>Id.</u> (citing <u>Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.</u>, 468 U.S. 85, 107 (1984) (<u>NCAA</u>)). The court added, "regardless of the exact price effects of the NFL's policy, the overall market effects of the policy are plainly unresponsive to consumer demand for ownership interests in NFL teams. . . . Thus, a jury could conclude that the NFL's policy injured competition by making the relevant market 'unresponsive to consumer preference.'" <u>Id.</u> (quoting <u>NCAA</u>, 468 U.S. at 107). In the face of the NFL's suggestion that plaintiff's "position was based on nothing more than sheer speculation," the Court emphasized that "[i]t would be difficult indeed to provide direct evidence of competition when the NFL effectively prohibits it." <u>Id.</u> at 1100. Thus, <u>Sullivan</u> countenances that measuring harm to competition is more complicated than simply assessing price and output – evidence of efficiency is also pertinent. <u>See id.</u> at 1100-02.

Blue Cross misses this when it declares, "[i]n order to establish harm to competition, a plaintiff <u>must show</u> 'a <u>reduction in output</u> and an <u>increase in prices</u> in the relevant market.'" (Def.'s Mem. 69 (quoting <u>Sterling Merch.</u>, 656 F.3d at 121 (first emphasis added))). Blue Cross omits the qualifying language, derived from <u>Sullivan</u>, 34 F.3d at 1097, that harm to competition

is "usually measured" in this way.  This case is far from "usual" – and it is not an instance where prospective harm to competition can only be assessed by a reduction in output or an increase in consumer prices.[40]

Blue Cross's argument that swapping out one potential hospital buyer for another actual buyer only works if the jury rejects Steward's theory that what it brought to the marketplace was a new competitive health care delivery model that Blue Cross feared and sought to defeat.  In other words, there is a difference, Steward contends, in a "Steward Landmark" and a "Prime Landmark," and this affects the legal parameters for assessing harm to competition.  Blue Cross's own assessments acknowledge that Steward offered something new and different to Rhode Island. (See, e.g., Andruszkiewicz Dep. at 297:9-13, SAUF Ex. 6 ("The other, which actually is a positive in terms of Steward's acquisition of Landmark, was that we knew that they did bring some innovation, a different kind of model for the way care was delivered, and we thought that was a good thing."); id. at 27:11-27:8, 39:9-39:12 ("[Dr. de la Torre and Steward] have their model and I think it's an advancement over, you know, what's been happening in Massachusetts" "because it's moving away from sort of the siloed sort of approach by providers and the fee for service

---

[40] Although, Blue Cross cannot, as a matter of undisputed fact, satisfy that test either.

only, you know, methodology of providers getting paid.")).  The

same was true of Thundermist's early assessments of the Steward

model.  In a September 28, 2011 email to Montanaro, Jones writes:

> met with Steward . . . [g]enerally impressed with what
> they are doing, including developing partnerships with
> tertiary hospitals for specialty care and progress on
> radiology quality.  Showing very good quality and cost
> results on the MA AQC.  With the new Tufts plan offering
> 15-30% discounts for their community model of care, they
> are a serious threat to the status quo.

(SAUF Ex. 98 at 2, ECF No. 215-23.)  And Montanaro's March 26,

2010 testimony before Justice Silverstein strikes the same chord:

> Now that we have health care reform and we understand
> much more about the direction in which health care is
> going, a great deal of change is going to be needed among
> all hospital systems and their relationship to primary
> care and specialist care.  In my preliminary
> conversations with Ralph de la Torre and his senior
> leadership team at Caritas, I feel very confident and
> actually enthusiastic about . . . their approach to
> meeting those opportunities and challenges across their
> whole system; and particularly . . . for the care
> delivery in northern Rhode Island.

(SAUF Ex. 99 at 61:5-17, ECF No. 215-24.)  Blue Cross also

recognized the value of the plan Steward offered and acknowledged

that Prime was not – and never purported to be – Steward.  (See

SAUF Ex. 101 at 2, ECF No. 215-26 (email from Blue Cross's Mark

Waggoner to Blue Cross employees) (comparing "Prime, vs. a few

months ago w Steward" and outlining the logic to explain variances

in negotiation rates with Steward versus Prime:  "we believed there

to be extensive value to engaging with Steward at higher rates

given the integrated delivery capabilities they could bring to the

market in year 3?"); Jones Dep. 285-286, SAUF Ex. 12 (describing conversation with Dr. Reddy of Prime, who "didn't know what an ACO was" which, among other things, made it "clear to [Jones] that the Prime model does not consider healthcare system efficiency as an overall goal"); id. at 286:18-287:4 ("Q. And [Prime] made improvements in how [Landmark] looks or repair it or make it more modern or anything? A. There's a nice piano in the entrance, and I think they've redone a couple -- I took a tour of one of the floors. It looks nicer, yes. Q. Has there been any substantive improvement at Landmark, in your view? A. Not in terms of quality or community partnership, no.")). Even Prime acknowledged that it had none of Steward's ambitions with respect to bringing a risk-based model or ACOs into Rhode Island. (Charest Dep. at 74:10-17, SAUF Ex. 14 ("Q. [D]oes Prime have any plans to participate in an ACO product in Rhode Island? A. No. . . . They've not found an ACO product that's been acceptable to them"); id. at 85:15 ("We don't have risk-based contracts.").

What Steward claims it could have introduced into the Rhode Island health care and health insurance markets was potentially beneficial to competition, and blocking it had potential antitrust consequences. See, e.g., Federal Trade Comm'n v. Arch Coal, Inc., 329 F. Supp. 2d 109, 146 (D.D.C. 2004) ("An important consideration when analyzing possible anticompetitive effects is whether the acquisition would result in the elimination of a particularly

aggressive competitor in a highly concentrated market . . . ."
(citations and quotations omitted)); cf. Brooke Grp. v. Brown &
Williamson, 509 U.S. 209, 223-24 (1993) (describing "maverick"
firm, i.e., a firm that, for a variety of reasons, is more likely
to "stray[] from the group"); United States v. H&R Block, Inc.,
833 F. Supp. 2d 36, 79 (D.D.C. 2011) ("In the context of antitrust
law, a maverick has been defined as a particularly aggressive
competitor that 'plays a disruptive role in the market to the
benefit of customers.'" (quoting Merger Guidelines § 2.1.5)).  That
is, it is both legally and factually important to the antitrust
analysis that Steward – a hospital owner that wanted to bring
change and to eventually compete to potentially minimize or
displace the modern and traditional role of insurance companies –
was swapped out with a hospital system that concededly had no –
and was even arguably troubled by – such aspirations.  (See Jones
Dep. at 286:7-10, SAUF Ex. 12.)

     The evidence that Blue Cross's alleged refusal to deal with
Steward harmed competition is plentiful.   Steward presents
evidence that Blue Cross's "Red Team"[41] – the group of employees
and consultants who considered business threats – identified and

---

     [41]  The Red Team's motto was "Attack Adapt Advance" and its
logo appears to be a hatchet enclosed within the "shield" of Blue
Cross's emblem.  (See, e.g., SAUF Ex. 29 at 2, ECF No. 214-29.)

analyzed Steward's potential competitive impact.[42]  (See, e.g., SAUF Ex. 31, ECF No. 214-31 (presentation to Blue Cross's ELT of potential competitive "risks to BCBSRI" of a Steward ACO partnering with Tufts to offer a new, less-expensive, higher-quality product to Rhode Island); SAUF Ex. 28, ECF No. 214-28 (email between Red Team members) ("One thought I had was in order to really press the issue of how big a potential threat Steward is, maybe change the map to show just how well positioned they are in the southeast part of MA...they have St. Anne's, Good Sam's, Morton, Norwood, and Quincy...they basically have RI bordered. Then [L]andmark would be the tip of the spear. . . . It'll look like they're getting ready for a blitzkrieg!"); SAUF Ex. 29.)  Steward presents evidence that Blue Cross employees were apprehensive that if Steward acquired Landmark, in addition to its continued operation of hospitals in nearby Massachusetts, the "Steward Community Choice health plan" with rates "15% to 30% below a comparable broad

---

[42]  Blue Cross has its own assignment of meaning to the Red Team documents, which may ultimately persuade the jury.  The Red Team's September 2012 presentation to Blue Cross's ELT included a disclaimer that, "Information included in the presentation is for illustrative purposes only; names and scenarios do not represent real life situations and parties could be interchanged."  (SAUF Ex. 31 at 2.)  Despite Blue Cross's proviso, how close the Red Team's analysis tracks in time and substance the reality of what Steward was seeking to bring to Rhode Island does more than raise a few eyebrows – it raises a genuine factual dispute over the meaning of the Red Team documents to both Blue Cross and this case. Indeed, the Red Team's cast of characters included those with major influence in real-life negotiations, including Consultant Maria Montanaro.  (See id.)

network plan" offered in partnership with Tufts in Massachusetts could more effectively infiltrate Rhode Island. (<u>See, e.g.</u>, SAUF Ex. 32, ECF No. 214-32 (email from Blue Cross employee Daniel Belvin to other employees: "I do not expect to see this move [of Steward's Community Choice Plan] in Rhode Island at launch since the required physicians and hospitals are all community hospitals and affiliated physicians in Massachusetts (Saint Anne's in Fall River is the closest at this time). However, if the Landmark acquisition goes through it could lead to a more effective entry point for this product into our market."); <u>cf.</u> SAUF Ex. 23 at 3, ECF No. 214-23 (Sept. 2012 Red Team Scenarios, "Expansion of Community Choice Product into Rhode Island": "However with Steward facilities in nearby Fall River (St. Anne's Medical Center) and Taunton (Morton Hospital), Bristol and Newport counties may also be served, bringing cost-effective coverage to more than 72% of the state's population."). And Steward presents evidence that Blue Cross was generally anxious about the potential competitive impact that ACOs and risk-based contracting posed for insurance companies. (<u>See, e.g.</u>, SAUF Ex. 35 at 11 ("Just supporting such structures is insufficient because the possibility exists for the ACO to develop a level of integration that makes an outside insurer redundant."); Coleman Dep. at 435-38, SAUF Ex. 7 (Blue Cross's then-CFO describing how an ACO in collaboration with a hospital could risk "disintermediation" of Blue Cross, i.e., "the health

care insurance company is no longer relevant"); Andruszkiewicz Dep. at 93:3-5, SAUF Ex. 6 (describing "disintermediation" as the provider "eliminat[ing] the intermediary known as the payer and [then] becom[ing] the provider and payer"); id. at 93:7-13 ("And so [disintermediation] was a concern among my team, me, and every health insurance executive in the United States at this time frame. And so we're walking here the fine line, in the way I guess I'd describe it, between having a partnership with this provider and protecting ourselves from them taking away our business."); Waggoner Dep. at 298:9-21, SAUF Ex. 11 ("Q. [W]asn't there some discussion at Blue Cross at about this same time about the possibility that the ACO model or integrated delivery system could in some sense replace a conventional insurance company? A. I'm sure there was. I don't recall, you know, specific conversations. But the trend in conversations at that point in time, there was a lot of conversation like that in the country at that point in time.")).

Blue Cross's second argument that Prime's acquisition of Landmark benefited consumers (and thus competition) because Prime charges lower prices than those Steward proposed is saturated with material factual disputes. Even assuming that the calculus is as narrow at Blue Cross suggests, Steward presents evidence that a Steward-owned Landmark would have saved Blue Cross (and therefore consumers) money. (See, e.g., SAUF Ex. 86 at 6, ECF No. 215-11

("Redirection of care to lower cost, non-network community hospital would have tremendous impact on lowering healthcare costs."); Eisenstadt Rep. ¶ 58, SDF Ex. 39, ECF No. 206-39 ("Steward would not have needed to achieve any volume growth at Landmark relative to 2011 for BCBSRI and its employer accounts to have been financially better off in 2015."). But see Noether Rep. ¶¶ 203-12, SDF Ex. 40, ECF No. 206-40 (Blue Cross's expert concluding Blue Cross saved money with Prime)). At bottom, whether competition was harmed is a matter of how the jury sees the question and assesses the facts.

Finally, Blue Cross's argument that "the actual evidence, as opposed to speculation about the future effect of Steward's business plans, shows that Steward's acquisition of Landmark would have harmed Rhode Islanders in the form of higher healthcare costs." (Def.'s Mem. 74.) Like the boy who kills his parents and then pleads for mercy as an orphan, Blue Cross's argument is the height of chutzpah. Steward cannot be faulted for having no direct evidence of the competitive benefits that it could have brought to Rhode Island when the barricade was erected by Blue Cross's allegedly exclusionary conduct. The Supreme Court long ago closed the door to this reasoning when it stated, "the most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." Coastal Fuels of P.R., Inc. v. Caribbean Petrol. Corp.,

79 F.3d 182, 200 (1st Cir. 1996) (quoting <u>Bigelow v. RKO Radio Pictures</u>, 327 U.S. 251, 256 (1946)).  To modify slightly what the First Circuit said in <u>Sullivan</u>, "It would be difficult indeed to provide direct evidence of competition when [Blue Cross] effectively prohibit[ed] it."  34 F.3d at 1100.

    3.   Damages

Blue Cross suggests that the Court should exclude Steward's damages model because all but a small portion of its damages could have been mitigated, and that Steward's damages model clashes with Steward's claims because it does not distinguish between damages caused by lawful versus unlawful conduct.[43]

Several overarching principles guide the Court's analysis.  First, although antitrust plaintiffs have a duty to mitigate their losses, <u>see, e.g.</u>, <u>Golf City, Inc. v. Wilson Sporting Goods, Co.</u>, 555 F.2d 426, 436 (5th Cir. 1977), the failure to mitigate is an affirmative defense, which the defendant must plead and prove.  <u>See, e.g.</u>, <u>Pierce v. Ramsey Winch Co.</u>, 753 F.2d 416, 436-37 (5th Cir. 1985) ("[D]efendant bears the burden of demonstrating a failure to mitigate . . . .");  <u>Malcolm v. Marathon Oil Co.</u>, 642 F.2d 845, 863 (5th Cir. 1981) ("[T]he burden of showing that the victim of [the anticompetitive] conduct failed to minimize his

_____

[43]   This section cross-references Steward's previously filed Motion in Limine To Exclude Damages Testimony of Keith Ghezzi and Marc Sherman (ECF No. 161).

damages rests with the wrongdoer." (quotations and citations omitted)). And second, on a summary-judgment motion, the defendant must clear that hurdle as a matter of undisputed fact. See Creative Copier Servs. v. Xerox Corp., No. Civ.A 301CV155SRU, 2005 WL 2175138, at *5 (D. Conn. Sept. 2, 2005) (deeming mitigation of damages in antitrust case a "classic example of a disputed issue of material fact").

It is also significant that, "any model supporting a plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged anticompetitive effect of the violation." Comcast Corp. v. Behrend, 133 S. Ct. 1426, 1433 (2013). Blue Cross asserts that Steward could have mitigated all but $800,000 of its damages by accepting Blue Cross's proposed reimbursement rates. This factual assertion essentially acknowledges that summary judgment is not appropriate. In reality, this part of Blue Cross's motion amounts to a motion in limine to restrict the evidence of damages at trial. It asks the Court to shun Steward's liability case as a matter of law. However it is characterized, the argument is rejected. Blue Cross suggests that Steward – in the midst of intense and seemingly ongoing, good-faith negotiations – was required to step back, identify a breach, i.e., an antitrust violation, and then accept Blue Cross's latest offer (having determined it was in bad faith), because not doing so would neglect its duty to mitigate. This is nonsensical, and,

not surprisingly, finds no support in the law, in antitrust or otherwise.  Cf. In re Kellett Aircraft Corp., 186 F.2d 197, 198-99 (3d Cir. 1950) ("The rule of mitigation of damages may not be invoked by a contract breaker as a basis for hypercritical examination of the conduct of the injured party, or merely for the purpose of showing that the injured person might have taken steps which seemed wiser or would have been more advantageous . . . ."); Koby v. United States, 53 Fed. Cl. 493, 497 (2002) ("Accordingly, courts have been reluctant to require parties, under the duty to mitigate, to deal further with the breaching party . . . .").  The offer Blue Cross says Steward should have accepted is part and parcel of Blue Cross's alleged anticompetitive conduct; it cannot be said that, as a matter of law, the duty to mitigate required Steward to accept Blue Cross's arguably bad faith offers in order to mitigate.

As to Blue Cross's suggestion that Steward's damages model is based in part on Blue Cross's failure to participate in a "collaborative relationship" with Steward and that holding Blue Cross responsible for failing to engage in such a relationship exceeds the law's proscription with respect to "lawful" conduct, Blue Cross can make this argument at trial.  For now, Steward has created a genuine dispute of material fact that Blue Cross would, if it had acted in good faith, implemented a rate agreement with Steward that included a collaborative, risk-based agreement in

year three, which is consistent with an antitrust approach to calculating damages: "an expert may construct a reasonable offense-free world as a yardstick for measuring what, hypothetically, would have happened 'but for' the defendant's unlawful activities." LePage's Inc. v. 3M, 324 F.3d 141, 165 (3d Cir. 2003). Part of the world Steward constructs as the reality but for Blue Cross's refusal to deal with Steward embraces a "cooperative" business relationship between Steward and Blue Cross – not because the antitrust laws required such a relationship, rather because the parties projected such an arrangement through their course of dealing. In other words, Steward's expert simply details what is implicit in every contract: the duty of good faith and fair dealing. See Dovenmuehle Mortg., Inc. v. Antonelli, 790 A.2d 1113, 1115 (R.I. 2002) (per curiam) ("[V]irtually every contract contains an implied covenant of good faith and fair dealing between the parties." (quoting Centerville Builders, Inc. v. Wynne, 683 A.2d 1340, 1342 (R.I. 1996)). It is premature to conclude, as Blue Cross does, that accepting Steward's damages model fails to distinguish between lawful and unlawful conduct. Unlike the many cases Blue Cross cites in which conduct had already been deemed lawful or unlawful, here there is no previously adjudicated, lawful conduct to filter out from Steward's model. Cf. MCI Commc'ns Corp. v. AT&T, 708 F.2d 1081, 1163 (7th Cir. 1983) (reversing jury award where plaintiff's damages model assumed

illegality of all of defendant's charged acts, when liability was predetermined as to only seven). And based on the viability of Steward's claims as outlined above, summary judgment is not the time to test Blue Cross's damages theory.

A final point: although damages will be further examined at trial, a plaintiff is not required to quantify damages to sustain a damages award in this context; when an antitrust plaintiff demonstrates it has been damaged, a jury may award nominal damages. See Sciambra v. Graham News, 892 F.2d 411, 415 (5th Cir. 1990) ("[P]roof of an antitrust violation and the fact of damage is a sufficient basis for an award of nominal damages."); Home Placement Serv., Inc. v. Providence J. Co., 819 F.2d 1199, 1207, 1210 (1st Cir. 1987) (affirming nominal damages award where plaintiff established fact of damage but did not set forth adequate evidence "to permit a trier of fact to ascertain the amount of damages by just and reasonable inference"). Blue Cross's declarations over damages do not suffice to grant summary judgment against Steward.

### 4. State-Action Doctrine

Finally, Blue Cross avers that the state-action doctrine forecloses Steward's antitrust claims because state regulation compelled the supposedly unreasonable rates that Blue Cross offered. As a matter of law, the Court doubts that the state-action doctrine contemplates these circumstances, and, even if it

did, Blue Cross's argument is deficient for many of the reasons outlined above with respect to the OHIC regulations.

The state-action doctrine immunizes from challenge conduct that is the intentional or foreseeable result of state or local government policy. See Parker v. Brown, 317 U.S. 341, 351 (1943). And it has two elements for immunizing supposed compelled conduct: "[f]irst, the challenged restraint must be 'one clearly articulated and affirmatively expressed as state policy'; second, the policy must be 'actively supervised' by the State itself." Ca. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc., 445 U.S. 97, 105 (1980) (quoting City of Lafayette v. Louisiana Power & Light Co., 435 U.S. 389, 410 (1978)). For purposes of argument, Steward concedes the first prong and solely addresses the second, the "active supervision prong."

In Patrick v. Burget, the Supreme Court set forth that "the active supervision requirement mandates that the State exercise ultimate control over the challenged anticompetitive conduct." 486 U.S. 94, 101 (1988). The "mere presence of some state involvement or monitoring does not suffice." Id. To invoke the doctrine also necessitates that "state officials have and exercise power to review particular anticompetitive acts of private parties and disapprove those that fail to accord with state policy." Id.; see also FTC v. Ticor Title Ins. Co., 504 U.S. 621, 634-35 (1992) ("[The active-supervision inquiry's] purpose is to determine

whether the State has exercised sufficient independent judgment and control so that the details of the rates or prices have been established as a product of deliberate state intervention, not simply by agreement among private parties. . . . The question is not how well state regulation works but whether the anticompetitive scheme is the State's own."). A brief summation of the state-action doctrine standard alone crystallizes why it does nothing to bar Steward's claims here. Because it cannot be said that Blue Cross's "anticompetitive acts were truly the product of state regulation," Blue Cross cannot "claim state-action immunity from Sherman Act liability." Patrick, 486 U.S. at 100; see also Ticor, 504 U.S. at 636 ("state-action immunity is disfavored.").

In any event, assuming arguendo that that the doctrine somehow contemplates these circumstances, Steward easily overcomes it. As a matter of disputed fact: (1) OHIC has no authority over hospitals – only health insurers; (2) based on OHIC's own publications, OHIC has previously excepted application of its regulations for certain hospitals, and OHIC regulations are not inflexible in the sense that they would prohibit Blue Cross from ever offering rate increases of a certain amount. Thus, Steward has at least created a material factual dispute regarding the "active supervision" prong. Blue Cross's request for summary judgment on this ground fails.

E.    Conclusion

For the reasons outlined above, the Court DENIES Blue Cross's Motion for Summary Judgment (ECF No. 157) on all Counts of Steward's Amended Complaint (ECF No. 90).  Accordingly, Counts I-XVIII will proceed to trial.

IT IS SO ORDERED.


_____
William E. Smith
Chief Judge
Date:  April 23, 2018